# United States Court of Appeals
# For the First Circuit

---

No. 25-1031

## UNITED STATES,

Appellee,

v.

## JOSE PEREZ, JR.,

Defendant - Appellant.

---

On Appeal From A Judgment In A Criminal Case Entered In
The United States District Court For The District Of Massachusetts

## APPENDIX – VOLUME I

---

Eamonn R. C. Hart (Bar #1181162)
BRANN & ISAACSON
113 Lisbon Street
P.O. Box 3070
Lewiston, ME  04243-3070
Tel.    (207) 786-3566
Fax     (207) 783-9325
Email:  ehart@brannlaw.com

*Counsel for Defendant-Appellant*

# CONTENTS OF APPENDIX

| Description of Document | Volume | Page |
|---|---|---|
| District Court Docket, *United States v. Jose Perez, Jr.*, 1:23-cr-10028-FDS-1 | I | JA 1 |
| Notice of Appeal | I | JA 20 |
| Transcript of Final Pretrial Conference of July 24, 2024 | I | JA 22 |
| Transcript of Status Conference of July 26, 2024 | I | JA 54 |
| Jury Trial Day 1 | I | JA 71 |
| Jury Trial Day 2 | I | JA 190 |
| Jury Trial Day 3 | I | JA 376 |
| Jury Trial Day 4 | II | JA 571 |
| Jury Trial Day 5 | II | JA 657 |
| Exhibit 001.1 | II | JA 665 |
| Exhibit 001.2 | II | JA 666 |
| Exhibit 001.3 | II | JA 667 |
| Exhibit 001.4 | II | JA 668 |
| Exhibit 001.5 | II | JA 669 |
| Exhibit 002 | II | JA 670 |
| Exhibit 002.1 | II | JA 761 |

| | | |
|---|---|---|
| Exhibit 002.2 | II | JA 762 |
| Exhibit 002.3 | II | JA 763 |
| Exhibit 002.4 | II | JA 764 |
| Exhibit 002.5 | II | JA 765 |
| Exhibit 002.6 | II | JA 766 |
| Exhibit 002.7 | II | JA 767 |
| Exhibit 002.8 | II | JA 768 |
| Exhibit 002.9 | II | JA 769 |
| Exhibit 002.10 | II | JA 770 |
| Exhibit 002.11 | II | JA 771 |
| Exhibit 002.12 | II | JA 772 |
| Exhibit 002.13 | II | JA 773 |
| Exhibit 002.14 | II | JA 774 |
| Exhibit 002.15 | II | JA 775 |
| Exhibit 002.16 | II | JA 776 |
| Exhibit 002.17 | II | JA 777 |
| Exhibit 002.18 | II | JA 778 |
| Exhibit 002.19 | II | JA 779 |
| Exhibit 002.20 | II | JA 780 |

| | | |
|---|---|---|
| Exhibit 002.21 | II | JA 781 |
| Exhibit 014 | II | JA 782 |
| Exhibit 015.1 | II | JA 784 |
| Exhibit 015.2 | II | JA 785 |
| Exhibit 015.3 | II | JA 786 |
| Exhibit 015.4 | II | JA 787 |
| Exhibit 015.5 | II | JA 788 |
| Exhibit 015.6 | II | JA 789 |
| Exhibit 015.7 | II | JA 790 |
| Exhibit 015.8 | II | JA 791 |
| Exhibit 015.9 | II | JA 792 |
| Exhibit 015.10 | II | JA 793 |
| Exhibit 015.11 | II | JA 794 |
| Exhibit 015.12 | II | JA 795 |
| Exhibit 016.1 | II | JA 796 |
| Exhibit 016.2 | II | JA 797 |
| Exhibit 016.3 | II | JA 799 |
| Exhibit 016.4 | II | JA 801 |
| Exhibit 016.5 | II | JA 802 |

| Exhibit 016.6 | II | JA 804 |
|---|---|---|
| Exhibit 016.7 | II | JA 805 |
| Exhibit 016.8 | II | JA 807 |
| Exhibit 016.9 | II | JA 809 |
| Exhibit 100 | II | JA 811 |
| Exhibit 100.1 | II | JA 838 |
| Exhibit 100.2 | II | JA 839 |
| Exhibit 100.3 | II | JA 840 |
| Exhibit 100.4 | II | JA 841 |
| Exhibit 100.5 | II | JA 842 |
| Exhibit 100.6 | II | JA 843 |
| Exhibit 100.7 | II | JA 844 |
| Exhibit 100.8 | II | JA 845 |
| Exhibit 100.9 | II | JA 846 |
| Exhibit 100.10 | II | JA 847 |
| Exhibit 100.11 | II | JA 848 |
| Exhibit 101.1 | II | JA 849 |
| Exhibit 101.2 | II | JA 850 |
| Exhibit 101.3 | II | JA 851 |

| | | |
|---|---|---|
| Exhibit 101.4 | II | JA 852 |
| Exhibit 101.5 | II | JA 853 |
| Exhibit 101.6 | II | JA 854 |
| Exhibit 101.7 | II | JA 855 |
| Exhibit 101.8 | II | JA 856 |
| Exhibit 101.9 | II | JA 857 |
| Exhibit 101.10 | II | JA 858 |
| Exhibit 101.11 | II | JA 859 |
| Exhibit 101.12 | II | JA 860 |
| Exhibit 101.13 | II | JA 861 |
| Exhibit 101.14 | II | JA 862 |
| Exhibit 101.15 | II | JA 863 |
| Exhibit 101.16 | II | JA 864 |
| Exhibit 101.17 | II | JA 865 |
| Exhibit 101.18 | II | JA 866 |
| Exhibit 101.19 | II | JA 867 |
| Exhibit 101.20 | II | JA 868 |
| Exhibit 101.21 | II | JA 869 |
| Exhibit 101.22 | II | JA 870 |

| Trial Audio/Video Exhibit List | II | JA 871 |

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:23–cr–10028–FDS–1

Case title: USA v. Perez et al

Magistrate judge case number: 1:23–mj–04084–DHH

Date Filed: 02/01/2023

Date Terminated: 01/03/2025

Assigned to: District Judge F. Dennis Saylor, IV

Appeals court case number: 25–1031

**Defendant (1)**

| | | |
|---|---|---|
| **Jose Perez, Jr.**<br>*TERMINATED: 01/03/2025* | represented by | **Cory S. Flashner**<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC<br>One Financial Center, 42nd Flr.<br>Boston, MA 02111<br>617–542–6000<br>Email: csflashner@mintz.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment* |

**Syrie D. Fried**
Good Schneider Cormier & Fried
83 Atlantic Avenue, 3rd Flr.
Boston, MA 02110
617–523–5933
Email: sf@gscfboston.com
*TERMINATED: 06/22/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Vivianne E. Jeruchim**
Jeruchim & Associates, P.C.
6 Beacon St.
Suite 825
Boston, MA 02109
617–312–2255
Fax: 617–977–1640
Email: aviva@jeruchimlaw.com
*TERMINATED: 04/19/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Edmund P. Daley , III**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
One Financial Center, 42nd Flr.
Boston, MA 02111
617–348–4921
Email: EPDaley@Mintz.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Julia Hutchinson**
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo
P.C.
One Financial Center
Boston, MA 02111
617–542–6000
Email: jrhutchinson@mintz.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 21 U.S.C. § 846– CONSPIRACY TO DISTRIBUTE AND TO POSSESS WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES (1s) | 142 months on Count 1s and 120 months on Count 2s to be served concurrently in this case and concurrently with the Revocation Judgments in 15–10256–FDS and 18–40034–FDS. |
| 18 U.S.C. § 922(g)(1)– FELON IN POSSESSION OF A FIREARM (2s) | 142 months on Count 1s and 120 months on Count 2s to be served concurrently in this case and concurrently with the Revocation Judgments in 15–10256–FDS and 18–40034–FDS. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 21 U.S.C. § 846– CONSPIRACY TO DISTRIBUTE AND TO POSSESS WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES (1) | |
| 18 U.S.C. § 922(g)(1)– FELON IN POSSESSION OF A FIREARM (2) | |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18 U.S.C. § 922(g)(1)–FELON IN POSSESSION OF A FIREARM; | |
| 21 U.S.C § 846– CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES | |

**Plaintiff**

| **USA** | represented by | **Michael J. Crowley** |
|---|---|---|
| | | US Attorney's Office – MA |
| | | J. Joseph Moakley U.S. Courthouse |
| | | 1 Courthouse Way |
| | | Suite 9200 |
| | | Boston, MA 02210 |

617−748−3375
Email: michael.crowley2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Sarah Hoefle**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748−3120
Email: sarah.hoefle@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2023 | 1 | COMPLAINT as to Jose Perez, Jr (1), Henry Del Rio (2). (Attachments: # 1 JS45 Perez, # 2 JS45 Del Rio, # 3 Affidavit)(Montes, Mariliz) [1:23−mj−04084−DHH] (Entered: 01/12/2023) |
| 01/13/2023 | 3 | ELECTRONIC NOTICE of Case Assignment as to Jose Perez, Jr, Henry Del Rio; Magistrate Judge David H. Hennessy assigned to case. (Finn, Mary) [1:23−mj−04084−DHH] (Entered: 01/13/2023) |
| 01/17/2023 | | Magistrate Judge David H. Hennessy: ORDER entered. Added attorney Aviva Jeruchim. (King, Dawn) [1:23−mj−04084−DHH] (Entered: 01/18/2023) |
| 01/18/2023 | 4 | ELECTRONIC NOTICE OF HEARING for Initial Appearance as to Jose Perez, Jr.<br><br>Initial Appearance VIA VIDEO set for 1/20/2023 at 10:30 AM in Courtroom 1 − Worcester (Remote only) before Magistrate Judge David H. Hennessy.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(King, Dawn) [1:23−mj−04084−DHH] (Entered: 01/18/2023) |
| 01/20/2023 | | Arrests of Jose Perez, Jr, Henry Del Rio (both in custody already). (King, Dawn) [1:23−mj−04084−DHH] (Entered: 01/20/2023) |
| 01/20/2023 | 9 | Magistrate Judge David H. Hennessy: ORDER entered. ORDER PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 5 as to Jose Perez, Jr, Henry Del Rio. (King, Dawn) [1:23−mj−04084−DHH] (Entered: 01/20/2023) |
| 01/20/2023 | 7 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Initial Appearance as to Jose Perez, Jr held on 1/20/2023. Case called. Defendant and his attorney (CJA: Jeruchim, V.) appear via video conference. Defendant appears remotely in custody at Wyatt. All other parties are present via video conference as well. Court instructs the Defendant on his right to be present in the courtroom. Defendant knowingly and voluntarily waives his appearance in the courtroom and agrees to participate via video conference. The Court finds that public access to this hearing has been made. The Court now proceeds with the hearing with respect to Defendant's Initial Appearance. |

| | | Case called. Court informs Defendant of reason for his appearance, charges, rights and constitutional rights. Government states maximum penalties. Defendant previously submitted a financial affidavit, the Court will adopt the previous financial affidavit filed in his revocation case. Court appoints CJA Jeruchim, V. Government moves for detention. Defendant advised of his right to Preliminary and Detention Hearings. Defendant wishes to assent to an order of voluntary detention, the Court will enter same, without prejudice. Preliminary Examination set for 2/3/2023 at 10:00 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. Court gives oral Brady order, written to issue as well. Defendant remains in custody at Wyatt. |
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | (Attorneys present: Crowley, Jeruchim, PO Charlton. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please contact the Clerk's office by email at https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Clerk's Office by email at mad_transcripts@mad.uscourts.gov. (King, Dawn) |
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | [1:23–mj–04084–DHH] (Entered: 01/20/2023) |
| 01/25/2023 | 15 | Magistrate Judge David H. Hennessy: ORDER entered. MEMORANDUM AND ORDER OF DETENTION as to Jose Perez, Jr. (King, Dawn) [1:23–mj–04084–DHH] (Entered: 01/25/2023) |
| 02/01/2023 | 16 | INDICTMENT as to Jose Perez, Jr (1) count(s) 1, 2, Henry Del Rio (2) count(s) 1. (Attachments: # 1 JS45)(DaSilva, Carolina) (Entered: 02/01/2023) |
| 02/01/2023 | 17 | ELECTRONIC NOTICE of Case Assignment as to Jose Perez, Jr, Henry Del Rio; Chief Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge David H. Hennessy. (Finn, Mary) (Entered: 02/01/2023) |
| 02/01/2023 | 18 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge David H. Hennessy Reason for referral: Full Pretrial Proceedings as to Jose Perez, Jr, Henry Del Rio (DaSilva, Carolina) (Entered: 02/01/2023) |

| 02/01/2023 | 19 | ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr.; Henry Del Rio. Arraignments VIA VIDEO set for 2/3/2023 at 10:00 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. *Please use same video conference link provided for the (canceled) Preliminary Hearings. |
|---|---|---|
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | (King, Dawn) (Entered: 02/01/2023) |
| 02/01/2023 | 20 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered. ORDER CANCELING Preliminary Examinations on 2/03/2023 as to Jose Perez, Jr., Henry Del Rio. (King, Dawn) (Entered: 02/01/2023) |
| 02/02/2023 | 21 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered. ORDER CANCELING Arraignments on 2/03/2023 as to Jose Perez, Jr., Henry Del Rio. Parties to contact the court regarding rescheduling for next week. (King, Dawn) (Entered: 02/02/2023) |
| 02/06/2023 | 24 | ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr. Arraignment VIA VIDEO set for 2/13/2023 at 1:00 PM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. |
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | (King, Dawn) (Entered: 02/06/2023) |
| 02/09/2023 | 25 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered. ORDER OF RESCHEDULING as to Jose Perez, Jr., Henry Del Rio. |
| | | Arraignments VIA VIDEO reset for 2/13/2023 at 12:30 PM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. |
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |

| | | (King, Dawn) (Entered: 02/09/2023) |
|---|---|---|
| 02/13/2023 | 26 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Arraignment as to Jose Perez Jr. (1) Count 1,2 held on 2/13/2023.<br><br>Case called. Defendant and his attorney (CJA: Jeruchim, A.) appear via video conference. Defendant appears remotely in custody at Wyatt, along with Defendant Del–Rio (at Plymouth). All other parties are present via video conference as well. Court instructs the Defendant on his right to be present in the courtroom. Defendant knowingly and voluntarily waives his appearance in the courtroom and agrees to participate via video conference. The Court finds that public access to this hearing has been made. The Court now proceeds with the hearing with respect to Defendant's Arraignment.<br><br>Court advises Defendant of reasons for his appearance. Defendant advised of charges, rights and constitutional rights. Government states maximum penalties. Defendant continues to be represented by counsel and is advised of his right to counsel. Defendant has reviewed the Indictment with counsel. Defendant waives reading of Indictment. Defendant pleads NOT GUILTY on Counts 1 and 2. Government requests 28 days for automatic discovery, due 3/13/23. Initial Status Conference VIA PHONE set for 3/27/23 at 11:15 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. Court to exclude time, without objection. Defendant remains in custody at Wyatt.<br><br>(Attorneys present: Crowley, Jeruchim )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please contact the Clerk's office by email at https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Clerk's Office by email at mad_transcripts@mad.uscourts.gov. (King, Dawn) (Entered: 02/13/2023) |
| 02/14/2023 | 28 | Magistrate Judge David H. Hennessy: ORDER entered. INITIAL SCHEDULING ORDER as to Jose Perez, Jr, Henry Del Rio.<br><br>Initial Status Conference VIA PHONE set for 3/27/2023 at 11:15 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 02/14/2023) |
| 02/14/2023 | 29 | NOTICE OF INITIAL STATUS CONFERENCE as to Jose Perez, Jr, Henry Del Rio.<br><br>Initial Status Conference VIA PHONE set for 3/27/2023 at 11:15 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 02/14/2023) |
| 02/14/2023 | 30 | Magistrate Judge David H. Hennessy: ORDER entered. ORDER ON EXCLUDABLE TIME as to Jose Perez, Jr, Henry Del Rio. Time excluded from 2/13/23 until 3/27/23. Reason for entry of order on excludable delay: 18 U.S.C. § 3161(h)(7)(A) Interests of justice. (King, Dawn) (Entered: 02/14/2023) |
| 03/21/2023 | 31 | STATUS REPORT by USA as to Jose Perez, Jr, Henry Del Rio (Crowley, Michael) (Entered: 03/21/2023) |
| 03/24/2023 | 32 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered. ORDER CANCELING Initial Status Conferenceon 3/27/2023 as to Jose Perez, Jr, Henry Del Rio. (King, Dawn) (Entered: 03/24/2023) |
| 03/29/2023 | 33 | Magistrate Judge David H. Hennessy: ORDER entered. REPORT IN LIEU OF INITIAL STATUS CONFERENCE PURSUANT TO LOCAL RULE 116.5(a) as to Jose Perez, Jr, Henry Del Rio.<br><br>Interim Status Conference VIA PHONE set for 5/16/2023 at 9:45 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 04/03/2023) |
| 03/29/2023 | 34 | Magistrate Judge David H. Hennessy: ORDER entered. ORDER ON EXCLUDABLE TIME as to Jose Perez, Jr, Henry Del Rio. Time excluded from 3/27/23 until 5/16/23. Reason for entry of order on excludable delay: 18 U.S.C. § 3161(h)(7)(A) Interests of |

JA 6

| | | |
|---|---|---|
| | | justice. (King, Dawn) (Entered: 04/03/2023) |
| 04/18/2023 | 35 | MOTION to Withdraw as Attorney by Vivianne Jeruchim as to Jose Perez, Jr. (Jeruchim, Vivianne) (Entered: 04/18/2023) |
| 04/19/2023 | 36 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered granting 35 Motion to Withdraw as Attorney Attorney Vivianne E. Jeruchim terminated as to Jose Perez Jr. (1) (King, Dawn) (Entered: 04/19/2023) |
| 04/19/2023 | | Magistrate Judge David H. Hennessy: ORDER entered. Added attorney Syrie Fried for Jose Perez, Jr. (King, Dawn) (Entered: 04/19/2023) |
| 05/15/2023 | 37 | STATUS REPORT *Joint Status Memorandum* by Jose Perez, Jr as to Jose Perez, Jr, Henry Del Rio (Fried, Syrie) (Entered: 05/15/2023) |
| 05/15/2023 | 38 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered. ORDER CANCELING Interim Status Conferenceon 5/16/2023 as to Jose Perez, Jr, Henry Del Rio. (King, Dawn) (Entered: 05/15/2023) |
| 05/15/2023 | 39 | Magistrate Judge David H. Hennessy: ORDER entered. REPORT IN LIEU OF INTERIM STATUS CONFERENCE PURSUANT TO LOCAL RULE 116.5(b) as to Jose Perez, Jr., Henry Del Rio. <br><br>Further Interim Status Conference set for 6/30/2023 at 9:45 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 05/19/2023) |
| 05/15/2023 | 40 | Magistrate Judge David H. Hennessy: ORDER entered. ORDER ON EXCLUDABLE TIME as to Jose Perez, Jr, Henry Del Rio. Time excluded from 5/16/23 until 6/30/23. Reason for entry of order on excludable delay: 18 U.S.C. s. 3161(h)(7)(A) Interests of justice. (King, Dawn) (Entered: 05/19/2023) |
| 06/14/2023 | 41 | MOTION to Withdraw as Attorney by Syrie D. Fried as to Jose Perez, Jr. (Fried, Syrie) (Entered: 06/14/2023) |
| 06/21/2023 | 42 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered granting 41 Motion to Withdraw as Attorney as to Jose Perez Jr. (1). Ms. Fried will stay as counsel of record until a new attorney is appointed. (King, Dawn) Modified on 6/22/2023 (King, Dawn). (Entered: 06/22/2023) |
| 06/22/2023 | 43 | Magistrate Judge David H. Hennessy: ORDER entered. CJA 20 as to Jose Perez, Jr: Appointment of Attorney Cory Flashner. (King, Dawn) (Entered: 06/22/2023) |
| 06/22/2023 | | Magistrate Judge David H. Hennessy: ORDER entered. Attorney Syrie D. Fried terminated in case as to Jose Perez, Jr. (King, Dawn) (Entered: 06/22/2023) |
| 06/30/2023 | 44 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Interim Status Conference as to Jose Perez, Jr., Henry Del Rio held on 6/30/2023. <br><br>Case called. Parties discuss status of discovery and that Mr. Flashner has recently been appointed as new counsel. Perez has two outstanding violations with 2 different district judges. Mr. Flasher has spoken with Ms. Fried and the court will direct her to file notices of withdrawals in those 2 matters and to appoint Mr. Flasher. Court will go out 30 days, Final Status Conference set for 8/8/2023 at 10:00 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy. Court to exclude time. <br><br>(Attorneys present: Crowley; Flashner, Daley; Gold. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please email the Court at https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Court by email at mad_transcripts@mad.uscourts.gov. (King, Dawn) (Entered: 06/30/2023) |
| 06/30/2023 | 45 | Magistrate Judge David H. Hennessy: ORDER ON ASSENTED–TO PROPOSAL TO CONTINUE STATUS CONFERENCE AND EXCLUDE TIME entered as to Jose Perez, Jr, Henry Del Rio |

| | | Final Status Conference set for 8/8/2023 at 10:00 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy.<br><br>ORDER ON EXCLUDABLE DELAY as to Jose Perez, Jr, Henry Del Rio. Time excluded from 6/30/23 until 8/823. Reason for entry of order on excludable delay: 18 U.S.C. § 3161(h)(7)(A) Interests of justice. (King, Dawn) (Entered: 07/03/2023) |
|---|---|---|
| 08/02/2023 | 46 | **ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr, Henry Del Rio:** Status Conference set for 8/17/2023 03:10 PM by telephone before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 08/02/2023) |
| 08/08/2023 | 47 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Final Status Conference as to Jose Perez, Jr. and Henry Del Rio held on 8/8/2023.<br><br>Case called. Parties discuss status of the case. A final report will be done and filed. Parties are requesting another final status before the magistrate judge even though the district judge has a set a pretrial conference date already. The report will note that. Court to exclude time, no objection.<br><br>(Attorneys present: Crowley; Flashner, Daly; Gold. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please email the Court at https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Court by email at mad_transcripts@mad.uscourts.gov. (King, Dawn) (Entered: 08/08/2023) |
| 08/09/2023 | 48 | Magistrate Judge David H. Hennessy: ORDER entered. REPORT AFTER FINAL STATUS CONFERENCEPURSUANT TO LOCAL RULE 116.5(c) as to Jose Perez, Jr.; Henry Del Rio. (King, Dawn) Modified on 9/14/2023 (McKillop, Matthew). (Entered: 08/14/2023) |
| 08/09/2023 | 49 | Magistrate Judge David H. Hennessy: ORDER entered. ORDER ON EXCLUDABLE time as to Jose Perez, Jr, Henry Del Rio. Time excluded from 8/8/23 until 8/17/23. Reason for entry of order on excludable delay: 18 U.S.C. § 3161(h)(7)(A) Interests of justice. (King, Dawn) (Entered: 08/14/2023) |
| 08/09/2023 | 50 | Case as to Jose Perez, Jr.; Henry Del Rio no longer referred to Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 08/14/2023) |
| 08/17/2023 | 51 | **ELECTRONIC NOTICE CANCELING HEARING OR OTHER DEADLINE as to Jose Perez, Jr, Henry Del Rio.** The Status Conference set for 8/17/23 in front of Chief Judge Saylor is canceled and will be referred back to the Magistrate Judge. (McKillop, Matthew) (Entered: 08/17/2023) |
| 08/17/2023 | 52 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge David H. Hennessy as to Jose Perez, Jr, Henry Del Rio (McKillop, Matthew) (Entered: 08/17/2023) |
| 08/18/2023 | 53 | ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr., Henry Del Rio. Final Status Conference VIA VIDEO set for 9/8/2023 at 10:00 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(King, Dawn) (Entered: 08/18/2023) |

| | | |
|---|---|---|
| 09/07/2023 | 54 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered. ORDER OF RESCHEDULING TIME ONLY as to Jose Perez, Jr, Henry Del Rio. Final Status Conference VIA VIDEO reset for 9/8/2023 at 10:15 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(King, Dawn) (Entered: 09/07/2023) |
| 09/08/2023 | 55 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Final Status Conference as to Jose Perez, Jr., Henry Del Rio held on 9/8/2023.<br><br>Case called. Parties discuss status of the case. The district judge had sent this back because the parties needed a little bit more time. Government states the parties are done with discovery at this time, Defendant Perez, Jr. agrees and states the case is unlikely to go to trial, but will estimate it at 4 days if it does. Defendant Del Rio states the same. Court to excluded time from 8/17 to pretrial conference date.<br><br>(Attorneys present: Crowley; Daley, Flashner; Gold. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please email the Court at https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Court by email at mad_transcripts@mad.uscourts.gov. (King, Dawn) (Entered: 09/08/2023) |
| 09/08/2023 | | Terminate Deadlines and Hearings as to Jose Perez, Jr, Henry Del Rio: Final Status Conference (King, Dawn) (Entered: 09/08/2023) |
| 09/08/2023 | 56 | Magistrate Judge David H. Hennessy: ORDER entered. REPORT AFTER FINAL STATUS CONFERENCE PURSUANT TO LOCAL RULE 116.5(c) as to Jose Perez, Jr., Henry Del Rio. (King, Dawn) Modified on 12/6/2023 (McKillop, Matthew). (Entered: 09/08/2023) |
| 09/08/2023 | 57 | Magistrate Judge David H. Hennessy: ORDER entered. ORDER ON EXCLUDABLE TIME as to Jose Perez, Jr, Henry Del Rio. Reason for entry of order on excludable delay: 18 U.S.C. § 3161(h)(7)(A) Interests of justice. (King, Dawn) (Entered: 09/08/2023) |
| 09/11/2023 | 58 | Case as to Jose Perez, Jr., Henry Del Rio no longer referred to Magistrate Judge David H. Hennessy. (King, Dawn) Modified on 12/6/2023 (McKillop, Matthew). (Entered: 09/11/2023) |
| 10/06/2023 | 59 | **ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr, Henry Del Rio:** Status Conference set for 10/23/2023 03:10 PM by telephone before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 10/06/2023) |
| 10/23/2023 | 60 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr, Henry Del Rio held by telephone on 10/23/2023. Case called; status discussed; Counsel requested further status conference. Court excluded time to 11/21/23. Order to follow.<br><br>NOTICE OF HEARING:<br><br>Status Conference set for 11/21/2023 03:00 PM by telephone before Chief Judge F. Dennis Saylor IV. (Attorneys present: Michael Crowley for the government. Cory |

| | | |
|---|---|---|
| | | Flashner and Ian Gold for the defendants.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 10/23/2023) |
| 10/23/2023 | 61 | Chief Judge F. Dennis Saylor, IV: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Jose Perez, Jr, Henry Del Rio. Time excluded from October 24, 2023 until November 21, 2023. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (de Oliveira, Flaviana) (Entered: 10/23/2023) |
| 11/21/2023 | 62 | Joint MOTION to Continue *Status Conference* as to Jose Perez, Jr. (Flashner, Cory) (Entered: 11/21/2023) |
| 11/21/2023 | 63 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 62 Motion to Continue as to Jose Perez Jr. (1), Henry Del Rio (2).<br><br>NOTICE OF HEARING:<br><br>Status Conference set for 12/6/2023 03:10 PM by telephone before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 11/21/2023) |
| 12/06/2023 | 64 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr, Henry Del Rio held by telephone on 12/6/2023. Case called; status discussed; Rule 11 hearing set for Defendant Del Rio. Further status set for defendant Perez Jr. Counsel to email clerk regarding trial availability from the end of May to Labor day. Court excluded time to 1/12/24. Order to follow. (Attorneys present: Michael Crowley for the government. Corey Flashner and Ian Gold for the defendants.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 12/06/2023) |
| 12/06/2023 | 65 | **ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr:** Status Conference set for 12/18/2023 11:00 AM by telephone before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 12/06/2023) |
| 12/06/2023 | 67 | Chief Judge F. Dennis Saylor, IV: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Jose Perez, Jr, Henry Del Rio. Time excluded from November 21, 2023 until January 12, 2024. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (de Oliveira, Flaviana) (Entered: 12/06/2023) |
| 12/18/2023 | 68 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr held by telephone on 12/18/2023. Case called; Status discussed; 1 week trial anticipated. Counsel to email clerk trial availability. Court excluded time to 12/20/23.<br><br>NOTICE OF HEARING:<br><br>Status Conference set for 12/20/2023 03:30 PM by telephone before Chief Judge F. Dennis Saylor IV.(Attorneys present: Michael Crowley for the government. Cory Flashner for the defendant.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 12/18/2023) |
| 12/20/2023 | 69 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr held by telephone on 12/20/2023. Case called; Jury trial and Pre trial deadlines set. Court excluded time to 7/29/24; order to follow.<br><br>PRETRIAL DEADLINES:<br><br>Witness lists, exhibit lists, proposed voir dire and proposed jury instructions due 7/2/24.<br>Motions in Limine due 7/9/24.<br>Oppositions due 7/18/24.<br><br>NOTICE OF HEARINGS: |

| | | | |
|---|---|---|---|
| | | | Status Conference set for 2/7/2024 03:10 PM by telephone before Chief Judge F. Dennis Saylor IV.<br>Final Pretrial Conference set for 7/24/2024 02:00 PM in Courtroom 10 (In person only) before Chief Judge F. Dennis Saylor IV.<br>Jury Trial set for 7/29–8/2/24 09:00 AM in Courtroom 10 (In person only) before Chief Judge F. Dennis Saylor IV. (Attorneys present: Michael Crowley for the government. Cory Flashner for the defendant.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) Modified on 4/29/2024 (McKillop, Matthew). (Entered: 12/21/2023) |
| 02/07/2024 | | 73 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr held by telephone on 2/7/2024. Case called; status discussed; Jury trial to remain set.<br><br>NOTICE OF HEARING:<br><br>Status Conference set for 6/18/2024 03:00 PM by telephone before Chief Judge F. Dennis Saylor IV. (Attorneys present: Michael Crowley for the government. Cory Flashner for the defendant.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 02/07/2024) |
| 02/07/2024 | | 74 | Chief Judge F. Dennis Saylor, IV: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Jose Perez, Jr, Henry Del Rio. Time excluded from December 20, 2023 until July 29, 2024. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (de Oliveira, Flaviana) (Entered: 02/07/2024) |
| 04/26/2024 | | 81 | **ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr:** Status Conference set for 4/29/2024 03:30 PM by telephone before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 04/26/2024) |
| 04/29/2024 | | 82 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr held by telephone on 4/29/2024. Case called; Status discussed; Further status conference and Jury trial to remain set. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner for the defendant.)Court Reporter Name and Contact or digital recording information: Robert Paschal at rwp.reporter@gmail.com. (McKillop, Matthew) (Entered: 04/29/2024) |
| 06/13/2024 | | 87 | NOTICE OF ATTORNEY APPEARANCE Sarah Hoefle appearing for USA. (Hoefle, Sarah) (Entered: 06/13/2024) |
| 06/18/2024 | | 88 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Status Conference as to Jose Perez, Jr held by telephone on 6/18/2024. Case called; Expert witnesses anticipated. Status discussed; Final Pretrial on for 7/24 and Jury trial on for 7/29 to remain set. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner for the defendant.)Court Reporter Name and Contact or digital recording information: Jessica Leonard at jessicamichaelleonard@gmail.com. (McKillop, Matthew) (Entered: 06/20/2024) |
| 06/27/2024 | | 89 | EXHIBIT/WITNESS LIST by USA as to Jose Perez, Jr, Henry Del Rio (Hoefle, Sarah) (Entered: 06/27/2024) |
| 06/27/2024 | | 90 | EXHIBIT/WITNESS LIST by USA as to Jose Perez, Jr, Henry Del Rio (Hoefle, Sarah) (Entered: 06/27/2024) |
| 06/27/2024 | | 91 | Proposed Voir Dire by USA as to Jose Perez, Jr, Henry Del Rio (Hoefle, Sarah) (Entered: 06/27/2024) |
| 06/27/2024 | | 92 | MOTION in Limine *to Preclude References to Potential Consequences of Conviction* as to Jose Perez, Jr, Henry Del Rio by USA. (Hoefle, Sarah) Modified on 7/26/2024 (McKillop, Matthew). (Entered: 06/27/2024) |
| 06/27/2024 | | 93 | MOTION in Limine *to Admit Evidence of Flight* as to Jose Perez, Jr, Henry Del Rio by USA. (Hoefle, Sarah) Modified on 8/7/2024 (McKillop, Matthew). (Entered: 06/27/2024) |

| 06/27/2024 | 94 | MOTION in Limine *to Admit Law Enforcement Lay Opinion Testimony* as to Jose Perez, Jr, Henry Del Rio by USA. (Hoefle, Sarah) Modified on 7/26/2024 (McKillop, Matthew). (Entered: 06/27/2024) |
|---|---|---|
| 07/01/2024 | 95 | NOTICE OF ATTORNEY APPEARANCE: Julia Hutchinson appearing for Jose Perez, Jr. Type of Appearance: CJA. (Hutchinson, Julia) (Entered: 07/01/2024) |
| 07/01/2024 | 96 | NOTICE OF ATTORNEY APPEARANCE: Edmund P. Daley, III appearing for Jose Perez, Jr. Type of Appearance: CJA. (Daley, Edmund) (Entered: 07/01/2024) |
| 07/02/2024 | 97 | MOTION in Limine as to Jose Perez, Jr by USA. (Attachments: # 1 Exhibit Rule 11 Transcript, # 2 Exhibit Judgment – 2020 Conviction)(Crowley, Michael) (Entered: 07/02/2024) |
| 07/02/2024 | 98 | Proposed Jury Instructions by USA as to Jose Perez, Jr (Crowley, Michael) (Entered: 07/02/2024) |
| 07/02/2024 | 99 | EXHIBIT/WITNESS LIST by Jose Perez, Jr (Flashner, Cory) (Entered: 07/02/2024) |
| 07/02/2024 | 100 | EXHIBIT/WITNESS LIST by Jose Perez, Jr (Flashner, Cory) (Entered: 07/02/2024) |
| 07/02/2024 | 101 | Proposed Voir Dire by Jose Perez, Jr (Flashner, Cory) (Entered: 07/02/2024) |
| 07/02/2024 | 102 | Proposed Jury Instructions by Jose Perez, Jr (Flashner, Cory) (Entered: 07/02/2024) |
| 07/02/2024 | 103 | MOTION *for Funds to Retain a Criminal Investigator to aid in the Preparation of his Defense* as to Jose Perez, Jr. (Flashner, Cory) (Entered: 07/02/2024) |
| 07/09/2024 | 104 | MOTION in Limine *to Exclude All Evidence Regarding Alleged Gang−Related Activity or Affiliation* as to Jose Perez, Jr. (Flashner, Cory) (Entered: 07/09/2024) |
| 07/09/2024 | 105 | MOTION in Limine *to Allow Receipt of Civilian Clothing* as to Jose Perez, Jr. (Flashner, Cory) (Entered: 07/09/2024) |
| 07/09/2024 | 106 | MOTION in Limine *to Sequester Witnesses During Trial* as to Jose Perez, Jr. (Flashner, Cory) (Entered: 07/09/2024) |
| 07/10/2024 | 107 | SUPERSEDING INDICTMENT as to Jose Perez, Jr (1) count(s) 1s, 2s. (Attachments: # 1 JS45)(DaSilva, Carolina) (Entered: 07/10/2024) |
| 07/10/2024 | 108 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge David H. Hennessy Reason for referral: Full Pretrial Proceedings as to Jose Perez, Jr (DaSilva, Carolina) (Entered: 07/10/2024) |
| 07/12/2024 | 109 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 103 MOTION for Funds to Retain a Criminal Investigator to aid in the Preparation of his Defense as to Jose Perez Jr. (1). Amount not to exceed $1,500. (McKillop, Matthew) (Entered: 07/12/2024) |
| 07/16/2024 | 110 | ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr.

Arraignment via video set for 7/18/2024 AT 10:00 AM in Courtroom 1 – Worcester (Remote only) before Magistrate Judge David H. Hennessy.

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the sessions courtroom deputy as soon as possible.

For questions regarding access to hearings, you may refer to the Courts general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

(King, Dawn) (Entered: 07/16/2024) |
| 07/16/2024 | 111 | RESPONSE to Motion by USA as to Jose Perez, Jr re 105 MOTION in Limine *to Allow Receipt of Civilian Clothing*, 106 MOTION in Limine *to Sequester Witnesses During Trial* (Hoefle, Sarah) (Entered: 07/16/2024) |

| 07/18/2024 | 112 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Arraignment as to Jose Perez Jr. (1) Counts 1s, 2s held on 7/18/2024.<br><br>Case called. Defendant and his attorney (CJA: Flashner, C.) appear via video conference. Defendant appears remotely in custody at Wyatt. All other parties are present via video conference as well. Court instructs the Defendant on his right to be present in the courtroom. Defendant knowingly and voluntarily waives his appearance in the courtroom and agrees to participate via video conference. The Court finds that public access to this hearing has been made. The Court now proceeds with the hearing with respect to Defendant's Arraignment on the Superseding Indictment.<br><br>Court advises Defendant of reasons for his appearance. Defendant advised of charges, rights and constitutional rights. Government states maximum penalties. Defendant is advised of his right to counsel. Defendant has reviewed the Superseding Indictment with counsel. Defendant waives reading of Indictment. Defendant pleads NOT GUILTY on Counts 1s and 2s. Defendant remains in custody at Wyatt.<br><br>(Attorneys present: Hoefle; Flashner, Hutchinson Morton. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please email the Court at https://forms.mad.uscourts.gov/Audio.html . For a transcript of this proceeding, contact the Court by email at mad_transcripts@mad.uscourts.gov. (King, Dawn) (Entered: 07/18/2024) |
| 07/18/2024 | 113 | Case as to Jose Perez, Jr no longer referred to Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 07/18/2024) |
| 07/18/2024 | 114 | Opposition by USA as to Jose Perez, Jr, Henry Del Rio re 104 MOTION in Limine *to Exclude All Evidence Regarding Alleged Gang–Related Activity or Affiliation* (Attachments: # 1 Exhibit Rule 11 Transcript, # 2 Exhibit Judgment – 2020 Conviction)(Hoefle, Sarah) (Entered: 07/18/2024) |
| 07/18/2024 | 115 | MEMORANDUM in Opposition by Jose Perez, Jr re 97 MOTION in Limine *to Introduce Evidence of Prior Federal Convictions and Condition of Federal Supervised Release* (Attachments: # 1 Exhibit 1)(Flashner, Cory) (Entered: 07/18/2024) |
| 07/18/2024 | 116 | MEMORANDUM in Opposition by Jose Perez, Jr re 93 MOTION in Limine *to Admit Evidence of Flight* (Flashner, Cory) (Entered: 07/18/2024) |
| 07/18/2024 | 117 | MEMORANDUM in Opposition by Jose Perez, Jr re 94 MOTION in Limine *to Admit Law Enforcement Lay Opinion Testimony* (Flashner, Cory) (Entered: 07/18/2024) |
| 07/22/2024 | 118 | REPLY TO RESPONSE to Motion by USA as to Jose Perez, Jr re 104 MOTION in Limine *to Exclude All Evidence Regarding Alleged Gang–Related Activity or Affiliation*, 97 MOTION in Limine (Crowley, Michael) (Entered: 07/22/2024) |
| 07/24/2024 | 119 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Final Pretrial Conference as to Jose Perez Jr. Case called. Jury selection process and trial issues discussed with counsel; 3–4 day trial anticipated starting 7/29/2024. Court to meet with counsel at 9:00 a.m. on 7/29/2024.<br><br>**ORDERS ON MOTIONS**<br>Court granted 92 Motion in Limine to Preclude References to Potential Consequences of Conviction as stated on the record.<br>Court granted 94 Motion in Limine to Admit Law Enforcement Lay Opinion Testimony, subject to instructions stated on the record.<br>Court granted 105 Motion in Limine to Allow Receipt of Civilian Clothing, subject to coordination with the Marshal's office.<br>Court granted 106 Motion in Limine to Sequester Witnesses During Trial.<br><br>(Attorneys present: AUSA Crowley, AUSA Hoefle, Daley, Flashner, Hutchinson)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Beatty, Barbara) (Entered: 07/24/2024) |
| 07/26/2024 | 120 | **ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr.:** Hearing set for 7/26/2024 12:00 PM by video before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 07/26/2024) |

| 07/26/2024 | 121 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Hearing as to Jose Perez, Jr held by video on 7/26/2024. Case called; Defendant appeared by video. Court addressed Motions in Limine. Court to meet with counsel at 9:00am on 7/29/24.<br><br>ORDERS ON MOTIONS:<br><br>Court granted with restrictions <u>97</u> MOTION in Limine as stated on the record. Court denied <u>104</u> MOTION in Limine to Exclude All Evidence Regarding Alleged Gang–Related Activity or Affiliation as stated on the record. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner, Edmund Daley, III and Julia Hutchinson for the defendant. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 07/26/2024) |
| 07/28/2024 | <u>123</u> | Proposed Voir Dire by Jose Perez, Jr (Flashner, Cory) (Entered: 07/28/2024) |
| 07/29/2024 | <u>124</u> | EXHIBIT/WITNESS LIST by USA as to Jose Perez, Jr, Henry Del Rio (Hoefle, Sarah) (Entered: 07/29/2024) |
| 07/29/2024 | 125 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Jury Trial as to Jose Perez, Jr held on 7/29/2024. ase called; Court met with parties to go over any outstanding issues. Jury empanelment conducted; Jury selected; Jurors sworn. Jury trial to begin 7/30/24 at 9:00AM. Court to meet with parties at 8:30AM. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner, Edmund Daley, III and Julia Hutchinson for the defendant.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 07/29/2024) |
| 07/29/2024 | <u>126</u> | EXHIBIT/WITNESS LIST by Jose Perez, Jr (Flashner, Cory) (Entered: 07/29/2024) |
| 07/30/2024 | 127 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Jury Trial Day 2 as to Jose Perez, Jr held on 7/30/2024. Court met with parties to go over any outstanding issues. Jury reconvened. Opening statements. Government called first witness Nicholas Morris. Direct examination; cross examination; witness excused. Government called second witness Matthew Snell. Direct examination, cross examination; witness excused. Government called third witness Donald Chisholm. Direct examination; cross examination. witness excused. Jury excused for the day. The court met with the parties to go over jury instructions and verdict form. Court to meet with parties at 8:30AM on 7/31/24. Trial to resume 7/31/24 at 9:00am. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner, Edmund Daley, III and Julia Hutchinson for the defendant.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 07/30/2024) |
| 07/31/2024 | <u>128</u> | Proposed Jury Instructions by Jose Perez, Jr (Daley, Edmund) (Entered: 07/31/2024) |
| 07/31/2024 | 129 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Jury Trial Day 3 as to Jose Perez, Jr held on 7/31/2024. Case called; Court met with parties to go over any outstanding issues. Juror in seat 11 is excused as stated on the record. Jury reconvened. Government called fourth witness Jack Sharer. Direct examination; cross examination; re–direct; re–cross. Witness excused. Government called fifth witness Aidan Evelyn. Direct examination; cross examination; re–direct; witness excused. Government called sixth witness Ryan Griffin. Direct examination; cross examination; witness excused. Government called seventh witness Katelyn Thomas. Direct examination; cross examination; witness excused. Government called eighth witness Michael Noone. Direct examination; cross examination; witness excused. Government rests. Defense motion to dismiss denied by the Court as stated on the record. Jury excused for the day. Court met with parties for a final jury instruction conference. Court to meet with parties at 8:30 on 8/1/24. Closing statements set to begin on 8/1/24 at 9:00am. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner, Edmund Dalye and Julia Hutchinson for the defendant. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 07/31/2024) |

| 08/01/2024 | 130 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Jury Trial Day 4 as to Jose Perez, Jr held on 8/1/2024. Case called; Court met with parties to finalize jury instructions. Closing arguments; Court instructed jury. Jury is excused to begin deliberating. Jury reconvened and excused for the night; Deliberations to continue 8/2/24 at 9:00am. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner, Edmund Daley, III and Julia Hutchinson for the defendant.)Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 08/01/2024) |
|---|---|---|
| 08/02/2024 | 131 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Jury Trial Day 5 as to Jose Perez, Jr held on 8/2/2024. Case called; Jury Reconvened and instructed to continue deliberations; Verdict is returned; Jury finds defendant guilty as to Counts 1s–2s on the Indictment. Sentencing date set. (Attorneys present: Michael Crowley and Sarah Hoefle for the government. Cory Flashner, Edmund Daley, III and Julia Hutchinson for the defendant. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (McKillop, Matthew) (Entered: 08/02/2024) |
| 08/02/2024 | 132 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting in part and denying in part 93 MOTION in Limine to Admit Evidence of Flight as to Jose Perez Jr. (1) (McKillop, Matthew) (Entered: 08/02/2024) |
| 08/02/2024 | 133 | Exhibit A: Message from Juror in seat 11 from 7/31/24. (McKillop, Matthew) (Entered: 08/02/2024) |
| 08/02/2024 | 134 | Defendant and Government Submissions regarding Missing Witness Instruction as to Jose Perez, Jr. (McKillop, Matthew) (Entered: 08/02/2024) |
| 08/02/2024 | 135 | JURY VERDICT as to Jose Perez Jr. (1) Guilty on Count 1s–2s. (McKillop, Matthew) (Entered: 08/02/2024) |
| 08/02/2024 | 136 | **ELECTRONIC NOTICE OF HEARING as to Jose Perez, Jr:** Sentencing set for 11/1/2024 11:00 AM in Courtroom 10 (In person only) before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 08/02/2024) |
| 10/24/2024 | 142 | Assented to MOTION to Continue *Sentencing Hearing* as to Jose Perez, Jr. (Flashner, Cory) (Entered: 10/24/2024) |
| 10/28/2024 | 144 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 142 Motion to Continue as to Jose Perez Jr. (1) NOTICE OF HEARING: Sentencing set for 11/26/2024 10:00 AM in Courtroom 10 (In person only) before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 10/28/2024) |
| 11/04/2024 | 146 | MOTION to Consolidate Cases as to Jose Perez, Jr. (Flashner, Cory) (Entered: 11/04/2024) |
| 11/05/2024 | 147 | Chief Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 146 Motion to Consolidate Cases as to Jose Perez Jr. (1) (McKillop, Matthew) (Entered: 11/05/2024) |
| 11/20/2024 | 148 | SENTENCING MEMORANDUM by USA as to Jose Perez, Jr, Henry Del Rio (Attachments: # 1 Exhibit)(Hoefle, Sarah) (Entered: 11/20/2024) |
| 11/21/2024 | 149 | **ELECTRONIC NOTICE OF RESCHEDULING as to Jose Perez, Jr:** Sentencing re–set for 12/20/2024 10:00 AM in Courtroom 10 (In person only) before Chief Judge F. Dennis Saylor IV. (McKillop, Matthew) (Entered: 11/21/2024) |
| 12/13/2024 | 151 | SENTENCING MEMORANDUM by Jose Perez, Jr (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Flashner, Cory) (Entered: 12/13/2024) |
| 12/20/2024 | 153 | MOTION for Forfeiture of Property *Preliminary Order of Forfeiture* as to Jose Perez, Jr by USA. (Attachments: # 1 Text of Proposed Order)(Lyons, Matthew) (Entered: 12/20/2024) |
| 12/20/2024 | 154 | Electronic Clerk's Notes for proceedings held before Chief Judge F. Dennis Saylor, IV: Sentencing held on 12/20/2024 for Jose Perez, Jr. (1), Count(s) 1s–2s. Case called; |

| | | |
|---|---|---|
| | | Parties made aware of the materials/submissions being relied upon by the Court for purposes of the hearing. Sentencing recommendations heard; Defendant sentenced to 142 months on Count 1s and 120 months on Count 2s to be served concurrently in this case and concurrently with the Revocation Judgments in 15−10256−FDS and 18−40034−FDS, 3 years supervised release to run concurrently on both counts and $200 special assessment. Defendant advised appeal rights. Defendant remanded to the custody of the USMS. (Attorneys present: Sarah Hoefle for the government. Cory Flashner, Edmund Daley, III, Julia Hutchinson for the defendant. Luciana Sousa for probation. )Court Reporter Name and Contact or digital recording information: Jessica Leonard at jessicamichaelleonard@gmail.com. (McKillop, Matthew) (Entered: 12/23/2024) |
| 12/20/2024 | <u>155</u> | Chief Judge F. Dennis Saylor, IV: PRELIMINARY ORDER OF FORFEITURE entered as to Jose Perez Jr. (1). (McKillop, Matthew) (Entered: 01/03/2025) |
| 01/03/2025 | <u>156</u> | Chief Judge F. Dennis Saylor, IV: ORDER entered. JUDGMENT as to Jose Perez, Jr. (1), Count(s) 1s−2s, 142 months on Count 1s and 120 months on Count 2s to be served concurrently in this case and concurrently with the Revocation Judgments in 15−10256−FDS and 18−40034−FDS, 3 years supervised release on both counts to run concurrently and $200 special assessment. (McKillop, Matthew) (Entered: 01/03/2025) |
| 01/03/2025 | <u>158</u> | NOTICE OF APPEAL by Jose Perez, Jr re <u>156</u> Judgment, (Fee Status: IFP granted) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 1/23/2025. (Flashner, Cory) (Entered: 01/03/2025)** |
| 01/06/2025 | <u>159</u> | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Jose Perez, Jr to US Court of Appeals re <u>158</u> Notice of Appeal − Final Judgment. (Cowan, Nicole) (Entered: 01/06/2025) |
| 01/07/2025 | 160 | USCA Case Number 25−1031 for <u>158</u> Notice of Appeal filed by Jose Perez, Jr. (Martin, Jacqueline) (Entered: 01/07/2025) |
| 05/05/2025 | <u>170</u> | Transcript of Telephonic Status Conference as to Jose Perez, Jr held on April 29, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25−1031. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/27/2025. Redacted Transcript Deadline set for 6/5/2025. Release of Transcript Restriction set for 8/4/2025. (DRK) (Entered: 05/06/2025) |
| 05/05/2025 | 171 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/06/2025) |
| 05/22/2025 | <u>172</u> | Transcript of Telephonic Status Conference as to Jose Perez, Jr held on October 23, 2023, before Chief Judge F. Dennis Saylor IV. COA Case No. 25−1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>173</u> | Transcript of Telephonic Status Conference as to Jose Perez, Jr held on December 6, 2023, before Chief Judge F. Dennis Saylor IV. COA Case No. 25−1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |

| 05/22/2025 | <u>174</u> | Transcript of Telephonic Status Conference as to Jose Perez, Jr held on December 18, 2023, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
|---|---|---|
| 05/22/2025 | <u>175</u> | Transcript of Telephonic Status Conference as to Jose Perez, Jr held on December 20, 2023, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>176</u> | Transcript of Telephonic Status Conference as to Jose Perez, Jr held on February 7, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>177</u> | Transcript of Final Pretrial Conference as to Jose Perez, Jr held on July 24, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>178</u> | Transcript of Status Conference conducted by Zoom as to Jose Perez, Jr held on July 26, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>179</u> | Transcript of Jury Trial Day 1 as to Jose Perez, Jr held on July 29, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>180</u> | Transcript of Jury Trial Day 2 as to Jose Perez, Jr held on July 30, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>181</u> | Transcript of Jury Trial Day 3 as to Jose Perez, Jr held on July 31, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | <u>182</u> | Transcript of Jury Trial Day 4 as to Jose Perez, Jr held on August 1, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be |

| | | |
|---|---|---|
| | | purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | 183 | Transcript of Jury Trial Day 5 as to Jose Perez, Jr held on August 2, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/12/2025. Redacted Transcript Deadline set for 6/23/2025. Release of Transcript Restriction set for 8/20/2025. (DRK) (Entered: 05/22/2025) |
| 05/22/2025 | 184 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/22/2025) |
| 05/25/2025 | 185 | Transcript of FTR Digital Recording Remote Initial Appearance as to Jose Perez, Jr held on January 20, 2023, before Magistrate Judge David H. Hennessy. COA Case No. 25–1031. Court Reporter Name and Contact Information: Marianne Kusa–Ryll at justicehill@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/25/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/25/2025 | 186 | Transcript of FTR Digital Recording Remote Arraignment as to Jose Perez, Jr, Henry Del Rio held on February 13, 2023, before Magistrate Judge David H. Hennessy. COA Case No. 25–1031. Court Reporter Name and Contact Information: Marianne Kusa–Ryll at justicehill@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/25/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/25/2025 | 187 | Transcript of FTR Digital Recording Interim Status Conference as to Jose Perez, Jr, Henry Del Rio held on June 30, 2023, before Magistrate Judge David H. Hennessy. COA Case No. 25–1031. Court Reporter Name and Contact Information: Marianne Kusa–Ryll at justicehill@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/25/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/25/2025 | 188 | Transcript of FTR Digital Recording Remote Status Conference as to Jose Perez, Jr, Henry Del Rio held on August 8, 2023, before Magistrate Judge David H. Hennessy. COA Case No. 25–1031. Court Reporter Name and Contact Information: Marianne Kusa–Ryll at justicehill@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/25/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/25/2025 | 189 | Transcript of FTR Digital Recording Final Status Conference as to Jose Perez, Jr, Henry Del Rio held on September 8, 2023, before Magistrate Judge David H. Hennessy. COA Case No. 25–1031. Court Reporter Name and Contact Information: Marianne Kusa–Ryll at justicehill@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/25/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/25/2025 | 190 | Transcript of FTR Digital Recording Remote Arraignment as to Jose Perez, Jr held on July 18, 2024, before Magistrate Judge David H. Hennessy. COA Case No. 25–1031. Court Reporter Name and Contact Information: Marianne Kusa–Ryll at justicehill@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/16/2025. Redacted Transcript Deadline set for 6/25/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |

| 05/25/2025 | 191 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/27/2025) |
|---|---|---|
| 05/27/2025 | <u>192</u> | Transcript of Hearing as to Jose Perez, Jr held on June 18, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Jessica Leonard at jessica@wickedsteno.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/17/2025. Redacted Transcript Deadline set for 6/27/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/27/2025 | <u>193</u> | Transcript of Sentencing as to Jose Perez, Jr held on December 20, 2024, before Chief Judge F. Dennis Saylor IV. COA Case No. 25–1031. Court Reporter Name and Contact Information: Jessica Leonard at jessica@wickedsteno.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/17/2025. Redacted Transcript Deadline set for 6/27/2025. Release of Transcript Restriction set for 8/25/2025. (DRK) (Entered: 05/27/2025) |
| 05/27/2025 | 194 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/27/2025) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                              Crim No. 1:23-cr-10028-FDS

JOSE PEREZ, JR.

### NOTICE OF APPEAL

Notice is hereby given that, Jose Perez Jr., the defendant, claims his right of appeal to the United States Court of Appeals for the First Circuit from the judgment (D-156) entered against him by this Court on January 3, 2025.

Respectfully Submitted,

Jose Perez, Jr.
By his counsel,

*/s/ Cory S. Flashner*
Cory S. Flashner (BBO # 629205)
Edmund P. Daley (BBO # 692290)
Julia R. Hutchinson Morton (BBO # 711250)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605 (telephone)
csflashner@mintz.com
epdaley@mintz.com
jhutchinsonmorton@mintz.com

Dated: January 3, 2025

JA 20

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this date, January 3, 2025.

/s/ Cory S. Flashner

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,         )
                                  )
vs.                               )  Criminal Action
                                  )
JOSE PEREZ, JR.,                  )  No. 23-10028-1-FDS
                    Defendant     )
                                  )
                                  )
                                  )


BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV


                    FINAL PRETRIAL CONFERENCE




          John Joseph Moakley United States Courthouse
                    Courtroom No. 10
                    1 Courthouse Way
                    Boston, MA 02210


                    July 24, 2024
                     3:10 p.m.
```

```
                    Valerie A. O'Hara
                 Official Court Reporter
        John Joseph Moakley United States Courthouse
                    1 Courthouse Way
                    Boston, MA 02210
              E-mail: vaohara@gmail.com
```

APPEARANCES:

For The United States:

    United States Attorney's Office, by MICHAEL CROWLEY, ASSISTANT UNITED STATES ATTORNEY, and SARAH HOEFLE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., by CORY S. FLASHNER, ESQ., EDMUND P. DALEY, III, ESQ., and JULIA HUTCHINSON, ATTORNEY, One Financial Center, 42nd Flr. Boston, Massachusetts 02111.

1                    <u>PROCEEDINGS</u>

2          THE CLERK:  Court is now in session in the matter of

3   United States vs. Jose Perez, Matter Number 23-10028.

4          Would counsel please identify themselves for the

5   record, starting with the government.

6          MR. CROWLEY:  Good afternoon, your Honor,

7   Michael Crowley and Sara Hoefle on behalf of the United States.

8          THE COURT:  Good afternoon.

9          MR. FLASHNER:  Good afternoon, your Honor,

02:04PM 10   Cory Flashner and Edmund Daley and Julia Hutchinson on behalf

11   of Mr. Perez, who is seated at counsel table.

12          THE COURT:  Good afternoon.  This is the final

13   pretrial conference in this case.  I am wrapping up another

14   trial tomorrow, and so I have -- I'm juggling a lot of balls

15   here, so I hope I hit all the things that we need to hit, so

16   let me begin by talking about the impanelment process.

17          We're supposed to impanel this coming Monday.  What is

18   that, the 29th?  I'm going to impanel 14 with two alternates,

19   even though I expect it will be a relatively short trial, and

02:05PM 20   the way I do this is the last two jurors impaneled regardless

21   of where they are seated will be the first alternate and the

22   second alternate.  We won't tell them that they're alternates

23   so that everyone is paying attention, all 14 of them, but if we

24   haven't lost anyone, we'll take those two people off at the

25   end.

1        And the parties each get an additional peremptory

2   because of that, so the government will have seven and the

3   defense will have eleven.  That means with 14 jurors and 18

4   peremptories, we need to have 32 people cleared.  I just did

5   this Monday in a drug case.

6        It's no secret it's getting harder and harder and

7   harder to impanel jurors in drug cases because of the opioid

8   epidemic, so many people are touched by that, and we have some

9   other overlays on that as well.  It's summertime, so people

02:06PM 10   have travel plans.

11        As you also know, our society is becoming increasingly

12   divided, and we have issues whether it's George Floyd or

13   Karen Read or whatever it is where individual people may have

14   individual issues, so bottom line is we have to bring in more

15   people, and it takes longer.  There's not much we can do about

16   that.  I had close to 60 people to get 32 on Monday, and we

17   were a little closer than I might have preferred, and so I

18   think we'll have to do more or less the same.

19        Barbara, is anyone else impanelling on Monday, do you

02:07PM 20   know?

21        THE CLERK:  I don't know.

22        THE COURT:  Okay, we'll look that up.  If no one else

23   is impaneling, typically we can start about 9:40 or so, and we

24   get the panel up from downstairs.  There are two others, so

25   we're in third place.  One of the benefits of being Chief Judge

1    is I always go last.  Sometimes they have enough people that

2    they can send them up to different courtrooms and we can get

3    started, but it's possible that this may be, you know, the

4    better part of the day.

5         Having said that, both sides should be prepared to

6    open.  You never know what might happen.  I will not split the

7    openings.  I will not expect you to have a witness ready.  I

8    think it's a very slim chance that we will open, but if

9    lightning strikes and we get the jury impaneled, I might have

02:08PM 10   you open.

11        Are both of you planning to open?

12        MR. FLASHNER:  Yes, your Honor, we are.

13        THE COURT:  So let me walk through the impanelment

14   process.  I will ask my voir dire questions to the entire

15   panel.  During the pandemic, I started this process where

16   people held up their individual numbers, and then I sent

17   everyone into the adjacent courtroom and brought them back in

18   one-by-one if they had responded affirmatively to any of my

19   questions.

02:08PM 20        I actually like that.  It's resource intensive, both

21   for the jury office and for my chambers, but it doesn't seem to

22   be any slower than doing it at sidebar, and I think it's a

23   better process.  We're not all crowding around.  You can get a

24   good look at the person.  I use that stand for this process, so

25   unless the jury clerk tells me I can't do it, I'm going to do

1   that process.

2        So let's say I ask, let's say we have 60 people and I

3   ask are any of you related to a law enforcement officer, and 37

4   people raise their cards, I will read those aloud, and we'll

5   write them down. So I'll say Number 5, Number 18, Number 37,

6   Number 2 and so on, and we'll create a list of people answered

7   affirmatively to that question, and then I'll move onto the

8   next question. We'll have those collated, and then we'll bring

9   people in one-by-one starting with Juror Number 1.

02:09PM 10        So that will be the basic screening of people for

11   cause. I permit very limited attorney voir dire as a follow-up

12   to my questions on some occasions. I've experimented a little

13   bit with this. I can't say I'm a fan of attorney voir dire

14   particularly. I think it creates a lot more problems than it

15   solves. I'm not sure it solves any problem, but it certainly

16   creates problems sometimes.

17        So let's say they were arrested 10 years ago for

18   marijuana possession and I ask a few questions and you want

19   some follow-up, you know, where did it occur, how did the case

02:10PM 20   turn out, something you want to know that I haven't asked.

21   I'll permit that within reason. If you have any doubt, ask my

22   permission, but otherwise I'm going to be doing the questioning

23   myself, and I think it will be fairly straightforward

24   questioning about connections to the parties, lawyers,

25   witnesses, if they've heard anything about the case,

connections to law enforcement, attitudes about drug or firearm
cases, hardship.  I try to ask various forms of catch-all
questions.  I try to pick up whatever is on people's mind, but
once we've gone through that process and I've screened out a
number of people, we'll take the first 14 people remaining on
the list and put them in the box.

So, for example, let's say that on your randomized
list, I have excused jurors 1, 2, 3 and 4 for cause, we will
put 5 through 18 in the box, and then we'll begin the
peremptory process.

I will ask follow-up questions as to the people who
are in the box, the 14.  For example, if someone says they're
unemployed, I'll ask what their previous job was; if they're
retired, the same thing.  People don't always put down if they
have a spouse or if so what the spouse does.  I'll ask those
kinds of questions, and I'm going to try to make sure I ask at
least one question to everyone, even if it seems like a
pointless question.

The idea of that exercise or the point of that
exercise is to make sure if someone doesn't speak English or
they're hard of hearing that I've picked that up, so I might
ask, you know, who is your favorite singer in Boyz II Men, just
some random.  I'm not going to ask that, obviously, but some
question that is just designed to elicit a response to make
sure they've heard the question and they speak English.

1    Peremptory challenges will be exercised in rounds

2    one-by-one.  The government will go first in the first round.

3    So we'll go to sidebar, and getting back my hypothetical, we

4    put jurors 5 through 18 in the box, and the government goes

5    first.  Let's say they strike Juror Number 5, I'll turn to the

6    defense, let's say you strike Juror Number 6, back to the

7    government, Juror Number 7, the defense Juror Number 8, and

8    then you both say you're satisfied.  We will remove 5, 6, 7 and

9    8, replace them with 19, 20, 21, and 22 or whoever is next on

02:13PM 10    the list.

11    And we'll continue that process until you've used up

12    your challenges or you are both satisfied.  No backstrikes,

13    meaning you have one opportunity to challenge someone.  Getting

14    back to my hypothetical, we replaced four jurors with four new

15    jurors, 19, 20, 21 and 22, and in the second round, in which

16    the defense goes first, you can only challenge one of those

17    four jurors.

18    So we'll continue that process until we have all 14

19    people, and, again, the last two seated regardless of their

02:14PM 20    seats will be the alternates.

21    So let me pause there.  Anything about any of that do

22    you want to ask about?  Mr. Flashner.

23    MR. FLASHNER:  Your Honor, just a point of

24    clarification, for the rounds, so for the first round, the

25    government would go first, they just exercise one?

1　　　　　THE COURT:  One and you exercise one.  Let's say they

2　exercise one, you exercise one, and they say they're satisfied,

3　you can keep going and go one, one, one.

4　　　　　MR. FLASHNER:  Thank you.

5　　　　　THE COURT:  But it's one-by-one, the government goes

6　first in the first round, the defense first in the second round

7　and so on.

8　　　　　All right.  Once we've seated a jury, sworn them in, I

9　have some preliminary instructions that are about 15 or

02:15PM 10　20 minutes long, some basic things like presumption of

11　innocence, burden of proof, rough sketches of the charges, what

12　is evidence and is not evidence, that sort of thing, talk about

13　the rules that the jury has to obey, like not discussing the

14　case among themselves before the evidence is closed and not

15　speaking to anyone about the case, then we will have our

16　openings.  I have a portable lectern that you can put in front

17　of the jury box, if you wish.  How long do you expect your

18　opening to be?

19　　　　　MR. CROWLEY:  No more than 20 minutes, your Honor.

02:15PM 20　　　　　THE COURT:  Mr. Flashner.

21　　　　　MR. DALEY:  10 minutes, 10 to 15 minutes.

22　　　　　THE COURT:  I'm not going to cut you off once the

23　clock ticks to 10 minutes or 20 minutes, but if you get into

24　your second hour, I will probably begin clearing my throat

25　loudly, if not worse, and that kind of goes for the whole case.

1   We've allotted a certain amount of time.  I'm going to tell the

2   jury I expect it to fit within that time.  I understand cases

3   take twists and turns, it doesn't go exactly how you hoped, but

4   in terms of your presentation, I don't like to use chess clocks

5   or to set arbitrary deadlines.

6         I don't like the idea of using what I consider to be a

7   gimmick, but if I do think you are unduly inefficient or your

8   estimates of your time are way off, I will begin to tighten the

9   screws, okay, and I have to be careful.  I obviously can't

02:16PM 10   impact the defense, which goes second, but I do expect that you

11   will be reasonably efficient.

12         You probably because you've appeared in front of me

13   know my views on some of these things, but I'll say some of

14   them anyway.  Lawyers talk too much, they ask too many

15   questions that contain too many words, they repeat themselves,

16   they're disorganized, it drives jurors crazy, it drives me

17   crazy.

18         If your second question is would you please describe

19   in your own words your current residential address as opposed

02:17PM 20   to where do you live, inwardly I'm going to be thinking oh,

21   boy, here we go, and one of your goals, I assume, is not to ask

22   a question that is so bad that it winds up in my trial training

23   materials as an example of a bad question.

24         I do expect you to be prepared, to be organized, to be

25   able to find Exhibit 17, to be able to ask questions like what

1    happened next, who was at the meeting, simple direct questions.

2          I expect you most of the time to use the podium there.

3    I use this witness stand, which I experimented with mock juries

4    in trial training exercises with two witness stands, and

5    100 percent of the mock jurors preferred this witness stand.

6          Everybody likes it better except my clerks who can't

7    see the person, and so the podium is set up so that you are

8    looking at the witness and talking across the jury.  I'm not

9    going to chain you to it, but I do expect that that will be

02:18PM 10   your default position.

11          You can display exhibits any way you want.  We have

12   the computer system, of course, the document camera.  You can

13   use easels, anything you want.  Just remember our courtroom

14   systems don't always quite work the way they are supposed to,

15   so you might want to have backup pieces of paper if it's

16   something you really care about.

17          Exhibits, I want them to be numbered, to have every

18   exhibit to have a unique number, in other words, no letter,

19   like Exhibit A that changes to Exhibit 1.  I don't want

02:19PM 20   prosecution and defense exhibits but just exhibits.  If it's

21   unclear what's going to come in or where your numbering should

22   start, the government can start with 1 and the defense can

23   start with 100.  I don't care if they come in out of sequence,

24   I don't care if there's gaps, I just want everything to have a

25   unique number, and I'm a fan of grouping exhibits, for example,

1   photographs, if you have 14 photographs, for example, of an

2   apartment that was searched, I think it's useful to call them

3   collectively Exhibit 14 and then each individual photograph

4   14.1, 14.2, 14.3 and so on, and that works with all kinds of

5   things, medical records, HR records, what have you.

6        You need to offer all exhibits, even if they're agreed

7   upon or stipulated to.  It may be that the way the trial begins

8   is that one of the prosecutors stands up and says, At this

9   time, your Honor, the government offers Exhibit 1 through 32,

02:20PM 10  which I understand are not objected to, but you have to offer

11  them in front of the jury with me and the clerk listening so we

12  can write that down.

13        All right.  The length of the trial, I think we were

14  talking about a week or less?

15        MR. CROWLEY:  Your Honor, we anticipate if we start

16  witnesses on Tuesday we'd be done either Wednesday or at the

17  latest Thursday morning.  We've already eliminated certain

18  witnesses.  We're trying to work out a couple of things.  We

19  should be able to minimize it.

02:21PM 20       THE COURT:  Okay.  What I'm going to tell the jury is

21  that it should be done during the week, but I need to know

22  their plans for the following week in case something goes

23  wrong.  Mr. Flashner.

24        MR. FLASHNER:  I think we should be closing some time

25  on Thursday, at the latest on Friday morning.

1          THE COURT:  Okay.  Our schedule will be 9 to 1.  As I

2     like to say, I want that to be a Rya Zobel 9 to 1, which is I

3     want to start at nine and go to one.  We will take a 10-minute

4     or so bathroom break at eleven, and I let people stretch their

5     legs at about ten and twelve.

6          I will want to meet every morning at 8:30, sometimes

7     earlier, to talk about whatever it is we have to talk about to

8     try to streamline the day and avoid sidebar conferences if we

9     can.

02:21PM 10          I will talk to the jury clerk about when we could

11     reasonably expect a panel of people, but why don't you assume

12     we'll meet at 9:00 on Monday because I think the earliest we

13     could get under any circumstances will be about 9:40, but

14     otherwise you should assume we'll meet at 8:30 every morning.

15     I will try to be reasonable about witness schedules, you know,

16     we have an out-of-state witness, an expert, what have you.

17          If you want to get somebody on and off on the stand in

18     a day, try to take people out of turn, interrupt testimony,

19     I'll be amenable to anything within reason that is not unfair,

02:22PM 20     just try to let me know.  I don't want people staying overnight

21     in a hotel room because they have four minutes left of

22     testimony to go but just let me know.

23          In terms of objections, I want them to be made with

24     either the simple word "objection" or a one or two word

25     shorthand, "objection, leading," "objection, hearsay" with

1    argument at sidebar.

2         I do allow the jurors to take notes with the usual

3    cautions.  As you may know, I give each individual juror a

4    written copy of the jury instructions to read along with me as

5    I read them aloud to them and to take back with them into the

6    jury room.

7         On this topic, I am evangelical.  I've managed to

8    convince no one as far as I can tell, but I have had jurors

9    repeatedly say to me that they can not imagine how they could

02:23PM 10   decide the case any other way, and that's true even in a

11   relatively routine gun or drug case, never mind a RICO

12   conspiracy with murder predicates, you know, where I've given

13   instructions that were well over 100 pages long and how judges

14   expect the jury to remember that and apply that is beyond me,

15   but I give them their own individual copy.

16        One consequence of that is I do what's kind of a

17   rolling charge conference.  I will circulate a draft copy of

18   the jury instructions for you to comment on and to try to focus

19   on where, you know, if anywhere we have real disagreements to

02:24PM 20   try to keep the charge conferences short as possible because I

21   want to make sure that we have the whole mechanical issue of

22   printing out, it's more than 14 copies, I think it's about 20

23   copies of the jury instructions.

24        Are there going to be recorded calls or anything in a

25   foreign language?

1          MR. CROWLEY:  Your Honor, we have, I believe both

2    sides will be using video clips from security cameras, so...

3          THE COURT:  With audio or just --

4          MR. CROWLEY:  Just video.  I'm not sure if they're

5    going to play turret tape.

6          MR. FLASHNER:  There may well be a turret tape but

7    it's all in English.

8          THE COURT:  Are you expecting to use a transcript?

9          MR. FLASHNER:  We do not have a transcript and we will

02:25PM 10   not be using it.

11          THE COURT:  The only issue on the videos is it

12   doesn't -- the systems don't always work, like totally

13   hypothetically yesterday, we were trying to play some recorded

14   calls, and they didn't quite get played the way the government

15   had hoped, so we'll do the best we can.  Just be forewarned.

16   All right.  We have some motions in limine, but let me pause

17   there.  Anything about the logistics, mechanics, my quirks and

18   oddities and preferences, Mr. Crowley?

19          MR. CROWLEY:  Your Honor, we'll have a case agent and

02:26PM 20   paralegal.  Do you require any identification pretrial for

21   that?

22          THE COURT:  Are they going to be sitting at counsel

23   table?

24          MR. CROWLEY:  The paralegal will be sitting behind us.

25          THE COURT:  Feel free to introduce that person.  Is

1    the case agent going to be a witness?

2         MR. CROWLEY:  No, help us get witnesses in and out as

3    quickly as possible.

4         THE COURT:  I think there's a sequestration motion,

5    which I will grant, so I have no problem with the case agent

6    being present or even sitting at counsel table, just introduce

7    them if they are in the bar enclosure, and one of the ways in

8    which times quietly slapped out of a trial is when the

9    witnesses aren't quite lined up, you know, if you're talking

02:27PM 10   about six or seven people in a row who are relatively short,

11   it's kind of good to have them lined up.  I know they wander

12   off and use the facilities or whatever, but the better

13   organized that is the better we will be.

14        MR. CROWLEY:  The other quick, for experts, does the

15   Court ask, does the Court require us or want us to ask to have

16   them qualified as an expert or simply --

17        THE COURT:  I do not.  This is a true expert, that is,

18   not lay opinion from a law enforcement officer?

19        MR. CROWLEY:  It would be our firearms, interstate,

02:27PM 20   and the chemist.

21        THE COURT:  No, I do not want you to say I ask that

22   you qualify them as an expert.  When people ask me to do that,

23   I say you may ask questions, opinion questions within the

24   meaning of Rule 702, something obscure, because I don't want to

25   put my imprimatur on them as an expert, but if the government

1    calls an expert, and, Mr. Flashner, if you think there's an

2    issue as to their qualifications or opinions, well, first off,

3    the time to raise that is now, but if the government has gone

4    through the background, you know, training, education, so

5    forth, my preference is that just launch into your opinion, and

6    if you have an issue, you can just say can I be heard at

7    sidebar?

8         MR. FLASHNER:  Thank you.

9         MR. CROWLEY:  We anticipate maybe using a map just as

02:28PM 10   this case involves some moving parts.

11         THE COURT:  Yes.

12         MR. CROWLEY:  Does the Court do it where it's the

13   person marks and then the clerk does like the free shot of

14   where the markings are?

15         THE COURT:  If you're doing it using the computer

16   system, yes, it's best to take a screen shot, just preserve it

17   for appeal, but whatever creates a clear record.  I am a big

18   fan of maps, which are now with Google Earth, they are free.  I

19   don't understand why lawyers don't use them more often.  You

02:29PM 20   know, you get the police officer says we proceeded

21   southwesterly whereupon we proceeded northeasterly, and, you

22   know, no one can follow what's going on.  I like maps, I like

23   the aerial photos from Google Earth, and if there's any dispute

24   as to authenticity, you can authenticate them.  And if you want

25   someone to mark something, you know, the path that someone

1     took, that's fine, but we should take a screen shot to preserve

2     it for appellate review.

3          A good principle is that lawyers talk too much and

4     show too little and maps are, I think, a big plus.

5          MR. CROWLEY:  I believe that's it for us, your Honor.

6          MR. FLASHNER:  Your Honor, just to -- I may have

7     spoken too soon.  With regard to experts, there's a potential

8     lay expert testimony that's the subject of a motion in limine.

9     I wasn't necessarily referring to that expert, I was referring

02:30PM 10    to more the chemist.

11          THE COURT:  Yes, that's why I was saying the true

12    experts.

13          MR. FLASHNER:  Yes.  Then there's some stipulations

14    between the parties as well.  I don't know, maybe the

15    government can read one, the defense can read one, we can

16    divide them up somehow.  I don't think it's fair if the

17    government reads all the stipulations.  I think we should read

18    some of them.

19          THE COURT:  The government can, if it's stipulated to,

02:30PM 20    the government can read it or not.  I think, and, again, I, of

21    course, appreciate stipulations, as I think the jury does as

22    well.  Nobody enjoys having a keeper of the records and things

23    that don't really matter.  You can, if they read a stipulation

24    and two days later the stipulation is short, you want to reread

25    it if for some reason or show it to a witness or whatever,

1    again, within reason, I don't mind a little bit of repetition.

2          MR. FLASHNER:  Of course.  Final question, your Honor,

3    if we're to approach, just ask your permission to approach?

4          THE COURT:  You don't need to.  I think things move a

5    little more smoothly if people are asking my permission only

6    for things that actually matter, so what you can say is that,

7    "With your Honor's permission," as you are walking up to the

8    witness stand, which will alert me because I may have my head

9    down, and I'm writing something down, and I'm not paying

02:31PM 10    attention, otherwise the whole trial comes to a halt while I

11    have to give you permission.

12          And a related point is once the witness is sworn, as

13    long as I have my head up and I'm looking at you, you don't

14    need to say, "May I proceed, your Honor," you can just launch

15    into the questions as long as it appears that I'm paying

16    attention, that's close enough.

17          MR. FLASHNER:  Thank you.  Those are the only

18    logistical issues.

19          THE COURT:  Let me quickly go through the motions in

02:32PM 20    limine.  Some of them are much easier than others.  The

21    government has moved to preclude references to the potential

22    consequences of conviction.  I will grant that.  Is there a

23    cooperating witness who --

24          MR. CROWLEY:  No, your Honor.

25          THE COURT:  Obviously, a cooperating witness, the

defense has the right to elicit what the penalty would be, and

maybe they're avoiding the mandatory minimum by cooperating,

but if that issue is not present, then the potential

consequences of conviction, including imprisonment, and

otherwise I think are out of bounds.

Let me do the easy ones first. The motion to

sequester, I granted. The motion to allow civilian clothing,

the defendant has a right to be tried in civilian clothing.

The marshals obviously are used to this. It's been many years

since I paid any attention to this issue, but basically he

needs to have civilian clothing made available to him in the

lockup, if that's where he's changing sufficiently in advance

of the court date so we don't have unnecessary delays.

MR. FLASHNER: Thank you, your Honor. We've

coordinated with the Marshals, and we'll have clothes here

Monday morning.

THE COURT: Okay. All right. The government's motion

in limine, I'm going to be frank here. Some of this I want to

maybe hear at least a few moments of argument, but I want to

think about it. The government's motion in limine to admit

evidence of the defendant's flight.

Let me give you my initial reaction. For years, as

I'm sure you know, it was really not particularly

controversial, that evidence of flight was probative of

consciousness of guilt. There has been an issue that has

arisen in recent years that I'll simplify as being the

evidence, that, for example, teenagers in the city might

scatter when there's -- when a cop car pulls up and that it's

really more evidence of distrust of the police as opposed to

consciousness of guilt, so it's a bit more complicated perhaps

than it used to be, but it seems to me the situation here is

not that, and I don't need to decide now what the government

can argue in its closing argument as to whether or not the

flight or the high speed chase, however you want to

characterize it, is probative of consciousness of guilt.

    I don't think there's any question the government can

elicit testimony as to the chase and its consequences, and I

think what that is probative of is a matter for a closing

argument, not for testimony at the trial.

    I expect there will be extrinsic evidence, and, of

course, a person's motives might be mixed.  They have a

suspended license, but they also have guns and drugs, you know,

whatever, and there are a number of reasons why someone might

choose to flee, but that's sort of a long-winded way of saying

that it seems to me this case evidence of the what I'll call

the chase seems to me to be clearly admissible, and what the

government can argue from that I think is a matter for closing

argument that perhaps I want to think about and make sure I've

reviewed the more recent cases, but let me get your reaction,

Ms. Hoefle.

1    MS. HOEFLE:  Yes, your Honor.  I take your Honor's

2    point.  This is not simply a case where someone scattered upon

3    police arrival or had some sort of perhaps there was distrust

4    of the police, but beyond that we would submit that there's

5    more than extrinsic evidence here as several witnesses will

6    testify, we expect.

7    We expect, as your Honor just mentioned, witnesses

8    will testify about seeing the defendant and seeing an object

9    fall from where the defendant was.  That object was later

02:37PM 10   determined to be a firearm loaded.  We expect there to be

11   testimony about the recovered drugs from the center console in

12   the car in which the defendant was driving, and, of course, the

13   recovered drugs and the flight path of the defendant's

14   passenger, so I take your point.

15   I agree certainly with your Honor, and I don't think

16   defendant objects, I think, if I'm reading their opposition

17   correctly, to the government eliciting the evidence of the

18   flight, and so I suppose I might revisit this with your Honor

19   prior to closing, but certainly we would request a chance to be

02:38PM 20   heard again were your Honor to consider that.

21   THE COURT:  Okay.

22   MR. FLASHNER:  Your Honor, we don't have much candidly

23   beyond what's in our papers.  In the government's papers, it

24   had referred to the officer seeing a firearm fall to the

25   ground.  That officer it's my understanding during the course

1    of trial prep has now changed that testimony.

2         THE COURT:  I understand that there are disputed

3    issues and maybe inconsistencies, and you can obviously explore

4    all that.

5         MR. FLASHNER:  And as long as we're able to explore

6    those, and I don't think we have anything really more beyond

7    the papers.  I think it is somewhat intrinsic.  The motor

8    vehicle chase does explain it from the government's

9    prospective, and I think they are allowed to have that in.

02:38PM 10    It's what the jury instructions will give at some point later,

11    and that's obviously not a topic for today.

12         THE COURT:  Okay.  So I'm going to leave that pending,

13    but, again, my understanding, and if I have any further deep

14    thoughts, I will or shallow thoughts, as the case may be, I'll

15    raise them next Monday or certainly in advance of the final

16    argument.

17         The government's motion to admit law enforcement lay

18    opinion testimony, I think it's clear that as a general

19    proposition the government can elicit from a qualified law

02:39PM 20    enforcement officer, that is, someone with appropriate training

21    and expertise, things such as how are drugs commonly packaged

22    for resale or quantities of drugs consistent with distribution

23    as opposed to personal use and other such things, which is lay

24    opinion testimony but routinely admitted.

25         There are a couple of wrinkles to that that are kind

1   of context and question dependent.  The Supreme Court maybe

2   three weeks or so issued this *Diaz* opinion, which was basically

3   on the question of the innocence of drug mules.  I'm raising it

4   partly because I just read it.

5          It's an issue in the case pending before me now, but

6   the Court -- the opinion turned on the fact that the lay

7   opinion testimony was not all drug dealers do this or all drug

8   mules do this but that this is common, and I think the

9   government needs to make clear with its witnesses their

02:40PM 10  witnesses should not speak in absolutes, which I think is

11  problematic because now you're either directly or indirectly

12  getting into issues such as the defendant's intent, but that

13  certainly for an experienced and properly trained drug

14  enforcement officer to say it is common for drugs to be

15  repackaged for resale in the corner of a baggy with a twist or

16  seal or whatever it is that they're going to say that that is

17  appropriate.

18         There are also complicated issues here, and I'm making

19  an abstract comment here.  The law enforcement officer has to

02:41PM 20  be careful not to opine on things, whether it's the defendant's

21  intent or the chemical composition of a drug, or the

22  operability of a firearm or things like that.  They can within

23  reason say the appearance of the drug, for example, was

24  consistent with cocaine or because it was not clear to me

25  whether it was an operable firearm, we secured it immediately,

1   whatever it is that the testimony is going to be but to just

2   make sure that agents are not cutting corners and that they are

3   testifying about their perceptions, that is, what they saw and

4   heard and so forth, and also what they have learned from their

5   experience and training, and if they are drawing reasonable

6   inferences to make sure, again, that they are being careful

7   about that.

8        So it's kind of context-dependent.  You know, I guess

9   maybe I'll leave it at that, and, obviously, a foundation has

02:43PM 10   to be laid that the person does have the relevant experience.

11   I think the defense has complained about that.

12        Are you going to have more than one agent testify

13   about some of these things?

14   MS. HOEFLE:  I think we anticipate as to this point I

15   believe we anticipate only one witness testifying as to that,

16   and I think as reflected in the footnote, perhaps in the

17   defendant's opposition, we anticipate calling Chelsea Police

18   Department Michael Noone.

19        And to your Honor's point, I suppose I'll proffer to

02:43PM 20   your Honor at this point that Chelsea Police Department

21   Michael Noone has been in law enforcement over for 20 years,

22   he's been a detective for approximately 15 years, an ATF TFO

23   for about 8 years, and has been involved in numerous arrests

24   involving narcotics, drug seizures, and the like, and so, of

25   course, we would certainly lay the proper foundation before

1    asking him those questions.

2         THE COURT:  Okay.  Let me quickly, the defendant has

3    moved to exclude evidence related gang-related activity or

4    affiliation.  I've read the papers.  Do you want to --

5         MR. FLASHNER:  Sure, Mr. Daley is going to handle

6    this.

7         MR. DALEY:  Your Honor, this relates also to the

8    404(b) motion that the government filed.  The premise here is

9    that introducing evidence of prior convictions, gang

02:44PM 10   affiliation is really the government's trying to use that to

11   prove the case here with past convictions and gang

12   affiliations, so this would be essentially telling the jury

13   that because Mr. Perez is not only affiliated with gang, but,

14   as in the past, committed gang-related gun and drug violations,

15   that it's more likely that he's guilty of the crimes here.  So

16   this is just classic propensity evidence and exactly against

17   the prohibition in both being unduly prejudicial under 403 and

18   being character evidence under 404.

19        THE COURT:  This is, I think, somewhat intertwined

02:45PM 20   with the motion on the 404(b) evidence in prior convictions,

21   which is I want to tell you just because I'm short of time

22   today, I've read that.  I want to think about that.  There's

23   kind of a lot going on there, and I want to make sure I'm

24   clearly thinking about all of it.

25        With gang affiliations, I'm sorry, I should know this,

1    and I'm just blanking, is there a conspiracy count?

2         MR. CROWLEY:  There is.  The defendant is charged with

3    conspiring to distribute controlled substances in Count One.

4         THE COURT:  So it tends to be a gang affiliation, it

5    tends to be probative of whether or not someone is in a

6    conspiracy or in a racketeering enterprise or a CCE.  You know,

7    I had these MS-13 cases where the defendants had MS-13 tattoos

8    all over their bodies, and it did tend to suggest that they

9    were all part of the same enterprise, for example.

02:46PM 10        So I do want to think that through, and we have this

11   kind of odd issue of the condition of supervised release that

12   the defendant wants to introduce about staying away from other

13   gang members, but certainly there is a danger of unfair

14   prejudice concerning gang affiliation, but there's also, you

15   know, it can be obviously probative of a conspiracy, so I want

16   to think that through very carefully before I rule on that.

17        MR. DALEY:  Your Honor, may I add that here the gang

18   affiliation would be coming in through, at least according to

19   the papers, the prior convictions, and so our point here is

02:47PM 20   that gang affiliation coming in through a prior conviction is

21   really taking a short-cut on the conspiracy charge.  It's

22   saying that two people who were generally involved or

23   affiliated with the same gang, essentially, therefore, were

24   part of the same conspiracy, even when there's no other

25   evidence connecting the two, no statements connecting the two,

1    nothing else.  It's just the vanilla kind of this is a gang,

2    there's a gang affiliation here between these two people.

3         MR. CROWLEY:  I believe that perceives our argument.

4    Our argument is that, as set forth by the First Circuit, that

5    the gang affiliation goes to the association and neutral trust

6    consistent with the second conspiracy, so what you have in the

7    conviction in 2020 is basically a mirror case where the

8    defendant was engaged in trafficking guns with a member of a

9    gang.

02:47PM 10         And then this shows why the conspiracy, and that's the

11   First Circuit law in the background of the conspiracy, where

12   the mutual trust comes from and why they would be in the car

13   together.  There's almost two elements to that.  There's the

14   mere presence defense, which they are clearly raising in this

15   case to say he was just in the car as a driver and didn't know

16   anything about the drugs and guns, so the gang affiliation goes

17   towards that.  We've proposed that we're prepared to sanitize

18   through stipulations that that area to make it as vanilla as

19   possible, and so we're happy to do that.

02:48PM 20         THE COURT:  Do you have evidence of gang affiliation

21   other than this prior conviction?

22         MR. CROWLEY:  Does he have --

23         THE COURT:  Evidence of gang affiliation independent

24   of whatever the past criminal?

25         MR. CROWLEY:  The first conviction in 2017, he was

selling guns to the leader of the gang.  The second conviction,

which took place in 2020, defendant admitted at his colloquy

that one of his co-defendants was a member of the gang and that

he was a member of the gang.  So it's an admission during his

colloquy that he was a member of the gang.

THE COURT:  Okay.  Let's do this.  This is, as I said,

complicated.  I mean sometimes 404(b) evidence is directly on

point.  Sometimes it's obviously not on point or unduly

prejudicial.  This has some layers of complication that I need

to think through, and I'm not prepared to rule now.

So I will certainly rule before your openings, but I

just want to think about this some more and look at the case

law and make sure I'm thinking clearly about it, so I'm going

to put that on hold.  It's really the two motions about gang

involvement and 404(b), 403 prior convictions.  It's all kind

of tied together.

Is that all the motions in limine?  Is there anything

I've missed?  Is that the universe?

MR. CROWLEY:  I believe that's everything, your Honor.

MR. DALEY:  That's everything, your Honor.

THE COURT:  All right.  If there's something that we

need to discuss before Monday, let the clerk know, we can

reconvene.  I think I'm charging the jury on this other case

tomorrow, so I have a lot on my plate right now, and I need to

get that done and renew my focus on this case.  But I think

1    let's pause there, and barring further developments, we'll

2    reconvene at 9:00 Monday morning.  I just got a note, the jury

3    clerk says now there's just two of us impaneling on Monday and

4    the other is a civil medical malpractice trial, and I think

5    criminal cases goes first, yes, so actually we will be first

6    out of the gate.

7         MR. CROWLEY:  Could we ask one other question, your

8    Honor?

9         THE COURT:  Yes.

02:50PM 10   MR. CROWLEY:  Does the Court have a prohibition or a

11   practice of bringing drugs into the courtroom?

12        THE COURT:  Is this for your personal use?

13        (Laughter)

14        MR. CROWLEY:  See how it goes.

15        THE COURT:  No.  Obviously, to state the obvious, it

16   has to be in careful custody.  Any party who is introducing the

17   evidence is responsible for keeping the evidence in their

18   custody.  I do not permit controlled substances or firearms to

19   go to the jury room.  I tell them that it's in evidence like

02:51PM 20   anything else and they can inspect it, but it needs to be under

21   my supervision.  I don't want to send, you know, a kilo of

22   cocaine and guns and ammunition back to the jury room, but

23   otherwise it's up to you.  All right.  Mr. Flashner.

24        MR. FLASHNER:  Nothing further, your Honor.  Your

25   Honor, if you had a ruling before the weekend, we'd love to

1    hear it.  It would impact openings.  I don't want to speak for
2    the government, I'm sure it would impact their opening.  It
3    certainly would impact our opening if we knew that evidence
4    would come in.
5         THE COURT:  I will do my best in that regard, and one
6    way or the other, it is somewhat -- well, it's not the core of
7    the case, let's put it that way, and I wouldn't -- I think you
8    should be prepared to open on Monday, but I wouldn't worry too
9    much about that.  I think it's more likely that you'll be
02:52PM 10 opening first thing Tuesday morning.
11        MR. FLASHNER:  Thank you.
12        THE COURT:  Thanks.
13        MR. CROWLEY:  Thank you, your Honor.
14        (Whereupon, the hearing was adjourned at 2:52 p.m.)
15
16
17
18
19
20
21
22
23
24
25

1          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7          I do hereby certify that the foregoing transcript,

8    Pages 1 through 32 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 23-10028-1-FDS, UNITED STATES of AMERICA vs. JOSE

11   PEREZ, JR. and thereafter by me reduced to typewriting and is a

12   true and accurate record of the proceedings.

13          Dated this May 5, 2025.

14

15                    s/s Valerie A. O'Hara

16          _____

17                    VALERIE A. O'HARA

18                    OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3


 4    UNITED STATES OF AMERICA,        )
                                       )
 5    vs.                              )  Criminal Action
                                       )
 6    JOSE PEREZ, JR.,                 )  No. 23-10028-1-FDS
                        Defendant      )
 7                                     )
                                       )
 8                                     )


 9


10    BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11
                      STATUS CONFERENCE CONDUCTED BY ZOOM
12


13


14
              John Joseph Moakley United States Courthouse
15                         Courtroom No. 10
                           1 Courthouse Way
16                         Boston, MA 02210

17
                             July 26, 2024
18                           11:50 p.m.

19


20


21


22


23                        Valerie A. O'Hara
                        Official Court Reporter
24    John Joseph Moakley United States Courthouse
                         1 Courthouse Way
25                       Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

APPEARANCES VIA ZOOM:

For The United States:

      United States Attorney's Office, by MICHAEL CROWLEY, ASSISTANT UNITED STATES ATTORNEY, and SARAH HOEFLE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

   Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., by CORY S. FLASHNER, ESQ., EDMUND P. DALEY, III, ESQ., and JULIA HUTCHINSON, ATTORNEY, One Financial Center, 42nd Flr. Boston, Massachusetts 02111.

1 <u>PROCEEDINGS</u>

2 THE CLERK:  Court is now in session in the matter of

3 United States vs. Perez, Number 23-10028-1.

4 Participants are reminded that photographing,

5 recording or rebroadcasting of this hearing is prohibited and

6 may result in sanction.

7 Would counsel please identify themselves for the

8 record, starting with the government.

9 MR. CROWLEY:  Good afternoon, your Honor,

11:50AM 10 Michael Crowley and Sarah Hoefle on behalf of the

11 United States.

12 THE COURT:  Good afternoon.

13 MR. FLASHNER:  Good afternoon, Cory Flashner,

14 Edmund Daley and Julia Hutchinson on behalf of Mr. Perez, who

15 is appearing today via video.

16 THE COURT:  All right.  Good afternoon.  This is a

17 Zoom conference that I convened essentially so I could make my

18 ruling on the defense motion to exclude evidence regarding gang

19 activity or affiliation and the government's -- the intertwined

11:50AM 20 and related government motion to admit evidence of prior

21 convictions and related conditions of supervised release.

22 As counsel is aware, today is Friday, July 26th.  The

23 case is to set to begin on Monday, July 29th.  We had our final

24 pretrial conference on Wednesday, the 24th.  At that time I

25 indicated I was not prepared to make a ruling on these two

1　motions.  I was on trial in another matter, and I wanted to

2　make sure I had time to think about it carefully and look at

3　the case law and walk through all of the issues, which I at

4　that point had not had a completely thorough chance to do.

5　　　　　Counsel had indicated, I think fairly, that they

6　wanted to have a ruling in advance of Monday in order to be

7　able to prepare openings, which are likely to be delivered on

8　Tuesday, but, nonetheless, advance notice is good.

9　　　　　Mr. Perez is detained.  Obviously, for transport, it

11:52AM 10　needs to be arranged in advance, and I thought it was advisable

11　to convene a Zoom hearing to have defendant present on the

12　video so you could have the benefit of my ruling in advance.

13　　　　　If there is an issue in terms of the requirement that

14　the defendant be physically present or anything involving open

15　court proceedings or anything of the like, I'm prepared to

16　repeat this process, which is really largely one way.  I'm

17　going to advise as to my ruling, but I'm happy to do that if

18　someone thinks it's necessary, and, again, Mr. Perez is

19　appearing by video.  He is physically separated obviously from

11:52AM 20　his counsel.

21　　　　　Mr. Perez, if you are unable to see or hear me, if

22　there's any problem with the transmission, you can't hear or

23　see it, try to let us know as best you can, we'll try to care

24　of it, and if you want to speak to your lawyers, we can put you

25　in a breakout room so you can have a private confidential

communication.

All right. With that, let me turn to the ruling. Essentially what I'm going to do is with some conditions admit the evidence of the prior convictions and the conditions of supervised release.

The two convictions are a 2017 conviction for dealing in firearms without a license and a 2020 conviction both for conspiracy to distribute controlled substances and being a felon in possession of a firearm. And a condition of supervised release arises out of the 2020 conviction, and, in substance, the condition is that the defendant have no communication or interaction with any East Side Money Gang members or associates.

The charges here are twofold: Conspiracy to distribute and to possess with intent to distribute a controlled substance, which is cocaine; and being a felon in possession of a firearm. And the central issue is the admissibility of this, the two convictions and the condition under Rule 404(b) and whether Rule 403 requires their exclusion or limitation.

The present case, as counsel is aware, involves an attempted traffic stop and alleged subsequent chase on December 8th, 2022. As I understand, the government intends to establish that Mr. Perez was driving, that Mr. Del Rio was his passenger, that there was a crash followed by a foot chase or

1   chases, that there was a firearm found afterwards as well as

2   drugs, both on the ground and in the center console of the

3   vehicle, and there is an explicit or implicit defense of

4   innocent involvement.

5          The parties are calling it a defense.  It's not an

6   affirmative defense, obviously, it's really a factual defense

7   based on failure of proof, but essentially I think the factual

8   defense is that the government does not have sufficient

9   evidence to establish that the firearm was his or that the

11:55AM 10   drugs were his.

11          And there are sort of three sets of issues, broadly

12   speaking, the convictions themselves, the underlying facts of

13   the convictions, and the gang membership aspect of that.

14          The government seeks to admit the convictions to show

15   that the defendant had the requisite knowledge and intent, that

16   he was not an innocent occupant of the vehicle.  The prior

17   firearms offenses here involve the same or similar type of

18   crime.  He has two such convictions, one for dealing in

19   firearms without a license, and the second is for being a felon

20   in possession.

21          Being a felon in possession is the same crime with

22   which he is charged here, and the drug conspiracy, again,

23   involves the same charge, conspiracy to distribute or to

24   possess with intent to distribute a controlled substance and

25   involves the same controlled substance, which is cocaine.

1    The case law, I think, is fairly clear that such

2  convictions are normally admissible under Rule 404(b) to show

3  knowledge and intent, and I will admit them for that limited

4  purpose.  I think the more substantial -- and they have special

5  relevance under Rule 404(b).  I think the more substantial

6  question is the Rule 403 issue, that is, does their probative

7  value outweigh the danger of unfair prejudice?

8    I think that balance comes down on the side of

9  admission, but, nonetheless, there is always an issue any time

11:57AM 10  a prior conviction is admitted that it will be treated by the

11  jury as propensity or character evidence, which is unfair.  I

12  will provide a cautionary and limiting instruction to that

13  effect that they may not consider it for any other purpose,

14  and, in particular, it may not be used to determine that the

15  defendant has a bad character or propensity to commit the

16  crime.

17    To perhaps state the obvious, the prior convictions

18  are for the same crime or type of crime.  This is not a prior

19  conviction, for example, for assault or bank robbery or

11:58AM 20  possession of child pornography or something entirely

21  unrelated, in which case the Rule 403 analysis would be quite

22  different.

23    The more complicated or I should say potentially

24  complicated issue concerns to what extent we can get into any

25  of the details underlying those convictions, particularly the

1     issue of gang membership.

2          The government contends that the underlying facts of

3     the convictions are relevant to explain the background

4     formation and development of the conspiracy.  Again, the case

5     law indicates as a general proposition that evidence tending to

6     show that two members of an alleged conspiracy are members of

7     the same gang or otherwise have a relationship and mutual trust

8     or friendship is relevant to show an agreement, membership in a

9     conspiracy.

11:59AM 10          I think central to the government's theory here is

11     that Mr. Perez is a member of the East Side Money Gang, that

12     Mr. Del Rio is also a member of that gang, and that Mr. Garcia,

13     who was part of the 2020 matter is a member of the gang as

14     well.

15          The government has proposed that the 2020 plea of

16     guilty included an admission to certain facts, that, among

17     other things, during which admission Mr. Perez acknowledged or

18     admitted not only to the underlying facts of the offense but

19     that he was a member of the East Side Money Gang and that

12:00PM 20     Mr. Garcia was as well.

21          The government will -- I think that evidence is, has

22     special relevance.  I think it's admissible.  For it to be

23     truly admissible, the government -- or relevant -- the

24     government will have to establish or I should say offer

25     competent evidence that Mr. Garcia was also a member of that

1  gang and so that Mr. Perez and Mr. Garcia are members of the

2  gang as established in 2020 and that Mr. Perez and Mr. Daley

3  are members of the gang traveling together in the same vehicle

4  with a firearm and a drug, but assuming that the government

5  ties that together, I think the admission to facts in

6  connection with the 2020 conviction again has special relevance

7  under Rule 404(b).  It's subject to the same 403 analysis, and

8  the same limiting and cautionary instruction will be provided.

9  I do not think that it is determinative or that it

12:01PM 10  changes the balance that Mr. Crowley during the detention

11  hearing in 2016 indicated that the government at that time was

12  not claiming that Mr. Perez was a member of the East Side Money

13  Gang.  He may not have been at the time or it may not have been

14  relevant.  There may not be sufficient proof.  I don't know the

15  answer to that, but we are now eight years past that point or I

16  should say the charged crime was six years past that point, and

17  the 2020 conviction was four years past that point.

18  It is true -- well, let me turn, I guess, to the

19  alleged violation of the condition of supervised release, the

12:02PM 20  condition being that the defendant not associate with gang

21  members or gang affiliates.  It is true that that has not been

22  adjudicated.

23  There is no admission of any such violation, but,

24  nonetheless, there is evidence or I expect that there will be

25  evidence that the condition was imposed, that the defendant was

aware of it, and that the defendant was present with Garcia nonetheless, and presumably the government can establish through inference or otherwise that the defendant was not only aware of the condition but aware that Garcia was a member of the gang and chose to be with him in an automobile with a firearm and drugs, nonetheless.

Again, I think it is admissible for the purposes I've offered subject to the same 403 analysis and with the caution that I think should be given that this violation of supervised release has not been adjudicated, and that is not what the jury is here to determine.

There is another layer to the question of gang affiliation, and that is the potential danger that the word itself could be associated in the jury's mind with -- unfairly associated in the jury's mind with uncharged criminal activity, particularly violent activity, and I think the way to handle that is I do not want to hear any reference to the nature of the East Side Money Gang.

I certainly don't want to hear the word "violent gang" used. I'm not sure why even "street gang" would be necessary, and I will provide a cautionary instruction presumptively. I would say something along the lines, In this case the ESMG is not the charged conspiracy, it is not coextensive with the charged conspiracy, it's not a charged racketeering enterprise or continuing criminal enterprise and that membership in the

1    gang without more is not a crime and not illegal and the jury

2    may only consider it for certain purposes and not others.

3         There's yet another overlay to all of this, and that

4    is the Rule 403 requirement that the admission of evidence,

5    404(b) evidence, not lead to a waste of time, particularly a

6    trial within a trial.

7         I would like to handle that issue basically as

8    follows:  To limit the 404(b) evidence to the minimum necessary

9    to accomplish its purpose.  The fact of the 2017 conviction,

12:05PM 10   the fact of the 2020 conviction, obviously, I have said is

11   admissible.

12        I think the 2020 admission to facts is admissible.  It

13   may need to be edited down or redacted in some way and the 2020

14   condition of supervised release, and that is about it, and I

15   suppose potentially there may be other evidence of gang

16   membership as to one or more of these individuals.  I don't

17   know whether that evidence is necessary or what that might be.

18        Just to put an exclamation point on all of that, in my

19   experience, some law enforcement agents like to editorialize,

12:06PM 20   like to perhaps blurt things out that are beyond the question

21   or that stray into areas that are excluded.

22        I will caution the government that I don't want any of

23   that happening here.  I don't like it generally, but I

24   certainly don't want it in a narrow area as sensitive as this.

25   I don't want an agent saying things like, well, such-and-such a

1  person is a known gang affiliate or known to Boston Police or

2  known to Chelsea Police to be a gang member, as sometimes

3  happens in cases like this.

4  I mean, if there's evidence, there's evidence.  There

5  are lots of different ways to establish someone is a gang

6  member, if that's what proves to be the case, tattoos, colors,

7  clothing, photographs.  There's lots of ways to do it, but I

8  don't want to hear about how they're known to be a gang member,

9  or worse, that ESMG is known to be a violent street gang, so I

12:07PM 10  want to keep it limited.  I don't want this to be a retrial

11  obviously of 2017 or 2020.

12  It is admissible I think under 404(b) and Rule 403 to

13  establish the defendant's knowledge, the defendant's intent,

14  and the background formation and development of the conspiracy.

15  I want it to be limited and straightforward.

16  Obviously, I'll permit cross-examination, and if

17  cross-examination opens a particular door, then it may be that

18  the government can walk through that door, but as a general

19  proposition, I'll admit, I'll admit it with limiting and

12:08PM 20  cautionary instructions subject to my comments and cautions,

21  and for those reasons, the government's motion to admit the

22  prior convictions and the related conditions of supervised

23  release is granted subject again to the restrictions so

24  indicated, and the defendant's motion to exclude evidence

25  regarding gang-- related activity or affiliation is denied.

1        So let me pause there.  Mr. Crowley or Ms. Hoefle, any

2    requests for clarification or anything you want to add?

3        MR. CROWLEY:  No, your Honor.  We are actually on the

4    minimization aspect, we have sent over in anticipation of a

5    ruling what we consider to be sanitized sections to achieve

6    this through stipulation, and I believe defense is reviewing

7    it.  We've spoken to them yesterday about that, so we're hoping

8    to do it that way to minimize the extraneous stuff, it can just

9    be done by stipulation.

12:09PM 10        THE COURT:  Mr. Flashner or anyone else on the defense

11    team?

12        MR. FLASHNER:  Yes, your Honor.  You know, though I

13    appreciate Mr. Crowley and Ms. Hoefle sending the stipulations,

14    first off, I just object to the Court's ruling.  I respect the

15    Court, I respect the ruling.  I disagree with it, and I would

16    object to it and preserve all rights for Mr. Perez under this

17    ruling under all the bases under 403, 404.

18        I would reiterate that there is -- I think it will be

19    impossible for a jury to look at Mr. Perez's involvement in a

12:10PM 20    street gang.  I mean, the idea of a nonviolent gang is -- with

21    all respect to the Court, "violent street gang" is kind of what

22    all comes out together, and to call them a gang is -- the other

23    words, whether they're said or not said, they are what will

24    form in the background.

25        Mr. Perez's appearance, he has face tattoos.  That's

1   not going to help that situation.  I understand that.  I think

2   that a jury is going to take a look at Mr. Perez, hear about

3   his gang membership, and this case will eventually be over at

4   that point in time.  I don't believe that he will able to have

5   a fair trial.  I respect the Court's ruling, but I have to

6   strenuously object.

7           I would again note that I again appreciate

8   Mr. Crowley's stipulation.  It puts me in a difficult position

9   because by accepting that stipulation, I am no way would be

12:11PM 10  waiving any appellate arguments, and I'm going to have to

11  repeat that several times during the course of the trial, but I

12  want to state it here now.

13          I think that it is the -- I've got to speak to

14  Mr. Perez about this, and I will speak to him, but if we do

15  accept that stipulation, if there's a sanitized version, it

16  does contain less details, it does in some de minimis way

17  impact the prejudice, but I don't think even with the

18  stipulations, it would allow Mr. Perez to have a fair trial,

19  and I am concerned.  And I think it's realistic that this jury

12:11PM 20  is simply going to equate Mr. Perez as a gang member doing gang

21  things, and that's who he is, and that's what he's done in the

22  past, so why is he not doing it here?

23          Thank you.

24          THE COURT:  Okay.  Several comments.  First, of

25  course, you don't have to stipulate to anything, and you can I

think as a practical matter suggest ways in which the sanitized

version might be more sanitized, I think, without waiving your

position, you know, just speaking off the top of my head here,

but I don't see why you can't nonetheless attempt to negotiate

with the government or convince me, for that matter, as long as

we're going to go down this path it should be framed in a

different way; Number 1.

Number 2, in terms of what my cautionary and limiting

instructions are, I would be happy to consider anything that

either party wants to propose. As you know, these things tend

to be done a little bit on the fly, and I'd be happy to have

something in front of me that's carefully thought out without

waiving your position that, you know, we'll, from your

standpoint, Mr. Flashner do as little damage as possible. I

understand your disagreement with my ruling.

Number 3, I'm prepared to give you a standing

objection on some of this. It's a little bit abstract right

now, but, you know, maybe give some thought to how we can do

this, maybe make an objection the first time it comes up, and

then I can give you a standing objection at sidebar, and with

any standing objection, obviously, if there's some new matter,

some wrinkle, you know, something that is -- that goes beyond

or is not quite constant with my expectations, obviously, I'm

issuing a ruling based on how I expect certain evidence to

unfold, and if things change or they're a little different, you

1   need to make that objection contemporaneously.

2          MR. FLASHNER:  Okay, thank you very much.  I

3   appreciate that.  I wouldn't want to have to object in front of

4   the jury every time, so I think finding a way to do this with a

5   standing objection is probably the best way to do it and not

6   waive Mr. Perez's trial rights.

7          THE COURT:  Okay.  And I'm not prepared to do that.

8   Again, if either party or both want me to repeat any of this,

9   if you think it's necessary for legal or other reasons, Monday

12:14PM 10   morning I'm prepared to do that as well.  But, again, I thought

11   it would be useful to everyone to have this ruling now, so

12   that's my ruling.

13          Again, it's a motion in limine.  It's based on certain

14   expectations and assumptions that sometimes change as the

15   evidence unfolds, but to the extent it is a motion in limine

16   and to the extent I can anticipate the evidence, that is the

17   ruling.  All right.  With that, we will reconvene Monday

18   morning at 9:00.  Anything further, Mr. Crowley?

19          MR. CROWLEY:  No, thank you, your Honor.

12:14PM 20          THE COURT:  Mr. Flashner.

21          MR. FLASHNER:  Nothing further, thank you, your Honor.

22   Thank you.

23          (Whereupon, the hearing was adjourned at 12:14 p.m.)

24

25

1            C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript,

8    Pages 1 through 17 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 23-10028-1-FDS, UNITED STATES of AMERICA vs.

11   JOSE PEREZ, JR. and thereafter by me reduced to typewriting and

12   is a true and accurate record of the proceedings.

13           Dated this May 5, 2025.

14

15                        s/s Valerie A. O'Hara

16           _____

17                        VALERIE A. O'HARA

18                        OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5   vs.                              )  Criminal Action
                                      )
 6   JOSE PEREZ, JR.,                 )  No. 23-10028-1-FDS
                      Defendant       )
 7                                    )
                                      )
 8                                    )

 9

10   BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11                         JURY TRIAL DAY 1

12

13                         JURY IMPANELMENT

14

15        John Joseph Moakley United States Courthouse
                        Courtroom No. 10
16                      1 Courthouse Way
                        Boston, MA 02210
17

18                        July 29, 2024
                           8:30 a.m.
19

20

21

22

23                      Valerie A. O'Hara
                      Official Court Reporter
24      John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                      Boston, MA 02210
                    E-mail: vaohara@gmail.com
</pre>

APPEARANCES:

For The United States:

    United States Attorney's Office, by MICHAEL CROWLEY, ASSISTANT UNITED STATES ATTORNEY, and SARAH HOEFLE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., by CORY S. FLASHNER, ESQ., EDMUND P. DALEY, III, ESQ., and JULIA HUTCHINSON, ATTORNEY, One Financial Center, 42nd Flr. Boston, Massachusetts 02111.

<u>PROCEEDINGS</u>

1

2      THE CLERK:  All rise.  Thank you.  You may be seated.

3  Court is now in session in the matter of United States of

4  America vs. Perez, Matter Number 23-10028.

5      Would counsel please identify themselves for the

6  record, starting with the government.

7      MR. CROWLEY:  Good morning, your Honor.  Michael

8  Crowley and Sarah Hoefle on behalf of the United States.

9      THE COURT:  Good morning.

09:03AM 10      MR. FLASHNER:  Good morning, your Honor.

11  Cory Flashner, Ed Daley, and Julia Hutchinson on behalf of the

12  defendant, Jose Perez, Jr.  Mr. Perez is seated to my right at

13  counsel table.

14      THE COURT:  All right.  Good morning.  All right.  It

15  looks like we are the only case impaneling today.  I think

16  we're going to have between 50 and 60 jurors, and typically

17  that panel will be ready around 9:40, 9:45, but we'll see how

18  that goes.  Again, I'm going to use what I'm referring to as

19  the pandemic impanelment process, which is we'll have people

09:03AM 20  hold up their cards and then we'll bring them back in

21  one-by-one.

22      A couple of questions for clarification.  The

23  government expects this is going to be three or four days,

24  right?

25      MR. CROWLEY:  Your Honor, we -- I think the Court

     1    thought we'd open tomorrow.

     2         THE COURT:  Yes, that's the most likely scenario.

     3         MR. CROWLEY:  We believe we'd be done Wednesday

     4    morning.

     5         THE COURT:  Okay.  Are all three drugs charged in the

     6    conspiracy, cocaine, cocaine base, and fentanyl?

     7         MR. CROWLEY:  Yes, your Honor.

     8         THE COURT:  And there's no drug weight for the jury to

     9    decide, correct?

09:04AM 10         MR. CROWLEY:  No, your Honor.

    11         THE COURT:  Okay.  And it's a single firearm?

    12         MR. CROWLEY:  Correct, your Honor.

    13         THE COURT:  Okay.

    14         MR. CROWLEY:  And we also submitted a revised -- we

    15    have a revised witness list for the Court.  We actually reduced

    16    people off it this weekend, if the Court wants that before.

    17         THE COURT:  I just -- I'll keep the longer list with

    18    more names just -- you know, if somebody has a connection, we

    19    might as well find out.  All right.

09:04AM 20         And then the defense has asked me to do a voir dire

    21    about gang involvement and gang-related questions, which I

    22    received this morning.

    23         MR. CROWLEY:  Your Honor.

    24         THE COURT:  Yes.

    25         MR. CROWLEY:  We made a decision last night that,

1    given the Court's concerns, we don't intend to go into gang

2    affiliation or the term of supervised release in our

3    case-in-chief.  We reserve the right for rebuttal, but at this

4    point, we don't intend to do it.

5           THE COURT:  Okay.  That's simple.  All right.  What

6    else do we have to talk about, if anything?

7           Mr. Flashner?

8           MR. FLASHNER:  That was our big issue, which seems to

9    be not --

09:05AM 10           THE COURT:  Okay.

11           MR. CROWLEY:  I think they had questions about

12    convictions.  We do intend to put in the two convictions and

13    the --

14           THE COURT:  By stipulation or the actual?

15           MR. CROWLEY:  We offered a stipulation, so we were

16    going to - - it was declined.  So we have spoken to defense

17    counsel.  They provided us a redacted version of the two J&Cs

18    and the transcript.  We're going to have to further redact the

19    transcript to take the gang materials out.  We'll send that to

09:05AM 20    defense counsel this afternoon, but that's how we intend to do

21    it.

22           THE COURT:  Okay.

23           MR. CROWLEY:  And I guess our only other question is

24    how the Court would want us to publish the transcript.  We

25    could read it to the jury, the relevant section, or put it on

1    the Elmo, whatever the Court thinks is appropriate.

2          THE COURT:  Why don't we see where we are when the

3    time comes, which will probably be I'm guessing tomorrow.

4          MR. CROWLEY:  Yes.

5          THE COURT:  See what those documents look like, and it

6    could be a partial stipulation, if not a complete stipulation.

7          Mr. Flashner.

8          MR. FLASHNER:  Your Honor, with regard to the

9    stipulation, I think Mr. Perez was a bit anxious about the gang

09:06AM 10   information.  It might benefit if I could have some time to

11   review -- an opportunity to have the stipulation as to the

12   convictions.  We may be able to work something out between now

13   and then.

14         THE COURT:  Okay.

15         MR. FLASHNER:  We just need some time with him.  We

16   just learned this this morning.

17         THE COURT:  Just to be clear, I cannot force anyone to

18   stipulate to anything.  It is certainly the norm, the practice

19   in felon in possession cases to just stipulate that the

09:06AM 20   defendant has a prior felony conviction so the jury doesn't

21   hear any of the details of that, but it's his choice.

22         MR. FLASHNER:  Your Honor, we are stipulating that

23   he's been convicted and know that he was convicted of a crime

24   punishable by more than one year.  This is a bit different.

25   This is the 2017 and 2020 convictions that I think Mr. Crowley

1    intends to offer.  This is slightly different.  He is willing

2    to stipulate to that first one.  It's the second, the actual

3    charges in the underlying two convictions.

4        THE COURT:  Got it.  Okay.  Well, let's see how that

5    goes then, what you can agree to and what you can't, and we'll

6    handle that in due course.  All right.  Anything else,

7    Mr. Crowley?

8        MR. CROWLEY:  Your Honor, I don't know if it makes

9    sense under *Frye* to just note for the record that we had some

09:07AM 10    settlement discussions, which didn't result in a final offer to

11    the defense leading up to last week, and the defense made a

12    decision they wanted to go to trial, just to make it clear on

13    the record.

14        THE COURT:  All right.  I cannot be involved in plea

15    discussions.

16        Mr. Flashner.

17        MR. FLASHNER:  Your Honor, I would just state that all

18    offers have been communicated to Mr. Perez, and we're here for

19    trial today.

09:08AM 20        THE COURT:  Okay.  He has a right to a jury trial, and

21    it's his choice and he can --

22        MR. FLASHNER:  Yes, your Honor.

23        THE COURT:  -- go to trial, or he can plead guilty,

24    and he can plead guilty part way through the trial, it's his

25    choice.  So -- all right.  We will regroup then as soon as we

1    have our jurors.

2         We have a lot of spectators, so I'll ask, when the

3    panel comes in if people could, I forget now whether we put

4    them on this side or that side, anyway, everyone on one side

5    separate from the prospective jury members.  Okay.  Thank you.

6         THE CLERK:  All rise.

7         (A recess was taken.)

8         THE CLERK:  All rise.  Thank you.  You may be seated.

9    Court is now in session in the matter of United States vs.

09:38AM 10    Perez, Matter Number 23-10028.

11         Would counsel please identify themselves for the

12    record, starting with the government.

13         MR. CROWLEY:  Good morning, your Honor,

14    Michael Crowley and Sarah Hoefle on behalf of the

15    United States.

16         THE COURT:  Good morning.

17         MR. FLASHNER:  Good morning, your Honor,

18    Cory Flashner, Ed Daley, and Julia Hutchinson on behalf of

19    Mr. Perez.

09:39AM 20         THE COURT:  All right.  Good morning.

21         Good morning, ladies and gentlemen.  My name is

22    Dennis Saylor.  I'm the Chief Judge of the United States

23    District Court for the District of Massachusetts, and I'm the

24    Judge assigned to this session of the court.

25         Let me start off by telling you what kind of a case

1    this is because many of you are probably curious about that.

2    This is a criminal case, a criminal prosecution.  There is one

3    defendant, Jose Perez, Jr.  He is charged with two crimes, one

4    involving controlled substances or illegal drugs and one

5    involving firearms.

6         The first charged crime is conspiracy to distribute

7    and to possess with intent to distribute certain controlled

8    substances, specifically cocaine, cocaine base, and fentanyl.

9    Cocaine base is a form of cocaine that can be smoked and

09:39AM 10    usually takes the form of crack cocaine.

11         The second charged crime is illegal possession of a

12    firearm, which I'll describe in more detail in a moment.

13         Those of you who are chosen as jurors will, of course,

14    be told what the precise charges are and what the government

15    has to prove beyond a reasonable doubt in order for you to

16    convict the defendant as to either or both of those charges.

17         So that's just a summary, it's not a complete and

18    precise description.  At this stage, it's only an allegation.

19    There's been no evidence and no proof of any kind.  The

09:40AM 20    defendant is presumed innocent and the government must prove

21    beyond a reasonable doubt that he is guilty of the precise

22    crimes with which he is charged.

23         The next topic I want to talk about is time.  I'm sure

24    most of you are curious or even nervous about that.  The

25    lawyers expect that this case will probably take about three or

1    four days to try.  It may well be shorter.  Sometimes cases go

2    longer, but I expect that the case will go to the jury later

3    this week.

4         In terms of telling me about your commitments, you

5    should tell me about whether you have something going on next

6    week as well just in case for some reason the case spills over.

7    I understand that jury service can be burdensome.  I'm going to

8    do what I can to make sure this case moves along as rapidly as

9    it can under the circumstances.  I can't quite control

10   everything, but I'll do my best.

11        Our normal trial day will be from 9:00 in the morning

12   until 1:00 in the afternoon with a short break at 11:00 and a

13   chance to stretch your legs at 10:00 and noon.  I'll explain to

14   those of you who are chosen why we have that schedule and what

15   we expect from you.

16        It's possible that if things go off track, we'll hold

17   an afternoon session if we need to, or to otherwise tweak the

18   schedule to make sure the case moves along without unnecessary

19   delay, but I expect that our normal trial day will be 9:00 to

09:41AM 20  1:00.

21        So I'm sure you've already heard some things about the

22   importance of jury service, but I want to add some thoughts of

23   my own.  The jury system goes back at least 800 years to

24   England in the time of the Middle Ages.  Obviously, a great

25   deal has changed in the world since then, but the basic idea is

1    essentially the same, that no person can be convicted of a

2    serious crime except upon the unanimous vote of a jury made up

3    of ordinary citizens.

4         The founders of our nation believed that the right to

5    a jury was so important that they put it in the Constitution

6    and the Bill of Rights.  Juries have always been composed of

7    ordinary citizens taken from all walks of life, each of whom

8    brings his or her own individual perspective and life

9    experience to the table.  You don't have to have any particular

09:42AM 10    education or experience or background, but what is truly

11    important is that you take your responsibilities seriously and

12    that you exercise your authority to the best of your ability.

13         The quality of justice in the United States depends on

14    the good judgment and common sense of ordinary citizens.  It is

15    a great system.  It is not a perfect system.  Nothing created

16    by human beings will ever be perfect, but it is a great system

17    nonetheless.

18         Trial by jury is not necessarily the most efficient

19    way to decide whether someone should be convicted of a crime,

09:43AM 20    and there are some things about it that are old-fashioned, but

21    there are things that are more important than efficiency, and

22    the protection of our rights is one of those things.

23         We enjoy a great many rights and freedoms in our

24    country.  All of us take them for granted from time to time.

25    Sometimes we have to be reminded what those rights are and why

1    they're important.

2         The jury is one of the most basic protectors of our

3    freedom.  It is fundamental to our system of justice.  It's

4    both an obligation of citizenship and an honor and a privilege

5    to serve, and if you are selected to serve, I hope you will

6    exercise your duties responsibly and solemnly and in accordance

7    with the law.

8         Of course, I understand that for many of you this is

9    not your first choice of how to spend the next week.

09:44AM 10  Unfortunately, there always seem to be a few people who view

11   this as a game and that the goal of the game is to get out of

12   jury service, but it's an obligation of citizenship.  It's one

13   of the prices that we pay for living in a free and democratic

14   society that respects civil rights and human rights.  It's a

15   price we pay for providing a system of justice that is rooted

16   in the values of the community, and, again, our system of

17   justice depends on the willingness of citizens to serve and on

18   the exercise of their good sense when they do serve.

19        You should not assume, however, that your jury service

09:44AM 20  will be burdensome.  I talk to jurors after every trial, and

21   the most common comment I have is that it was one of the most

22   interesting and rewarding experiences of their lives.

23        So let me talk next about how we're going to select a

24   jury.  The parties in this case have a right to a jury that is

25   fair and impartial, one that is not biased or prejudiced one

1    way or the other.

2           In order to try to obtain a fair jury, we have a

3    selection process that we go through.  I'll introduce the

4    lawyers or have them introduce themselves and the defendant,

5    and I'll ask whether any of you know them or have any kind of

6    connection with them.  I'll list the possible witnesses, again,

7    to see if any of you know them or have any connection to them,

8    and then I'll ask other questions on other topics.

9           The purpose of those questions is to determine whether

09:45AM 10   or not any of you should be exercised for what we call cause.

11   And once we've gone through that whole process and have

12   eliminated people who cannot or should not serve on the jury

13   for one reason or another, we'll call a group of people up into

14   the jury box.

15          By law, the parties will have an opportunity to

16   challenge a number of those prospective jurors.  Those are what

17   we call peremptory challenges, where the parties don't have to

18   give a reason, and when the parties are both satisfied with the

19   jury, or they've run out of challenges, we will have the jury.

09:45AM 20          We're going to panel 14 jurors.  Only 12 will

21   deliberate, but we're going to impanel 2 alternates.  Things

22   happen to jurors, they get sick, things come up in their lives,

23   and if we impanel only 12 jurors, we're operating without any

24   kind of a net, so we're going to have 2 alternates.

25          If you're not chosen to sit on the jury, it does not

1    reflect upon you personally or your ability to be a good

2    citizen or a good juror.  This is not a scientific process,

3    it's not a merit selection process, and you should not be in

4    the least concerned if for some reason you're not chosen or

5    you're struck.

6         So I'm going to start by asking you, as I said, some

7    questions.  Your answers must be under oath.  In other words,

8    you must swear that your answers are truthful.  It's very

9    important that you give truthful responses.  So I'll ask

09:46AM 10   Mr. McKillop, the deputy clerk, to please swear in the jury

11   pool.

12         (Prospective jurors were sworn)

13         THE COURT:  All right.  What we're going to do is --

14   actually we started doing this during the pandemic, and it

15   turned out to be a useful system.  So when I ask a question and

16   you think your answer is yes, I want you to hold up your card

17   with your number.  I'm going to write all those down.  I'll

18   call out the number as you raise it.  We've learned the hard

19   way Juror Numbers 6 and 9, please make sure you're holding it

09:47AM 20   the right way.  And then what we're going to do is we're going

21   to send you all out to the courtroom next door, and we're going

22   to take you one-by-one, and I'll follow up with the people who

23   have raised their cards.

24         Obviously, for some of my questions, more than one of

25   you are going to raise your card.  Please don't be shy.  Do not

1    hesitate to hold up your card if you're not sure what to do.

2    The time to ask questions or to raise issues is now, not

3    partway through the trial, and I will not be upset with you if

4    you raised your hand because you weren't sure what to do.

5         All right.  Again, this is a criminal case.  There's

6    one defendant, Jose Perez, Jr.  He's charged with two crimes.

7    The first charged crime is conspiracy to distribute and to

8    possess with intent to distribute certain controlled

9    substances.  Those substances are cocaine, cocaine base, and

09:48AM 10   fentanyl.

11        The second charged crime is illegal possession of a

12   firearm.  It is a crime for someone who has previously been

13   convicted of a felony, that is, a crime punishable by

14   imprisonment for a term exceeding one year to possess a

15   firearm.  That is, the firearm crime with which he is charged.

16   A shorthand expression for that is being a felon in possession

17   of a firearm, or just a felon in possession, but that's the

18   second crime with which he is charged.

19        And with that, I'll ask counsel to introduce

09:49AM 20   themselves and the defendant to the jury.  Mr. Crowley.

21        MR. CROWLEY:  I'm Assistant United States Attorney

22   Michael Crowley.  I represent the government.

23        MS. HOEFLE:  Hi, good morning.  I'm Assistant United

24   States Attorney Sarah Hoefle.  I also represent the government.

25        MR. CROWLEY:  And we have our paralegal sitting with

1     us, Ryan O'Donnell.

2              THE COURT:  All right.  Thank you.

3              Mr. Flashner.

4              MR. FLASHNER:  Thank you, your Honor.

5              Good morning, ladies and gentlemen, my name is

6     Cory Flashner.  I'm an attorney, and I represent Jose' Perez,

7     Jr., who is standing to my left.

8              Co-counsel, would you stand up?

9              MR. DALY:  Good morning.  My name is Ed Daley.  I'm

09:49AM 10     also a lawyer.  I represent Jose' Perez, Jr.

11             MS. HUTCHINSON:  Hi, my name is Julia Hutchinson.  I

12     also represent Jose' Perez.

13             THE COURT:  All right, thank you.  Again,

14     Michael Crowley and Sarah Hoefle are the Assistant

15     United States Attorneys.  They are the prosecutors in this

16     case.  They represent the government.  Cory Flashner,

17     Edmund Daley, and Julia Hutchinson represent Mr. Perez, the

18     defendant.

19             Do any of you know or are you related to or acquainted

09:50AM 20     with the defendant, Jose Perez, Jr.?  I see no cards.

21             To your knowledge, is any member of your family or any

22     close friend acquainted with Mr. Perez?  I see no cards.

23             Do any of you know or are you related to or acquainted

24     with Mr. Crowley, Michael Crowley, or Sarah Hoefle?  I see no

25     cards.

1          To your knowledge, is any member of your family or any

2     close friend acquainted with Michael Crowley or Sarah Hoefle?

3     I see no cards.

4          Have you or any member of your family or any of your

5     close friends ever worked for the United States Attorney's

6     Office, or had any dealings with them?  I see no cards.

7          Do any of you know, or are you related to or

8     acquainted with Cory Flashner, Edmund Daley, or Julia

9     Hutchinson?  I see no cards.

09:50AM 10          To your knowledge, is any member of your family or any

11     close friend acquainted with Cory Flashner, Edmund Daley or

12     Julia Hutchinson?  I see no cards.

13          I'm now going to read a list of people who may be

14     called as witnesses in this case.  I don't expect that all of

15     these people are actually going to be called, but I asked the

16     lawyers to give me a list of all potential witnesses and anyone

17     whose name may come up in the trial.  Listen carefully because

18     I'm going to ask whether you know any of these people.

19          Katelyn Thomas, who is a forensic drug chemist at

09:51AM 20     U.S. Customs and Border Patrol; Ryan Griffin, who is a special

21     agent with the Bureau of Alcohol, Tobacco, Firearms, and

22     Explosives; Michael Noone, N-o-o-n-e, who is a sergeant

23     detective with the Chelsea Police Department; Nicholas Morris,

24     who is an officer with the Lexington Police Department;

25     Michael Barry, a sergeant at the Lexington Police Department;

1    Brian Savage, also with the Lexington Police Department;

2    Matthew Snell with the Lexington PD; John Frissore,

3    F-r-i-s-s-o-r-e, or Frissore, with the Lexington Police

4    Department; Jack Sharer, S-h-a-r-e-r, with the Lexington Police

5    Department; Aiden Eveyln, E-v-e-y-l-n, who is with the

6    Lexington Police Department; Chris Ducharme, D-u-c-h-a-r-m-e,

7    with the Lexington Police Department; Christine Hankins,

8    detective with the Lexington Police Department; Donald Chisel,

9    who is an assistant chief at the Lexington Fire Department;

09:52AM 10   Carolina Abrizio Santiago, who is with the United States

11   Probation Office for the District of Massachusetts; and

12   Craig Nicewicz, N-i-c-e-w-i-c-z, who is with Legal

13   Investigative Solutions.

14        Do any of you know or are you related to or acquainted

15   with any of those people?  I see no cards.

16        To your knowledge, is any member of your family or any

17   close friend acquainted with any of those people?  I see no

18   cards.

19        Do any of you have any special disability or physical

09:53AM 20   problem that would make serving as a member of the jury

21   difficult or impossible or might interfere with your service as

22   a juror?  59, 9, 48.

23        All right.  As I indicated, I expect this case will

24   take three or four days to try.  Our normal trial date will be

25   from 9 to 1.  It's possible we'll have an afternoon session if

1    we need to.  I wouldn't do that without checking with the jury

2    first, and once the jury gets the case, it should be prepared

3    to meet for full days from 9 to 5 to deliberate, if necessary,

4    to reach a verdict.  Obviously, anyone who serves on the jury

5    will be inconvenienced to some extent, but do any of you have

6    any unusual hardship caused by the trial schedule, or the

7    length of the trial?  All right.  20, 50, 40, 43, 61 -- I'm

8    sorry.  I can't see that one.  48.

9         All right.  Have any of you heard or read anything

09:54AM 10   about this case in the newspapers, on the Internet, or anywhere

11   else?  Okay.  I see no cards.

12        I'm now going to ask you some questions about a number

13   of topics, including things like connections or feelings or

14   attitudes about law enforcement or drug prosecutions, firearm

15   prosecutions, the justice system.

16        I want to make a couple of points upfront.  No one

17   expects you to erase your life experience or background.  You

18   are who you are.  The jury system is intended to bring together

19   people from different backgrounds, and I'm sure most of you,

09:55AM 20   probably all of you, have beliefs or feelings about all these

21   topics.  No one expects that you have no opinion at all about

22   drug use or guns or the justice system.  But what we need are

23   jurors who will be fair and unbiased, what we call impartial.

24        The fact that other people, for example, may be

25   committing other crimes, drug crimes, firearm crimes, whatever

1    they are, has nothing to do with this case.  None of that means

2    that this defendant is guilty of these charged crimes.

3         The fact that other people may commit other crimes,

4    had done so in the past, may do so in the future has nothing to

5    do with this case.  The question here is whether this defendant

6    committed these crimes.  The jury is not here to make a

7    statement, or to prove a point of some kind, it's to make a

8    very specific decision, two decisions really, whether the

9    government has proved the defendant guilty beyond a reasonable

09:56AM 10    doubt of the charged crimes, and to do that, we need jurors who

11    will be fair and impartial and decide the case on its merits or

12    lack of merits as the situation may be and not because of

13    feelings or beliefs about any of these topics.

14         So let me turn to the first topic, which is I'm going

15    to ask you some questions about law enforcement officers or the

16    law enforcement system.  Sometimes people have strong feelings

17    about law enforcement that might affect their ability to be

18    fair to both sides.  An individual law enforcement officer

19    might or might not tell the truth in a particular case.  That's

09:56AM 20    for the jury to decide, but some people might generally favor

21    law enforcement and have trouble believing that a law

22    enforcement officer might lie.  Others might generally dislike

23    law enforcement officers and have trouble believing that a law

24    enforcement officer is telling the truth.  In other words, some

25    people may have such strong preconceived ideas, it may affect

1       their view of the evidence, and instead of listening carefully

2       and evaluating each witness and the evidence on its merits.

3               It would be unfair if the jurors who decided this case

4       were prejudiced either in favor of law enforcement or against

5       it.  Again, this case must be decided according to the evidence

6       and according to the law and not based on prejudice or bias.

7               With that, let me ask:  Have you or any member of your

8       immediate family or any close friend ever been employed by U.S.

9       Customs and Border Protection, the Bureau of Alcohol, Tobacco,

09:57AM 10      Firearms and Explosives, sometimes called ATF, the Chelsea

11      Police Department, or the Lexington Police Department?

12      All right.  I see no cards.

13              Have you or any member of your immediate family or any

14      close friend ever been employed by any other federal, state, or

15      local police department or law enforcement agency?  All right,

16      1, 3, 33, sorry, I can't see the -- 19, 20, 50, 51, 6, 22, 55,

17      8, 40, 56, 57, 41, 25, 10, 27, 44.

18              Have you or any member of your immediate family or any

19      close friend ever been employed by a prosecutor's office, a

09:58AM 20      public defender's office, a court, a probation office, or a

21      prison?  1, 4, 21, 6, 22, 25, 12, 27, 62.

22              Do any of you have any feelings or beliefs about law

23      enforcement officers or other government agents, whether those

24      feelings are positive ore negative, that might interfere with

25      or affect your ability to serve as a fair and impartial juror

1    in the trial of this case?  21, 6, 54, 22, 8, 57, 9, 25, 27,

2    12.

3          Do any of you believe that law enforcement officers or

4    other government agents are more likely or less likely to tell

5    the truth than other kinds of witnesses just because of the job

6    they hold?  Again, just to make that clear, all witnesses,

7    including law enforcement agents, must be judged by the jury

8    based on who they are and what they say, but if any of you

9    believe that someone, just because they're a police officer,

10:00AM 10   are more likely or less likely to tell the truth, please raise

11   your card.  1, 50, 52, 20, 21, 6, I got 52, 22, 54, 8, 9, 56,

12   57, 25, 43, 45, 48.

13         Again, this case involves allegations concerning the

14   drugs cocaine, cocaine base, and fentanyl.  Do any of you have

15   any feelings or beliefs about the use of those drugs or any

16   other drugs that might interfere with or affect your ability to

17   be a fair and impartial juror in the trial of this case?  20,

18   51, 52, 21, 6, 54, I got 20, 22, 8, 9, 10, 40, 56, 57, 25, 26,

19   27, 43, 12, 45, 13, 15, 47, 48, 46, 62 -- do any of you -- oh,

10:01AM 20   11.  Thank you.

21         Do any of you have any feelings or beliefs about the

22   drug laws or prosecution of drug cases that might interfere

23   with or affect your ability to serve as a fair and impartial

24   juror in this case, in other words, the criminal enforcement of

25   drug laws?  52, 6, 9.

1        Have any you ever been arrested or charged with any

2   kind of offense involving drugs?  52, 9.

3        Have any of you ever been treated for addiction or

4   dependency of drugs of any kind?  9, 14.

5        Do any of you have any feelings or beliefs concerning

6   firearms or the regulation of firearms or criminal enforcement

7   of firearm laws that would affect your ability to serve as a

8   fair and impartial juror in the trial of this case?  52, 40,

9   56, 57, 26, 27, 12, 13, 28.

10:03AM 10        Have you or any member of your family or any close

11   friend ever been involved in a criminal matter either as a

12   defendant, a victim, or a witness?  1, 17, 4, 21, 37, 54, 22,

13   8, 9, 7, 59, 27, 11, 62.

14        The defendant has a constitutional right not to

15   testify in this case and no inference of guilt or anything else

16   may be drawn from that fact if he does not testify.  For any

17   juror to draw such an inference would be improper and a

18   violation of the juror's oath.  Are there any of you who might

19   have trouble accepting that basic principle concerning a

10:04AM 20   defendant's right not to testify and might hold it against the

21   defendant if he does not testify?  6.

22        The fact that the defendant has been charged with a

23   crime is not evidence that he is guilty of that crime.  He is

24   not presumed to be guilty; on the contrary, he is presumed to

25   be innocent, and the government has the burden of proving his

1     guilt beyond a reasonable doubt.

2          Are there any of you who would have trouble accepting

3     that basic principle concerning the presumption of innocence

4     and the burden of proof?  I see no cards.

5          Are there any of you who might have trouble accepting

6     the basic principle that the case must be decided on the

7     evidence presented in the courtroom and not according to

8     anything else?  Do any of you have any issues with that or do

9     you think that might interfere with your ability to be a fair

10    juror?  All right.  I see no cards.

11         Do any of you have any political or religious or

12    ethical beliefs that might interfere with or affect your

13    ability to serve as a fair and impartial juror?  I do not want

14    to know your politics or your religion or your personal beliefs

15    unless there's something about them that might somehow

16    interfere with your ability to follow the law as I instruct you

17    and to render a fair verdict in this case.  21.

18         Are you aware of any beliefs or feelings that might

19    prevent you from completely and honestly applying the law as I

20    give it to you at the end of this case to the facts as you find

21    them?  I see no cards -- oh.  27, 52.

22         Do you know of any reason that I have not suggested or

23    mentioned why you might not be able to serve as a fair and

24    impartial juror in the trial of this case?  51, 42, 1, 13, 47,

25    15, 53, 54.

1          Is there anything that I have not asked you about that

2    you think you would like to raise with me before we go any

3    further?  32.

4          All right.  Let me see counsel at sidebar.

5          (THE FOLLOWING OCCURRED AT SIDEBAR:)

6          THE COURT:  Anything further in terms of voir dire,

7    Mr. Crowley?

8          MR. CROWLEY:  Not for the government.

9          THE COURT:  Mr. Flashner.

10:07AM 10    MR. FLASHNER:  Your Honor, I would renew our objection

11   to not asking the question you posed originally, and I would

12   make the one additional note, I may have missed it, but when

13   you thought about addiction and not anyone in the family.

14         THE COURT:  I can do that.  Again, if you have the

15   specific request that you think I haven't covered because

16   there's always imperfect overlap between proposed questions and

17   what I actually say.

18         MR. FLASHNER:  There's nothing else.  Thank you.

19         (SIDEBAR CONFERENCE WAS CONCLUDED)

10:07AM 20    THE COURT:  When I was asking about drug-type issues,

21   it's not clear whether I asked the question about immediate

22   family or close friends who had addiction or dependency issues

23   as opposed to you individually, so let me ask that question.

24   Do any of you have a close friend or immediate family member

25   who has been treated for addiction or dependency of any kind?

1    Everyone.  2, 33, 34, sorry, I can't see that one, 19, 20, I
2    got 33 and 19, 21, 6, 22, 7, 54, 8, 40, 57, 25, 9, 10, 42, 59,
3    27, 43, 45, 46, 62, 14, sorry, the one over -- 47.

4         What we're going to do now, as I said, we're going to
5    send you all out to an adjacent courtroom and we're going to
6    bring you back in one-by-one.  When you come in, we'll put you
7    in this witness stand and I'll follow-up on the questions you
8    raised.  I may let you go, I may not, but I'll explore with you
9    a little bit.  Thank you for your cooperation.  It's hard to do
10:09AM 10   this without inconveniencing a lot of people.  I'll make this
11   go as quickly as I can consistent with a fair trial, but I need
12   your cooperation as well, so thank you.

13         Line up 1, 2, 3, 4.

14         THE COURT:  You're Ms. Pierre; is that right?

15         THE JUROR:  Yes.

16         THE COURT:  You raised your card for a number of my
17   questions.  Let me start with the one about attitudes about law
18   enforcement and whether they're telling the truth or not.  Tell
19   me about that.

10:15AM 20        THE JUROR:  I mean, I think your question was do I
21   think law enforcement officers will sometimes either not tell
22   the truth or lie?

23         THE COURT:  Well, it's a little different than that.
24   I mean, everyone -- whatever group of people --

25         THE JUROR:  Because of their position.

1    THE COURT:  In other words, some people think, well,

2    they're cops, they're more likely to tell the truth, or all

3    cops lie.  What I'm looking for is a bias preconceived notion,

4    it's not --

5    THE JUROR:  I firmly believe that they will lie

6    because of their position, though, so I don't know.

7    THE COURT:  Let me drill into that.  Again, no one

8    expects you to erase your experiences and your beliefs --

9    THE JUROR:  Right.

10:16AM 10    THE COURT:  -- and no one expects you need to take the

11    testimony of a law enforcement officer at face value, but it's

12    really more about bias.  In other words, not some cops lie, not

13    all cops lie.

14    THE JUROR:  Right.

15    THE COURT:  And you have to treat them as individuals,

16    not, you know, blindly reject.

17    THE JUROR:  Right.  And I don't think it's all, but

18    I'm saying do I think, based on their position, will they do

19    that because of the position they are in, I do believe that,

10:16AM 20    but I don't think it's all officers or law enforcement

21    employees.

22    THE COURT:  And do you think that will affect your

23    ability to be fair in the trial of this case?

24    THE JUROR:  No.  To be fair?  No, I don't think it

25    would affect me.

1          THE COURT:  Including being fair to the government,

2     including listening to the testimony?

3          THE JUROR:  Right.

4          THE COURT:  Okay.  I think you also, I asked this

5     catch-all question.  Let me ask why did you raise your card on

6     that one?  You know, I think I said do you know of any other

7     reason why you might not be able to serve or might not be fair?

8          THE JUROR:  My brother's also a convicted felon facing

9     the same exact charges, so I just -- obviously, I'm conflicted

10:17AM 10     a bit with the charges and the case.

11          THE COURT:  Okay.  Again, this has nothing to do with

12     your brother.

13          THE JUROR:  Exactly, but it goes to whether I'm able

14     to kind of look at something without bias or, I don't know, so

15     I just answered because I'm not sure.

16          THE COURT:  Okay.  In other words, you're not

17     confident you can be fair to both sides?

18          THE JUROR:  Right.

19          THE COURT:  Okay.  I think that this may not be the

10:17AM 20     right case for you to sit on then.

21          THE JUROR:  I agree.

22          THE COURT:  I can't look inside your head, I have to

23     trust what you say, but if you have doubts about whether you

24     can be fair, I think it's probably not the right kind of case

25     for you to sit on.

1          THE JUROR:  I agree.

2          THE COURT:  Thank you.

3          THE JUROR:  Thank you.

4          THE CLERK:  Juror Number 2.

5          THE COURT:  You're Mr. Kaszanek.  Am I pronouncing

6     that right?

7          THE JUROR:  Yes, Kaszanek.

8          THE COURT:  Kaszanek, okay.  You raised your card for

9     a number of questions.  Let me start with I think I asked you a

10:18AM 10  question about attitudes about the criminal prosecution of drug

11    cases or drug laws, and I think you raised your card.  Tell me

12    about that.

13         THE JUROR:  I only raised my card for one thing.  It

14    wasn't that one.

15         THE COURT:  Okay.  All right.  My notes may be wrong.

16    How about I asked about I think people close to you who had

17    been treated for addiction or dependency.  Tell me about that.

18         THE JUROR:  Yeah, I had a cousin that he ended up --

19    he was under the influence of some type of narcotics while he

10:19AM 20  was in a car accident or whatever.  He was in treatment, and he

21    did go to the -- he was sentenced to prison for a period of

22    time.

23         THE COURT:  Okay.  And is there anything about that

24    experience that would affect your ability to be a fair juror in

25    the trial of this case?

1            THE JUROR:  No.

2            THE COURT:  Okay.  Did you raise your card when I

3  asked about whether you had been arrested or charged with any

4  kind of drug offense?

5            THE JUROR:  No.

6            THE COURT:  Okay.  Again, my notes must be off here.

7  Let me just -- so you only raised your card for that one thing,

8  which was concerning your cousin?

9            THE JUROR:  Yes.

10:20AM 10            THE COURT:  Okay.  In that case, I'm going to ask you

11  to -- I'm going to leave you on the panel for now and I'll ask

12  you to return to the other courtroom.

13            THE JUROR:  Thank you.

14            THE COURT:  Thank you.

15            THE CLERK:  Juror Number 3.

16            THE COURT:  All right.  You're Ms. MacDonald, I think?

17            THE JUROR:  Yes.

18            THE COURT:  And you raised your card, if my notes are

19  right, I asked about whether you or anyone close to you had

10:20AM 20  been employed by a federal, state, or local police department.

21            THE JUROR:  Yes.

22            THE COURT:  Tell me about that.

23            THE JUROR:  My uncle was a retired police officer, my

24  brother-in-law is a retired police officer, and I have another

25  brother-in-law who is currently employed as a police officer.

1          THE COURT:  Okay.  And with what cities or towns?

2          THE JUROR:  My uncle and brother-in-law that are

3    retired were with Watertown, and my brother-in-law that's

4    currently employed is with Clinton Police Department.

5          THE COURT:  Clinton, Mass.?

6          THE JUROR:  Yes.

7          THE COURT:  All right.  And is there anything about

8    those connections or relationships that would affect your

9    ability to be a fair juror in the trial of this case?

10:21AM 10          THE JUROR:  Yes.

11          THE COURT:  Are you confident you can be fair to both

12   sides?

13          THE JUROR:  Yes.

14          THE COURT:  Thank you, Ms. MacDonald, I'll ask you to

15   return to the other courtroom.

16          THE JUROR:  Thank you.

17          THE CLERK:  Juror Number 4.

18          THE COURT:  Ms. Delaney?

19          THE JUROR:  Yes.

10:22AM 20          THE COURT:  And I think you raised your card a couple

21   of times.  I had asked a question about whether you had ever

22   been employed or anyone close to you by a prosecutor's office,

23   public office, court, probation, prison.  Can you tell me about

24   that?

25          THE JUROR:  Yeah, my brother was a criminal attorney,

1    so I wasn't sure if that fell into that category.

2         THE COURT:  Okay.  I hope you mean criminal defense

3    attorney?

4         THE JUROR:  Sorry.  Yes.

5         THE COURT:  And where does he practice?

6         THE JUROR:  He's no longer practicing, but he had an

7    office in Peabody.

8         THE COURT:  Peabody, okay.  And is there anything

9    about that connection or relationship that would affect your

10:22AM 10  ability to be a fair juror in the trial of this case?

11         THE JUROR:  No, I don't think so.

12         THE COURT:  And then I think you also raised your card

13    about -- I think I asked about connections to a criminal case,

14    defendant, victim, witness.

15         THE JUROR:  My brother was charged with a DUI.

16         THE COURT:  Okay.  And how did that case turn out?

17         THE JUROR:  He was found not guilty.

18         THE COURT:  Okay.  And do you think he was treated

19    fairly by the criminal justice system?

10:23AM 20         THE JUROR:  I do.

21         THE COURT:  Okay.  And the same question, is there

22    anything about that relationship or connection that would

23    affect your ability to be fair?

24         THE JUROR:  No, I don't think so.

25         THE COURT:  Okay.  Thank you, Ms. Delaney, I'll ask

1          you to return to the other courtroom.

2                    THE JUROR:  Okay.

3                    THE COURT:  Juror Number 6.

4                    MS. HOEFLE:  Your Honor, did we miss Juror Number 5?

5                    THE COURT:  I don't have Juror Number 5 having raised

6          a card.  Again, I'll talk about it in a moment.

7                    THE CLERK:  Juror Number 6.

8                    THE COURT:  All right.  You're Mr. Bennett?

9                    THE JUROR:  Yes.

10:24AM 10           THE COURT:  And you raised your card I think for a

11          number of the questions.  Let me start with the one about law

12          enforcement, about feelings about law enforcement.  Tell me

13          about that.

14                    THE JUROR:  Just that I got close friends that are

15          staties and I just trust what they're doing.

16                    THE COURT:  Meaning by staties, do you mean state

17          police officers?

18                    THE JUROR:  Yes, sir.

19                    THE COURT:  And do you think that you'd have trouble

10:24AM 20          being fair and impartial as a juror in the trial of this case

21          based on that?

22                    THE JUROR:  I just tend to believe, yes, I believe,

23          you know, the state, the police.

24                    THE COURT:  Okay.  All right.  If that's how you feel,

25          I'm not going to talk you out of it, so I'm going to let you

1    go.  Thank you.

2              THE JUROR:  Thank you.

3              THE CLERK:  Juror Number 7.

4              THE COURT:  All right.  You're Mr. Barnewolt?

5              THE JUROR:  Yes, sir.

6              THE COURT:  Dr. Barnewolt?

7              THE JUROR:  Yes.

8              THE COURT:  You raised your card I think a couple

9    times.  One was a question about treatment for addiction or

10:25AM 10  dependency.  Tell me about that.

11             THE JUROR:  There was a family member who had an

12   addiction and ultimately died from his addiction.

13             THE COURT:  Okay.  Was that someone close to you?

14             THE JUROR:  Yes.

15             THE COURT:  And who was that?

16             THE JUROR:  A brother-in-law.

17             THE COURT:  And what was the drug?

18             THE JUROR:  Cocaine, alcohol, opiates.

19             THE COURT:  Okay.  And is there anything about that

10:26AM 20  experience that would affect your ability to be fair as a juror

21   in the trial of this case?

22             THE JUROR:  No.

23             THE COURT:  And I think you also raised your card

24   about someone close to you being involved in a criminal matter.

25   Is that the same situation?

       1           THE JUROR:  Yes.

       2           THE COURT:  Okay.  So he was arrested or charged from

       3    time to time?

       4           THE JUROR:  Yes.

       5           THE COURT:  Okay.  How long ago did he pass away,

       6    ballpark?

       7           THE JUROR:  Over 10 years.

       8           THE COURT:  Okay.  And same question, are you

       9    confident you can be fair to both sides notwithstanding that

10:26AM 10    experience?

      11           THE JUROR:  Yes.

      12           THE COURT:  All right.  Thank you, Doctor.  I'll ask

      13    you to return to the other courtroom.

      14           MR. FLASHNER:  Your Honor, may I follow-up just

      15    briefly?

      16           THE COURT:  Sure.  You may follow-up.

      17           MR. FLASHNER:  Thank you.

      18           Doctor, I see you work at Tufts Medical Center as an

      19    emergency physician.  Is that the emergency room?

10:26AM 20           THE JUROR:  That's correct.

      21           MR. FLASHNER:  And you talked about your experience

      22    with your brother-in-law, sorry about that.  And in your

      23    experience as an emergency room physician, would that impact

      24    your ability to hear the facts of this case?

      25           THE JUROR:  No.

```
 1              MR. FLASHNER:  Thank you.

 2              THE COURT:  I assume you see drug overdoses?

 3              THE JUROR:  Yes.

 4              THE COURT:  Okay.  Thank you, Doctor.  You may return

 5      to the courtroom.

 6              THE CLERK:  Juror Number 8.

 7              THE COURT:  You're Ms. Torres?

 8              THE JUROR:  Yes.

 9              THE COURT:  And you raised your card I think for a

10      number of questions.  Let me start with the ones about law

11      enforcement and attitudes about law enforcement.  Tell me about

12      that.

13              THE JUROR:  I just feel like some police officers, you

14      know, they -- some are bad, some are good.  You know, it all

15      depends on their attitude and how they act towards certain

16      people of a certain race.

17              THE COURT:  I think it's probably a provable fact that

18      some are bad and some are good, but my real question is, again,

19      can you be fair to both sides?

20              THE JUROR:  Yes.

21              THE COURT:  The point being that you're not here to

22      prove a point, you're not here to speak out against police

23      officers, it's to listen to the ones who do testify and either

24      you credit their testimony or you don't, but you have to treat

25      them as individuals and not based on preconceived notions.
```

1          THE JUROR:  Correct.

2          THE COURT:  And do you think you'd have an issue doing

3   that?

4          THE JUROR:  No, I'll just go by what they say.

5          THE COURT:  And you think you can be fair to both

6   sides?

7          THE JUROR:  Yes.

8          THE COURT:  One of my questions, just to be clear

9   about this, is whether police officers are more likely or less

10:29AM 10  likely to tell the truth just because of the job they hold.  In

11  other words, some people might say, well, police officers don't

12  lie, others might say, well, they lie all the time.  You know,

13  again, it's the same question, can you treat the officers who

14  do testify as individuals and consider their testimony fairly

15  and vote in accordance with the evidence as you see it?

16          THE JUROR:  Yes.

17          THE COURT:  All right.  I think you also raised your

18  card, I'd asked about whether anyone had ever or whether you or

19  anyone close to you had ever been employed by a police

10:29AM 20  department.  Tell me about that.

21          THE JUROR:  I've got two cousins that work at the

22  Lawrence Police Department.

23          THE COURT:  In Lawrence?

24          THE JUROR:  Yes.

25          THE COURT:  Are they patrol officers?

                    THE JUROR:  Yes.

                    THE COURT:  Anything about that connection or

relationship that would affect your ability to be fair?

                    THE JUROR:  No.

                    THE COURT:  Okay.  I hope your cousins are good law

enforcement officers.

                    THE JUROR:  I hope so.

                    THE COURT:  All right.  You also, I think, raised your

card about feelings or beliefs about drug use, drug abuse.

Tell me about that.

                    THE JUROR:  I just have, you know, my brother died of

an overdose.

                    THE COURT:  Your brother died?

                    THE JUROR:  Uh-hum.

                    THE COURT:  Was he an addict?

                    THE JUROR:  Yes.

                    THE COURT:  What was the drug?

                    THE JUROR:  Heroin.

                    THE COURT:  How long ago did that happen?

                    THE JUROR:  Oh, many years ago, like over 10 years.

                    THE COURT:  And is there -- and I'm sorry to hear

that.  Is there anything about that unfortunate situation that

would affect your ability to be fair?

                    THE JUROR:  No.

                    THE COURT:  Okay.  I had asked about involvement in

1    the criminal justice system.  Is that the same situation, was

2    that your brother?  Had he been arrested?

3              THE JUROR:  Yes, both my brothers were.

4              THE COURT:  Both your brothers.  Tell me about the

5    other brother.

6              THE JUROR:  He's alive.  He got arrested for

7    possession of drugs.

8              THE COURT:  For possession of drugs?

9              THE JUROR:  Uh-hum.

10:31AM 10              THE COURT:  What was the drug?

11              THE JUROR:  Cocaine.

12              THE COURT:  And how did that turn out?

13              THE JUROR:  He's served two years and he's out and

14    he's a recovering addict.  He's working.  He's fine.  He's

15    better now.

16              THE COURT:  He's working where?

17              THE JUROR:  He's working like multiple jobs, so he's

18    doing good.

19              THE COURT:  Okay.  Do you think he was treated fairly

10:31AM 20    by the criminal justice system?

21              THE JUROR:  Yes.

22              THE COURT:  And did that happen in Massachusetts,

23    state court?

24              THE JUROR:  Uh-hum.

25              THE COURT:  You have to answer yes or no for the

1    record.

2            THE JUROR:  Yes.

3            THE COURT:  All right.  Thank you, Ms. Torres, I think

4    I hear you saying you can be fair to both sides, so I'm going

5    to ask you to return --

6            THE JUROR:  To the other room?  Okay.

7            THE COURT:  Thank you.

8            THE CLERK:  Juror Number 9.

9            THE COURT:  You're Mr. Hayes?

10:32AM 10            THE JUROR:  Yes.

11            THE COURT:  And I think you raised your card multiple

12    times, but let me start with the questions I asked about law

13    enforcement.  Tell me about that, attitudes about law

14    enforcement, law enforcement officers.

15            THE JUROR:  Yes, either way with everything going on

16    in the world as far as they're capable of lying or capable of

17    telling the truth, both ways.

18            THE COURT:  Okay.  Well, that's a true fact that they

19    can tell the truth or not tell the truth.  What I need is for

10:33AM 20    you to be confident that you could be fair to both sides, in

21    other words, to evaluate each police officer as an individual

22    and decide whether you believe them or not and not because,

23    again, because of some other --

24            THE JUROR:  Yeah, I don't think I would be fair.

25            THE COURT:  You don't think you could be fair?

```
 1              THE JUROR:  No.

 2              THE COURT:  All right.  If you don't think you could

 3      be fair, I'm not going to try to talk you out of it, so I'm

 4      going to let you go, Mr. Hayes.  Thank you.

 5              THE JUROR:  Okay.

 6              THE CLERK:  Juror Number 10.

 7              THE COURT:  You're Mr. O'Donoghue?  Yes?

 8              THE JUROR:  Yes.

 9              THE COURT:  Okay.  You raised your card a couple of

10      times, I think.  One of the things you raised your card for was

11      feelings or beliefs about drug use or drug abuse.  Tell me

12      about that.

13              THE JUROR:  I believe the question was a family member

14      or friend that was in drug rehab.  Two young boys that I

15      coached at Scituate High School Hockey have died of heroin and

16      my nephew died of fentanyl last November.

17              THE COURT:  I'm very sorry to hear that.  So you

18      coached hockey at Scituate?

19              THE JUROR:  Yes, Scituate.

20              THE COURT:  And two of the players died of --

21              THE JUROR:  Yes, a couple of years after they

22      graduated.

23              THE COURT:  And is there anything about those

24      experiences that would affect your ability to be a fair juror

25      in the trial of this case?
```

1          THE JUROR:  I was just answering the question.  I

2     don't know that it would sway my testimony or my judgment in

3     any way.

4          THE COURT:  Okay.  Well, that's sort of what I'm

5     driving at.  I can't look inside your head, so I have to ask

6     the questions.

7          THE JUROR:  I think pretty much everybody has somebody

8     that they know in this day and age that has been the victim of

9     drugs.

10:35AM 10          THE COURT:  It's true, and, as I said, this isn't a

11    jury that's going to fix that problem, it's to decide whether

12    this defendant is guilty beyond a reasonable doubt about these

13    charges.  And do you think you could be fair and impartial in

14    deciding that issue?

15          THE JUROR:  I would certainly try.

16          THE COURT:  Okay.  I just want to make -- again, I

17    can't look inside your head, I need to be -- I need to know

18    whether you're confident you'll be fair.

19          THE JUROR:  I'm sorry, I didn't hear that.

10:36AM 20          THE COURT:  I need to know that you are confident that

21    you can be fair, that you'll listen, and, of course, I want you

22    to try to give it your best shot, but I need you to -- I need

23    to know whether you're confident you can be fair?

24          THE JUROR:  I believe I am.

25          THE COURT:  Okay.  All right.  And I think you also

 1    raised your card about whether you or anyone close to you had

 2    ever been employed by a police department?

 3            THE JUROR:  Well, my brother-in-law, the father of my

 4    nephew who died last November, he was Treasury Department

 5    Secret Service.

 6            THE COURT:  Okay.  Is he still in the Secret Service?

 7            THE JUROR:  He's no longer with us.

 8            THE COURT:  Okay.  The same question, anything about

 9    that connection that would affect your ability to be fair?

10:37AM 10            THE JUROR:  That should have no bearing on it at all.

11            THE COURT:  All right.  Mr. O'Donoghue, I'm going to

12    leave you on the panel, and I appreciate your candor.  Again, I

13    can only go by what people tell me, and my sense is that you

14    believe you can be fair to both sides, so I'm going to leave

15    you on the panel, and I'll ask you to return to the other

16    courtroom.  Okay.  Thank you.

17            THE CLERK:  Juror Number 11.

18            THE COURT:  All right.  You're Ms. Calderon?

19            THE JUROR:  Yes.

10:38AM 20            THE COURT:  I think you raised your card a couple of

21    times, including I asked a question about feelings or beliefs

22    about the use of drug or drug abuse.  Tell me about that.

23            THE JUROR:  Where I work, I see families that they

24    really need help and that affect me and my job.

25            THE COURT:  Okay.  Do you think that would affect your

```
 1    ability to be fair in the trial of this case?
 2              THE JUROR:  Yeah.
 3              THE COURT:  You think it would?  You think you'd have
 4    trouble being fair?
 5              THE JUROR:  I don't understand much the question.
 6              THE COURT:  Okay.  What I'm trying to -- let me ask a
 7    different question.  Is English your first language?
 8              THE JUROR:  No, Spanish.
 9              THE COURT:  Okay.  And are you having a little trouble
10    understanding some of my questions?
11              THE JUROR:  Yes.
12              THE COURT:  Okay.  How do you feel about your ability
13    to understand the trial, which obviously is going to be in
14    English, do you think that might be an issue for you, being
15    able to understand the testimony?
16              THE JUROR:  Yes.
17              THE COURT:  Okay.  All right.  I think I'm going to
18    let you go then, Ms. Calderon.  I appreciate your honesty, but
19    I'm going to let you go.
20              THE JUROR:  Thank you.
21              THE COURT:  Thank you.
22              THE CLERK:  Juror Number 12.
23              THE COURT:  You're Ms. McLean?
24              THE JUROR:  Yes.
25              THE COURT:  I'm going to ask you to take your mask off
```

1    just long enough so that the lawyers can get a good look at

2    you.  They're entitled to do that.  You raised your card a

3    couple of times.  I think a few times.  One of the questions I

4    asked and I think you raised your card about is attitudes about

5    law enforcement officers.  Tell me about that.

6         THE JUROR:  Sure.  So I happen to live across the

7    street from a drug dealer, and I seen customers come in and out

8    of her home.  I -- my husband has had to call the cops.  One of

9    her clients has tried to hit someone, and my understanding is

10:40AM 10   that the cops know about this, about what's happening in this

11   home and nothing has been done, so I'm very skeptical about

12   cops being honest and really dealing with issues.

13        THE COURT:  Okay.  And this case obviously has nothing

14   to do with that unfortunate situation, but do you think you'd

15   have trouble being fair in this case because of that?

16        THE JUROR:  I do and the drug part.

17        THE COURT:  Okay.  In that case, I'm going to have to

18   let you go, Ms. McLean.  I'm sorry about your situation in your

19   neighborhood, but I'm going to let you go.  Thank you.

10:41AM 20        THE CLERK:  Juror Number 13.

21        THE COURT:  You're Mr. Petreyko?  Am I pronouncing

22   that right?

23        THE JUROR:  Petreyko, yes.

24        THE COURT:  And you raised your card a couple of times

25   beginning with I had asked a question, I think, about beliefs

1    about the use of drugs.  Tell me about that.

2         THE JUROR:  So not drugs, but I am a recovering

3    alcoholic.

4         THE COURT:  Okay.  How long have you been sober?

5         THE JUROR:  If I make it through today, two years,

6    seven months.

7         THE COURT:  Okay.  Congratulations.  And is there

8    anything about that situation that would affect your ability to

9    be fair in the trial of this case?

10:42AM 10         THE JUROR:  I just spent a lot of my energy just

11   trying to stay sober and between meetings and my sponsor, you

12   know, it's been, you know, a good run, but I still preserve a

13   lot of energy towards that.  It's not easy for me.

14         THE COURT:  I understand.  Would that affect your

15   ability to serve on the jury, I guess?

16         THE JUROR:  I don't know.  It's not something that I'm

17   positive about, so I don't know how to, you know, kind of

18   answer that because I put so much energy into it so I don't

19   want to say that it would, but I don't know.  I've never been

10:43AM 20   in the position.  I, you know, have kept it simple and straight

21   and kind of have my own thing, so I don't really know how to

22   answer that, that's why I had a question on it.

23         THE COURT:  I'm just trying to drill into this a

24   little bit.  Do you think you'd have trouble paying attention?

25   It's four hours a day, but it does require, you know, paying

1    attention and being focused.

2              THE JUROR:  I think I would.

3              THE COURT:  You think you would have trouble doing

4    that?

5              THE JUROR:  Yes.

6              THE COURT:  Okay.  In that case, I think I'm going to

7    let you go.  All right, and good luck to you.

8              THE JUROR:  Thank you, your Honor.

9              THE CLERK:  Juror Number 14.

10:44AM 10         THE COURT:  All right.  Ms. Grande?

11             THE JUROR:  Grande.

12             THE COURT:  Grande.  I think you raised your card, I

13   asked a question about whether you or someone close to you had

14   been treated for addiction or dependency.  Tell me about that.

15             THE JUROR:  Well, I had been treated for an alcohol

16   problem after my mother had died about five years ago, and so

17   this past -- I had been sober for three years now, but I felt

18   that I was drinking too much.  I just had become very casual

19   and not, you know, celebratory anymore.

10:45AM 20         THE COURT:  Okay.  But you've been sober for three

21   years or so?

22             THE JUROR:  Yes.

23             THE COURT:  Congratulations.

24             THE JUROR:  Thanks.

25             THE COURT:  Do you think any of that would affect your

1       ability to be serve in a trial of this case?

2                THE JUROR:  No.

3                THE COURT:  And to be a fair and impartial juror?

4                THE JUROR:  Yes.

5                THE COURT:  All right.  Thank you, Ms. Grande, I'm

6       going to leave you on.  I'll ask you to return to the other

7       courtroom.

8                THE JUROR:  Okay.

9                THE COURT:  Thank you.

10:45AM 10                MR. FLASHNER:  Your Honor, before you bring in the

11      next juror, my notes could well be incorrect, but I thought she

12      also indicated an arrest and charged, but if I'm the only one

13      who has that, perhaps I'm incorrect.

14                THE COURT:  I don't have that in my notes.  Hold on.

15      No, I don't.

16                MR. FLASHNER:  Thank you.

17                THE COURT:  Well, hold on.  No, I don't see it.

18                THE CLERK:  Juror Number 15.

19                THE COURT:  All right.  Ms. Negoshian?

10:47AM 20                THE JUROR:  Yes.

21                THE COURT:  You raised your card a couple of times,

22      including I kind of asked a catch-all question at the end and

23      you raised your card then.  Tell me why you did that.

24                THE JUROR:  I try to be impartial, but I generally

25      call a spade a spade.

1          THE COURT:  You generally what?

2          THE JUROR:  I generally call a spade a spade.

3          THE COURT:  Well, I'm not quite sure what you mean by

4    that, but if you -- in this context, calling a spade a spade

5    means, you know, if you think the defendant is guilty, the

6    evidence supports you, you can vote that way, if you think he's

7    not guilty because the evidence doesn't support it, you can

8    vote that way?

9          THE JUROR:  I don't know if I could be impartial is I

10:47AM 10   guess what I'm saying.

11         THE COURT:  You're not confident you can be fair to

12   both sides?

13         THE JUROR:  Yes.

14         THE COURT:  In that case, I'm going to have to let you

15   go.  Thank you.

16         THE JUROR:  Thank you.

17         THE COURT:  All right.  Number 17.

18         THE CLERK:  Juror Number 17.

19         THE COURT:  All right.  Ms. Bruno?

10:48AM 20         THE JUROR:  Good morning.

21         THE COURT:  I think you raised your card, I had asked

22   about connections to the criminal justice system or whether

23   anyone had been involved in a case as a defendant, victim, or

24   witness.  Tell me about that.

25         THE JUROR:  My cousin was -- he lives in -- he used to

1    live in Texas.  He was part of drugs, selling drugs, as well as

2    he was a victim to a case of drugs.

3                THE COURT:  Okay.  And was he sent to prison?

4                THE JUROR:  He was murdered a year ago and the

5    gentleman was sentenced three weeks ago.

6                THE COURT:  Okay.  Is this someone you were close to?

7                THE JUROR:  Kind of far cousin, distance, not too

8    close.

9                THE COURT:  Okay.  And he lived in Texas?

10:49AM 10           THE JUROR:  Uh-hum.

11                THE COURT:  You have to say yes or no for the

12    transcript.

13                THE JUROR:  Yes.  Sorry.

14                THE COURT:  That's all right.  Is there anything about

15    that sad situation that would affect your ability to be fair in

16    this case?

17                THE JUROR:  No, sir.

18                THE COURT:  You're confident you can be fair to both

19    sides?

10:49AM 20           THE JUROR:  Yes.

21                THE COURT:  Okay.  Thank you, Ms. Bruno.

22                THE JUROR:  You're welcome.

23                THE CLERK:  Juror Number 19.

24                THE COURT:  You're Ms. Porter?

25                THE JUROR:  Yeah.

1    THE COURT:  And you raised your card a couple of

2 times.  I had asked about connections, whether you or family

3 members or friends worked for police departments.  I think you

4 raised your card.  Tell me about that.

5    THE JUROR:  My daughter is married to a Quincy police

6 officer.

7    THE COURT:  Okay.  And is there anything about that

8 connection or relationship that would affect your ability to be

9 fair?

10:50AM 10    THE JUROR:  No.

11    THE COURT:  And I think you also raised your hand

12 about whether you or someone close to you had been treated for

13 addiction or dependency.  Tell me about that.

14    THE JUROR:  I had a niece that died in her early 20's,

15 possibly seven years ago or so, from a heroin overdose.

16    THE COURT:  And the same question, that's very sad.

17 Is there anything about that situation that would affect your

18 ability to be fair?

19    THE JUROR:  I don't think so.

10:51AM 20    THE COURT:  My form says you're retired.  What did you

21 do before you retired?

22    THE JUROR:  I was a blood bank technician in the

23 hospital.

24    THE COURT:  Okay.  And your spouse is also retired?

25    THE JUROR:  Yeah, he was a truck driver, uh-hum.

1          THE COURT:  All right.  Thank you, Ms. Porter.  I'm

2     going to send you back to the other courtroom.  Thank you.

3          Mr. Boy?

4          THE JUROR:  Yeah.

5          THE COURT:  You raised your card a few times,

6     including I asked about hardship.  Tell me about that.

7          THE JUROR:  I put in my questionnaire that I'm a

8     full-time student, and it was completely grazed over.  They

9     said I can't request a work hardship, but I requested a school

10:52AM 10   hardship.

11          THE COURT:  And where are you in school?

12          THE JUROR:  UMass Amherst.

13          THE COURT:  I'm sorry?

14          THE JUROR:  UMass Amherst.

15          THE COURT:  Okay.  And it says you're from South

16     Yarmouth.  Are you in Amherst?

17          THE JUROR:  I'm in Yarmouth, so I'm commuting three or

18     two hours, and then I'm living out in Amherst in the next

19     couple of weeks.

10:53AM 20          THE COURT:  All right.  Let me put that on pause for

21     the moment.  You also raised your card a few other times, once

22     for a question about law enforcement officers, whether they

23     were more likely or less likely to tell the truth.  Tell me

24     about that.

25          THE JUROR:  I think their jobs are more on the line

1   than normal people, that they tell the truth in the court of
2   law.
3         THE COURT:  Okay.  Meaning they're more likely to tell
4   the truth you think than a regular witness?
5         THE JUROR:  Yeah.
6         THE COURT:  All right.  The combination of your
7   commute from the Cape, the fact you're a full-time student, and
8   your response to that last question, I'm going to let you go,
9   okay.  Thank you, Mr. Boy.
10:53AM 10        THE JUROR:  Just leave now?
11        THE COURT:  Yes.
12        THE CLERK:  Juror Number 21.
13        THE COURT:  All right.  You're Ms. Keefe?
14        THE JUROR:  Yes.
15        THE COURT:  And you raised your card a few times.  Let
16   me ask you, I'm going to start with questions about the
17   attitudes about law enforcement and law enforcement officers.
18   Tell me about that.
19        THE JUROR:  I just -- I guess, based on like current
10:54AM 20   events and things that have been happening, I don't go straight
21   to trust police officers.  I just, yeah, I don't, that's my
22   first thought when I like think of it based upon power.
23        THE COURT:  All right.  As I said, you're entitled to
24   pay attention to the news and to draw whatever conclusions you
25   have, and in this trial you have to be fair because these are

1    specific human beings, specific police officers who are going

2    to be testifying, and the jurors have to be fair to both sides,

3    and that means evaluating that officer's testimony, each

4    officer's testimony on the merits.  Are you saying you think

5    you might have -- might not be able to do that fairly?

6         THE JUROR:  I don't know if I can be impartial.  I

7    think the police officers thing is just like a thought that I

8    have, but more on the other side, just like current events that

9    have happened in my life, more on the drug side is where I

10:55AM 10   think I can't be impartial more than the officers's side.

11        THE COURT:  Okay.  All right.  I think this is maybe

12   not the right case for you to sit on, so I'm going to let you

13   go.

14        THE JUROR:  Okay, thank you.

15        THE COURT:  22.

16        THE CLERK:  Juror Number 22.

17        THE COURT:  Mr. Cassidy.

18        THE JUROR:  Yeah.

19        THE COURT:  So you raised your card a few times.  Let

10:56AM 20   me ask you, you raised it in response to some questions about

21   law enforcement officers and attitudes about that.  Tell me

22   about that.

23        THE JUROR:  Yes, so I just know a lot of people who

24   were cops or work in that kind of field, so I feel like I would

25   have a hard time not taking their word in many ways, I guess.

                    1          THE COURT:  Okay.  I think I'm hearing you say you

                    2    think you'd have trouble being fair to both sides?

                    3          THE JUROR:  Yes.

                    4          THE COURT:  Okay.  I'm going to let you go then,

                    5    Mr. Cassidy.  Number 25.

                    6          THE CLERK:  Juror Number 25.

                    7          THE COURT:  You're Mr. Kelly?

                    8          THE JUROR:  Yeah.

                    9          THE COURT:  And you raised your card a few times,

    10:57AM 10    including attitudes about law enforcement officers.  I asked

                   11    you about that.  Tell me about that.  Why did you raise your

                   12    card?

                   13          THE JUROR:  A couple of my close friends are police

                   14    officers.  One is a police officer, one is in the process of

                   15    getting hired.

                   16          THE COURT:  And do you think -- obviously, this case

                   17    has nothing to do with your friends.  Do you think that would

                   18    affect your ability to be a fair juror in the trial of this

                   19    case?

    10:58AM 20          THE JUROR:  Yeah, I think it's kind of a product of

                   21    your environment, you know, I kind of rub off on them.

                   22          THE COURT:  So I think I hear you saying you'd have

                   23    trouble being fair to both sides?

                   24          THE JUROR:  I think I would be fair, but I think

                   25    there's other candidates that probably would fit the role

1    better than me.

2         THE COURT:  Well, I'm not looking for perfection, I'm

3    just looking for fairness, and I can't look inside your head,

4    so you have to tell me, you know, what you're thinking.  I

5    thought I heard you say you might struggle to be fair and

6    impartial.  And if that's true, tell me, and I need you to be

7    confident, I guess, let's put it that way that you can be fair.

8         THE JUROR:  Yes, I think that's fair to say.

9         THE COURT:  That you are not confident?

10:59AM 10         THE JUROR:  No, that I would not be fair based on.

11         THE COURT:  Okay.  All right.  In that case, I'm going

12    to let you go, Mr. Kelly.  Thank you.

13         THE JUROR:  Thank you.

14         THE CLERK:  Juror Number 26.

15         THE COURT:  Ms. Lau?

16         THE JUROR:  Yes.

17         THE COURT:  You raised your card a couple of times.  I

18    had asked about feelings or beliefs about drugs or drug abuse.

19    Tell me about that.

10:59AM 20         THE JUROR:  Well, I may have watched too much TV show.

21    I watched Dopesick, so that's more of about, you know, drugs.

22         THE COURT:  Well, this case has nothing at all to do

23    with TV shows.

24         THE JUROR:  Okay.

25         THE COURT:  And one of the problems of TV shows is

1    they, you know, they're fake, they don't reflect what the world

2    really is.

3         THE JUROR:  Yeah.

4         THE COURT:  And what I need is jurors who can be fair

5    to both sides and listen to the evidence and to decide the case

6    on the merits and not, you know, because there was something on

7    TV that affects your thinking.  Do you think you'd have trouble

8    doing that, being fair to both sides, deciding the case on the

9    evidence?  I can't look inside your head, you have to tell me.

11:00AM 10    THE JUROR:  I mean, I could be biased a little bit

11   just because --

12        THE COURT:  Okay, you think you might have an issue?

13        THE JUROR:  Yeah.

14        THE COURT:  I'm going to let you go, Ms. Lau.  Thank

15   you.

16        THE CLERK:  Juror Number 27.

17        THE COURT:  You're Mr. Grassi?

18        THE JUROR:  Yes.

19        THE COURT:  You raised your card a few times,

11:01AM 20   including I had asked some questions about I guess feelings or

21   beliefs about drug abuse or drug enforcement.  Tell me about

22   that.

23        THE JUROR:  Personally, I've lost family members to

24   drugs, and what I could say to the prosecutors that I hope

25   there's a day where they have 10, 100 times the funding to get,

1   you know, to get the drugs off the streets, and if I could talk

2   to these guys, you know, maybe if he did a ride -- I have a

3   daughter that's in law enforcement, and maybe if you took a

4   ride along in a cruiser from the night or with an EMT and you

5   saw what drugs are doing to this country.

6         My small home town that I grew up, maybe you wouldn't

7   even take a case like this, that's my personal opinion.  You

8   might not want to hear it, but, you know, to these guys that

9   are out there fighting the war on drugs, they're being held

11:02AM 10   back, they're not funded enough.  You know, that's my personal

11   opinion, so I would love to sit on that jury, and I'll tell you

12   right now I'm not going to be biased.  That's all I have to

13   say.  This guy isn't here because he's a choir boy.

14         I heard you when you mentioned earlier about the gun

15   charge.  If there's another gun charge being brought up, to me,

16   what I know about the law, he's already been convicted and he's

17   already a felon, so I can't, you know, I'm not 100 percent

18   sure.

19               THE COURT:  Okay.

11:03AM 20               THE JUROR:  In my opinion, also when these guys, like

21   maybe the courts start being a little harder on these people,

22   that's how we're going to get a chance to some day -- I have

23   grandchildren in this world now, and it's awful to see the

24   world that they are being brought up in, and it needs to change

25   one way or the other.

1          THE COURT:  Okay.  Mr. Grassi, I'll tell you I agree

2     with many of the things you said, but --

3          THE JUROR:  My opinion, I don't even know how

4     somebody, and I understand it's their job, but how somebody

5     would take a case like this.

6          THE COURT:  Well --

7          THE JUROR:  And sleep at night, look at themselves in

8     the mirror, you know, drive through your cities, Brockton,

9     Lowell, Lynn and look at what's going on with our society, and

11:04AM 10    it all stems from drugs.

11          THE COURT:  I don't agree with that in the sense we

12     need criminal defense lawyers, and we can't have a system

13     without it, but I'm going to cut to the bottom line.  I'm not

14     sure this is the right case for you to sit on.  Okay, so --

15          THE JUROR:  I would 100 percent agree with that.  I

16     would put me on for the prosecution beyond a shadow of a doubt.

17     This guy isn't here because he's a choir boy.

18          THE COURT:  Okay.  So I think this is not the right

19     case for you, so I'm going to let you go.

11:04AM 20          THE JUROR:  Thank you, I'd like to say to you guys

21     good luck in the future, and I hope you get as many of these

22     guys off the streets as you can.  Good luck, guys.

23          THE CLERK:  Juror Number 28.

24          THE COURT:  You're Ms. Carlson?

25          THE JUROR:  Yes.

1          THE COURT:  And I think you raised your card once, I
2    asked a question I think about --
3          THE JUROR:  Guns.
4          THE COURT:  -- guns.  Yeah.  Tell me about that.
5          THE JUROR:  I also should have raised -- I can't
6    remember what the previous question was about opinions on
7    drugs, illegal drug use.
8          THE COURT:  Sure.  Tell me what's on your mind.
9          THE JUROR:  Okay.  So it's not a direct connection,
11:05AM 10   but a good friend of mine's daughter, her boyfriend died of a
11   fentanyl overdose, cocaine that's what he was doing and ended
12   up dead, so not close enough that I was at the funeral, but
13   close enough that I was, you know, a sobering lesson to try and
14   impart to my kids.  You know, last night's sleep thinking about
15   it a little bit.  And regarding guns, it's just I don't
16   think -- I have a problem with legal gun possession, let alone
17   illegal gun possession.  I think there's too many of them out
18   there.
19         THE COURT:  So -- okay.  So let's take the drugs one.
11:06AM 20   THE JUROR:  Okay.
21         THE COURT:  You're not going to get any disagreement
22   from me that drugs are bad, and they're doing lots of bad
23   things in our society, but this isn't a jury trial about fixing
24   that problem.
25         THE JUROR:  Sure, no.  I understand.

1          THE COURT:  You're entitled to your attitudes, but you
2     have to be fair, and that doesn't mean that this defendant is
3     guilty.
4          THE JUROR:  Yeah.
5          THE COURT:  You have to have an open mind, and the
6     same goes with gun charges.  We can't have juries who think --
7     well, I'm not sure if there's enough evidence or enough
8     credible evidence here, but I don't like guns, I don't like
9     drugs, therefore, we're going to convict him.  You can't do
11:07AM 10     that.  You have to be able to say no, I'm going to do what my
11     duty is, and that's acquit if the evidence isn't there, so...
12          THE JUROR:  I hesitated to lift my card.
13          THE COURT:  No, no.
14          THE JUROR:  I think I can listen to the evidence, but
15     I didn't want to not --
16          THE COURT:  I'm not giving you a hard time, I just
17     need 12 people or 14 people who can be fair.  As I said, this
18     isn't, you know, the friend's daughter boyfriend who died, or
19     this case is not about that.  It's not about drugs generally,
11:08AM 20     firearms generally, all the problems we have in our society,
21     it's a really specific narrow thing, is this defendant guilty
22     of these crimes, and I think I hear you saying you're confident
23     you can be fair to both sides?
24          THE JUROR:  I think so.
25          THE COURT:  All right.  And I'm going to leave you in

1  the pool for now, Ms. Carlson.  Don't worry about -- don't feel

2  guilty about your candor.  I need your candor and there's

3  nothing wrong with those opinions.  I share a lot of them, but

4  that's not the point.  The point is this defendant is guilty of

5  the crimes with which he is charged.

6          Mr. Flashner.

7          MR. FLASHNER:  Your Honor, may I inquire briefly?

8          THE COURT:  Yes.

9          MR. FLASHNER:  Just a couple of questions for you, and

11:08AM 10  I'm sorry, I know it was somewhat personal, but your friend's

11  daughter's boyfriend, when he passed away, how long ago was

12  that?

13          THE JUROR:  Three years, I think.

14          MR. FLASHNER:  And the drug you said was fentanyl,

15  right?

16          THE JUROR:  Yeah, it was -- I don't think he knew

17  there was fentanyl, you know, that was the sobering thing was

18  you see this stuff in the news, and then it's somebody that you

19  have a close connection to.  It was more of a talking to my

11:09AM 20  kids, don't do illegal drugs because you don't know what's

21  going to be in there sort of moment.

22          THE COURT:  And there's likely to be testimony that

23  involves a seizure of fentanyl in this case.  Given your

24  experience and given that, would you be able to be fair and

25  impartial and view this case based on the evidence?

1        THE JUROR:  Yes, I think so.

2        MR. FLASHNER:  Thank you.

3        THE COURT:  Thank you, Ms. Carlson.

4        THE JUROR:  Yes.

5        THE CLERK:  Juror Number 32.

6        THE COURT:  All right.  Ms. Casey?

7        THE JUROR:  Yes, sir.

8        THE COURT:  I had asked kind of a catch-all question,

9   I think you raised your card.  Tell me what's on your mind.

11:10AM 10        THE JUROR:  I did.  Good morning, your Honor, and to

11   counsel.  I'm not sure if I've ever -- I have served in the

12   court system before, but I have not ever heard of the court

13   system making an exception to excuse a juror for a -- excuse

14   me, I may get a little emotional, for a financial hardship.

15        On July 26th, I had to retire from my employer because

16   my financial situation at home is very difficult, so the

17   retirement is not the retirement that I had planned.  It is not

18   that I do not want to serve on the Federal Circuit, I would be

19   honored to do so, but at this time it's very difficult for me

11:11AM 20   because I need to find another place of employment, and I can't

21   return to my employer for three months, but I have to return to

22   work a little sooner.  I do hope that you will consider this

23   situation to excuse me, but I would like to be also considered

24   to serve and be asked to serve again.

25        THE COURT:  Okay.  Can I ask you a favor, can you step

1    out for a minute?  Let me talk to the lawyers.

2              THE JUROR:  Yes, thank you.

3              THE COURT:  All right.  Here's what I'd like to do

4    with her.  I would like to drop her to the bottom of the list

5    and not make this decision yet.  We need 32 cleared jurors.  By

6    my count, we're up to 18.  As a practical matter, we almost

7    never reach these people, but I'm also a little reluctant to

8    let her go, and if it looks like we might need her, I might

9    drill into this a little deeper and see what's going on.  So

11:12AM 10    it's de-randomizing her in a way, but I'm also okay with

11    letting her go.  Is that all right?

12              MR. FLASHNER:  That's acceptable.

13              MR. CROWLEY:  That's acceptable to the government.

14    Thank you, your Honor.

15              THE COURT:  All right.  Bring her back in.

16              You can stop there, Ms. Casey.  So here's what I'm

17    going to do, I'm going to drop you to the end of the list.  As

18    a practical matter, at least, you're probably not going to be

19    called, but I want to make sure we have enough people, and so I

11:13AM 20    might let you go anyway, but I might ask more questions, you

21    know, if it looks like we might possibly need you, so I'll ask

22    you to sit tight and, like I say, we'll put you at the end of

23    the list and hopefully we won't need you, and if it looks like

24    we do, I'll ask you I think some more questions, okay?

25              THE JUROR:  Thank you.

         1              THE COURT:  All right.  Thank you.

         2              THE CLERK:  Juror Number 33.

         3              THE COURT:  You're Mr. Brophy?

         4              THE JUROR:  Yes.

         5              THE COURT:  And I think you raised your card a couple

         6     of times.  One was I think connections to law enforcement

         7     officers.  Tell me about that.

         8              THE JUROR:  I have two brother-in-laws, one has passed

         9     away now, but two Boston police brother-in-laws that I have in

11:14AM 10     the family.

        11              THE COURT:  Okay.  Were they patrol officers, do you

        12     know?

        13              THE JUROR:  One was a detective and one was a

        14     community police.

        15              THE COURT:  Okay.  Did the detective work drug cases?

        16              THE JUROR:  Yes.

        17              THE COURT:  Okay.  Gun cases?

        18              THE JUROR:  Yes.

        19              THE COURT:  Okay.  Is there anything about that

11:14AM 20     connection or relationship that would affect your ability to be

        21     a fair juror in the trial of this case?

        22              THE JUROR:  No.

        23              THE COURT:  Okay.  And I think you also, you raised

        24     your card, I had asked about whether you or anyone close to you

        25     had an addiction or dependency issue.  Tell me about that.

1        THE JUROR:  Yes, my -- I have two daughters.  One of

2    my daughters, my younger daughter, she is a recovering heroin

3    addict.  She's ten years in recovery.

4        THE COURT:  Okay.  Ten years, okay.  Good.  And is

5    there anything about that situation, again, that would affect

6    your ability to be fair?

7        THE JUROR:  I mean, I'm just glad she's a recovering

8    addict.

9        THE COURT:  But...

11:15AM 10    THE JUROR:  No, it shouldn't affect, I don't think.

11        THE COURT:  Okay.  Again, the case has nothing to do

12    with your daughter.  It's great she's ten years in.  I mean,

13    that's wonderful, but this case has nothing to do with her.  I

14    just want to make sure that whatever, that both the unfortunate

15    and fortunate situation, but it won't affect your ability to be

16    fair here?

17        THE JUROR:  No.

18        THE COURT:  Your form says your spouse is retired.

19    What is she retired from?

11:16AM 20    THE JUROR:  She was -- she worked in finance and HR at

21    a company in Canton.  She just retired a month ago.

22        THE COURT:  Okay.  All right.  Thank you, Mr. Brophy.

23        THE JUROR:  Thank you.

24        THE CLERK:  Juror Number 34.

25        THE COURT:  All right.  Mr., Dr. Smolinski.

1           THE JUROR:  Yes.

2           THE COURT:  You raised your card, I had asked about

3     whether people had personally or someone close to them had been

4     treated for addiction or dependency, and I think you raised

5     your card.  Tell me about that.

6           THE JUROR:  Two of my nephews died of drug overdose,

7     so they didn't really get treatment.  Along the way, of course,

8     they tried.  A sister of my wife is on Suboxone.  It's pretty

9     typical, I would say.

11:17AM 10         THE COURT:  The two nephews that died, do you know

11    what the drug was that they were involved with?

12          THE JUROR:  They died of opiate use.  Along the way,

13    of course, they smoked pot, drank alcohol.

14          THE COURT:  Okay.  And opiate, you don't know whether

15    it was fentanyl or heroin, OxyContin, all of the above?

16          THE JUROR:  Right.  If you're familiar with the

17    process, it usually starts with Oxy or Oxycodone, and then once

18    doctors cut you off, you go to heroin.  Fentanyl is fairly new,

19    but so these people died in the '90s.

11:18AM 20         THE COURT:  Okay.

21          THE JUROR:  So they weren't part of the fentanyl

22    crisis.

23          THE COURT:  And your wife's sister, did you say, is --

24    currently has an issue with Suboxone?

25          THE JUROR:  Her husband, too, they were long time

1    users of heroin.  They started in, jeeze, like the '70s or the

2    '80s.  Both became very productive.  Both had long-term jobs.

3    Her sister has rheumatoid arthritis, and that means she has to

4    ask the doctors to get opiates, and so she became re-addicted.

5    And now she's on Suboxone and doing quite well.

6            THE COURT:  Okay.  And is there anything about those

7    situations that would affect your ability to be fair in the

8    trial of this case?

9            THE JUROR:  No.

11:19AM 10        THE COURT:  Are you confident you can be fair to both

11    sides?

12            THE JUROR:  Say that again.

13            THE COURT:  You're confident you can be fair to both

14    sides?

15            THE JUROR:  I am comfortable being fair, yes.

16            THE COURT:  What kind of physician were you before you

17    retired?

18            THE JUROR:  General practitioner, ER work for about

19    24 years, urgent care.  I did occupational health for ten more.

11:19AM 20        THE COURT:  Okay.

21            THE JUROR:  Ended before the COVID thing.

22            THE COURT:  Okay.  All right.  Thank you, Doctor.  I'm

23    going to let you go or send you to the other courtroom, not let

24    you go.

25            THE JUROR:  Thank you.

```
 1              THE CLERK:  37.

 2              THE COURT:  All right.  Mr. Pino?

 3              THE JUROR:  Pino.

 4              THE COURT:  Pino.  You raised your card, I asked about

 5    whether you or anyone close to you had been involved in a

 6    criminal case as a defendant, victim, or witness.  I think you

 7    raised your card.  Tell me about that.

 8              THE JUROR:  Yes.  My younger brother was involved in a

 9    criminal case.

11:20AM 10              THE COURT:  Okay.  What kind of case?

11              THE JUROR:  He had possession of a firearm.

12              THE COURT:  Okay.  And how did that case get resolved?

13              THE JUROR:  He was found -- he plead guilty and he was

14    serving -- he's serving a year and a half sentence.

15              THE COURT:  Okay.  And is that in the state system or

16    federal?

17              THE JUROR:  The state.

18              THE COURT:  Was it in Massachusetts?

19              THE JUROR:  Yes.

11:20AM 20              THE COURT:  Okay.  And what made his firearm

21    possession illegal?  Did he not have a license or was --

22              THE JUROR:  Correct.  He was also, he had a previous

23    crime.

24              THE COURT:  Okay.  Do you think he was treated fairly

25    by the criminal justice system?
```

1          THE JUROR:  I have mixed feelings about it.

2          THE COURT:  Okay.  And it's probably complicated, but

3     tell me about your mixed feelings a little bit, I guess, as

4     best you can.

5          THE JUROR:  I don't think he should have had a

6     firearm, but also I think the way that they found the firearm

7     on him, it was -- they did a -- it sounded like, to me, it was

8     an illegal search of his vehicle.

9          THE COURT:  Okay.  And this case, of course, has

11:21AM 10     nothing to do with your brother.  Are you confident you can be

11     fair to both sides?  And as I said, you don't have to erase

12     your experience, but you have to be fair to both sides, the

13     government and the defense, and decide this case on the merits.

14     Are you confident you can do that?

15          THE JUROR:  I think I could.

16          THE COURT:  Okay.  And just to be clear, again, the

17     jury is not here to make a statement.  It's to decide guilty or

18     not guilty, and your experience can be brought to bear on your

19     judgment and weighing the credibility of the witnesses, but you

11:22AM 20     have to decide the case on the merits.  And you're confident

21     you can do that?

22          THE JUROR:  Yes.

23          THE COURT:  Okay.  All right.  I'm going to keep you

24     in the pool then, Mr. Pino, thank you.

25          THE CLERK:  Juror Number 40.

                    THE COURT:  Mr. Fairbanks?

                    THE JUROR:  Yes.

                    THE COURT:  You raised your card for a number of my

questions, including I think I had asked about hardship.  Let's

start with that.  What is your hardship?

                    THE JUROR:  Yes, my 93-year-old mother is recently in

ill health, and I'm going to have to take care of her

definitely this week and in the near future.  I don't know

what's going to happen, but it's at the top of the list, for

sure.

                    THE COURT:  Okay.  And who is taking care of her

today?

                    THE JUROR:  My sister was, but she's been brought into

some health circumstances of her own that I may have to take

over.

                    THE COURT:  All right.  I had also asked about

feelings about drug cases, drug abuse.  I think you raised your

card.  Tell me about that.

                    THE JUROR:  A good friend of mine last week, as a

matter of fact, her son -- her son died of a drug overdose, and

he was a wonderful kid, and it's weighing heavy on my mind

right now, recent suicide of a friend.  He obtained a firearm

from the illegal market, if you will, so there's a lot of

personal things involved.

                    THE COURT:  All right.  Do you think all of that might

         1    affect your ability to serve as a juror in this case?

         2              THE JUROR:  Yes.

         3              THE COURT:  Okay.  All right.  I'm going to let you

         4    go, Mr. Fairbanks.  Thank you.

         5              THE JUROR:  Thank you.

         6              THE CLERK:  Juror Number 41.

         7              THE COURT:  Ms. Tellier.

         8              THE JUROR:  Yes.

         9              THE COURT:  You raised your card, I had asked about

11:25AM 10    connections to police officers.  Tell me about that.

        11              THE JUROR:  Yes, I have family members who are police

        12    officers and then I worked for a town in the police department.

        13              THE COURT:  Okay.  Let's start with you.  You live in

        14    Marshfield; is that right?

        15              THE JUROR:  Yes.

        16              THE COURT:  What did you do for the police department?

        17              THE JUROR:  I worked for beaches and we were run by

        18    the police department, and my supervisor was one of the

        19    lieutenants.

11:26AM 20              THE COURT:  All right.  And what family members do you

        21    have that are police officers?

        22              THE JUROR:  I have two uncles and two cousins.

        23              THE COURT:  Okay.  And where are they employed?

        24              THE JUROR:  One is employed by the State Police,

        25    another is Suffolk County, and one Boston Police, and then the

```
 1    other one in Rockland.
 2              THE COURT:  I'm sorry, Rockland?
 3              THE JUROR:  Rockland, yeah.
 4              THE COURT:  And is there anything about all of that
 5    experience and those connections that would affect your ability
 6    to be a fair juror in the trial of this case?
 7              THE JUROR:  No.
 8              THE COURT:  Are you confident you can be fair to both
 9    sides?
10    THE JUROR:  Yes.
11              THE COURT:  Okay.  Thank you.  I'm going to keep you
12    in the pool.  Thank you.
13              THE CLERK:  Juror Number 42.
14              THE COURT:  All right.  Mr. Corey.  I think I had
15    asked kind of a catch-all question and you raised your card.
16    Tell me why you did that.
17              THE JUROR:  Can you hear me?  Sorry.
18              THE COURT:  Yes.
19              THE JUROR:  So I'm not sure how much, but I want to
20    disclose that I work for a news station in Boston, so I'm not
21    sure if this case has received media coverage.  If it has,
22    there's a high likelihood that I've -- it's come across my eyes
23    at some point, so I just wanted to disclose that ahead of time.
24              THE COURT:  Thank you.  To my knowledge, there's been
25    no media coverage.  I mean, sometimes there's Internet, you
```

The timestamps in the left margin: 11:26AM at line 10, 11:27AM at line 20.

1    know, items but...

2          THE JUROR:  Okay.

3          THE COURT:  Nothing that I'm aware of, and I doubt

4    there will be, certainly not at the level of a local news

5    story.

6          THE JUROR:  Okay.

7          THE COURT:  And if for some reason there is, I'll ask

8    you to, while the trial is happening, it's a pretty short

9    trial, that you not pay any attention to it.

11:28AM 10          THE JUROR:  Okay.

11          THE COURT:  And then I think I also -- you had raised

12    your card about whether you or someone close to you had been

13    treated for addiction or dependency.  Tell me about that.

14          THE JUROR:  Yes, so I have two close childhood

15    friends, both of whom have been treated for various

16    addiction-related issues.  One for alcohol, one for drugs.

17          THE COURT:  Okay.  And what is the drug?

18          THE JUROR:  Opioids.

19          THE COURT:  Okay.  And are they sober now, do you

11:29AM 20    know?

21          THE JUROR:  Off and on, yeah.

22          THE COURT:  Okay.  And is there anything about that

23    situation that would affect your ability to be here?  Obviously

24    this has nothing to do with your friends.

25          THE JUROR:  I don't think so.

                1    THE COURT:  Okay.  I need a -- I can't look inside

                2    your head, so I have to trust what you tell me.  Are you

                3    confident you can be fair to both sides?

                4         THE JUROR:  Yes.

                5         THE COURT:  Thank you, Mr. Corey.  I'm going to leave

                6    you in the pool.  Okay.  Thank you.

                7         THE CLERK:  Juror Number 43.

                8         THE COURT:  All right.  Mr. Gibbons?

                9         THE JUROR:  Yes, sir.

    11:30AM    10         THE COURT:  And you raised your card for a few

               11    questions, beginning with hardship.  Let me ask you about that.

               12    What is your hardship?

               13         THE JUROR:  I'm an owner/operator of a small charter

               14    boat company, and I'm the only captain, and I have three

               15    charters, Tuesday, Wednesday, and Thursday and taking young

               16    inner city children out fishing.  I don't have another captain

               17    to do it for me.

               18         THE COURT:  Okay.  All right.  I think I'm going to

               19    let you go.  I do like the title Boston Fun Cruises.

    11:31AM    20         THE JUROR:  Boston Fun Cruises.

               21         THE COURT:  The word "fun" is not in my job

               22    description.

               23         THE JUROR:  You're welcome to board my boat any time.

               24         THE COURT:  Thank you, Mr. Gibbons.  I'm going to let

               25    you go.

1          THE JUROR:  Thank you.

2          THE CLERK:  Juror Number 44.

3          THE COURT:  You're Ms. Buckley?

4          THE JUROR:  Yes.

5          THE COURT:  And I think you had raised your card, I

6    asked about whether you or anyone you knew worked for a police

7    department and tell me about that.

8          THE JUROR:  I have an uncle who is a retired State

9    Police officer.

11:31AM 10          THE COURT:  Was he a patrol officer?

11          THE JUROR:  No, in my lifetime mostly he was at the

12    Registry.

13          THE COURT:  Okay.  And is there anything about that

14    connection or relationship that would affect your ability to be

15    a fair juror in the trial of this case?

16          THE JUROR:  No.

17          THE COURT:  Okay.  Thank you, Ms. Buckley.

18          THE JUROR:  Thank you.

19          THE COURT:  Just give me a moment to talk to the

11:32AM 20    lawyers.  So by my count, we have 28 cleared jurors, so I need

21    four more.  I would normally take a bathroom break at 11:30,

22    but I'm a little bit inclined to power through and see if we

23    can get the last four before taking our break.

24          MR. FLASHNER:  That's fine, your Honor.

25          MR. CROWLEY:  That's fine for the government, your

1    Honor.

2         THE COURT:  Famous last words, let's see how this

3    goes, Number 45.  Okay.

4         THE CLERK:  Juror Number 45.

5         THE COURT:  All right.  Mr. Hood, right?

6         THE JUROR:  Yes.

7         THE COURT:  I think you raised your card a few times,

8    including I asked about whether law enforcement officers were

9    more likely or less likely to tell the truth, and I think you

11:33AM 10  raised your card.  Tell me about that.

11        THE JUROR:  You know, of course, I'm an

12   African-American, and I kind of follow the news and have my own

13   experiences, and so I can't say that I always feel law

14   enforcement is always objective across the board.

15        THE COURT:  And you're certainly completely entitled

16   to feel that, but what I need is to be confident that you would

17   judge the law enforcement officers who testify here as

18   individuals.  In other words, this doesn't have anything to do

19   with whatever bad cops are out there or rude or racist cops, or

11:34AM 20  whatever they are.  These police officers are their own people

21   and the jurors need to evaluate them based on what they hear in

22   court.

23        Do you think you could be fair to both sides, or do

24   you think you would struggle to do that?  Again, you don't have

25   to erase your experience, but you have to be fair.

1      THE JUROR:  To tell you the truth, I believe I might

2  be able to do it, but I can't say, you know, I'm positive that

3  my experience hasn't, you know, shaken me to a certain extent

4  about --

5      THE COURT:  So I think I hear you saying you have some

6  doubts you could be fair?

7      THE JUROR:  I do have doubts.

8      THE COURT:  In that case, this is not the right case

9  for you to sit on, so I'm going to let you go.

11:35AM 10      THE JUROR:  Okay.  Thank you.

11      THE CLERK:  Juror Number 46.

12      THE COURT:  Mr. Baga?

13      THE JUROR:  Yes.

14      THE COURT:  You raised your card a couple of times,

15  including I had asked a question about beliefs about drug use,

16  drug abuse.  Tell me about that.

17      THE JUROR:  Yes, I had similar people who, you know,

18  are good friends, so I had a friend who overdosed from heroin a

19  number of years ago.

11:36AM 20      THE COURT:  Did he survive?

21      THE JUROR:  He did not.

22      THE COURT:  How long ago was that?

23      THE JUROR:  That was in 2018.

24      THE COURT:  And I think you also raised your card, I

25  had asked about people close to you who had addiction or

1    dependency issues.  Is that the same situation?

2              THE JUROR:  Yes.

3              THE COURT:  And, obviously, this case doesn't have

4    anything to do with your friend.  Do you think you can be

5    impartial and fair to both sides in this case?

6              THE JUROR:  Yes.

7              THE COURT:  Okay.  Are you confident you can be fair?

8              THE JUROR:  Yes.

9              THE COURT:  All right.  I'm going to leave you on,

11:36AM 10   thank you, Mr. Baga.

11             THE JUROR:  Thank you.

12             THE CLERK:  Juror Number 47.

13             THE COURT:  All right.  Ms. Xu, am I pronouncing that

14   correctly?

15             THE JUROR:  Yes, Xu.

16             THE COURT:  You raised your card a few times, and

17   including I asked kind of a catch-all at the end.  Tell me why

18   you did that.  In other words, I asked is there anything else

19   out there and I think you raised your card?

11:37AM 20         THE JUROR:  Yes, I did, your Honor.  I raised my card

21   for to respond to, I guess, two questions.  One is, one was in

22   terms of the history of -- oh, a family who had been in the

23   treatment of drug --

24             THE COURT:  Yes.

25             THE JUROR:  -- abuse.  So my uncle who had been

1    abusing cocaine for a long time, and he committed suicide

2    after -- under the influence of cocaine abuse, so I believe

3    that was something that, you know, really kind of impacts my

4    judgment in terms of hearing a case involving drug abuse or

5    possession or anything.

6         THE COURT:  So you think it would affect your ability

7    to be fair?

8         THE JUROR:  I think so.  And another reason is I just

9    want to mention is I'm a lawyer, although I really was not

11:38AM 10  involved in any criminal cases, but given the kind of education

11   and the prior practices, I don't think that would impact my

12   kind of fair judgment, but that was something that I think the

13   Court might want to know.

14        THE COURT:  Okay.  All right.  I think based on your

15   concerns about whether you could be fair in light of your

16   uncle's situation, I'm going to let you go.  Thank you.

17        THE JUROR:  Thank you.

18        THE CLERK:  Juror Number 48.

19        THE COURT:  All right.  Ms. Tedesco-Martin, am I

11:39AM 20  pronouncing that right?

21        THE JUROR:  Yes.

22        THE COURT:  And you raised your card I guess a few

23   times, but including about disability or hardship.  Tell me

24   about that.

25        THE JUROR:  I think hardship, or the question you

1    asked after applies more than the word "disability."

2              THE COURT:  Okay.

3              THE JUROR:  Two things related to that.  One is that I

4    have a cancer gene called Lynch syndrome that puts me at risk

5    for many cancers of various types, so I have to do frequent

6    appointments and screenings for this, and I'm supposed to have

7    an endoscopy this week on Friday that's already late because

8    the doctor canceled it the first time.

9              THE COURT:  The endoscopy?

11:40AM 10         THE JUROR:  Endoscopy, and they're really, really hard

11   to reschedule.  So that's the first reason I raised my card to

12   that.

13             THE COURT:  Okay.  All right.  I think what I'm going

14   to do is to let you go.  It's -- in my experience, rescheduling

15   medical appointments is harder than rescheduling jury duty, but

16   I'm going to let you go.  Good luck.

17             THE JUROR:  Thank you very much.

18             THE CLERK:  Juror Number 50.

19             THE COURT:  You're Ms. Woodbury?

11:41AM 20         THE JUROR:  Yes.

21             THE COURT:  And I think you raised your card a couple

22   of times, including one for hardship.  Tell me about that.

23             THE JUROR:  My son-in-law is a Haverhill police

24   officer.  He works the overnight shift, sleeps during the day,

25   and my daughter has a full-time job, and I care for their three

1    children all day while they're at work and sleeping.

2        THE COURT:  Okay.  And who is taking care of the

3    children today?

4        THE JUROR:  So my son-in-law is -- he took today as a

5    personal day so I could be here.

6        THE COURT:  Okay.  All right.  I think under the

7    circumstances, I'm going to let you go, Ms. Woodbury.

8        THE JUROR:  Thank you.  I appreciate the time.

9        THE COURT:  We'll talk to this juror and then let me

11:43AM 10    talk to the lawyers afterwards.

11        THE CLERK:  Juror Number 51.

12        THE COURT:  Mr. Ruffing?

13        THE JUROR:  Yes.

14        THE COURT:  And you raised your card a couple of

15    times, including I think attitudes about drug abuse or

16    experiences with drug abuse.  Tell me about that.

17        THE JUROR:  Just a family history, a couple of uncles.

18        THE COURT:  Were they drug dependent?

19        THE JUROR:  Drug dependent, yes.

11:43AM 20        THE COURT:  And are they still drug dependent?

21        THE JUROR:  Passed away.

22        THE COURT:  Because of an overdose?

23        THE JUROR:  Just it led to their --

24        THE COURT:  It led to other health problems?

25        THE JUROR:  It led to other health problems, yes.

1          THE COURT:  All right.  And is there anything about

2     that situation which, of course, has nothing to do with this

3     case that would affect your ability to be fair in the trial of

4     this case?

5          THE JUROR:  No.

6          THE COURT:  Okay.  And you also, I think, raised your

7     card, I had kind of a catch-all question, and you raised your

8     card.  Tell me about that.

9          THE JUROR:  I own a business in Lexington.  I do not

11:44AM 10     know any of the officers, but I do own a business in Lexington.

11          THE COURT:  Okay.  And that's a gym?

12          THE JUROR:  A gym, yes.

13          THE COURT:  It's probably a good thing that you

14     haven't had enough dealings with the police to --

15          THE JUROR:  I just kind of keep to myself, yes.

16          THE COURT:  Or your customers do also.  And then I

17     think also I'd asked about whether you had any connections to

18     people who were employed as police officers.  Tell me about

19     that.

11:44AM 20          THE JUROR:  Just friends and a cousin, who are either

21     State Police or a local police.

22          THE COURT:  Okay.  And anything about those

23     connections or relationships that would affect your ability to

24     be fair?

25          THE JUROR:  No.

1          THE COURT:  All right.  Thank you, Mr. Ruffing, I'm

2     going to ask you to --

3          MR. FLASHNER:  Your Honor, may I just inquire briefly?

4          THE COURT:  Oh, yes.  Sorry.

5          MR. FLASHNER:  Thank you.  You said you had some

6     friends that were in law enforcement and local police and you

7     work in Lexington.  I just want to ask if you're familiar with

8     the Lexington police officers, or if any of them are your

9     friends despite they're not being the ones that were furnished

11:45AM 10     by his Honor?

11          THE JUROR:  I don't know any of the names honestly of

12     the Lexington Police, like I said, or the Fire, or whoever.

13          MR. FLASHNER:  So let me just probe a little deeper

14     there.  So you interact with Lexington Police?

15          THE JUROR:  I don't interact with them at all, no.

16          MR. FLASHNER:  Okay.  How about the Fire?

17          THE JUROR:  No.

18          MR. FLASHNER:  Okay.  Thanks.

19          THE COURT:  Thank you, you may go to the other

11:45AM 20     courtroom.  And let me have a moment to talk to the lawyers.

21          All right.  By my count, we're at 31.  We're one

22     short, but what I would propose to do is take our break, it's a

23     quarter to 12:00, start the impanelment process.  If we get

24     that deep, you know, if it looks like somebody needs to see

25     that 32nd person, I'll continue this, we'll do it at sidebar

1      rather than this way and maybe save a little bit of time.

2             The next clump of jurors, all of them raised their

3      card about something or other, and we may not get that far, and

4      if we do, we'll just keep going down the list.  Let's start

5      with 31, and see if we get a jury, and if we don't, and if we

6      need to look at person 32, we'll do that.  Does that work?

7             MR. CROWLEY:  Fine for the government, your Honor.

8             MR. FLASHNER:  That's fine, your Honor.

9             THE COURT:  Why don't we give everyone a short

11:47AM 10      bathroom break.

11             Can you call in the panel, and I'll explain to them

12      what's going on, and we'll try to make this as close to

13      10 minutes as we can.

14             (Prospective jurors returned to courtroom)

15             THE COURT:  All right.  Ladies and gentlemen, don't

16      get too comfortable.  Basically what we're going to do is we're

17      going to take a bathroom break of hopefully ten minutes or so,

18      and then we're going to start the next phase of the jury

19      impanelment process by putting 14 people in the jury box.  So

11:49AM 20      we can't get started until all of you are here.  We have to

21      count you.  So you can go to the restroom, but please don't go

22      downstairs and have a cigarette outside, or do anything like

23      that, go down to the cafeteria.  You have to stay on this floor

24      because we can't get started again until you're all here, but I

25      appreciate your patience and cooperation, and we'll get through

1   this as quickly as we can, again, consistent with a fair trial.

2   So we'll take a short break.  Thank you.

3               THE CLERK:  All rise.

4               (THE FOLLOWING OCCURRED AT SIDEBAR:)

5               So I just want to make sure we're on the same

6   page here.  So by my count here are the 31 cleared jurors, 2,

7   3, 4, 5, 7, 8, 10, 14, 16, 17, 18, 19, 23, 24, 28, 29, 30, 31,

8   33, 34, 35, 36.

9               MR. FLASHNER:  I'm sorry, 31?

11:51AM 10   THE COURT:  31, 33, 34 because I dropped 32.

11              MR. FLASHNER:  Yes.

12              THE COURT:  31, 33, 34, 35, 36, 37, 38, 39, 41, 42,

13  44, 46, 49 and 51.  By my count, that's 31.  Okay.  So when we

14  come back, we'll put 14 people in the box, I'll do some

15  follow-up.  Some of these people I haven't talked to, I'll ask

16  my Backstreet Boys questions to them, make sure they don't have

17  hearing issues, that they speak English.

18              I'll ask ome follow-up questions for some of them,

19  fill in some blanks and ask about prior jury service, and then

11:52AM 20  we'll begin the exercise of peremptory challenges.  The

21  government has 7; the defense has 11.  We'll proceed in rounds

22  one by one, and the last two persons seated regardless of their

23  seat position will be the alternates, and if we need to look at

24  Juror Number 32, we'll pick up with Alexander Hart and keep

25  going until we have a second cleared juror.

1          MR. FLASHNER:  Your Honor, when we seat the jurors,

2     Juror Number 2 would go to Seat Number 1?

3          THE COURT:  Juror Number 2 goes to seat 1, 4 to seat

4     4, 7 to seat 5 and so on.

5          (SIDEBAR CONFERENCE WAS CONCLUDED).

6          ( A recess was taken.)

7          THE CLERK:  All rise.

8          THE COURT:  Thank you, ladies and gentlemen, for your

9     cooperation.  We're now going to begin the process of

12:05PM 10     exercising peremptories challenges and seating the jury.  The

11     clerk will read out the names of 14 people and we'll start the

12     process.

13          THE CLERK:  All right.  Once I call your name, can you

14     please come up?  Mr. Kaszanek in seat 1, Mr. MacDOnald in

15     seat 2.  Right down here.  Yeah.  Mr. Delaney in seat 3,

16     Mr. Glickman in seat 4.  My apologies if I pronounce anyone's

17     name wrong, Ms. Barnewalt in seat 5.

18          THE COURT:  Mr. --

19          THE CLERK:  Mr.  Sorry.

12:06PM 20          THE COURT:  Doctor.

21          THE CLERK:  Sorry, I got it.  Ms. Torres in seat 6,

22     and Mr. O'Donoghue in seat 7.  All right.  And all the way to

23     the end here in seat 8, Ms. Grande; seat 9 will have

24     Ms. MacNeil -- it's that second seat in there.  Seat 10 will

25     have Ms. Bruno; seat 11 will have Ms. Storer; seat 12 will have

1    Ms. Porter; seat 13 will have Mr. Steliotis, and seat 14 will

2    have Ms. Trueman.

3            THE COURT:  All right.  I'm going to have some

4    follow-up questions for some of you in the jury box.  I'm going

5    to ask a number of you whether you're married.  I'm not doing

6    that to pry, but just to find out whether you have a spouse,

7    and, if so, what the spouse's occupation is, and to just try to

8    fill in some blanks here.

9            So Mr. Kaszanek, are you married?

12:08PM 10            THE JUROR:  No, divorced.

11            THE COURT:  Ms. Glickman, are you married?

12            THE JUROR:  No.

13            THE COURT:  Okay.  And you're -- I'm sorry, you're an

14    R.N. at Boston Children's; is that right?

15            THE JUROR:  Yes.

16            THE COURT:  Ms. Torres, are you married?

17            THE JUROR:  No.

18            THE COURT:  Ms. MacNeil, are you married?

19            THE JUROR:  No.

12:08PM 20            THE COURT:  Okay.  And you're a teacher for the Town

21    of Billerica; is that right?

22            THE JUROR:  Yes.

23            THE COURT:  What grade?

24            THE JUROR:  Fourth grade.

25            THE COURT:  Fourth grade.  Okay.  They're still cute

1  and loveable at that point.

2  THE JUROR:  They really are.

3  THE COURT:  That changes for a while.  All right.

4  Ms. Storer, are you married?

5  THE JUROR:  No.

6  THE COURT:  Okay.  And you're a student.  Where are

7  you a student?

8  THE JUROR:  Tufts University.

9  THE COURT:  Tufts.  Okay.  And you're off for the

12:09PM 10  summer?

11  THE JUROR:  Yes.

12  THE COURT:  Mr. Speliotis, okay.  And -- I'm sorry,

13  you're a family advocate.  What do you do exactly?

14  THE JUROR:  I support homeless families.

15  THE COURT:  Okay.  And Ms. Trueman, Dr. Trueman, are

16  you married?

17  THE JUROR:  No.

18  THE COURT:  Okay.  And you work as a physician where?

19  THE JUROR:  Dothouse.  It's a community health center.

12:09PM 20  THE COURT:  Okay.  All right.  And the 14 of you, have

21  any of you ever served on a jury before of any kind, state or

22  federal, civil or criminal?  If you are, please raise your

23  hand, and I'll go down the row.  And just tell me what kind of

24  case it was, when it was, what court, that sort of thing.  So

25  front row, anyone?  Yes.

1          THE JUROR:  Two juries, one was a driving under the

2     influence and the other was an assault.

3          THE COURT:  Assault, okay.  Both in state court, I

4     assume?

5          THE JUROR:  State court.

6          THE COURT:  Okay.  In the back.  Yes?

7          THE JUROR:  It was state court and it was like a

8     neighbor dispute over like a driveway area type thing.  I was

9     the alternate.

12:10PM 10          THE COURT:  Yes.

11          THE JUROR:  It was for Lowell, it was also state

12     court, it was manslaughter.

13          And you, yes.

14          THE JUROR:  State court, Wareham, drunk driving.

15          THE COURT:  Okay.  All right.  I'll give the attorneys

16     a couple of moments.

17          I do add, I do love my children, but they are more

18     loveable at different stages than others.  All right, counsel.

19          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12:12PM 20          THE COURT:  This is round 1, the government goes

21     first.

22          MR. CROWLEY:  Seat 5, Dr. Barnewolt I believe is

23     Number 7.

24          THE COURT:  Juror 7, seat 5.  Defense.

25          MR. FLASHNER:  Your Honor, just to be clear, there's

```
 1       no backstrikes, but within this round, it doesn't matter?

 2              THE COURT:  You can use all 11 in this round.

 3              MR. FLASHNER:  We don't have to start at the lowest

 4       seat number?

 5              THE COURT:  No, no.

 6              MR. FLASHNER:  Thank you.  In Seat Number 13, Juror

 7       Number 23.

 8              THE COURT:  Juror Number 23, Seat 13, and that is

 9       Mr. Speliotis.  The government.

12:13PM 10             MR. CROWLEY:  Seat 6, Ms. Torres, I believe she's

11       Number 8.

12              THE COURT:  Juror 8, seat 8, Ms. Torres.  Defense.

13              MR. FLASHNER:  Juror 10.

14              THE COURT:  Juror 10, seat 7, Mr. O'Donoghue.  The

15       government.

16              MR. CROWLEY:  Seat 11, Ms. Storer, I believe she's

17       Number 18.

18              THE COURT:  Juror 18 in seat 11.  Defense.

19              MR. FLASHNER:  In Seat Number 2, Juror Number 3.

12:13PM 20             THE COURT:  Juror 3, seat 2, Ms. MacDonald.

21              MR. CROWLEY:  Seat 14, Dr. Trueman, I believe she's

22       24.

23              THE COURT:  Juror 24, seat 14, Dr. Trueman.  Defense.

24              MR. FLASHNER:  Can we have a second?  Juror in Seat

25       Number 10, Juror Number 17.
```

1          THE COURT:  Mr. Bruno, Juror 17, Seat 10, Bruno.

2          MR. CROWLEY:  That's it for the government in this

3     round.

4          THE COURT:  Okay.  Defense.

5          MR. FLASHNER:  In Seat Number 12, Juror Number 19.

6          THE COURT:  Seat 12, juror 19, Porter.  All right.

7     Anything else from the defense this round?

8          MR. FLASHNER:  May I have a moment?

9          THE COURT:  Yes.

12:14PM 10          MR. FLASHNER:  No more, that's fine.

11          THE COURT:  The government has used 1, 2, 3, 4, so you

12     have 3 remaining, and the defense has used 1, 2, 3, 4, 5, so

13     you have 6 remaining.  Okay.  I will replace those with the

14     next six people on the list, which I have as 15, 16, 17 -- I'm

15     sorry, 28, 29, 30, 31, 33, 34, okay.

16          THE CLERK:  35, 36 and 37 as well?

17          THE COURT:  I'm sorry, yes.

18          (SIDEBAR CONFERENCE WAS CONCLUDED)

19          THE CLERK:  Okay, Juror Number 3 in seat 2 is excused,

12:16PM 20     Juror Number 7 in seat 5 is excused, Juror Number 8 in seat 6

21     is excused, Juror Number 10 in seat 7 is excused, Juror Number

22     17 in seat 10 is excused, Juror Number 18 in seat 11 is

23     excused, Juror Number 19 in seat 12 is excused, Juror Number 23

24     in seat 13 is excused, and Juror Number 24 in seat 14 is

25     excused.

1        Ms. Carlson, please come up to Seat Number 2,

2   Mr. Fiander in Seat Number 5, Mr. DeJonge in seat Number 6,

3   Ms. Dise in Seat Number 7, Mr. Brophy for Seat Number 10,

4   Mr. Smolinski for Seat Number 11, Ms. Sumkarapalli in Seat

5   Number 12, Ms. Rumble for Seat Number 13, and Mr. Pino for Seat

6   Number 14.

7             THE COURT:  All right.  Mr. Fiander, are you married?

8             THE JUROR:  Yes.

9             THE COURT:  What does your spouse do?

12:18PM 10        THE JUROR:  She's a nurse.

11            THE COURT:  And where does she work?

12            THE JUROR:  At Mass. General.

13            THE COURT:  Mr. DeJOnge, are you married?

14            THE JUROR:  Yes.

15            THE COURT:  What does your spouse do?

16            THE JUROR:  She's a clinical research scientist.

17            THE COURT:  Where?

18            THE JUROR:  Merck.

19            THE COURT:  Okay.  Ms. Dise.

12:18PM 20        THE JUROR:  Dise.

21            THE COURT:  Dise.  Are you married?

22            THE JUROR:  Yes.

23            THE COURT:  What does your husband do?

24            THE JUROR:  He's a property development accountant.

25            THE COURT:  Mr. Sunkarapalli, am I pronoucning that

```
 1    correct?
 2              THE JUROR:  Yes.
 3              THE COURT:  Are you married?
 4              THE JUROR:  Yes.
 5              THE COURT:  And what does your spouse do?
 6              THE JUROR:  She's a software engineer.
 7              THE COURT:  Okay.  And where does she work?
 8              THE JUROR:  At Salesforce in Burlington.
 9              THE COURT:  All right.  And Ms. Rumble, are you
12:19PM 10   married?
11              THE JUROR:  No.
12              THE COURT:  And you're a student; is that right?
13              THE JUROR:  Yes.
14              THE COURT:  Where do you study?
15              THE JUROR:  Gordon College.
16              THE COURT:  Okay.  Are you off for the summer?
17              THE JUROR:  Yes.
18              THE COURT:  Well, I mean not in school for the summer?
19              THE JUROR:  Yes, correct.
12:19PM 20              THE COURT:  And have any of the newly seated jurors
21   ever served on a jury of any kind, state or federal?
22              Yes.
23              THE JUROR:  State criminal drug case and then an armed
24   robbery case.
25              THE COURT:  Okay.
```

1              Yes.

2              THE JUROR:  Federal, it was a civil case, at U.S.

3    District Court, it was an economist suing the State of

4    California.

5              THE COURT:  Okay.

6              THE COURT:  Yes.

7              THE JUROR:  It was a federal case in Boston, it was a

8    drug trial, someone from Lowell.

9              THE COURT:  Okay.  All right.  I'll give the lawyers a

12:20PM 10   few moments.

11             (THE FOLLOWING OCCURRED AT SIDEBAR:)

12             MR. FLASHNER:  Your Honor, could I have a minute?

13             THE COURT:  All right.

14             (SIDEBAR CONFERENCE WAS CONCLUDED.)

15             (THE FOLLOWING OCCURRED AT SIDEBAR:)

16             THE COURT:  Counsel.  This is Round 2, the defense

17   goes first.

18             MR. FLASHNER:  In Seat Number 11, Juror Number 34.

19             THE COURT:  Juror 34 in seat 11 is Mr. Smolinski.  The

12:23PM 20   government.

21             MR. CROWLEY:  Seat 12, Juror Number 35.

22             THE COURT:  Juror 35, seat 12, Ms. Sunkarapalli.

23             MR. FLASHNER:  In Seat Number 10, Number 33.

24             THE COURT:  Seat 10, juror 33, Mr. Brophy.  The

25   government.

1          MR. CROWLEY:  Seat 13, Juror Number 36, Ms. Rumble.

2          THE COURT:  Juror 36, seat 13, Ms. Rumble.

3          MR. FLASHNER:  That's all of our strikes for now, your

4    Honor.

5          THE COURT:  Anything further from the government?

6          MR. CROWLEY:  Seat Number 14, Juror Number 37,

7    Mr. Pino.

8          THE COURT:  Juror 37, seat 14, Mr. Pino.  Anything

9    else from the government?

12:24PM 10          MR. CROWLEY:  I think we're out.

11          THE COURT:  You've used up all your challenges.  All

12   right.  And the defense has used 2, that's 7 total.  That means

13   you have 4 remaining, and we'll replace those five jurors.

14          (SIDEBAR CONFERENCE WAS CONCLUDED)

15          THE CLERK:  Juror Number 33 in seat 10 is excused,

16   Juror Number 34 in seat 11 is excused, Juror Number 35 in seat

17   12 is excused, Juror Number 13 -- sorry, Juror 36 in seat 13 is

18   excused, and Juror Number 37 in seat 14 is excused.

19          All right.  Can I have Mr. Katz come up in Seat

12:25PM 20   Number 10, Ms. Brooks in Seat Number 11, Ms. Tellier in seat

21   12, Mr. Corey in Seat 13, and Ms. Buckley in Seat 14.

22          THE COURT:  All right.  Mr. Katz, are you married?

23          THE JUROR:  No.

24          THE COURT:  And you work for Dyno Therapeutics; is

25   that right?

|    |    |
|----|----|
| 1  | THE JUROR:  That's correct. |
| 2  | THE COURT:  Okay.  Ms. Brooks, are you married? |
| 3  | THE JUROR:  No. |
| 4  | THE COURT:  And you're an architect? |
| 5  | THE JUROR:  Correct. |
| 6  | THE COURT:  Ms. Buckley, are you married? |
| 7  | THE JUROR:  No. |
| 8  | THE COURT:  All right.  And have any of the newly |
| 9  | seated jurors ever served on a jury of any kind before?  Yes. |
| 12:27PM 10 | THE JUROR:  State court 13 years ago.  It was a |
| 11 | criminal case involving sexual assault. |
| 12 | THE COURT:  Sexual assault.  All right.  I'll give the |
| 13 | lawyers a few minutes. |
| 14 | (THE FOLLOWING OCCURRED AT SIDEBAR:) |
| 15 | THE COURT:  Counsel.  All right.  The government has |
| 16 | run out, the defense has four challenges remaining, we have |
| 17 | three cleared jurors remaining, so if you want to look at the |
| 18 | fourth, you can, Mr. Flashner. |
| 19 | MR. FLASHNER:  In Seat Number 12, Juror Number 41. |
| 12:29PM 20 | THE COURT:  Juror 41, seat 12, Ms. Tellier and Seat |
| 21 | Number 13, Juror Number 42. |
| 22 | THE COURT:  Seat 13, juror 22, I'm sorry, 42? |
| 23 | MR. FLASHNER:  42. |
| 24 | THE COURT:  Okay. |
| 25 | MR. FLASHNER:  That's it for now, your Honor. |

1         THE COURT:  You've used 9, you have 2 remaining.

2         MR. FLASHNER:  Just one second.  And Seat Number 44,

3  Seat Number 14, Juror Number 44.

4         THE COURT:  Seat 14, Juror Number 44, Ms. Buckley.

5  All right.  We will replace those three.  You have one

6  remaining, is that right, and the last two jurors regardless of

7  their seat will be the alternates.  Okay.

8         MR. FLASHNER:  Thank you.

9         (SIDEBAR CONFERENCE WAS CONCLUDED)

12:31PM 10         THE CLERK:  All right.  Juror Number 41 in seat number

11  12 is excused, Juror Number 42 in seat number 13 is excused,

12  and Juror Number 44 in seat 14 is excused.

13         In Seat Number 12, can I have Mr. Baga, in Seat

14  Number 13, can I have Ms. Bellefeuille, and sorry, and in Seat

15  Number 14, can I have Mr. Rutland?

16         THE COURT:  All right.  Mr. Baga, are you married?

17         THE JUROR:  No.

18         THE COURT:  Ms. Bellefeuille?

19         THE JUROR:  I am married.

12:32PM 20         THE COURT:  Okay.  I take it I'm not pronouncing your

21  name correctly?

22         THE JUROR:  No, but that's okay.  Nobody can say my

23  name.

24         THE COURT:  And your spouse is a lawyer?

25         THE JUROR:  Yes.

1           THE COURT:  What kind?

2           THE JUROR:  Patent.

3           THE COURT:  Okay.  And, Mr. Rutland, are you married?

4           THE JUROR:  No.

5           THE COURT:  Have any of the three of you ever served

6    on a jury of any kind?

7           THE JUROR:  No.

8           THE COURT:  Okay.  Let me see counsel at sidebar.

9           (THE FOLLOWING OCCURRED AT SIDEBAR:)

12:33PM 10           MR. FLASHNER:  This is my last remaining challenge

11   Number 14.  We'll strike Juror Number 51.

12           THE COURT:  That means we'll need two, so seat 14.

13   That means we need to clear another juror, right, because we're

14   out of people.  So we've the next cleared juror whoever that

15   person is.  Let's do this at sidebar.  Let me look at my notes.

16   20 years of being a Judge, this is the first time I've used all

17   32 people.  It's never happened.

18           THE CLERK:  Do you want to excuse Juror Number 51

19   first, Judge?

12:34PM 20           THE COURT:  No, let's --

21           (SIDEBAR CONFERENCE WAS CONCLUDED.)

22           THE COURT:  Can I see Alexander Hard?  Juror Number

23   52, please come forward.

24           (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

25           THE COURT:  Hi.  You had raised your card for a number

1    of questions, I think, including attitudes about law

2    enforcement.  Can you tell me about that.

3              THE JUROR:  I don't remember which one it was.

4              THE COURT:  Okay.  I just ask you to keep your voice

5    down so the jurors don't hear you.  I asked a question about

6    whether law enforcement officers are more likely to tell the

7    truth.  Let's start there.  Less likely?

8              THE JUROR:  I don't know, depends, I guess, there's

9    nuance to that.  It's definitely not a one-size-fits-all.  I

12:35PM 10    actually at this point I wouldn't even say there would be a

11   difference.

12             THE COURT:  Okay.

13             THE JUROR:  Is that why, is that what you're looking

14   at?

15             THE COURT:  I'm just trying to figure out why you

16   raised your hand or raised your card.  Let me ask you about

17   drug dependency issues.  I think you raised your card, you

18   know, someone who had drug issues?

19             THE JUROR:  Oh, yeah, for sure.

12:35PM 20             THE COURT:  Tell me about that.

21             THE JUROR:  Family, friends.

22             THE COURT:  Is there anything about that situation

23   that would affect your ability to be a fair juror in the trial

24   of this case?

25             THE JUROR:  Fair like this would have to do with my

1    ability to serve?

2            THE COURT:  Any of the things that you raised your

3    card for, is that what you mean?

4            THE JUROR:  Yeah, it was more generalized answering

5    the questions.

6            THE COURT:  What about gun regulation, I think you

7    raised your card on that one?

8            THE JUROR:  I'm not a huge proponent of gun

9    regulations, but that doesn't mean I couldn't have an objective

12:36PM 10    on the situation.

11            THE COURT:  I think the bottom line here is are you

12    confident you can be fair to both sides?

13            THE JUROR:  Yeah, I would think so.

14            THE COURT:  Can I get you to step aside for a moment,

15    let me talk to the lawyers.

16            It occurs to me in fairness, Mr. Flashner, since you

17    didn't know when you exercised that peremptory that you knew

18    who the next juror was that you were going to get, so I guess

19    I'll allow you to withdraw that peremptory and keep the juror

12:37PM 20    in Seat 14 or you can get Mr. Hard.

21            MR. FLASHNER:  I think we're going to be fine with

22    Mr. Hard, I will just ask that you inquire about his work with

23    the fire department, something fire equipment.  There's going

24    to be essentially a witness that is a fireman in this case.  I

25    don't know if that interacts with his views on fire.

1        All right.  Mr. Hard, hi.  You work for a fire

2    equipment company.  What do you do exactly?

3        THE JUROR:  I work on fire extinguishers and

4    cylinders, tanks.

5        THE COURT:  You install them, deliver them?

6        THE JUROR:  I mostly work on them.

7        THE COURT:  Thank you.  I think what we're going to do

8    is the clerk is going to call you up into the jury box.  We'll

9    let Mr. McKillop do that.  Thank you.

12:38PM 10        THE JUROR:  Cool.

11        (SIDEBAR CONFERENCE WAS CONCLUDED)

12        THE CLERK:  All right.  Juror Number 51 in seat 14 is

13    excused.  Juror 52, please come up.  Excuse me, Mr. Rutland.

14        THE COURT:  All right.  Mr. Hart, are you married?

15        THE JUROR:  No.

16        THE COURT:  All right.  And have you ever served on a

17    jury before?

18        THE JUROR:  No.

19        THE COURT:  All right.  Thank you, the 14 of you are

12:38PM 20    going to be the jury in this case, so I'll ask you to stand

21    once more and have Mr. McKillop swear you in.

22        (Jurors were sworn)

23        THE COURT:  All right, the rest of you on the panel,

24    thank you very much for your patience and cooperation.  Again,

25    this doesn't work without the willingness of people like you to

1    serve as jurors.  I very much appreciate you, but you are free

2    to go.

3              THE JUROR:  Thank you.

4              (Prospective jury pool left the courtroom.)

5              THE COURT:  All right.  Ladies and gentlemen, I didn't

6    mean to thank them without thanking you as well.  I greatly

7    appreciate your cooperation as well.  I have a few preliminary

8    instructions and comments about your duties.  It will last

9    about 15 or 20 minutes.  I think it will take us to the lunch

12:40PM 10   hour, and then I'll let you go, and then we'll start tomorrow

11   with the opening statements, but, I'm going to --

12             As I said, I'm going to talk about your duties as

13   jurors and I'm also going to give you some very brief

14   preliminary instructions on the law.  At the end of the trial,

15   I'll give you complete and detailed instructions on the law.

16   I'm going to give you those in writing, and each of you will

17   have your own copy to read as I read them aloud and to take

18   back with you into the jury room.

19             The reason I'm giving you some instructions now is to

12:40PM 20   give a bit of a framework for considering the evidence and to

21   help you understand it.  I don't want you to think that these

22   preliminary instructions are the only ones that matter or that

23   they're more important than the ones that come at the end.  You

24   must apply the instructions I give you at the end of the trial

25   as a whole.

1        You're going to be asked to find, as to the two

2   charges against the defendant, whether he is guilty or not

3   guilty of those crimes.  In order to do that, you will hear the

4   evidence and decide whether the government has proved the

5   defendant guilty beyond a reasonable doubt.  You and you alone

6   are the judges of the facts.  I, as the Judge, will decide what

7   law applies.  You must follow the law as I explain it to you

8   whether you agree with it or not.

9        Sometimes jurors are curious about what I think and

12:41PM 10   whether I think, for example, that a defendant is guilty or not

11   or whether I think a particular witness is believable.  My

12   opinion, if I have one, and I certainly do not have one now, is

13   not relevant.  It's your role, not mine, to decide those

14   issues, and you should not interpret anything I might say

15   during the trial as indicating what I think about a witness or

16   what I think your verdict ought to be.

17        Again, this is a criminal case that's brought by the

18   United States Government.  The government has what we sometimes

19   call the prosecution.  The defendant, Mr. Perez, has been

12:42PM 20   charged with the crime of conspiracy to distribute and

21   possession with intent to distribute certain controlled

22   substances.  Those controlled substances are alleged to be

23   cocaine, cocaine base, and fentanyl.  He's also been charged

24   with a crime of being a felon in possession of a firearm.  The

25   charges against the defendant are contained in a document

1    called an indictment.  The indictment is simply a description

2    of the charges against him.  It's not evidence of anything.  He

3    has pleaded not guilty to the charges.  He is presumed

4    innocent.  The government must prove his guilt beyond a

5    reasonable doubt.  He does not have to prove his innocence, he

6    does not have to put on any evidence, and he does not have to

7    testify.  Those are rights that are guaranteed by the

8    United States Constitution.

9         Again, at the end of the trial, as to both counts,

12:43PM 10   you'll be asked to render a verdict of guilty or not guilty,

11   and your verdict must be unanimous.  That is, you may convict

12   the defendant of any charge only if every one of you agrees

13   that he is guilty beyond a reasonable doubt.

14        Every crime has what we call elements.  Those are the

15   things that the government must prove beyond a reasonable doubt

16   as to that particular crime.  Again, at the end of the case,

17   you'll be instructed on what those elements are and I'll give

18   you important definitions.

19        The elements of Count One, which is the charge of

12:43PM 20   conspiracy to distribute and to possess with intent to

21   distribute controlled substances, are the following:

22        That the agreement charged in the conspiracy, as

23   charged in the indictment, which is a -- a conspiracy is a form

24   of agreement, that the agreement charged in the indictment

25   existed between the defendant and at least one other person,

1   and, second, that the defendant knowingly and intentionally

2   joined that conspiracy.

3        The second count charges him with the crime of being a

4   felon in possession of a firearm.  The elements of that offense

5   are the government must prove that the defendant had been

6   previously convicted in any court of a crime punishable by

7   imprisonment for a term exceeding one year.  That's what we

8   call a felony for shorthand.  Second, that the defendant

9   possessed the firearm specified in the indictment.  Third, that

12:44PM 10   the defendant acted knowingly.  And, fourth, that the firearm

11   was in or affected interstate or foreign commerce.

12        That is only a thumbnail sketch of what the government

13   has to prove.  Again, at the end I'll give you a final

14   instruction on all these matters, including the formal

15   definitions, and that will govern your deliberations.

16        I've mentioned the word "evidence."  The evidence in

17   this case will include the testimony of witnesses.  I expect it

18   will include documentation and objects and other things

19   received as exhibits.  The evidence consists of all the

12:45PM 20   testimony both on direct and cross-examination and all the

21   exhibits no matter who introduced them.

22        There are rules that control what you may consider as

23   evidence.  When a lawyer asks a question or offers something in

24   evidence and the lawyer on the other side thinks it is

25   improper, that lawyer may object.  That simply means that the

1    lawyers are requesting that I make a decision.  Sometimes I

2    need to do that outside of your hearing, either by a conference

3    at the sidebar, or, very rarely, by sending you out of the

4    courtroom.

5         Obviously, the purposes of those conferences is so I

6    can make a decision.  We don't keep you from things just to

7    frustrate you, but sometimes we do need to discuss things

8    outside of your earshot, and I'll do what I can to keep all

9    that to a minimum.

12:45PM 10    Certain things are not evidence.  Statements and

11   arguments by lawyers are not evidence.  The lawyers are not the

12   witnesses.  Questions by lawyers, standing alone, are not

13   evidence.  Again, the lawyers are not the witness.  It's the

14   question and the answer taken together that are the evidence.

15        Objections are not evidence, the lawyers have a duty

16   to object if they think something is not right.  If I sustain

17   an objection, I keep something out, you should ignore the

18   question or the exhibit and try not to guess what that answer

19   might have been, or what the exhibit might have contained.  I

12:46PM 20   hope this doesn't happen, but if I tell you to disregard

21   something or I strike it, it's not evidence and you may not

22   consider it.  And anything you see or hear about this case,

23   about anything really outside the courtroom is not evidence.

24   You must decide the case based only what you see and hear in

25   court.

1          Sometimes a particular item of evidence can come in

2     for a limited purpose only.  That means you can use it for one

3     purpose and not for any other.  If that happens, I'll tell you

4     and give you proper instructions at that time.

5          In determining your verdict, you may have to decide

6     what testimony you believe and what testimony you do not

7     believe.  You may believe everything a witness says, or only

8     part of it, or none of it.  It's entirely up to you.

9          Now, many people watch television shows and movies

12:47PM 10  about courts or lawyers or the justice system, and sometimes

11    people are affected by that when they serve as jurors.

12    Television shows and movies can create false expectations about

13    real life, for example, how a trial is going to proceed or what

14    evidence is going to look like.  You must decide this case on

15    the evidence before you and the laws as I give it to you.  Do

16    not decide this case, even in part, based on something you saw

17    on television or in a movie.  That's improper and unfair.

18         Let me turn next to the subject of how you're to

19    conduct yourselves during the trial to ensure that the trial is

12:47PM 20  fair.  You, as jurors, must obey the following rules:

21         The first rule is don't talk among yourselves about

22    the case until all the evidence is in and it's time for you to

23    deliberate.  You should feel free to get to know one another,

24    but you should talk about the Olympics, or the weather, or the

25    Red Sox, or your families, or something other than this case.

1        And it's particularly important that jurors not start

2    to pair up and have side discussions with one another about the

3    case outside the hearing of everyone else.  Because whether you

4    intend it or not, you're going to start to influence each other

5    and affect each other's thoughts and opinions, even if it just

6    seems like a casual conversation at the time.  So it's very

7    important that you wait and make sure everyone hears everything

8    anyone has to say all about the case all at the same time.

9        The second rule is not to make up your mind of what

12:48PM 10    the verdict ought to be until you've gone to the jury room to

11    decide the case and you and your fellow jurors have had a

12    chance to discuss it.

13        The evidence has to come in one piece at a time.

14    Something has to go first, something has to go last, and it

15    could be that the last question and the last answer are the

16    most important thing in the whole trial, so please keep an open

17    mind.

18        The third rule is not to talk with anyone else about

19    this case until the trial is over and you've been discharged as

12:49PM 20    jurors.  When I say don't talk with anyone else, that includes

21    your family, your friends, your roommates.  You may tell them

22    you're a juror and what kind of case it is, but that's it.

23        It's the most natural thing in the world when you get

24    home to have your spouse or your friends or your roommates say

25    to you, So, what do you think?  Who is guilty?  You know, is he

1    guilty?  I saw something on TV the other day about a case like

2    this, and I know it may feel or seem awkward, but you cannot

3    have that conversation.  Your friends, your loved ones are

4    going to have a powerful influence on your opinion.  And

5    they're not here, they haven't heard the evidence, they haven't

6    heard my instructions.  So you can go ahead and blame it on me,

7    tell them that I ordered you not to talk about it.

8         Fortunately, it's going to be a pretty short trial.

9    It's not going to be three weeks or three months.  I think it's

12:50PM 10    going to be closer to three days, but, still, you cannot have

11    those conversations while the trial is underway.

12         The next rule is please don't mention or discuss this

13    case in any way on Facebook or Instagram or Twitter or any

14    social network of any kind.  I'm sure you know that a lot of

15    people post everything that happens to them on social media.

16    You cannot do that here.  If you do it and we find out about

17    it, I may have to declare a mistrial, which means that we'll

18    have to start over and that will be a gigantic waste of time,

19    so please don't do it.

12:50PM 20         Next, don't let anyone talk to you about the case.  If

21    someone approaches you and tries to talk to you about it,

22    please report that to me immediately.

23         The next rule is, during the trial, you should not

24    speak with any of the lawyers, witnesses, anyone involved in

25    the case.  You should not even say hello to any of them.  It's

1    important not only that you do justice but that you give the

2    appearance of doing justice.

3          So if someone sees you talking to someone involved in

4    the case, either if it's just waiting for the elevator and it's

5    a casual conversation and you're just being polite, it might

6    arouse suspicion and I'll have to look into it.  I'll have to

7    inquire on what the conversation was about, so just don't do

8    it.

9          And if the lawyers or witnesses or anyone else doesn't

12:51PM 10   speak to you when they see you in the courthouse, they're not

11   being rude, it's because they're following the same rules.

12         Next, I don't expect that they'll be any news stories

13   or articles about the case or anyone involved with it, but if

14   there are, don't watch them, don't listen to them, or read the

15   articles.  If there's something that you want to read, you can

16   have someone set it aside, or you can set it aside or bookmark

17   it and come back to it later, but don't read it during the

18   trial.

19         The next rule is please don't do any research on your

12:52PM 20   own.  Don't do your own investigation of the case, and please,

21   please, please, please, please do not look up things on the

22   Internet.  If you think some piece of information is missing,

23   you're not allowed to find that on your own.  That's true even

24   if you think it's harmless, even if you're just curious, even

25   if you're frustrated or confused because you don't know

1      something.  You must decide the case based solely on the

2      evidence you've been given in this case.

3              This may come as a shock to you, but some of the

4      things on the Internet are not true.  I guess we'll start

5      there, but also if you're reading something on the Internet, it

6      means that none of us have a chance to see what it is you're

7      reading, what you're thinking about.  There's no fair chance

8      for everyone to respond to it, so please don't do it.  Decide

9      the case based only on the evidence that you've been given, and

12:53PM 10   after the case is over, you can look up what you want.

11             Please try to be respectful of the Court.  Please

12      don't bring food or drink in the courtroom, and please don't

13      chew gum during the trial, and please try to dress

14      appropriately.

15             If you have an issue during the trial, please raise

16      your hand.  We'll try to take care of it.  Sometimes people

17      mumble, you can't hear, or sometimes your computer screens will

18      go blank or start blinking.  Sometimes people need a Kleenex, a

19      glass of water, a quick bathroom break.  We'll try to take care

12:53PM 20   of it, but please try to let me know.

21             If you need to communicate with me and we're not in

22      court, please give a signed note to the court security officer

23      to give to me.

24             Now, all these rules are important and are designed to

25      make sure that the trial is fair and I instruct you to follow

them.

I'm going to permit you to take notes in this case. You'll get a notebook and a pencil. I want to give you a couple warnings about taking notes. First, don't allow taking notes to distract you from listening carefully to the testimony. It's important that you observe and listen to the witnesses. Some people take very copious notes, some take none at all. You can do whatever you want, but please make sure that you're watching and listening.

Please remember that not everything that is written down is necessarily what was said. And when you return to the jury room to discuss the case, you should not assume simply because something appears in someone's notes that it necessarily took place in court. Notes are an aid to recollection, and the fact that it's written down doesn't necessarily mean that it's necessarily true.

One of the things that happens, for example, is people start to write down a question and they run out of time and they don't write down the answer. Again, the question is not the evidence. It's the question and the answer put together.

You should take your notebooks to the jury room at every recess. You cannot take your notes home or anywhere else outside the courtroom or the jury room. At the end of the case your notes will be destroyed, and no one but you will ever look at them.

1          Now, as you can see, we have a court reporter who is
2     creating a record of everything that happens in this trial.
3     Sometimes jurors think that they'll have a transcript when they
4     go back to the jury room.  That is not true.  You will not be
5     given a transcript.  There are a number of reasons for that,
6     but one of them is strictly practical.  Usually there's not
7     time to prepare one.
8          The court reporter has a difficult job.  It's
9     time-consuming to take a raw record, which is what she's
12:55PM 10     creating, and turning it into a final transcript.  And so you
11     will not have a transcript and you should listen very carefully
12     and take whatever notes you think you may need to help you
13     remember.
14          All right.  Let me walk through quickly the outline of
15     the trial.  The first thing that will happen will be the
16     opening statements.  The government in its opening will
17     describe the evidence that it expects to introduce.  The
18     opening statement is not evidence.  Again, the lawyers are not
19     the witness.  Its purpose is to help you understand what the
12:56PM 20     expected evidence will be.  After the government opens, the
21     defense counsel may, if he chooses, make an opening.  The
22     government will then put on its case, which will consist of the
23     testimony of witnesses and will likely include documents and
24     objects and other exhibits.
25          After the government rests, the defendant may present

 1    evidence, if he chooses.  He's not required to do so.  He's

 2    presumed innocent.  He does not have to prove his innocence, he

 3    does not have to testify or put on any evidence.

 4         After you've heard all the evidence, the government

 5    and the defense will each be given time for final arguments or

 6    closing arguments.  Again, like the openings, the closings are

 7    not evidence.  The lawyers will have a chance to summarize and

 8    help you understand the evidence, but, of course, lawyer

 9    argument is not evidence.

12:57PM 10         I will then instruct you both orally and in writing

11    about the law that you're to use in issuing your verdict.  You

12    will then leave the courtroom together to render your decision.

13    You will never have to reveal your deliberations or explain

14    your verdict to anyone.

15         All right.  As I told you at the beginning, our normal

16    trial day will be from 9:00 to 1:00.  Now, you may wonder why

17    we do it that way rather than going all day long and getting

18    the case over with sooner.  Well, one of the things we found

19    over the years is that the cases don't really move that much

12:57PM 20    faster if we try to go all day.

21         There are a lot of reasons for that.  One of them is

22    that I have other work to do sometimes on other cases,

23    sometimes on the one that is on trial.  And what happens often

24    is jurors wind up sitting around waiting while we attend to

25    other business.  That tends to be very frustrating.  Lunch

1    winds up not being 25 minutes to an hour, but an hour and a

2    half to two hours.

3         It's much easier on jurors, it's easier on the parents

4    of school-aged children who need to home, for people who need

5    to check in to their office, it's easier to do an afternoon

6    commute.  And maybe the most important reason is the lawyers

7    and the jurors get tired when we go all day.  The cases tend to

8    drag in the afternoon.  The lawyers know that no one is paying

9    that close attention at ten minutes to five, and they pad the

12:58PM 10   evidence sometimes a little bit.

11        So the schedule is going to be from 9:00 to 1:00, but

12   to make sure that works properly, we have to be disciplined and

13   try to keep to a tight schedule.  I would like to begin every

14   day at 9:00 sharp.  Some of you are coming long distances, and

15   the T is less than perfectly reliable, but I need you to get

16   here well in advance to allow enough time to begin at 9:00

17   promptly.

18        We'll take a break at about 11:00.  It will be

19   10 minutes or so for a bathroom wreak, and I'll give you a

12:59PM 20   chance to stretch your legs at 10:00 and noon, but I want to go

21   to 1:00 sharp.  As I told you, if it looks like we're falling

22   behind, I might require an afternoon session, but I won't do

23   that without checking with you.  And when the time comes for

24   you to deliberate, you should be prepared to meet all day until

25   you reach a decision.  It may not take you that long, but you

1    should plan for that possibility.

2         If you have a problem, there's an accident, the T

3    breaks down, you have a flat tire, don't go silent on us, let

4    us know what is going on.  It's one of the reasons we have

5    alternates.  If you're not -- if you can't make it here for

6    three hours, we may go on without you, it kind of depends if

7    you're going to be 5 or 10 minutes late, we'll wait for you,

8    but let us know.  Let us know what your situation is.

9         Mr. McKillop will give you a number to call if you

01:00PM 10   have any issues, but for me to make the judgment about what

11   we're going to do I need to know what your situation is, and,

12   again, please try to enough allow enough time, so we can start

13   at 9:00.  So Mr. McKillop is going to show you to the jury room

14   and give you the phone number to call and all of that.

15         And I have one last instruction before we break for

16   the day.  Under our Constitution, all persons are equal before

17   the law.  All persons accused of a crime are entitled to a fair

18   trial.  You should not hesitate to convict if the government

19   has met its burden of proof, and you should not hesitate to

01:00PM 20   acquit if it has not, but you must be completely and

21   scrupulously open-minded, honest, and fair.  That is your duty

22   as jurors and citizens of the United States.

23         So, again, thank you for your patience and your

24   cooperation.  Mr. McKillop will show you to the jury room, and

25   we'll see you at 9:00 sharp tomorrow.  Thank you.

1          THE CLERK:  All rise for the jury.

2          (JURORS EXITED THE COURTROOM.)

3          THE COURT:  He was grabbing his book, and the lawyers

4     were curious to know, what are you reading, what book did you

5     bring?  I had a trial with an Indian National where it was my

6     client, a criminal defendant, and the juror went up to the box

7     carrying a biography of Gandhi, which I thought was helpful

8     somehow.  It was the government's first peremptory, so that was

9     that.

01:02PM 10          All right.  Is there anything we need to discuss now?

11     I'd like to meet at 8:30 tomorrow just to make sure we're all

12     set, and if there's any issue that can be raised before trial

13     rather than at sidebar, it's preferable.

14          Are you going to open, Mr. Flashner?

15          MR. FLASHNER:  The defense will be opening and

16     Mr. Daley will be opening.

17          THE COURT:  Okay.  How long is your expected opening?

18          MR. CROWLEY:  No more than 20 minutes, your Honor.

19          MR. FLASHNER:  About 15 minutes, your Honor.

01:02PM 20          THE COURT:  Anything for today?

21          MR. CROWLEY:  Not for the government, thank you.

22          MR. FLASHNER:  Thank you.

23          (Whereupon, the hearing was adjourned at 1:02 p.m.)

24

25

1       C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS ) ss.

5   CITY OF BOSTON )

6

7           I do hereby certify that the foregoing transcript,

8   Pages 1 through 119 inclusive, was recorded by me

9   stenographically at the time and place aforesaid in Criminal

10  Action No. 23-10028-1-FDS, UNITED STATES of AMERICA vs. JOSE

11  PEREZ, JR. and thereafter by me reduced to typewriting and is a

12  true and accurate record of the proceedings.

13          Dated this May 22, 2025.

14                  s/s Valerie A. O'Hara

15                  _____

16                  VALERIE A. O'HARA

17                  OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,        )
                                      )
5    vs.                              )  Criminal Action
                                      )
6    JOSE PEREZ, JR.,                 )  No. 23-10028-1-FDS
                    Defendant         )
7                                     )
                                      )
8                                     )

9

10   BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11
                          JURY TRIAL DAY 2
12

13

14
              John Joseph Moakley United States Courthouse
15                      Courtroom No. 10
                        1 Courthouse Way
16                      Boston, MA 02210

17
                         July 30, 2024
18                        8:30 a.m.

19

20

21

22

23                    Valerie A. O'Hara
                    Official Court Reporter
24     John Joseph Moakley United States Courthouse
                      1 Courthouse Way
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by MICHAEL CROWLEY,
ASSISTANT UNITED STATES ATTORNEY, and SARAH HOEFLE,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
Boston, Massachusetts 02110;

For the Defendant:

    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.,
by CORY S. FLASHNER, ESQ., EDMUND P. DALEY, III, ESQ., and
JULIA HUTCHINSON, ATTORNEY, One Financial Center, 42nd Flr.
Boston, Massachusetts 02111.

**INDEX**

OPENING STATEMENT BY MR. CROWLEY                    10

OPENING STATEMENT BY MR.. DALEY                     15

|                    | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|--------------------|------------|-----------|--------------|-------------|
| NICHOLAS MORRIS    | 30         | 64        |              |             |
| MATTHEW SNELL      | 139        | 146       |              |             |
| DONALD A. CHISOLM  | 152        | 162       |              |             |

INDEX OF EXHIBITS

| EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
|----------|--------------------|-------------|
| 1.1 through 1.5 |  | 26 |
| 2, 2.1 through 2.21 |  | 29 |
| 15.1 through 15.12 received |  | 29 |
| 3, 4, 4.1, 5, 6, 7, 8, 8.1 and 9 |  | 28 |
| 9.1 |  | 28 |
| 10 |  | 59 |
| 11 and 13 |  | 61 |

1

12 ................................................................. 62

2

3

16.1 .............................................................. 26

4

16.2 .............................................................. 26

5

16.3 .............................................................. 28
16.4

6

.................................................................... 61

7

100 ................................................................ 84
100.8
through .......................................................... 87
100.11

8

9

101.1
.................................................................... 113

10

101.2
through .......................................................... 114
101.5
101.9

11

12

.................................................................... 174

13

103 ................................................................ 94

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Court is now in session in the matter of United States vs. Perez, Matter Number 23-10028.

Would counsel please identify themselves for the record.

MR. CROWLEY:  Good morning, your Honor, Michael Crowley and Sarah Hoefle on behalf of the United States.

THE COURT:  Good morning.

MR. FLASHNER:  Good morning, your Honor, Cory Flashner, Ed Daley, and Julia Hutchinson on behalf of Mr. Perez, who is seated at counsel table with me.

THE COURT:  Good morning.  If I forget to ask you, you should have received a draft of the jury instructions last night or this morning.  Yes?  Okay.  It's a draft and meaning that it's in many ways a cut and paste initial draft so there may be things in there that need to be tweaked, added to, but it's intended to kick start the discussion on the jury charge.  If the government is resting and if there isn't a defense case, or a very lengthy one, we may be charging the case tomorrow, so we need to pay attention to this.

Why don't you look at that when you have a chance, and we may need to discuss it this afternoon.  And you also should have gotten a draft of the jury verdict form, which is just -- I think a standard guilty/not guilty form as to the two

1   questions, the two charges.

2           What else, if anything, do we have to talk about,

3   Mr. Crowley or Ms. Hoefle?

4           MR. CROWLEY:  We're just waiting on the stipulations

5   to the 404(b).  Once we have those, that should take care of

6   the evidence for our purposes.

7           THE COURT:  Okay.

8           MR. FLASHNER:  Your Honor, this would be probably an

9   appropriate time to put it on the record.  Mr. Perez is

08:37AM 10  reviewing the second of the stipulations with regard to 404(b).

11  They're consistent with, I believe, our discussions, my

12  discussions with AUSA Crowley yesterday.  We are still

13  objecting to the admission of this evidence as I've now stated

14  repeatedly and probably will do several more times, but given

15  the Court's ruling and the position that -- that ruling on the

16  evidence and the position that it puts the defense in, we

17  believe that the stipulations are in Mr. Perez's best interests

18  and so are agreeing to them without waiving our objection to

19  the evidence coming in.

08:37AM 20          THE COURT:  All right.  Understood.

21          MR. CROWLEY:  That's correct, your Honor.  The only

22  other two practical issues, we intend to read -- basically the

23  sides have agreed to the admission of a number of exhibits, so

24  to fast track the witness testimony, we'll read the

25  stipulations on them, move the exhibits in before we call

1   witnesses, and that way we can use our witnesses.  And if it's

2   all right with the Court, we were hoping to use, since some

3   potential technical issues, a blow-up.  Is the Court all right

4   if we put an easel there with the blow-up of maps?

5          THE COURT:  It's absolutely fine as long as everyone

6   can see it, including the jury.  It's like time travel back to

7   when I was an AUSA.  This is what we did.

8          MR. CROWLEY:  Yes.

9          THE COURT:  And the easels are notoriously flimsy, so

08:38AM 10   be careful moving it, but it needs to be in a place where

11   everyone can see it.  Typically the best place is kind of front

12   and center.  The witness can step down, counsel and the

13   defendant can move around, if necessary, to see it, but

14   whatever works as long as...

15          MR. CROWLEY:  That makes sense.  We'll probably also

16   be -- either that or electronic -- the maps put on the screens

17   and maybe just have the witness because our understanding is

18   that it can't be marked, we can't preserve those, have the

19   witness describe, you know --

08:39AM 20          THE COURT:  Well, you can put marks on it, just take a

21   photograph of it.  If you have your phone or --

22          THE CLERK:  They can't draw on it.

23          THE COURT:  Oh, they can't draw on the screens?

24          MR. CROWLEY:  We may have the witness describe.

25          THE COURT:  Whatever works within reason and whatever

1    is necessary to preserve the appellate record, again, within

2    reason, is fine with me.

3         MR. FLASHNER:  Your Honor, just one other issue I'd

4    flag for the Court.  I don't think it will be an issue during

5    the course of the trial, but it could be.  We were advised by

6    the government late yesterday afternoon, early yesterday

7    evening, that one of their witnesses, there's an assistant Fire

8    Chief Chisolm who actually recovers the firearm from near the

9    black SUV.  His description of the firearm I think is now

08:40AM 10    inconsistent with the firearm that's recovered in terms of the

11    coloring of the firearm.  I'd anticipate some inquiry there.

12    It may be a bit clumsy, and I'm not sure what all, but just to

13    advise the Court that there's an issue there.  I don't know

14    that it will be a particularly lengthy examination, but it will

15    be something that will come up.

16         THE COURT:  That's the way this works, you get to

17    cross-examine witnesses about possible inconsistencies.

18         MR. FLASHNER:  Of course.

19         MR. CROWLEY:  Just to be clear on that, your Honor.

08:40AM 20    The original report from the fire chief had the description

21    that we provided, we just confirmed it.

22         THE COURT:  I --

23         MR. FLASHNER:  I'm not alleging any discovery

24    violation.

25         THE COURT:  This is not exactly the first time in the

1    history of the American law that a witness has potentially said
2    something inconsistent or maybe said something consistent on a
3    prior occasion, we'll just follow the rules.

4         All right.  Anything else?

5         MR. CROWLEY:  Not for the government.  Thank you, your
6    Honor.

7         THE COURT:  Okay.  All right.  When I came on the
8    bench, I think we had 6 of our jurors, and as soon as we have
9    all 14, we'll get started.

08:41AM 10         THE CLERK:  All rise.

11         (A recess was taken.)

12         THE CLERK:  All rise for the jury.

13         (JURORS ENTERED THE COURTROOM.)

14         THE COURT:  All right.  Ladies and gentlemen, welcome
15    back.  Thank you for your cooperation in helping us start on
16    time.  I think we're ready for the government's opening
17    statement.  Before we do that, I want to tell you who these
18    people are.  They are my law clerks.  Recent -- well a year
19    ago, recent graduates of law school who help me with my work.

09:00AM 20         And sometimes they can't see the witness, as we use
21    this witness stand, so you may see them moving around, and it's
22    just so they can see better.

23         Mr. Crowley, whenever you're ready.

24         MR. CROWLEY:  Thank you, your Honor.

25

1  OPENING STATEMENT

2      MR. CROWLEY:  Good morning.  Ladies and gentlemen, the

3  evidence will show in this case some basic facts.  It will show

4  that on December 8th, 2022, a little before 11:00 a.m., the

5  defendant, Mr. Perez, was driving a black Ford Explorer.  His

6  passenger was Henry Del Rio and they were speeding.  They were

7  speeding through Lexington on a main street and were observed

8  by Lexington police officers who tried to stop them.

9      The police officer turned on his blue lights and

09:01AM 10  started following the defendant as he drove the black Ford

11  Explorer through a Main Street of Lexington at high speeds.

12  The defendant didn't stop, continued to drive down a main

13  street until he got to an intersection where he hit a red

14  Prius.  The Ford Explorer bounced off the red Prius and then

15  came to rest across the street from the Lexington Fire

16  Department, crashed into a cement post and stopped.

17      You'll hear that the officer who was following was

18  Officer Nicholas Morris, and Officer Morris was right behind

19  them as the accident happened and continued as the Ford

09:02AM 20  Explorer crashed near the fire department.  And Officer Morris

21  saw two people exit the vehicle.  The defendant got out of the

22  driver's side, and Henry Del Rio got out of the passenger's

23  side, and when the defendant got out of the driver's side,

24  Officer Morris observed something fall at the defendant's feet.

25      You'll also hear testimony that later, in response to

the crash, a Lexington fire captain came on scene and found a
pistol, a semiautomatic pistol laying next to the driver's
door, that the fire captain retrieved that pistol and took it
back to the fire department for safekeeping.  He put into a
fire truck on the front seat and left it there and watched it
until the Lexington police officer came and retrieved the
pistol, and that pistol was a Glock 43X semiautomatic pistol
and it was loaded and there was a round in the chamber.

Now, in addition to seeing that object fall at the
defendant's feet as he exited the crashed Ford Explorer,
Officer Morris also saw Mr. Del Rio, when he exited the
vehicle, wearing a full ski mask and then both the individuals
began to flee.

They didn't stay by the Ford Explorer, they fled
through a parking lot of a Stop & Shop that was right in that
area.  They ran through the parking lot towards the back end of
the Stop & Shop where there was dumpsters and a wooded area,
and you'll hear the testimony that Officer Morris followed
them, that he ran chasing them as they headed towards that area
shouting for them to stop.

And as he was following them, the officers saw them
reaching, both individuals, Mr. Del Rio and the defendant,
reaching into their pockets.  The officer was then able to
arrest the defendant, Mr. Perez, and after he arrested them,
what he found was a large amount of cash on Mr. Perez's person.

1        Mr. Del Rio, who wasn't stopped by Officer Morris, he

2   was able to make his way into the wooded area, and you'll hear

3   testimony from another officer who arrived and arrested

4   Mr. Del Rio as he was laying in a creek bed, laying against the

5   creek bed in that wooded area, and when that officer arrested

6   him, Mr. Del Rio still had the black ski mask on.

7        After the two individuals were arrested, the officers

8   went back to the crash scene, and you'll hear that

9   Officer Morris, along with a detective, Detective Evelyn,

09:05AM 10   conducted an inventory of the vehicle, which is the inventory

11   of the property in the vehicle.  And that, as they conducted

12   that inventory, Officer Morris found in the center console cup

13   holder area of the vehicle an area that was accessible to both

14   the driver, the defendant, and Henry Del Rio a white bag -- a

15   bag with white powder in it.

16        Not only was it a bag with white powder, it was a bag

17   with white powder and smaller twists, plastic twists with white

18   powder in it.  And that bag was subsequently submitted for

19   testing to a laboratory, analyzed, and that was found to

09:05AM 20   contain cocaine base, as the Court noted also known as crack,

21   and cocaine in the center console area.

22        After that occurred, Detective Evelyn went back to the

23   wooded area, contacted by another officer, went to the wooded

24   area and observed two more bags, the area where Henry Del Rio

25   had been running, the same area where both defendants were seen

1    reaching into their pockets as they ran.  Two more bags.

2    You'll see photos of those bags and that Detective Evelyn

3    recovered the bags, that they were clean, not covered with

4    debris laying in this wooded area.

5         Those two bags, one of them was tested, it had

6    white -- a white substance in it.  That white substance was

7    cocaine base.  The other bag, which had a brownish substance

8    was tested, it contained fentanyl, and in that bag with the

9    fentanyl were over 40 small individual packs with fentanyl in

09:06AM 10    them.  Two bags in that area, so a total of three bags of drugs

11    recovered from the scene.

12         These facts support the charges at issue in this case.

13    First, the conspiracy, the Court noted, spoke to you about the

14    conspiracy.  That's an agreement between the defendant to

15    distribute drugs.  The facts support that agreement, including

16    the three recovered bags of drugs, the cash on the defendant,

17    and the flight from the police.

18         In addition, for the second charge, the felon in

19    possession charge that the Court discussed with you, you'll

09:07AM 20    hear that the parties have stipulated to two facts.  They're

21    undisputed, that at the time that this event occurred, the

22    defendant had been convicted of a felony.  That's a crime for

23    which the punishment exceeded one year.  You'll also -- the

24    parties will also agree that the defendant knew he had been

25    convicted of a felony, so those two things are not disputed.

1      You'll further hear, the evidence will be discussed,

2   that the defendant possessed the firearm.  The evidence

3   supports he possessed the firearm because it dropped at his

4   feat as he exited the vehicle.

5      And, finally, as the Court noted, we have to show that

6   the firearm traveled in interstate or foreign commerce, and

7   you'll hear testimony from an agent from the Bureau of Alcohol,

8   Tobacco, Firearms and Explosives, a federal bureau, that the

9   firearm that was seized in this case, the Glock 43 handgun

09:08AM 10   traveled in foreign commerce.

11      And an element of that testimony will be that the

12   Glock 43 pistol actually had stamped on it "made in Austria,"

13   so the evidence will prove that the defendant committed the two

14   crimes.

15      The evidence will also show that the defendant was not

16   an innocent bystander who happened to be in the vehicle with

17   Henry Del Rio and didn't know about the three bags of drugs, or

18   about the handgun, and that evidence you'll hear during trial,

19   the parties have stipulated, that prior to this event in 2017,

09:08AM 20   the defendant plead guilty to engaging in the business of

21   dealing in firearms without a license in Massachusetts.  That

22   was 2017.

23      You'll also hear that the parties stipulated that in

24   2020, the defendant plead guilty to conspiracy to distribute

25   controlled substances and to being a felon in possession of a

1    firearm in Massachusetts.

2         And for that second conviction, the parties have

3    stipulated that the defendant admitted for that conviction that

4    he had conspired with two other people to distribute controlled

5    substances, that he was stopped in a car with his other

6    co-conspirators, that he was driving the car when he was

7    stopped, that he had on his person two small amounts of cocaine

8    and $1,000 in cash, and I would note in this case that when the

9    defendant was arrested by Officer Morris, he had a large amount

09:09AM 10    of cash on his person.

11         And then in addition, in that car, there was a bag of

12    marijuana that was approximately a pound, and that from that

13    car, the officers who stopped that car recovered a pistol

14    within reaching distance of the defendant.

15         That evidence shows that this is not a case where the

16    defendant was an innocent bystander who happened to be in the

17    black Ford Explorer.  The evidence will show beyond a

18    reasonable doubt that the defendant committed both crimes and

19    that, at the end of the trial, we'll ask you to return a

09:10AM 20    verdict of guilty.

21              THE COURT:  All right.  Thank you.

22         Counsel.

23                    OPENING STATEMENT

24         MR. DALEY:  Thank you, your Honor.  Good morning.

25    "You can't judge a book by its cover."  This is a phrase we've

1    all probably heard a thousand times, and it's a simple phrase,

2    but it has a really important meaning.  You just can't assume,

3    but the evidence in this case will show that's exactly what

4    happened on the night of December 8th, 2022.  The

5    Lexington Police Department took one look at my client, and

6    they took one look at the scene, and they judged that book by

7    its cover.  They let assumptions substitute for an

8    investigation.

9         What you'll see during this trial, you're going to see

09:11AM 10   video surveillance footage, you're going to see maps, you're

11   going to see photographs, but what you won't see is exactly

12   what the Lexington Police did not see on December 8th, 2022.

13   You're not going to see Jose Perez, my client.  You'll never

14   see him possess a gun.  You'll never see him anywhere near

15   drugs, and you will never see or hear any testimony about

16   communications between Jose and Henry Del Rio.

17        What you will see, and the government talked about

18   this in their opening statement, you'll see a lot about a car

19   accident, but this isn't a car crash case.  You're going to see

09:12AM 20   Jose driving a black SUV, and he's going to come down Bedford

21   Street, and he is going to hit that granite post, and you're

22   going to see Jose get out of the car, and Jose is going to run

23   towards the Stop & Shop.  You're going to see that.  It is on

24   the firehouse surveillance video.  You'll see this video.

25        You'll also see the passenger.  That's Henry Del Rio.

He's the man in red.  You'll see him run after Jose, and then
you'll see an officer from Lexington Police Department.  He'll
chase both those men, but this case requires careful attention.

The details in that fire house video, those are
everything.  That's the case.  And it's important what that
video shows and what it doesn't show, what you see and what you
don't see, and what you'll see in that video is what I just
described, the car crash, the flight.

What you won't see is you'll never see Jose fumbling
with a gun, you'll never see Jose drop the gun, and you'll
never see Jose holding a gun or drugs.

I mentioned this man a moment ago, and you'll hear
about him, as well, and that's Henry Del Rio.  He's the man in
red.  He was in the passenger seat.  You're going to see video
of that car come to a stop, and you're going to see video of
Jose get out of the car, and he's going to get out of the car
and start running, and then you'll see this on the video, 1, 2,
3, 4, 5, 6.  6 seconds.  That's when Jose is out of the car,
out of the SUV, and running towards the Stop & Shop.

That video will show that the passenger, the man in
red, he's still in the SUV when Jose is out.  The video shows
that, but what the video does not show, or you can't see from
that fire house video, is what's going on inside that car when
Jose is already gone and the passenger is still seated inside.

The video will show that six seconds later, after Jose

1    is already gone, you'll see the man in red run through that

2    same parking lot, and the evidence will show that the officer,

3    Officer Morris of the Lexington Police Department, he runs

4    after both men.  The video shows that.  And the evidence will

5    show that Jose stops running right on the side of the Stop &

6    Shop near the dumpster.  He gave himself up.  He was arrested,

7    and what Officer Morris will testify is that when he searched

8    Jose, he didn't find a gun, he didn't find drugs, and he didn't

9    find a gun or drugs anywhere near Jose.

09:14AM 10        The testimony and the evidence will also show that the

11    man in red continued to run, he didn't give himself up, he

12    jumped over a fence and ran into a wooded area behind the

13    Stop & Shop.

14        And the evidence will show that that man, the man in

15    red, drugs were found near him, but a gun wasn't found near

16    Jose, drugs were not found near Jose.

17        The evidence will show that Jose never entered that

18    wooden area -- that wooded area, rather.  Jose never jumped

19    over that fence, Jose never went through the woods, Jose was

09:15AM 20    not found next to the man in red.  This is what the evidence

21    will show.  And the evidence will also show that the

22    Lexington Police had already made up their mind.  They had

23    already judged this book by its cover, and that substituted for

24    an investigation, a thorough investigation.

25        And you're going to hear a lot about the gun in this

case.  It was a gun located somewhere near that -- I'm sorry, the driver's side door of that black SUV, but this is where your duty as jurors really kicks in.  This is where you need to separate facts from guesswork.

And let's talk about what you're not going to see. You're not going to see any pictures of that gun lying on the ground next to the SUV.  You're not even going to see an evidence marker of where that gun was found, no photos of that. You're going to be left with guesses about how that gun got there and who possessed it.

You'll see more evidence of what the government, what the Lexington Police Department did -- failed to do to investigate this situation and what they actually did.  And let's go back to go that video surveillance I just talked about, the fire house video.  You'll see evidence of the maps and the videos where the fire station is right across the street from where the black SUV hit the granite post and the Stop & Shop is further back.

What you'll see, and the firehouse video has a direct line of sight right to the crash, and you're going to see that video.  Again, you'll see the video of the car coming to a stop, you'll see Jose get out, six seconds later the man in red gets out, and the chase happens.  But what you don't see in that video is just as important as what you do see.  What's not there is just as important what's there, and in that video, the

government's video, a video that the government collected from
the fire department, you'll see that that video just stops,
just cuts out.  You'll see the chase happen, but then nothing
more.  It inexplicably just stops recording, so what you won't
see is that you won't see anyone going near that SUV,
Officer -- Fire Chief Chisolm, you're not going to see that on
the video, and you're not going to see him pick up a gun,
you're not going to see anybody go back to the car in that
video and identify where a gun was, and you're not going to see
on that video, that video that is looking directly at the car,
you're not going to see any inventory search or investigation
of that car.  That video just stops recording.

        This is a federal case brought by the United States
Government, and in this case, there's some really important
things that you're not going to see or hear.  You're not going
to hear or see that the Lexington Police ever tested the
firearm for fingerprints.  You're not going to see or hear that
the Lexington Police tested the firearm for DNA, and you're not
going to hear or see any forensic evidence connecting that
firearm to Jose.

        In a case where the key issue for this firearm is who
was holding it, who possessed it, and how it got there, you're
not going to see any forensic evidence about that, just
assumptions.

        And even when this case was transitioned from the

Lexington Police Department to the Department of Justice, no

testing happened on the firearm.  The Department of Justice did

not test the firearm for fingerprints.  The Department of

Justice did not test that firearm for DNA.

As the Judge will instruct you, and the Judge has

instructed you, the burden is on the government to prove to you

by proof beyond a reasonable doubt of every element.  The

government has to prove every element of every charge in this

case, but what are you going to have?  You're not going to have

photos of where that gun was found, you're not going to have

any video of -- showing who was holding the gun, you're not

going to have any video of someone dropping the gun, no

fingerprints, no DNA.

And we talked a lot about the gun just now, but the

drugs, you'll start -- you'll see a lot about the drugs as

well, and that evidence is going to show that after Jose

stopped running and he was arrested, the man in red jumped over

that fence, ran into the woods and was several hundred feet

away from Jose.

And then you'll hear after Jose stopped running and

that man was arrested in the woods, Officer Michael Barry from

the Lexington Police Department searched the woods, and he

searched around where the man in red was found, and just like

the government told you, Officer Barry found two plastics bags

containing white powdery substances that we'll call the drugs

1    in this case.

2            You'll also hear about that third plastic bag, and you

3    did hear about the third plastic bag, and that was found

4    somewhere inside the SUV, but just like the gun, you're not

5    going to see a single photograph of where those drugs were

6    found, you're not going to see the drugs in the cup holder,

7    you're not going to see the photographs of the drugs in the

8    center console, you're not going to see any physical proof that

9    Jose possessed the bag found in the SUV.

09:20AM 10            Just like the gun, you're not going to see any

11    fingerprint evidence on that bag, and just like the gun, you're

12    not going to see any DNA testing was ever done on that bag.

13    That's the gun, those are the drugs.

14            Now let's talk about this conspiracy.  My client is

15    being charged with a conspiracy here, an agreement, but what

16    you're not going to see is a single text message, you're not

17    going to see a single Facebook post, Snapchat, email, recorded

18    phone call, nothing.  You're not going to see evidence of a

19    single communication between Jose and Henry Del Rio, the man in

09:21AM 20    red.

21            But you will see that the Lexington Police seized

22    Jose's phone and Henry Del Rio's phone on the night in

23    question.  They had it, but what they didn't do, they didn't

24    investigate the phone.  They didn't search the phone.  They had

25    the phone, they did not search them.  So there are no text

1   messages in this case, no phone calls, no communications

2   between Henry Del Rio and Jose Perez.  In a case charging

3   conspiracy, you're not going to see evidence of a single

4   communication.  That's important.

5       So what will you see?  The evidence will show the

6   video footage I just mentioned, the fire house footage that

7   just stops recording.  Again, that's the government's video --

8   I'm sorry, that's the video that the government collected from

9   the fire station.  What does that show?  Well, it doesn't show

09:22AM 10   Jose holding a gun, it doesn't show Jose getting out of the car

11   and fumbling with a gun or dropping a gun, it just does not

12   show that.  And what the government won't be able to show is

13   any forensic evidence connecting Jose to the gun or the drugs.

14       You'll also hear about guilty pleas in 2017 and 2020.

15   AUSA Crowley mentioned that in his opening statement.

16   Jose Perez pleaded guilty in 2017 and 2020.  That's the truth,

17   he did.  He admits that.  But those cases, that's not this

18   case.  What Mr. Perez took responsibility for in 2017 and 2020,

19   that's not this case.  Mr. Perez pleads not guilty to the

09:23AM 20   crimes charged here in this case, and the evidence in this case

21   is the only thing that matters.

22       What happened and what didn't happen on the night of

23   December 8th, 2022, what the government can actually prove on

24   the night of December 8th, 2022, that's what's important here.

25   Not 2017, not 2020.  What the evidence in this case will show

1   you and the testimony, as well, what we'll leave you with are

2   assumptions and guesses.

3           What the evidence will show is that the

4   Lexington Police made the mistake of judging a book by its

5   cover, but this jury has an opportunity to not make the same

6   mistake, to not judge a book by its cover.  Guesses just can't

7   substitute for proof beyond a reasonable doubt.  No video

8   evidence, no photo evidence, no forensic evidence connecting

9   Jose to the gun or the drugs.

09:24AM 10           We ask that you keep an open mind throughout this

11   case, as I'm sure you'll do, and don't judge this book by its

12   cover.  Demand more, hold the Federal Government to its burden,

13   proof beyond a reasonable doubt, and after the close of

14   evidence, my colleague, Cory Flashner, he's going to come up

15   here and talk about what happened at trial, talk about the

16   evidence.  And he's going to ask you, after considering all of

17   the evidence in this case, that you find a verdict that is

18   required by that evidence, a verdict that is required by the

19   evidence in this case, the verdict that justice demands, and

09:24AM 20   that's a verdict of not guilty on each of the crimes charged.

21   Thank you very much.

22           THE COURT:  All right.  Thank you.  I think we have a

23   report, the two of you are going to switch seats.  All right.

24   Problem solved.

25           Ms. Hoefle.

1          MS. HOEFLE:  Thank you, your Honor.  Before we call

2     the first witness, your Honor, at this point the government

3     would like to offer several stipulations, so with your Honor's

4     permission, I would do that and subsequently call the witness.

5          THE COURT:  Okay.  Let me explain.

6          A "stipulation" is sort of a fancy lawyer word that

7     just basically means the parties agree on something.  Usually,

8     they agree to a fact.  It's a way of streamlining the trial and

9     avoiding bringing in unnecessary witnesses, so that's what that

09:25AM 10     means.

11          MS. HOEFLE:  Thank you, your Honor.  So first, your

12     Honor, the government would offer Exhibit 16.1, which is the

13     stipulation concerning authenticity and admissibility of maps.

14     Mr. O'Donnell, if we could pull it up.

15          THE COURT:  All right.  It's admitted, 16.1.

16          (Exhibit No. 16.1 received into evidence.)

17          MS. HOEFLE:  Can everyone see?  I think you have

18     screens.  Oh, great.  They're up.  Thank you.  Please let us

19     know at any point if you can't see on your screens.

09:26AM 20          So I'll read the stipulation that's now been admitted.

21     "The United States of America and the defendant Jose Perez,

22     Jr., by undersigned counsel, hereby stipulate and agree to the

23     following facts:

24          "Exhibits 1.1, 1.2, 1.3, 1.4 and 1.5 are maps

25     depicting true and accurate representations of certain portions

1    of the area of Lexington, Massachusetts.  The parties stipulate

2    and agree that the exhibits referenced herein are admissible at

3    trial and may be received in evidence."

4         Your Honor, I would offer Exhibits 1.1, 1.2, 1.3, 1.4,

5    1.5, which are the subject of the stipulation.

6         MR. FLASHNER:  No objection, your Honor.

7         THE COURT:  All right.  They're admitted, 1.1 through

8    1.5.

9         (Exhibit No. 1.1 through 1.5 received into evidence.)

09:27AM 10    MS. HOEFLE:  Mr. O'Donnell, if we could please have

11   Exhibit 16.2.

12        I would offer Exhibit 16.2, which is the stipulation

13   concerning the authenticity and admissibility of video

14   recordings.

15        THE COURT:  All right.  That's admitted as well.

16        (Exhibit No. 16.2 received into evidence.)

17        MS. HOEFLE:  I will read this.

18        "The United States of America and the defendant

19   Jose Perez, Jr., by undersigned counsel, hereby stipulate and

09:27AM 20    agree to the following facts:

21        "During the investigation of the incident involving

22   Mr. Perez that occurred on December 8th, 2022 in the area of

23   Bedford Street in Lexington, Massachusetts, Lexington Police

24   Department Detective Christopher Ducharme obtained video

25   surveillance footage from Lexington Fire Department

1   headquarters located at 45 Bedford Street.  The individual

2   video files comprising this footage are identified as Exhibits

3   3 through 8 and clips thereof are identified as Exhibits 4.1

4   and 8.1.

5       "A technical issue occurs on these video files at the

6   timestamp of approximately 10:43:40 p.m., after which

7   additional footage is unable to be viewed.  The content

8   depicted in this footage is a true and accurate representation

9   of the events in question.

09:28AM 10      "During the investigation of the incident involving

11  Mr. Perez that occurred on December 8th, 2022 in the area of

12  Bedford Street in Lexington, Massachusetts, Lexington Police

13  Department Detective Kristina Hankins obtained video

14  surveillance footage from the Stop & Shop located at

15  36 Bedford Street.  This video file is identified as Exhibit 9

16  and a clip thereof is identified as Exhibit 9.1.  The content

17  depicted in this footage is a true and accurate representation

18  of the events in question.

19      "The parties stipulate and agree that the exhibits

09:29AM 20  referenced herein are admissible at trial and may be received

21  in evidence."

22      Your Honor, I would offer Exhibits 3, 4, 4.1, 5, 6, 7,

23  8, 8.1 and 9.1, which are the subject of the stipulation.

24      THE COURT:  All right, they're admitted, 3, 4, 4.1, 5,

25  6, 7, 8, 8.1 and 9.

1        MS. HOEFLE:  Thank you.

2              (Exhibit No. 3, 4, 4.1, 5, 6, 7, 8, 8.1 and 9 received

3    into evidence.)

4              MS. HOEFLE:  Your Honor, did -- I apologize if I

5    missed it, but did your Honor reference 9.1?  I would offer

6    9.1, as well, which was the subject of the stipulation.

7              THE COURT:  9.1 is also admitted.  Both 9 and 9.1 are

8    admitted.

9              (Exhibit No. 9.1 received into evidence.)

09:29AM 10         MS. HOEFLE:  Thank you, your Honor.  I would now ask

11   Mr. O'Donnell to pull up Exhibit 16.3.  Your Honor, I would

12   offer Exhibit 16.3.

13             THE COURT:  It's admitted.

14             (Exhibit No. 16.3 received into evidence.)

15             MS. HOEFLE:  Thank you.  This is a stipulation

16   concerning authenticity and admissibility of photographs, so I

17   will read this.

18             "The United States of America and the defendant

19   Jose Perez, Jr., by undersigned counsel, hereby stipulate and

09:30AM 20   agree to the following facts:

21             "During the investigation of the incident involving

22   Mr. Perez that occurred on December 8th, 2022 in the area of

23   Bedford Street in Lexington Massachusetts, Lexington Police

24   Department Detective Aiden Evelyn took photographs of the area

25   and related evidence identified as Exhibits 2 and 2.1 through

1   2.21.

2          "During the investigation of the incident involving

3   Mr. Perez that occurred on December 8th, 2022 in the area of

4   Bedford Street in Lexington, Massachusetts and during review

5   and analysis of substances recovered during the incident, U.S.

6   Border Protection chemist Katelyn Thomas took photographs of

7   the recovered substances identified as Exhibits 15.1 through

8   15.12.

9          "During the investigation of the incident involving

09:31AM 10  Mr. Perez that occurred on December 8th, 2022 in the area of

11  Bedford Street in Lexington, Massachusetts, Craig Nicewicz of

12  Legal Investigative Solutions took photographs of the area

13  identified as Exhibits 100 through 100.11.  The parties

14  stipulate and agree that the exhibits referenced herein are

15  admissible at trial and may be received in evidence."

16          Your Honor, I would offer Exhibit 2, 2.1 through 2.21

17  and 15.1 through 15.12, which are the subject of the

18  stipulation.

19          THE COURT:  All right.  They're admitted.

09:31AM 20          (Exhibit No. 2, 2.1 through 2.21 and 15.1 through

21  15.12 received into evidence.)

22          MS. HOEFLE:  Thank you, your Honor.  And with that,

23  your Honor, the government calls its first witness, Lexington

24  police officer Nicholas Morris.

25          NICHOLAS MORRIS, having been duly sworn by the Clerk,

1    testified as follows:

2                    DIRECT EXAMINATION

3    BY MS. HOEFLE:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   What is your name?

7    A.   Nicholas Morris.

8    Q.   Where do you work?

9    A.   In the Town of Lexington.

09:33AM 10          MR. FLASHNER:  Can I go to a different location?  I

11   just can't see the witness.

12               THE COURT:  Sure.

13               MR. FLASHNER:  Sorry, counsel.

14               THE COURT:  You don't need to ask permission any time

15   you move.

16               MR. FLASHNER:  Thanks.

17               THE COURT:  Go ahead, Ms. Hoefle.

18               MS. HOEFLE:  Thank you.

19   BY MS. HOEFLE:

09:33AM 20   Q.   Could you just repeat where you work, please.

21   A.   Sure, the Town of Lexington.

22   Q.   Specifically where within the town?

23   A.   The police department.

24   Q.   How long have you been with the Lexington Police

25   Department?

|  |  |
|---|---|
| 1 | A.    Three years. |
| 2 | Q.    What is your current position? |
| 3 | A.    I'm a police officer, assigned to patrol. |
| 4 | Q.    What are your duties and responsibilities? |
| 5 | A.    Answer calls to service, investigate crime, numerous |
| 6 | tasks. |
| 7 | Q.    What training, generally, have you had in connection with |
| 8 | your job? |
| 9 | A.    By Massachusetts State Law, I'm required to attend a |
| 09:33AM 10 | six-month police academy, which I did in 2021 at the Plymouth |
| 11 | Police Academy. |
| 12 | Q.    Are you familiar with an investigation into two people |
| 13 | named Jose Perez, Jr. and Henry Del Rio? |
| 14 | A.    I am. |
| 15 | Q.    How are you familiar with that? |
| 16 | A.    I arrested Mr. Perez in December of 2022. |
| 17 | Q.    Before that incident, before December 2022, did you know |
| 18 | Jose Perez, Jr. or Henry Del Rio? |
| 19 | A.    No. |
| 09:34AM 20 | Q.    Do you know what Jose Perez, Jr. looks like? |
| 21 | A.    Yes. |
| 22 | Q.    Do you see him in the courtroom today? |
| 23 | A.    I do. |
| 24 | Q.    Can you please identify him by an article of clothing? |
| 25 | A.    The navy suit with the tie with stripes. |

1        MS. HOEFLE:  May the record reflect that the witness

2   has identified the defendant?

3        MR. FLASHNER:  No objection.

4        THE COURT:  Yes.

5   Q.   So, Officer, I want to bring you back to the night of

6   December 8th, 2022.

7   A.   Yes.

8   Q.   Were you working that night?

9   A.   I was.

09:34AM 10   Q.   What were you doing?

11   A.   I was assigned to patrol.

12   Q.   What, generally, does being on patrol entail?

13   A.   Answering calls for service, patrolling the sector you're

14   assigned to, conducting traffic enforcement, so on.

15   Q.   What kind of car were you in?

16   A.   A marked Lexington police cruiser.

17   Q.   While you were on duty, how, if at all, do you communicate

18   with other officers?

19   A.   Via radio.

09:35AM 20   Q.   Were you aware of other officers on duty that night?

21   A.   Yes.

22   Q.   And, specifically, were you aware of other officers in

23   your area, or as you referred to as sector that night?

24   A.   Yes.

25   Q.   Who was that?

1    A.    Officer Matt Snell.

2    Q.    Was Officer Snell in a different car than you?

3    A.    He was in a marked police car, yes --

4    Q.    Separate from you?

5    A.    -- but a different vehicle, yes.

6    Q.    Focusing your attention on approximately 10:40,

7    10:45 p.m., approximately where were you?

8    A.    I was sitting across from the temporary police station

9    located at 173 Bedford Street in the Town of Lexington.

09:35AM 10    Q.    What were you doing there?

11    A.    Observing the flow of traffic.

12    Q.    What kind of street is Bedford Street in Lexington?

13    A.    It's a main throughway, one of the few main throughways in

14    the Town of Lexington.  It connects Lexington to Route 128/95.

15    Q.    Okay.

16        MS. HOEFLE:  Mr. O'Donnell, if we could please pull up

17    Exhibit 1.1 -- and is everyone able to see Exhibit 1.1?  Yes.

18    I'm seeing yeses.  So I think what we're going to do here.  I

19    also have a blow-up of Exhibit 1.1 that, with your Honor's

09:36AM 20    permission, I would set up.

21        THE COURT:  All right.

22    Q.    Okay.  So on the screen and the blow-up in front of the

23    jury is what's been marked here and admitted as Exhibit 1.1.

24    Officer Morris, can you please tell us what we're looking at

25    here?

1    A.   This is a map, an aerial view of the Town of Lexington,

2    specifically Bedford Street from the -- where that clover leaf

3    is 128, Route 95, and heading down is Lexington -- you're

4    traveling down Bedford Street towards Lexington Center and the

5    area of Bedford Street.

6    Q.   Okay.  Can you please describe for us, you mentioned, you

7    testified before that you were across from 173 Bedford Street,

8    which was at that point the temporary Lexington Police

9    Department; is that correct?

09:38AM 10   A.   Yes.

11   Q.   Can you please describe for us, if you can, and with your

12   Honor's permission, you could get down from the witness stand

13   and point on the map approximately where you were at that

14   point?

15   A.   Sure.  Is that okay?

16           THE COURT:  Yes, go ahead.

17           Ladies and gentlemen, I'll just explain, we have

18   technology that permits witnesses to mark things on the screen,

19   and it disappeared with our latest round of computer updates,

09:38AM 20   so we're going old school here with the easel.

21           MS. HOEFLE:  And, if you could, to the extent you'll

22   speak -- just be sure to speak up so the court reporter can

23   hear you.

24           THE WITNESS:  Sure.  Can you hear me?  Okay.

25           So this is Route 128/95 and --

BY MS. HOEFLE:

Q.   And just for the record, you're pointing here, there's a four leaf clover-esque image in the middle, and you're pointing to the road that sort of crosses between the clover; is that right?

A.   Yes.

Q.   Okay.

A.   So this is Bedford Street where it is labeled "Bedford Street," going over 128, continuing down here, you'll see a commercial area.  This is Lexington Golf Club, it sits adjacent to Bedford Street.  I was parked across from the Lexington Police Station, which is approximately in this area right here.

Q.   So you're pointing now at the -- towards the bottom of the map.  Could you please place your finger again where you were pointing approximately?

A.   Yes.

Q.   So you were positioned approximately towards the bottom part of the map; is that right?

A.   Correct.

Q.   Okay.  What -- you can return to your seat.  Thank you.

A.   Thank you.

Q.   What happened at approximately 10:45-ish p.m. that night, as you were sitting there?

A.   While conducting traffic enforcement, observing the flow of traffic, Officer Matt Snell radioed to me via police radio

1　　that there was a vehicle traveling towards my location on

2　　Bedford Street at a high rate of speed.

3　　Q.　　What did you do after you heard that?

4　　A.　　Initially, prior to Officer Matt Snell radioing that, I

5　　observed Officer Matt Snell --

6　　　　　　MR. FLASHNER:　Objection, your Honor.

7　　　　　　THE COURT:　Why don't you put a question to him.

8　　Q.　　Sure.　As you were sitting there across from 173 Bedford

9　　Street, did you have an understanding of where approximately

09:40AM 10　　your partner that night, or an officer also on patrol that

11　　night, Officer Snell, was?

12　　A.　　Yes.

13　　Q.　　Where approximately was that?

14　　A.　　Officer Snell has pulled out across from me at the police

15　　station and took a right, traveling westbound towards the Town

16　　of Bedford, towards 128.

17　　Q.　　So if we're looking at the map here, you previously

18　　identified that you were sort of towards the bottom of the map

19　　and then you're describing right now Officer Snell was

09:40AM 20　　across -- you observed Officer Snell across from you take a

21　　right, so does that -- would he have traveled then up towards

22　　the top of the map towards the four-leaf clover?

23　　A.　　Correct.　Towards the four-leaf clover.

24　　Q.　　Okay.　So what happened after you saw Officer Snell pull

25　　out and travel towards the four-leaf clover?

1    A.    Moments later, Officer Snell radioed to me that there was

2    a vehicle traveling at a high rate of speed.

3              MR. FLASHNER:  Objection.

4              THE COURT:  I'll permit the testimony.  Let me

5    explain, ladies and gentlemen.  There's a concept in the law

6    that you may have heard called "hearsay."  Sometimes when

7    things are reported to us, the person making the statement is

8    saying it or offering it for its truth.

9              If I tell you what my birthday is, I'm telling you

09:41AM 10    that because I think it's true.  But sometimes what matters is

11    what was said because you did something in response to what was

12    said.  So I'll give you an example.  If somebody opened the

13    door of the courtroom and said you need to evacuate, the

14    building is on fire, you evacuated.  If you never learned

15    anything else, that's not proof that the building is on fire.

16    That's hearsay, but why did you leave the building, because

17    someone told you something, someone told you the building was

18    on fire, so in this case, I'm going to permit this testimony.

19    I expect the witness is going to say he was told something,

09:42AM 20    and, therefore, he reacted.  I'll allow you to consider it for

21    that limited purpose.

22              Go ahead, Ms. Hoefle.

23              MS. HOEFLE:  Thank you, your Honor.

24    Q.    What did you do?  What was your reaction to hearing that?

25    A.    My immediate reaction was my head turned left, facing the

1   west of Bedford Street, observing the flow of traffic, waiting

2   for that vehicle.

3   Q.   What did you see afterwards?

4   A.   I saw a black Ford Explorer traveling at an extremely high

5   rate of speed towards my location on Bedford Street.

6   Q.   What is the posted speed limit on Bedford Street?

7   A.   It's a 35 mile an hour posted zone.

8   Q.   What did you do?

9   A.   I observed the vehicle pass my location, and when it was

09:43AM 10   safe to do so, I pulled out immediately behind the black Ford

11   Explorer and attempted to stop the motor vehicle.

12   Q.   Onto Bedford Street?

13   A.   Correct.

14   Q.   So then, again, if we're looking at Exhibit 1.1, the map

15   here, you just testified you turned right, so driving towards

16   the bottom of the map as we look at it?

17   A.   Yes.

18   Q.   Okay.  What did you do next?

19   A.   In an effort to stop the vehicle, I activated my emergency

09:43AM 20   lighting and sirens.

21   Q.   What did the Explorer do?

22   A.   It continued to accelerate, pulling away from me.

23   Q.   Did it stop?

24   A.   No.

25   Q.   What did you do next?

A.   I radioed to dispatch informing them that I was attempting

to stop a black Ford Explorer.

Q.   At that point were you aware of approximately what rate of

speed you were traveling trying to chase the Ford Explorer?

A.   Based on may training and experience, I estimated the

speed of the vehicle to be in excess of 85 miles an hour.

Q.   What happened after that?

A.   As I continued to attempt to stop the Explorer, I made my

way down Bedford Street to the area of Lois Lane, and I

observed the black Ford Explorer crash into a red Toyota Prius

that was turning left from Worthen Road onto Bedford Street.

        MS. HOEFLE:  If we could please pull up Exhibit 1.2.

I actually have a blow-up of this just in case it's helpful.

        Can everyone see Exhibit 1.2 either on your screen or

on the blow-up map in front of you?  Yes.  Okay.

Q.   Officer, you just testified that you observed the Explorer

crash into a Prius at approximately -- well, can you describe

for us again and sort of narrate for us or describe for us

where on the map you saw that crash occur?

A.   Would you like me to stand up and point?

Q.   Yes, if you don't mind.  Thank you.

A.   So this is the intersection of Bedford Road at Worthen

Road, this is Camellia Place, the red Toyota Prius was on

Worthen Road turning onto Bedford Street.  It was in the middle

of the intersection where the black Ford Explorer struck the

1    front of the red Toyota Prius.  I was approximately in this

2    area right here.

3    Q.   And just for the record, so you're pointing towards the

4    top of the map on Bedford Street; is that right?

5    A.   Correct, yes.

6    Q.   Thank you.  You can sit down.  Officer, what did you do?

7    A.   I observed the vehicle crash and the vehicle, the black

8    Ford Explorer deflect, ricochet off the Toyota Prius.  My

9    initial reaction was to go to the black Ford Explorer.

09:46AM 10   Q.   What did you do -- and when you say go towards the Ford

11   Explorer, what exactly did you do?

12   A.   So the black Ford Explorer had ricocheted, like I said,

13   off the Toyota Prius into the driveway for the -- the front

14   driveway for the Lexington Fire Department, the pad, and then

15   overcorrected back over the marked lanes across and rested near

16   a granite post and rod iron fence.

17   Q.   Across from the Lexington Fire Department?

18   A.   Yes, so I went towards the black Ford Explorer, the

19   vehicle I was attempting to stop.  I saw --

09:47AM 20        MS. HOEFLE:  I'll just pause there for a second.

21   Mr. O'Donnell, could we please have Exhibit 4.1.

22   Q.   Officer, in connection with this incident, are you aware

23   of whether investigators recovered video surveillance footage?

24   A.   I am.

25   Q.   Okay.  I'll pull up --

```
          1            MS. HOEFLE:  Or Mr. O'Donnell, please pull up
          2    Exhibit 4.1.  Can you play it just so we can see the -- and
          3    pause it.  Thank you.
          4    Q.    So before we play this, Officer Morris, can you please
          5    explain to us what we're looking at here?
          6    A.    So this is the front of the Lexington Fire headquarters at
          7    45 Bedford Street.  Looking at the intersection of Bedford
          8    Street at Worthen Road and Camellia Place, Worthen road is
          9    where the headlights are.  The gray SUV in the middle of the
09:48AM   10    intersection travelling up would be Bedford Street.
         11    Q.    So if we're looking at this video here, if I understood
         12    you correctly, just for the jurors's orientation, the road
         13    that's running sort of north/south on this picture here is --
         14    which road is that?
         15    A.    Worthen Road.
         16    Q.    And then the road that's running horizontal?
         17    A.    That is Bedford Street.
         18    Q.    Okay.
         19            MS. HOEFLE:  Can we please play this.
         20            (Video plays.)
         21    Q.    Officer Morris, what did we just see?
         22    A.    That was the motor vehicle crash.  It was a black Ford
         23    Explorer traveling eastbound on Bedford Street and a red Toyota
         24    Prius attempting to turn onto Bedford Street from Worthen Road.
         25    Q.    Okay.
```

1              MS. HOEFLE:  Can you please continue to play.

2              (Video plays.)

3    Q.   Officer Morris, can you sort of narrate what's happening?

4    A.   So that's my cruiser --

5    Q.   The first car that --

6    A.   The first cruiser.  Sergeant Barry had pulled out from a

7    driveway right next door to the 57 Bedford Street.  To put that

8    in perspective, this is 45 (indicating) and 57 is about two

9    buildings down.  And he, I saw him when I was -- when I saw the

09:49AM 10   motor vehicle crash, I saw Sergeant Barry pull behind me.  I

11   continued on with the black Ford Explorer while Sergeant Barry

12   rendered aid to the operator of the red Prius.

13             MS. HOEFLE:  Okay.  You can put that down.

14   Q.   So what did you do next?

15   A.   I observed a driver and a passenger, driver in the driver

16   seat, passenger in the front passenger seat getting out of the

17   black Ford Explorer.  As they both were doing so, I saw both

18   moving their hands around.

19   Q.   What, if any, significance did that have to you, moving

09:50AM 20   their hands around?

21   A.   Moving hands around is not usually a first reaction to

22   someone that's been in a motor vehicle crash.

23             MR. FLASHNER:  Objection.  Move to strike.

24             THE COURT:  I'll allow it.  It's lay opinion.

25   A.   I've been to numerous motor vehicle crashes.  I've saw --

Q.   So, Officer, what did you do next after you observed that?

A.   I observed -- so I observed a male in all black and a passenger in all red with a ski mask on.

Q.   Were those -- are you aware of whether those people, the driver and the passenger, were later identified?

A.   Yes.

Q.   Who were they identified as?

A.   Henry Del Rio and Mr. Perez, Jose Perez.

Q.   And who was -- specifically, who was --

A.   The driver was Mr. Perez, the passenger was Mr. Del Rio.

Q.   What happened next?

A.   So, like I said, I observed them both get out of the vehicles in their respective seats, front driver and front passenger.  I observed movements, and then I observed them run towards the back of the Stop & Shop parking lot.

Q.   What did you do after that?

A.   I got out of my cruiser, and I attempted to -- I was pursuing, on foot, the two subjects.

Q.   What, if anything, did you say?

A.   I numerous times, throughout the foot pursuit, I got out and said "Police, stop, police."  I made myself known multiple times.

Q.   And prior to the pursuit, what, if anything, did you see as the individuals exited the car?

A.   I observed the driver drop an item outside the vehicle.

1    Q.    At that point did you stop running to recover whatever

2    that item was?

3    A.    Could you repeat?

4    Q.    At that point, did you stop running to try to recover

5    whatever that item was?

6    A.    No, I continued pursuing the two subjects.

7    Q.    And if we could just have Exhibit 1.2 again, please.  And

8    this is the same map that's in front of you.  Can you just

9    describe for us where the foot pursuit and where you ran and

09:52AM 10    where the individuals ran?

11    A.    Would you like me to get up, or would you like me to

12    describe in words?

13    Q.    Sure, you can get up, please.  Thank you.  And I apologize

14    again for the back and forth and clumsiness of these physical

15    maps.

16    A.    This is the Lexington Fire Department.  The crash was

17    here.

18    Q.    And you're pointing just -- point with your fingers

19    approximately in that area on -- between Bedford and Worthen?

09:53AM 20    A.    Yes.

21    Q.    Okay.

22    A.    The black Ford Explorer then came left over towards the

23    fire station driveway and then overcorrected coming back over

24    the marked lanes into the eastbound travel lane resting near a

25    granite post and rod iron fences.  The two subjects got out of

1    the vehicle and ran down like so.

2    Q.   And for the record, you're pointing your fingers sort of

3    through the Stop & Shop parking lot; is that correct?

4    A.   Correct.  Through the Stop & Shop parking lot toward the

5    loading dock area, which is located here.

6    Q.   And when you said "here," that's sort of on the left --

7    sort of towards the bottom left-hand side of the map, the back

8    of the Stop & Shop parking lot?

9    A.   Yes.

09:53AM 10   Q.   Okay.  And that is where you continued to pursue them?

11   A.   Correct, yes.

12   Q.   Thank you.  You can take a seat.  What did you do next?

13   A.   As I was pursuing on foot, I gave radio dispatch, I

14   dispatched to radio -- communications and other officers

15   responding physical descriptions and where they were running

16   to.  I also radioed to responding officers to cut the two

17   subjects off at the Battle Green Apartments, which is directly

18   behind Stop & Shop.

19   Q.   What, if anything, were -- did you see them doing as they

09:54AM 20   ran?

21   A.   As they continued to evade me when I gave off orders to

22   stop and identified myself --

23          MR. FLASHNER:  Objection, move to strike.

24          THE COURT:  Overruled.

25   A.   -- I saw both Perez and Del Rio, grabbing and moving their

1   hands in their pockets.

2   Q.   What, if anything, based on your training and experience,

3   does someone or two people sprinting away from you holding

4   their hands in their pockets indicate to you?

5   A.   People that are --

6        MR. FLASHNER:  Objection.

7        THE COURT:  Again.  I'll allow him as a trained police

8   officer to offer a lay opinion about what inference he may draw

9   under the circumstances.

09:55AM 10   A.   Based on my observations, training, and experience, people

11   evading you and putting hands in their pockets either have a

12   weapon or evidence of a crime that they're trying to discard.

13   Q.   What did you do next?

14   A.   We came to the rear of the loading area at Stop & Shop.  I

15   observed Del Rio and Perez attempting to vault the wooden fence

16   in an effort to evade me furthermore.

17   Q.   What happened after that?

18   A.   I drew my firearm and ordered them both to stop.

19   Q.   Did they stop?

09:56AM 20   A.   Mr. Perez eventually stopped.

21   Q.   What happened to Mr. Del Rio?

22   A.   Mr. Del Rio continued to move around, go behind a

23   dumpster, put his hands in his pockets and eventually I lost

24   sight of him.

25   Q.   So when the defendant stopped, what happened after that?

1    A.   To Mr. Perez?

2    Q.   Yes.

3    A.   Mr. Perez finally complied to my orders, got on the

4    ground, put his hand behind his back, interlaced his fingers,

5    and he was handcuffed.

6    Q.   What did -- what, if anything, did you ask?

7    A.   I asked him why he was running.

8    Q.   What did he respond?

9    A.   Because he had a suspended license.

09:57AM 10    Q.   Was Mr. Perez searched?

11    A.   He was.

12    Q.   By you, did you search him?

13    A.   Right.

14    Q.   What, if anything, did you find in searching him?

15    A.   It was a large amount of cash.

16    Q.   Where did you find that cash?

17    A.   In his pocket.

18        MS. HOEFLE:  Could we please pull up Exhibit 8.1.

19    Play just so we can see the start of it but not any further.

09:57AM 20    Okay.

21    Q.   So, Officer Morris, we're looking here at Exhibit 8.1.

22    Before we play it, what are we looking at here?

23    A.   This is a view of the landing pad area, driveway for

24    apparatus of the Lexington Fire Department located at 45

25    Bedford Street.

1    Q.   So this is sort of another view of -- or sorry, another

2    camera from the Lexington Fire Department, the prior clip that

3    we played is a different view; is that right?

4    A.   Yes, it is.

5         MS. HOEFLE:  Okay.  Could you please play this.

6         (Video plays.)

7    Q.   We see that same school bus up in the top right-hand

8    corner driving through the intersection?

9    A.   Yes.

09:58AM 10  Q.   What did we just see?

11   A.   That's the motor vehicle crash between the black Ford

12   Explorer and the red Toyota Prius.

13   Q.   And then what are we looking at here?

14   A.   That is my cruiser catching up to Perez and Del Rio.

15   Q.   And what's going on here?

16   A.   That is me observing them running on foot away from me,

17   giving lawful commands to stop, and continuing forward in an

18   on-foot pursuit.

19        MS. HOEFLE:  Okay.  We can pause.  Thank you.  And can

09:58AM 20  we please pull up Exhibit 9.1.

21   Q.   And before we play this, Officer Morris, what are we

22   looking at here in Exhibit 9.1?

23   A.   So this is Stop & Shop looking towards Bedford Street.

24   This is the front corner of Stop & Shop, or the loading bay

25   side.

1          MS. HOEFLE:  Okay.  Can you play this, Mr. O'Donnell.

2     Q.   Officer Morris, what are we looking at here in this

3     Exhibit 9.1?

4     A.   That is me chasing Mr. Perez and Mr. Del Rio on foot to

5     the back of the loading area.

6          MS. HOEFLE:  Okay.  Thank you.  You can pause.  You

7     can take that down.

8     Q.   So you testified that you arrested the defendant, searched

9     the defendant, and what -- to the extent you didn't already

09:59AM 10     mention it, what, if anything, happened to Mr. Del Rio?  Was he

11     eventually apprehended as well?

12     A.   He was.

13     Q.   What -- after both the defendant and Mr. Del Rio were

14     secured, what, if anything, did you communicate to other

15     investigating officers?

16     A.   The -- could you rephrase that?

17     Q.   Sure.  Did you say anything to -- after both were

18     apprehended, were other investigating officers present at the

19     scene who had come to help investigate the scene?

10:00AM 20     A.   Yes.

21     Q.   What, if anything, did you communicate to those people who

22     had helped to investigate?

23     A.   I described to them how Mr. Perez and Mr. Del Rio had

24     their hands in their pockets and continued to run towards the

25     back of the Stop & Shop.

1   Q.   Why did you feel that was important to communicate?

2   A.   Because based on my training and experience, people that

3   have --

4         MR. FLASHNER:  Objection.

5         THE COURT:  Overruled.

6   A.   People that are holding or feeling around in their pockets

7   while they're running away from you, or feeling around while

8   they're not compliant to you either have a weapon or have

9   evidence of a crime.

10:01AM 10   Q.   Are you aware of whether photographs were taken of the

11   scene?

12   A.   I am.

13         MS. HOEFLE:  Can we, please, pull up Exhibit 2.1?

14         THE COURT:  While we're doing that, why don't we take

15   a moment and stretch.

16   Q.   So we have pulled up here Exhibit 2.1.  Officer, what is

17   this?

18   A.   You're looking at the intersection of Bedford Street and

19   Worthen Road and the red Toyota Prius that was involved in the

10:01AM 20   motor vehicle crash with Mr. Perez's vehicle.

21   Q.   Could we please have 2.2?  Officer, what's this?

22   A.   This is another angle.  This is the middle of the

23   intersection looking towards Worthen Road where the cones are,

24   and that is the front damage that was sustained to the red

25   Prius.

1    Q.    2.3, please.  What are we looking at here with

2    Exhibit 2.3?

3    A.    Again, this is another photo of the motor vehicle crash

4    between the red Toyota Prius and Ford Explorer.

5    Q.    And 2.4.  What do we see here?

6    A.    And this is, again, more damage from the red Toyota Prius

7    sustained by the black Ford Explorer.

8    Q.    Could we please have Exhibit 2.5.  What do we see here in

9    Exhibit 2.5?

10:02AM 10    A.    That is the defendant's vehicle that he was operating

11    towards its crash.

12    Q.    Are both doors open?

13    A.    Yes.

14    Q.    Could we please have 2.6.  What do we see here in 2.6?

15    A.    That is the final resting point, like I said, with the

16    granite post and rod iron fence, the final resting point of the

17    defendant's vehicle with the airbags deployed.

18    Q.    Thank you.  You can take that down for now.  What, if

19    anything, did you do with regard to the Explorer after the

10:03AM 20    defendant and Del Rio were apprehended?

21    A.    Subsequent to arrest, the motor vehicle inventory was

22    conducted roadside.

23    Q.    Of the Explorer?

24    A.    Yes.

25    Q.    Did you conduct the motor vehicle inventory?

1    A.    Yes.

2    Q.    What did you find?

3    A.    Numerous items.  In the center console, I found a bag with

4    a white powder-like substance with a bunch of individually

5    wrapped white, or individually wrapped bags with the white

6    substance inside.  I also found --

7    Q.    Was -- that was in the center console, you testified?

8    A.    The center console, yes.

9    Q.    Was that center console accessible to both the driver and

10:04AM 10   passenger?

11   A.    Absolutely.

12          MR. FLASHNER:  Objection.

13          THE COURT:  Overruled.

14   Q.    What else did you find?

15   A.    Also in the front cup holder was an open Sprite can.  I

16   smelled the Sprite can, and I smelled, based on my training and

17   experience, an odor of an alcoholic beverage inside the Sprite

18   can.  And, furthermore, I looked into the floor board of the

19   passenger area, and I observed four blue label Johnny Walker

10:04AM 20   nips.  Two and a half were empty.  One was full.

21   Q.    What else did you find in the car?

22   A.    I also found a marijuana cigarette, some glasses,

23   sunglasses, a game controller, and then underneath the

24   passenger side seat, front seat, was a box with a -- there's a

25   bag with a green leafy substance inside.

1    Q.   Was anything else found in the car of note that you can

2    recall?

3    A.   I can't recall at this time, no.

4    Q.   Can we please up Exhibit 2.7.  What is Exhibit 2.7?

5    A.   This is the trunk area where everything was laid out by

6    Detective Evelyn for pictures and processing.  The bag on the

7    right side, underneath the air pod case is the white bag that I

8    was talking about in the center console area with the

9    individually-wrapped bags with white substance inside, more

10:05AM 10   evidence and property inside the vehicle, the Johnny Walker

11   nips, as I stated, the game controller, sunglasses.

12   Q.   Are you aware of what that black item on the top right

13   corner is?

14   A.   Yes.  That was a ski mask, another ski mask that was -- it

15   was not the one that was on Mr. Del Rio, it was one that was

16   just in the vehicle.

17   Q.   Can you please pull up Exhibit 2.8.  What does Exhibit 2.8

18   show here?

19   A.   Like I said, that was the -- this is a close-up image of

10:06AM 20   the powder-like substance that was found in the center console

21   area.

22   Q.   And Exhibit 2.9.  What is Exhibit 2.9?

23   A.   And this is the green leafy substance that was found

24   underneath the front passenger seat.

25   Q.   Are you aware of whether a firearm was recovered that

1    evening?

2    A.   I am.

3    Q.   Are you aware of whether photos were taken of that

4    firearm?

5    A.   I am.

6    Q.   Could you please pull up Exhibit 2.10.  What is

7    Exhibit 2.10?

8    A.   This is the firearm that was recovered at the scene.

9         MR. FLASHNER:  Objection.  What are we seeing, your

10:07AM 10   Honor?

11        THE COURT:  Why don't you lay a foundation how he --

12        MS. HOEFLE:  Sure.

13   Q.   So you mentioned you were -- you testified that you were

14   aware that a firearm was recovered?

15   A.   I am.

16   Q.   And that photos were taken of that firearm?

17   A.   I am.

18        MR. FLASHNER:  Objection, leading.

19        THE COURT:  Overruled.

10:07AM 20   Q.   At some point was that firearm brought to the Explorer for

21   photographs?

22   A.   It was.

23   Q.   And is this -- and what is this photograph?

24   A.   This is a photo of the firearm that was found at the scene

25   of the crash.

1    MR. FLASHNER:  Objection.  Move to strike, your Honor.

2  May we be heard?

3    THE COURT:  No, I will permit him -- I don't -- if I

4  understand it, this officer did not actually recover the

5  firearm or the ammunition, but that someone else brought it to

6  the car, right, and there it was photographed?

7    MS. HOEFLE:  Correct.

8    THE COURT:  And 2.10 is in evidence, as I understand

9  it?

10:08AM 10    MS. HOEFLE:  That's correct.

11    THE COURT:  So he may testify the firearm was brought

12  to the car and --

13    MR. FLASHNER:  The firearm was brought to the car.

14    THE COURT:  Well, he didn't recover it so he has no

15  personal knowledge.

16    MR. FLASHNER:  Exactly, thank you, your Honor.

17  Q.   For the sake of clarity, did you personally recover a

18  firearm?

19  A.   I did not recover a firearm, no.

10:08AM 20  Q.   Okay.  Did you take steps to document the evidence

21  recovered that night?

22  A.   I did.

23  Q.   What generally did that entail?

24  A.   Detective Evelyn would log items for me, I would then take

25  the item, enter it into our CAD, computer automated dispatch.

1    Q.    So taking a step back, so before that, you just looked at

2    photos that you just testified were photographs of various

3    evidence at the scene, right?

4    A.    Yes.

5    Q.    So what did you do after that?  With the evidence, what

6    steps did you take?

7    A.    The evidence was brought to the Lexington Police Station

8    for further processing.

9    Q.    At the Lexington Police Station, what did you do or what

10:09AM 10    was done that you observed with the evidence?

11    A.    The substances were tested.

12    Q.    And before that.  Sorry, I just want to take this

13    step-by-step.  So what was done with all of the evidence that

14    was recovered?

15    A.    It was placed into a -- so in the exhibits prior where you

16    could see the trunk with all the evidence, there was a brown

17    paper bag there.  That brown paper bag was used to transport

18    all the evidence to the Lexington Police Station.

19    Q.    Were you actually present at the police station then in

10:09AM 20    reviewing and taking steps to document the evidence?

21    A.    I was.

22    Q.    Can we please look at Exhibit 2.20.  Officer, what is

23    this?

24    A.    So this a picture inside the Lexington Police report room

25    on the desk table with all the evidence that was brought to the

1   scene from the scene being the motor vehicle crash.

2   Q.   And we see two phones, a firearm, ammunition?

3   A.   Yes.

4   Q.   We see the -- what else do we see here?

5   A.   A brown substance and another white substance that was

6   found by another officer.

7   Q.   As well as the items that you previously described for us?

8   A.   Correct, yes.

9   Q.   So -- and can we please have Exhibit 2.21.  What is this?

10:10AM 10   A.   The marijuana cigarette.  Again, another photo of the --

11   up top would be the bag with the white substance that was

12   individually wrapped into multiple little baggies, and then the

13   brown substance --

14   Q.   And that was recovered from the scene?

15   A.   Correct, yes.  -- as well as the green leafy substance.

16   Q.   Okay.  So what steps did you take to record these items?

17   A.   The items were scanned by Detective Evelyn and then tested

18   by Detective Evelyn, and then other items were bagged and

19   property labels was made by me.

10:11AM 20   Q.   What does --

21   A.   I'm sorry.  A property label was created by me with a bar

22   code, case number, property number, which was -- is an item

23   number and then the time and date at the top of the sticker

24   when it was made.

25   Q.   So you generated a bar code for each specific item?

1    A.    Yes.

2    Q.    Okay.  Did you also record the amount of money that you

3    recovered from the defendant's pockets?

4    A.    I did.

5    Q.    Do you recall approximately how much that was?

6    A.    It was over $2,000.  Not off the top of my head.  It's in

7    my report.

8    Q.    But you just testified you recall it being over $2,000?

9    A.    Yes.

10:12AM 10    Q.    Okay.  So I want to walk through a couple items in detail.

11    So first, let's talk about the firearm.  So what did you do

12    with the firearm while taking steps to document or record the

13    evidence?

14    A.    The firearm serial number on the slide was ran through

15    CJIS, which is a --

16    Q.    Did you -- let me just -- did you observe the serial

17    number on the firearm?

18    A.    Yes.

19    Q.    Okay.  Did you write down that serial number?

10:12AM 20    A.    Yes.

21    Q.    Okay.  I'm showing you, and with your Honor's permission,

22    I'll approach, what's been marked as Exhibit 10.  Do you

23    recognize Exhibit 10?

24    A.    Yes, I do.

25    Q.    How do you recognize that?

1   A.   It's the firearm that was located at the scene.

2        MR. FLASHNER:  Objection.

3   Q.   How do you recognize this --

4        THE COURT:  Well --

5        MR. FLASHNER:  Move to strike the last phrase that he

6   stated.

7        THE COURT:  Let's just be clear.  My understanding is

8   that it was reported to this officer that the firearm was

9   recovered at the scene.  So I'll allow him to answer with that

10:13AM 10  understanding.  He did not recover the firearm, someone else

11  did.  Where it was recovered and so forth is for other

12  witnesses to testify, but my understanding from his testimony

13  is he took custody of it, recorded the serial numbers, and so

14  forth, and I'll allow that testimony.

15       MR. FLASHNER:  Thank you, your Honor.

16  Q.   How do you recognize this firearm?

17  A.   The distinct gray slide, as well as the serial number at

18  the top of the slide.

19  Q.   Okay.  Thank you.  I'll take that back.

10:14AM 20       MS. HOEFLE:  Your Honor, I would offer Exhibit 10.

21       MR. FLASHNER:  No objection.

22       THE COURT:  It's admitted, Exhibit 10.

23       (Exhibit No. 10 received into evidence.)

24  Q.   And you previously started to testify about this, but to

25  take a step back and start from the beginning, what was done

1    with the substances that were -- that you had with you at the

2    evidence -- on the evidence table at the station?

3    A.    The evidence was tested, those substances were tested, and

4    then were scaled and bagged into an evidence bag, which is

5    sealed with a property label on it.

6    Q.    With your Honor's permission, I'll approach again.  I'm

7    showing you what's been marked Exhibit 11.  Do you recognize

8    Exhibit 11?

9    A.    Do you mind if I just?

10:15AM 10    Q.    Yes, you can move the plastic bag around so you can see

11    the interior.

12    A.    Yes.

13    Q.    How do you recognize that?

14    A.    My property label that I printed out that night is on

15    there.

16    Q.    What generally is this, Exhibit 11?

17    A.    This is the items that were recovered at the scene.

18    Q.    Certain substances?

19    A.    Certain substances, correct.

10:15AM 20    Q.    And I'm handing you now what's been marked as Exhibit 13.

21    Do you recognize Exhibit 13?

22    A.    Yes.

23    Q.    How do you recognize that?

24    A.    Other substances that were found at the scene and property

25    label by me, and it was time stamped at the top with the case

1    number.

2           MS. HOEFLE:  Your Honor, at this point I would offer

3    Exhibits 11 and 13.

4           THE COURT:  All right.  They're admitted, 11 and 13.

5           (Exhibit No. 11 and 13 received into evidence.)

6           MS. HOEFLE:  And at this point I would Exhibit 16.4,

7    which is a stipulation.

8           THE COURT:  All right.  Admitted, 16.4.

9           MS. HOEFLE:  Thank you.

10          (Exhibit No. 16.4 received into evidence.)

11          Can we have 16.4.

12          MS. HOEFLE:  So I'll read Exhibit 16.4, which is a

13   stipulation of undisputed facts regarding Exhibit 12, which I'm

14   holding here in my hand.

15          "The United States of America and the defendant

16   Jose Perez, Jr., by undersigned counsel, hereby stipulate and

17   agree that the following facts are true:

18          The item contained within Exhibit 12 was recovered in

19   the area of Bedford Street in Lexington, Massachusetts on

10:17AM 20   December 8th, 2022 by Lexington police officers and

21   subsequently sent to the U.S. customs and border protection

22   laboratory.

23          "The item identified as item 2 was tested and analyzed

24   by chemist Katelyn Thomas.  The parties further agree that this

25   stipulation of undisputed facts be admitted into evidence

1    without any further foundation."

2              So at this point I would offer Exhibit 12.

3              MR. FLASHNER:  No objection.

4              THE COURT:  Admitted -- oh, I'm sorry, you're offering

5    Exhibit --

6              MS. HOEFLE:  Yes, the Exhibit 12, itself, which is the

7    subject of the stipulation.

8              THE COURT:  Exhibit 12 is admitted.

9              MR. FLASHNER:  No objection to the stipulation coming

10:18AM 10    in, either.

11              (Exhibit No. 12 received into evidence.)

12    Q.   So, Officer Morris, after the report you just talked

13    about, the property tags that you generated, and what did you

14    do with the property tags?

15    A.   The property tags were placed on each item, respective

16    item, which was on the bag of each item.

17    Q.   What did you do with the evidence after that?

18    A.   I personally walked the evidence down to the evidence

19    lockers, which is downstairs -- which was downstairs at our

10:18AM 20    temporary building at Bedford Street in a secure locker.

21    Q.   And what did you do?

22    A.   Each item was placed into a property locker and the

23    lockers were sealed with a key and then the key was placed into

24    a key drop box, which I do not have access to.

25    Q.   Okay.  One moment.  Nothing further, your Honor.

1          THE COURT:  All right.  Cross.

2          MR. FLASHNER:  Your Honor, may we approach, a

3     housekeeping matter?

4          THE COURT:  Yes.

5          (THE FOLLOWING OCCURRED AT SIDEBAR:)

6          THE COURT:  Yes.

7          MR. FLASHNER:  Thank you, your Honor.  Thanks for

8     allowing me to approach.  There's a slight housekeeping issue,

9     I think some of the stipulations.  We've numbered some of the

10    photographs that were provided by the government with slightly

11    different exhibit numbers.  I can clean it up with the

12    stipulation tomorrow, and I'd ask to use them as they're

13    admitted now.  I don't think there's any objection to the

14    government's photos.

15         MS. HOEFLE:  You're just saying you took what's

16    already been admitted as --

17         MR. FLASHNER:  Yes, they are contained in Exhibit 2,

18    but they have different page numbers on them.

19         THE COURT:  I'm sorry, the same photos we've already

20    looked at?

21         MR. FLASHNER:  No, Exhibit, 2 which was part of the

22    stipulation contained all of the what I'll call crime scene

23    photos.  It was just a compilation of all the photographs.

24    I've picked particular ones, and I've given them specific

25    numbers.  We've neglected to put them on the stipulation, so

1    I'm just going to proceed as though those are in, there's no

2    objection.  The other issues is we're using the same fire house

3    video, but we're using it in a native format because it allows

4    me to pause and go frame by frame.  We neglected to put that,

5    the stipulation either, and I realized that as --

6              THE COURT:  It doesn't need to be stipulated, you can

7    offer it and it's in.

8              MR. FLASHNER:  Thank you.

9              (SIDEBAR CONFERENCE WAS CONCLUDED)

10:21AM 10        THE COURT:  All right.  Counsel.

11             MR. FLASHNER:  Your Honor, we're having an issue with

12   the laptop connecting to the court system.  I can take start or

13   we can take the break.  I don't know what time the Court was --

14             THE COURT:  Why don't you start and see how far you

15   get.

16             MR. FLASHNER:  May I inquire, your Honor?

17             THE COURT:  Yes, you don't need to ask my permission,

18   go ahead.

19                        CROSS-EXAMINATION

10:22AM 20   BY MR. FLASHNER:

21   Q.   Good morning, Officer.

22   A.   Good morning, sir.

23   Q.   My name is Cory Flashner, and I represent Mr. Perez who is

24   seated over there.  You identified him earlier for the members

25   of the jury.  You and I, as far as we both know, have never met

1    before today, correct?

2    A.   Yes.

3    Q.   All right.  And we've never spoken?

4    A.   No.

5    Q.   All right.  I'm going to ask you a series of questions

6    over the next -- I don't know -- maybe hour, maybe 45 minutes.

7    If you don't understand anything I ask you, if I'm unclear,

8    please just tell me, and I'll try to rephrase the question,

9    okay?

10:22AM 10   A.   Yes.

11   Q.   Thank you.  So we've never met, but you did -- you have

12   met with AUSA Crowley and AUSA Hoefle to prepare for your

13   testimony today, correct?

14   A.   Yes.

15   Q.   And how many times did you meet with them to prepare, and

16   by them, either AUSA Crowley or AUSA Hoefle?

17   A.   Two times.

18   Q.   I'm sorry?

19   A.   I believe two times.

10:22AM 20   Q.   Two times?

21   A.   Yes.

22   Q.   All right.  If you wouldn't mind keeping your voice up.

23   A.   I'm sorry, is this better?

24   Q.   That's perfect.  It's not you, it's me, trust me.  I hear

25   it all the time.  So when did those meetings occur?

1   A.   One was yesterday afternoon and the other one was a week

2   prior maybe.  I cannot recall the specific date.

3   Q.   All right.  Some time in July?

4   A.   Yes.

5   Q.   Were there other Lexington police officers present for

6   those meetings?

7   A.   No.

8   Q.   Just you and an Assistant United States Attorney and maybe

9   someone else from the United States Attorney's Office staff?

10:23AM 10   A.   Yes.

11   Q.   All right.  How long did the first meeting last?

12   A.   Maybe an hour.

13   Q.   And the meeting yesterday, how long did that last?

14   A.   Again, maybe an hour.

15   Q.   During that first meeting some time earlier in July, did

16   you watch the video surveillance footage from the fire station

17   from back on 12, December 8, 2022?

18   A.   Yes.

19   Q.   Did you watch that footage again yesterday?

10:24AM 20   A.   I believe so.

21   Q.   And just yesterday, so I'd ask you just to think if you

22   wouldn't mind.  Do you remember watching it again yesterday?

23   A.   I recall seeing evidence, I cannot recall -- I believe so,

24   yes.  I would say yes.

25   Q.   And that first meeting back in July, was that the first

1    time you saw the surveillance footage from the Lexington Fire

2    Department?

3    A.    No.

4    Q.    When was the first time you reviewed it?

5    A.    I think it was a week after the incident itself.

6    Q.    So --

7    A.    Where Detectives recovered the evidence of the video

8    footage.

9    Q.    Some time in mid-December of 2022?  Is that fair?

10:24AM 10    A.    I would say yes.

11    Q.    And in preparing today, you reviewed presumably the police

12    reports, correct?

13    A.    Yes.

14    Q.    Did you review the reports of other police officers?

15    A.    No.

16    Q.    Just your own?

17    A.    Just my own.

18    Q.    And did you review -- I'm going to use an expression here,

19    did you review the police recordings or turret recordings?

10:25AM 20    A.    No.

21    Q.    Do you know what the expression is?

22    A.    No, could you elaborate on that?

23    Q.    I think I'm dating myself.

24    A.    Okay.

25    Q.    You're familiar with the fact that when police officers

1   broadcast something, it's recorded on a recording system?

2   A.   Yes.

3   Q.   Okay.  And what would you call those?

4   A.   Radio transmissions.

5   Q.   Radio transmissions, radio broadcasts, okay.  Did you

6   review the radio broadcasts from December 8, 2022?

7   A.   No.

8   Q.   Beyond logistics, in terms of how you were going to come

9   to court today and things like that, did you discuss your

10  testimony today with any other Lexington police officers?

11  A.   No.

12  Q.   Now, you started with the Lexington Police Department in

13  2021?

14  A.   Correct.

15  Q.   Is that correct?

16  A.   Correct.

17  Q.   In what month did you start?

18  A.   I was hired in March of 2021.

19  Q.   When did you actually start working for the police

20  department?

21  A.   July 23rd.

22  Q.   So 7-23-21?

23  A.   Correct.

24  Q.   And was that about a year after you graduated from

25  college?

1    A.    Do I have to graduate college to become a police officer?

2    I did not to go -- I've gone to classes, but I've never

3    graduated college.

4    Q.    Okay.  I'm sorry.  I thought you graduated from UMass

5    Lowell?

6    A.    No, I never said I graduated at UMass Lowell.

7    Q.    My apologies.

8    A.    I went to UMass Lowell, sir.

9    Q.    So you took classes at UMass Lowell?

10:26AM 10    A.    Yes.

11    Q.    And then you left those a classes without attaining a

12    degree; is that right?

13    A.    Yes.

14    Q.    And you applied for the police department in March of

15    2021?

16    A.    No, it was before that.  I was hired in March of 2021.

17    Q.    The process takes a while, right?

18    A.    It does.

19    Q.    And then you start in July of 2021?

10:26AM 20    A.    Correct.

21    Q.    Any law enforcement experience prior to joining the

22    Lexington PD?

23    A.    No.

24    Q.    So in December of 2022, how long had you been a police

25    officer?

1    A.    Since July 23rd of 2021.

2    Q.    Somewhere around -- we'll do the math together.

3    A.    I can't recall.

4    Q.    Somewhere around 18 months or so, a little bit less,

5    17 months?

6    A.    Sure.

7    Q.    Okay.  When you say you were hired in July of 2023, is

8    that when you go to that -- I'm sorry, you say you started

9    working in July of 2023?

10:27AM 10    A.    No, that's incorrect.  So July of 2021.

11    Q.    July of 2021?

12    A.    Yes.

13    Q.    Sorry about that.  Is that when you started actually

14    working as a law enforcement officer, or is that when you

15    started at the police academy?

16    A.    No, I started the police academy on March 1st, 2021 in

17    Plymouth, Massachusetts.  I graduated July 23rd, 2021 and then

18    attended a field training program and then was, yes, I was

19    hired with police powers July 23rd, 2021.

10:28AM 20    Q.    All right.  And with the exception of that police academy

21    or six-month training, did you receive any other training prior

22    to starting at the Lexington PD?

23    A.    I went to a part-time reserve police academy, sir, in

24    Chelsea a year prior, during COVID.

25    Q.    And when you started with the Lexington PD in July of

1    2021, do they immediately send you out in a police cruiser by

2    yourself?

3    A.    No, with another officer, field training officer.

4    Q.    If you could explain to the members of the jury how that

5    field training works, the on-the-job training.

6    A.    So when you're hired as a police officer, you attend a

7    six-month police academy in the Commonwealth of Massachusetts.

8    You then become certified through post, at least -- it's a

9    training, an accreditation since 2021.  And from then you, when

10:29AM 10    you graduate, you attend what's called -- you do an orientation

11    into a field training program.  Field training, you're with

12    another officer for a period of time, then you are on your own

13    and you're shadowed by another officer.  It's about 12 weeks,

14    but every department has their own policy, procedure, every

15    different way of doing it.  Some places do a little bit more of

16    certain things than others, but in general it's 12 weeks of

17    training.

18    Q.    And that field training and the shadowing, are those

19    separate events?

10:29AM 20    A.    So field training is broken into four phases.  There's the

21    first phase, a second, third, and fourth.  The first phase,

22    obviously, you're with someone.  They do 75 percent of the

23    work, you do 25.  They show you how to do it.  The second phase

24    they give a little bit more to you, more responsibility; third

25    phase a little bit more to you; and then fourth phase, you're

1  basically doing everything on your own and they're overseeing

2  you from a distance.

3  Q.    So if I'm correct then it's about another three months or

4  so, so that takes us to the end of October, October 23rd, 2021

5  would be when you probably started going out in a cruiser by

6  yourself as a Lexington police officer?

7  A.    Yes, it was October.

8  Q.    And you're aware -- during this training, you became aware

9  that the Lexington Police Department has a policy and

10:30AM 10  procedural manual?

11  A.    Yes, there is.

12  Q.    And you're aware that that manual is available to anybody

13  online?

14  A.    Yes, on their website.

15  Q.    Right.  And as part of your training as a police officer,

16  sir, you learned about the importance of writing accurate

17  police reports, correct?

18  A.    Of course, yes.

19  Q.    Is that yes?

10:30AM 20  A.    Yes.

21  Q.    And you can -- for the Lexington Police Department, you

22  can write an initial police report, but you also have the

23  ability to write supplemental police reports, correct?

24  A.    Yes.

25  Q.    And in this case, you did write a supplemental report, as

1  well as an original report, correct?

2  A.   Yes.

3  Q.   All right.  And whether it's an initial police report or a

4  supplemental police report, you would agree with me that your

5  report needs to be an accurate record of what transpires,

6  correct?

7  A.   Yes.

8  Q.   And you know, as a police officer, that others rely on

9  your reports to make decisions?

10:31AM 10  A.   Yes.

11  Q.   And you'd agree that you rely on your reports to make

12  decisions as -- to make decisions to go back when you're

13  testifying, correct?

14  A.   Can you clarify that?

15  Q.   I can rephrase that.  You'd agree that other individuals,

16  including prosecutors, may review your reports in order to make

17  a charging decision about whether to charge someone with a

18  crime, correct?

19       MS. HOEFLE:  Objection.

10:31AM 20       THE COURT:  I'll allow it, I guess.

21  A.   I'm sorry.  Could you repeat that one more time?

22  Q.   I could try.

23  A.   I'm sorry, I apologize.

24  Q.   No worries.  You're aware, sir, that other individuals,

25  including prosecutors, rely on your police reports to make

1   important decisions like whether to charge someone with a

2   crime.  You're aware of that, correct?

3   A.   Yes, they do.  Yes.

4   Q.   And, in fact, you rely on your reports, as well, to recall

5   the details of certain events when you're asked about these

6   incidents.  If it's many months later, you might look back at

7   your report, correct?

8   A.   Yes.

9   Q.   And that's part of what did in this case by looking at

10:32AM 10   your reports.  That's part of the reason you went and looked at

11   them to prepare for your testimony today, correct?

12   A.   Yes.

13   Q.   Now, back on December 8th you testified on direct

14   examination -- let me rephrase that.  You testified on direct

15   examination about an incident that happened on December 8, 2022

16   and you testified about being involved in a foot chase.  Was

17   that the first time you had been involved in a foot chase as a

18   Lexington police officer?

19   A.   Yes.

10:33AM 20   Q.   And you were the arresting officer for Mr. Perez that

21   night, correct?

22   A.   I was.

23   Q.   All right.  Now, I want to talk about your training, but

24   I'm going to skip from that and just try to discuss December 8,

25   2022 with you, Officer.  You were alone in your police cruiser

1    on December 8th, 2022, just before 11:00 p.m., correct?

2    A.   I was.

3    Q.   And you received a radio call about two cars racing,

4    correct?

5    A.   Yes.

6    Q.   Less than a minute later, you see a black SUV, correct?

7    A.   I do.

8    Q.   The black SUV is speeding, correct?

9    A.   Yes.

10:33AM 10   Q.   And the black SUV is traveling on Bedford Street?

11   A.   Yes.

12        MR. FLASHNER:  Your Honor, if I can just -- I'm going

13   to take these down.

14   Q.   So you see this black SUV, it speeds by you.  It's on

15   Bedford Street, correct?

16   A.   Yes.

17   Q.   And when you see it go past you, you pull out onto Bedford

18   Street, correct?

19   A.   Yes.

10:34AM 20   Q.   You activate your lights and sirens, correct?

21   A.   Yes.

22   Q.   And at that point, what you have and what you know is that

23   you have a black SUV and you know it's speeding, correct?

24   A.   I do, yes.

25   Q.   You don't know who is driving it?

```
 1    A.    Correct.

 2    Q.    You don't know who the passenger is?

 3    A.    Right.

 4    Q.    You have no idea what's -- about anything else about that

 5    car, just black SUV speeding, correct?

 6    A.    And that it was racing another vehicle.

 7    Q.    And you heard from another officer that it was racing?

 8    A.    Yes.

 9    Q.    Did you see the other car it was racing?

10    A.    No, I did not.

11    Q.    So all that you've seen is this black SUV, correct?

12    A.    Right.

13    Q.    Speeding?

14    A.    Right.

15    Q.    On Bedford Street.  And Bedford Street is a main road

16    through the Town of Lexington, correct?

17    A.    It is.

18    Q.    All right.  I think you described it as one of the major

19    thoroughfares or cut-throughs?

20    A.    Yes, it is.

21    Q.    There's nothing special about this SUV except for the fact

22    it's going very fast, correct?

23    A.    Yes.

24    Q.    Anything else special about it?

25    A.    The fastest that I've seen, and I've -- based on my
```

10:35AM (line 10)

10:35AM (line 20)

1  training and experience, the fastest I've ever seen a vehicle

2  go down Bedford Street.

3  Q.   Okay.  When you say your training, what training did you

4  have about this SUV?  You hadn't had any, right?

5  A.   It's not that.  It's speed detection, yes.

6  Q.   Just the speed.  You could tell it was going fast, right?

7  A.   Absolutely.

8  Q.   And Bedford Street has commercial properties on it as well

9  as residences, correct?

10:35AM 10  A.   Yes.

11  Q.   All right.  And at this time you have this speeding SUV,

12  but you don't have any guns, correct?

13  A.   No.

14  Q.   Nobody reported shots fired or anything like that?

15  A.   No.

16  Q.   Nobody reported a robbery, nobody reported any crime of

17  violence, right?  Anything along those lines, correct?

18  A.   Right.

19  Q.   But you make a decision to pursue the SUV, correct?

10:36AM 20  A.   Yes.

21  Q.   All right.  And the Lexington Police Department has a

22  policy, it's policy 41D, and that specifically deals with high

23  speed chases, correct?

24  A.   Yes, I can't recall the specific statute, but there is a

25  policy on high speed chases, yes.

1  Q.   Okay.  So you recall there's a policy?

2  A.   There is, correct.

3  Q.   And what are the factors that you considered within that

4  policy before you decided to chase that car that night?  What

5  are the factors you considered?

6  A.   The time of day, weather conditions, traffic pattern, the

7  offense, numerous things, but yes, primarily those that I can

8  recall right now.

9  Q.   So time of day, weather conditions?

10:37AM 10  A.   Time of day, road conditions, right?  Snow, ice.  Offense.

11  Q.   Sorry, what else?

12  A.   The offense.

13  Q.   The offense?

14  A.   The reason for stopping the vehicle.

15  Q.   Let's talk about those.  So the offense at that point was

16  speeding, correct?

17  A.   Right.

18  Q.   Okay.  You agree with me that that's a traffic infraction?

19  A.   No, not that speed.  That's reckless operation.

10:37AM 20  Q.   You can charge him with reckless operation, correct?

21  A.   Absolutely.

22  Q.   The road conditions were it's a two-lane road, correct?

23  A.   Correct, yes.

24  Q.   Civilians are driving on it?

25  A.   Yes.

| | |
|---|---|
| 1 | Q.   There's traffic lights? |
| 2 | A.   There are. |
| 3 | Q.   And you can see from that video that Ms. Hoefle played, |
| 4 | there's a school bus coming out, there's vehicle traffic on |
| 5 | that road? |
| 6 | A.   There is. |
| 7 | Q.   You made a decision to pursue that SUV, correct? |
| 8 | A.   I attempted to stop the SUV, yes. |
| 9 | Q.   My question is a little different, though.  You made a |
| 10 | decision to pursue it.  I know you stopped it, but you made a |
| 11 | decision to pursue it, correct? |
| 12 | A.   Yes. |
| 13 | Q.   Okay.  And fair to characterize that as a high speed |
| 14 | pursuit? |
| 15 | A.   Okay, yes. |
| 16 | Q.   It's not fair? |
| 17 | A.   What's that? |
| 18 | Q.   Is it fair to characterize it as a high speed pursuit? |
| 19 | A.   I would feel, yes. |
| 20 | Q.   You're driving your cruiser and you're going -- are you |
| 21 | going 75 miles an hour, is that fair? |
| 22 | A.   I believe so.  I was trying to catch up to the vehicle. |
| 23 | Q.   My question is a little different.  How fast do you think |
| 24 | you were going?  Do you think you were going at least 75? |
| 25 | A.   I'd say at least 65.  I can't recall.  It might be in my |

10:38AM 10

10:38AM 20

1    report.

2    Q.   And as you embark, is it fair to call it a high speed

3    pursuit?  I don't want to -- if that's not a term that you're

4    comfortable with?

5    A.   I would call it a pursuit at that point with the failure

6    to stop.  I attempted to stop the motor vehicle and then he

7    pulled away and it became a pursuit.

8    Q.   It became a pursuit?

9    A.   Yes.

10:39AM 10   Q.   And if you're driving 65 or 75, you'd agree that that's a

11   high speed pursuit, correct?

12   A.   It depends on the roadway, but yes, on Bedford Street.

13   Q.   On Bedford Street that would be a high speed pursuit,

14   right?

15   A.   Absolutely.

16   Q.   All right.  And you don't follow this car for a particular

17   long distance before it has that accident with the Prius?

18   A.   Correct.

19   Q.   All right.  And Ms. Hoefle showed you either four or five

10:39AM 20   photographs of the Prius after the accident, right?

21   A.   Sure, yes.

22   Q.   Fair to say the operator of that Prius declined medical

23   attention?

24   A.   Yes.

25   Q.   He was okay?

1    A.   Yes.

2         MR. FLASHNER:  Now, if we can have Exhibit 1.3.  Thank

3    you.  Your Honor, this has previously been admitted pursuant to

4    stipulation.

5    Q.   And I don't know if the Assistant United States Attorney

6    showed you this before?

7    A.   No.

8    Q.   Have you seen this before?

9    A.   No, I have not.

10:39AM 10   Q.   Okay.  Let me just help you get oriented here.  You see in

11   the upper left-hand corner, you see something labeled

12   "Lexington Fire Department"?

13   A.   Yes.

14   Q.   And then you see to the right of that, in orange, there's

15   something that says "Gulf Gas"?

16   A.   I do.

17   Q.   And then you'll see across the street in blue there is

18   something that says "M&T Bank"?

19   A.   Yes.

10:40AM 20   Q.   Okay.  And in the lower right-hand corner, there's

21   something that says "Stop & Shop," do you see that?

22   A.   I do.

23   Q.   All right.  And based on your time as a police officer in

24   the Town of Lexington, I'm going to assume you're familiar with

25   this area of Worthen Road and Bedford Street, correct?

1   A.   Yes, I'm from Lexington.

2   Q.   And you'd agree with me that this is just a Google shot or

3   an overhead shot of the particular area?

4   A.   It is.

5   Q.   All right.  And this area on the way left-hand side of the

6   screen, and I'm going to ask -- do you see a cursor go there up

7   to the intersection of Worthen and Bedford Street?

8   A.   That is Worthen Road, where the cursor is, and then, yes,

9   that's the intersection.

10:40AM 10   Q.   And that's where the accident happened between the SUV and

11   the Prius, right?

12   A.   Yes.

13   Q.   And then the SUV continued down the road and you would

14   agree with me it came to a stop somewhere right where the

15   cursor has gone now, just on the other side.  If we could just

16   blow that up just a tiny bit.

17   A.   That's incorrect.

18   Q.   In that area right there?

19   A.   That's incorrect.  That's not the area.

10:41AM 20   Q.   Blow that up one more time.

21   A.   Yeah.  So that last road that you drew before the entrance

22   and a ways of the arrows, to your left, to your left.

23   Q.   Okay.  And the stone pillar, what I'm going to call a

24   metal fence and then a second stone pillar, those are somewhat

25   obscured by that tree, though, correct?

1    A.    In the picture?

2    Q.    Yes.

3    A.    I can't -- I couldn't be able to determine that in the

4    picture.

5    Q.    I know you can't see it there, but based on being a

6    Lexington police officer and being on this road, and presumably

7    preparing for your testimony today, you know that there's two

8    stone pillars and a metal fence there, right?

9    A.    There's a granite post and a rod iron fence, yes.

10:42AM 10    Q.    Okay.  And that's where the black SUV came to a rest,

11    correct?

12    A.    It was its final resting point, yes.

13    Q.    Now -- I'm going to pivot now.  I'm going to show you a

14    series of photographs.

15         MR. FLASHNER:  And, your Honor, at this time I believe

16    they've been offered, but I'm going to offer them again.

17    They're daytime photographs of the scene, and they are

18    Exhibit 100, and, more specifically, I'm going to be relying on

19    Exhibits 100.1 through 100.7.

10:42AM 20         THE COURT:  They have not been offered.

21         MR. FLASHNER:  I'll offer them at this time.

22         THE COURT:  Collectively Exhibit 100.  I don't believe

23    there's any objection, your Honor.

24         MS. HOEFLE:  No objection.  There's a reference in the

25    stipulation.

         1              (Exhibit No. 100 received into evidence.)

         2     Q.   So if you could pull up Exhibit 100.1, please.  100.1.

         3     Officer, you're familiar with the perspective here, correct?

         4     A.   Yes, sir.

         5     Q.   And this would be those granite pillars or posts that we

         6     were just discussing, correct?

         7     A.   Yes.

         8     Q.   And there's the Gulf gas station across the street?

         9     A.   Correct.

10:43AM 10     Q.   So if this photograph was much bigger, to the left of the

        11     photo, as you stare at it, if you were standing where the

        12     photographer was, would be the fire station?

        13     A.   Yes.

        14     Q.   And behind you would be the Stop & Shop parking lot?

        15     A.   Correct.

        16     Q.   And that Gulf gas station, you're familiar with that,

        17     you've driven by it, I assume, as a Lexington police officer

        18     hundreds of times?

        19     A.   Yes.

10:43AM 20     Q.   Now, if we can go to 100.2, please.  This is another

        21     photograph of the same Gulf gas station, correct?

        22     A.   That is.

        23          MR. FLASHNER:  All right.  And if you could focus in

        24     on the right-hand corner of the Gulf gas station, just above

        25     the little tiny Gulf sign.

1    Q.   You're able to see the Gulf gas sign in that blow-up from

2    there, correct?

3    A.   Yes.

4    Q.   And just above that you're able to see what appears to be

5    a video camera, correct?

6    A.   Yes.

7         MR. FLASHNER:  Can we now go to 100.3, please.

8    Actually -- can we -- that's okay.  100.3 is fine.

9    Q.   You'll see another photograph there and that's just a

10:44AM 10   slightly closer one.  It might be a slightly better angle.  If

11   you could blow up that same area.  You'll see that same video

12   camera, correct, Officer?

13   A.   Yes.

14   Q.   If we could go to the next numbered exhibit, 100.4,

15   please.  You'll see this is the other side of that same Gulf

16   gas station, correct?

17   A.   Yes.

18   Q.   And you see a video camera there, correct?

19   A.   I do.

10:44AM 20   Q.   Could you just blow that out.  Okay.  And now if we could

21   switch to 100.5.  This is just another view slightly across the

22   street of that same Gulf gas station, correct?

23   A.   Yes.

24   Q.   And would you agree with me that this would be somewhere

25   in the area as maybe not exactly either stone pillar, but at

1    least in that general area looking diagonally across the

2    street?

3    A.   Yes.

4    Q.   Now, if we could go to 100.6.  And this is another

5    photograph of that same camera on the upper left-hand corner,

6    correct?

7              MS. HOEFLE:  100.6?

8              MR. FLASHNER:  100.1, I apologize.  Evidently it's

9    mislabeled.  So I'll relabel that, but you'll see in the upper

10:45AM 10   left-hand corner --

11             THE COURT:  Hold on.  There already is a 100.1.

12             MR. FLASHNER:  Your Honor, we can skip this exhibit.

13   How about that?

14             THE COURT:  Okay.

15             MR. FLASHNER:  If we could go to 100.7, please.

16   BY MR. FLASHNER:

17   Q.   You'll see another photograph there and this would be that

18   far camera off on the right side as you face the gas station,

19   correct?

10:46AM 20   A.   Yes.

21   Q.   All right.  Now, I want to show you another series of

22   photographs, as well.  Do you remember when we were looking at

23   the larger map that I had up just a few moments ago.  You

24   remember that was an M&T Bank?

25   A.   Yes.

```
 1   Q.    That M&T Bank has been there for a while, correct?

 2   A.    Yes.

 3   Q.    At least long as you've been a Lexington police officer?

 4   A.    Yes.

 5         MR. FLASHNER:  All right.  So if we would go to

 6   Exhibit 100.8, please, and I'll offer Exhibits 100.8 through

 7   100.11.

 8         MS. HOEFLE:  No objection.

 9         THE COURT:  All right.  They're admitted.  100.8

10   through 100.11.

11         (Exhibit No. 100.8 through 100.11 received into

12   evidence.)

13   Q.    Looking at Exhibit 100.8, this is a view -- well, why

14   don't you tell us where that view is?

15   A.    That's -- I believe it's at the crash site at M&T Bank,

16   which sits in front of the Stop & Shop plaza.

17   Q.    And the Gulf gas station, just so the members of the jury

18   who may not be familiar with this area as well as you are, the

19   Gulf gas station is behind the photographer, correct?
```
10:47AM
```
20   A.    Correct.

21   Q.    And Stop & Shop would be off to the left of the

22   photographer, correct?

23   A.    Correct.

24   Q.    Okay.  And from that pillar you have a clear view of the

25   M&T Bank, correct?
```

1    A.    Correct.

2    Q.    All right.  And if we can go to Exhibit 100.2.  So that

3    would be the Gulf gas station that you'd see across the street?

4    A.    Yes.

5    Q.    Okay.  Can we go to the next exhibit, please.  The next

6    exhibit of the bank.  100.9.  So looking at that, that's

7    another view from that stone pillar across the street, correct?

8    A.    It is.

9    Q.    And if we look close-up you can see inside the glass

10:48AM 10   portion of the bank there appears to be a video camera?

11   A.    Yes.

12   Q.    We'll blow that up so you can see it a little bit more

13   clearly.  Do you agree with me that's a video camera, correct?

14   A.    It is.

15   Q.    All right.  And now can we go to Exhibit 100.10.  That

16   would be a view looking out of that glass interior where the

17   ATM machine is toward the stone pillar where the SUV came to

18   rest, correct?

19   A.    It is.

10:48AM 20   Q.    And can you just zoom in to that area where the post is.

21   In that zoom is -- you see the tree and then just to the right

22   of the tree, you see the pillar, the stone pillar, correct?

23   Yes?

24   A.    Yes.

25   Q.    Now, if you can go to 100.11.  This is a view further down

1    the side of the M&T Bank heading back out towards Bedford

2    Street, correct?

3    A.    Yes.

4    Q.    And on the right you see the Gulf gas station, correct?

5    A.    I do, yes.

6    Q.    And in the foreground, in the top left of the photo, you

7    see another video surveillance camera, correct?

8    A.    Yes.

9    Q.    And the area where the stone pillars are is just past the

10:49AM 10    stop sign, correct?

11    A.    Yes.

12    Q.    Could you zoom in on that just for the members of the

13    jury, please.  Now, you can take this off the screen, please.

14    Thank you.  Now the video from the Gulf gas station, the

15    cameras there, that was never obtained as part of this

16    investigation, correct?

17    A.    As far as my knowledge, yes.  No, it was not.

18    Q.    Well, no one --

19    A.    I've never seen it.

10:50AM 20    Q.    No one has ever shown you that video, correct?

21    A.    I've never seen it.

22    Q.    Okay.  And, in fact, it's not mentioned your report,

23    correct?

24    A.    Correct.

25    Q.    And are you aware of any other Lexington police report

1   about anyone obtaining that Gulf gas station video?

2   A.   No, not to my knowledge.

3   Q.   Okay.  And the video from the M&T cameras at the time of

4   the incident back on December 8, 2022, as far as you know, that

5   was never obtained by anyone in the Lexington Police

6   Department, as well, correct?

7   A.   Not to my knowledge.

8   Q.   Okay.  No one has ever showed you that video, correct?

9   A.   No, sir.

10:50AM 10   Q.   Okay.  In fact, you're aware of any report of any

11   Lexington police officer ever making any effort to get that M&T

12   video, correct?

13   A.   Not to my knowledge.

14   Q.   And who is in charge of this investigation for

15   Lexington Police Department?  Is it you?

16   A.   It would be a chain of command.  So I initiated, I made

17   the arrest on Mr. Perez.  It's then passed to the detective

18   bureau.  I put the charges in.  The Detective Bureau is in

19   charge of collecting evidence.  It's a whole process and chain

10:51AM 20   of command.  The police department is all chain of command.

21   Q.   I understand there's a --

22   A.   So I start and then you have other people helping, which

23   is why you see supplemental reports, which is why you see other

24   points of view.

25   Q.   I understand.  But you testified on direct examination

1    about there being an investigation.  I'm just asking who is in

2    charge of the investigation?

3    A.   I would assume, sir, that -- I am not going to assume

4    anything actually, sir.  I redact that.  I made the arrest, I

5    charged him with the laws in Massachusetts that were

6    appropriate, and from there it goes to the next level.

7    Q.   My question is --

8              THE COURT:  Don't interrupt him.

9              MR. FLASHNER:  Sorry, your Honor.

10:51AM 10   A.   I was trying to finish, sir.  That's all.

11   Q.   So you're not in charge of the investigation, correct?

12   A.   Of the preliminary investigation, sir, yes.

13   Q.   Okay.  And then if Detective Evelyn responded to the

14   scene, would he become the person in charge of the

15   investigation?

16   A.   He would be in charge of the data collection, such as

17   evidence and whatnot, video footage.  My job is to --

18             THE COURT:  Let him explain.

19   A.   If you don't mind.  My job is to detect the crime, right.

10:52AM 20   I do what's necessary by the laws that are -- that I am sworn

21   to protect and uphold.  I then write my report and charge

22   dutifully so, and then from there, it goes into the next wrung,

23   which is prosecution with the ADA.

24   Q.   I understand what you did and thank you for giving us that

25   summary, but my question was is Detective Evelyn in charge of

1    the investigation, yes or no?

2    A.   That's above my knowledge and pay grade, sir.  No.  I

3    don't know.

4    Q.   You don't have any information about who is in charge of

5    the investigation?

6    A.   That's -- I'm not the appropriate person.  No, I do not.

7    Q.   My question wasn't whether you're appropriate, but --

8         THE COURT:  All right, you're just going around in

9    circles, Mr. Flashner.

10:53AM 10        MR. FLASHNER:  Your Honor, he testified about an

11   investigation.

12        THE COURT:  He said it went up to the detective.  Your

13   question is argumentative.  Let's move on.

14        MR. FLASHNER:  Thank you.

15   Q.   So the SUV in this case, right, there was an inventory

16   search of that SUV?

17   A.   Yes.

18   Q.   And there was an examination or investigation into that

19   SUV, correct?

10:53AM 20   A.   There was a motor vehicle inventory conducted subject to

21   arrest.

22   Q.   And you're aware that Mr. Del Rio was actually the person

23   that rented that SUV, correct?

24   A.   Yes, sir.

25   Q.   Okay.  So it wasn't rented by Mr. Perez?

        1    A.    Not to my knowledge.

        2    Q.    So -- your Honor, I'm just going to step back to my -- to

        3    grab a piece of paper.  So stepping back now to December 8,

        4    2022.  When you arrive at the area across the street from the

        5    fire station at that stone pillar, you've just been involved in

        6    a high speed chase, correct?

        7    A.    Yes.

        8    Q.    Your first high speed chase as a police officer?

        9    A.    I can't recall.  I've been in numerous.

10:54AM 10    Q.    Well, do you recall any other high speed chases happening

       11    before that?

       12    A.    I can't recall, sir.

       13    Q.    Okay.  Fair to say your adrenaline is going?

       14    A.    Absolutely.  Yes, sir.

       15    Q.    Absolutely.  And the black SUV, it stopped up against that

       16    pillar.  It's pressed up against it, right?  Yes?

       17    A.    It was -- yes, it was close to.

       18    Q.    And then you -- and you can take this down, if that's

       19    okay.  From the time that SUV stopped to the time you exit your

10:55AM 20    car, your police cruiser --

       21    A.    Yes.

       22    Q.    -- that's about eight seconds, right?

       23    A.    I can't recall off the top of my head.  I'm sorry.

       24    Q.    So I'm going to play a portion of the fire house video for

       25    you, okay?

1    A.   Sure, okay.

2         MR. FLASHNER:  Okay.  So this is Exhibit 103, your

3    Honor.  I think there's no objection to this being admitted.

4    It's another, it's the video from the firehouse, but it's in a

5    slightly different format that allows different playing.

6         THE COURT:  All right, it's admitted.

7         MR. FLASHNER:  I'd offer it at this time.

8         THE COURT:  It's admitted.

9         MR. FLASHNER:  103, your Honor.  Thank you.

10:56AM 10         (Exhibit No. 103 received into evidence.)

11   Q.   So you're familiar with this general area, correct?

12   A.   I am.

13   Q.   Okay.  And this is a video shot from the Lexington Fire

14   Department looking across Bedford Street, right?

15   A.   Yes.

16   Q.   So just to make sure the jury is oriented, to the way left

17   is going to be the Gulf gas station, correct?

18   A.   Yes.

19   Q.   And the M&T Bank is going to be in that building that's

10:56AM 20   directly across the street on the left side?  Just looking in

21   the picture, can you see that --

22   A.   Yes, yes.

23   Q.   All right.  So if we can play through now from about

24   10:42:10, as close as you can get to it.  Okay.  If you just

25   move it back frame by frame a little bit further.  Can you

1    pause it right there.  So I've paused the video and you'll see

2    it says "10:42:11 p.m.," do you see where it says that?

3    A.    Yes.

4    Q.    And then it says "front right" and it's difficult to read

5    because it's in green, but it says "10:42.11."  Can you read

6    that in the green?

7    A.    Yes.

8    Q.    Okay.  It is kind of hard to read.  Now, that car that

9    is -- you can see the brake lights on and it's just past the

10:57AM 10    white lane in the road on the left third.  Is that your police

11    car going down?

12    A.    No.

13    Q.    No, okay.  Is that the black SUV?

14    A.    Yes.

15    Q.    All right.

16        MR. FLASHNER:  Can you move it forward just frame by

17    frame from here?

18    Q.    And I want you to just note the time, 10.42.11.

19        Just slowly frame by frame.  You can stop it right

10:58AM 20    there.

21    Q.    Do you agree with me that the door of the black SUV is

22    open?

23    A.    Yes.

24    Q.    And that is 10.42.14, correct?

25    A.    Correct.

1    Q.   Your police cruiser hasn't quite entered the field of

2    vision.  It may well be those headlights that are coming in,

3    but you can't really see it, correct?

4    A.   Yes.

5         MR. FLASHNER:  Can you keep moving it just slowly

6    frame by frame, please, Ms. Hutchinson.  Pause it right there.

7    Q.   You'll agree with me that this is paused now at 10:42.20?

8    A.   Yes.

9    Q.   And your car is still moving towards the scene, correct?

10:59AM 10    A.   Yes.

11        MR. FLASHNER:  Keep moving it.  Pause it right there.

12   Q.   You'd agree with me we're at 10:42:21 and you're still

13   moving towards the scene?

14   A.   Yes.

15   Q.   Do you also agree with me that the driver appears to have

16   exited the vehicle?

17   A.   Yes.

18        MR. FLASHNER:  Okay.  You can keep going forward just

19   frame by frame.  Stop it right there.

10:59AM 20   Q.   And you'll agree with me that your car appears to have

21   stopped there at 10:42:22?

22   A.   Yes.

23   Q.   So 10:42:14 to 10:42:22, you agree with me that that's

24   about eight seconds after the black SUV has crashed, correct?

25   A.   Yes.

1    Q.   Thank you.

2        MR. FLASHNER:  Now, Ms. Hutchinson, we're going to

3    back to 10:42:14, please.  You can pause it right there.

4    That's fine.  Actually, I'm sorry.  Just play it for another

5    second.  Pause it right there.  Thanks.  So, Ms. Hutchinson,

6    would you be so kind as to blow up that area around the black

7    SUV.  You can go out a little bit.  That's probably good.

8    Q.   Now, you recall testifying just earlier this morning that

9    you observed the driver of the SUV drop an item, correct?

11:01AM 10    A.   Yes, an unknown item.

11    Q.   Well, your testimony was drop an item, correct?

12    A.   Yes.

13    Q.   Okay.  And you don't know what that item was?

14    A.   No.

15    Q.   Now, this is the first time that you've offered testimony

16    about -- testimony under oath about what you observed that

17    night involving Mr. Perez when he exited the car, correct?

18    A.   Yes.

19    Q.   But it's not the first time that you had the opportunity

11:01AM 20    to memorialize your observations about what occurred that

21    night, correct?

22    A.   No, you're right.  Yes.

23    Q.   In other words, it's a fancy way of saying you wrote a

24    police report, right?

25    A.   Yes.  Yes.

1   Q.   And that police report that you prepared was about what

2   you observed on December 8; 2022, and you wrote that hours

3   after the incident, correct?

4   A.   Yes.

5   Q.   All right.  And you just made the observations that night,

6   correct?

7   A.   Yes.

8   Q.   Now it's been about 20 months since that time, correct?

9   A.   Yes.

11:02AM 10   Q.   And as a police officer, as we covered before, you

11   received training about how to prepare your police reports,

12   correct?

13   A.   I do, yes.

14   Q.   You know the importance of those police reports, right?

15   A.   Yes.

16   Q.   They need to be accurate?

17   A.   Right.  Yes.

18   Q.   They need to be true, correct?

19   A.   Yes.

11:02AM 20   Q.   Others rely on them, correct?

21   A.   Yes.

22   Q.   You rely on them, correct?

23   A.   Yes.

24   Q.   And certainly, no one's going to -- you don't lie on your

25   police reports, right?

1   A.   No.

2   Q.   All right.  Now, contrary to what you testified today, in

3   your police report, however, you said something different about

4   what you observed that night, correct?

5   A.   I'm unaware.

6   Q.   You're unaware.  Okay.  Let me refresh your recollection.

7   Would looking at your police report refresh your recollection,

8   sir?

9   A.   That would, yes.

11:03AM 10        THE COURT:  Whenever is a good point, we'll take our

11   break, Mr. Flashner.

12        MR. FLASHNER:  If I could get through this one point

13   and then that would be fine.  May I approach, your Honor?

14        THE COURT:  Yes.

15   Q.   Sir, I'm approaching you with a Lexington Police

16   Department police report.  It's your original police report.

17   Let me just make sure you're on the right page.  I'm going to

18   direct your attention to the first paragraph of your police

19   report, okay?  And I've underlined it there for you.  Just take

11:04AM 20   a moment and read that to yourself.  If you could look up at me

21   once you've read it.

22   A.   I'm all set, sir.

23   Q.   Thank you.  So in that police report, you indicate that,

24   as Perez started to run, a loaded Glock 34X semiautomatic

25   handgun with one bullet in the chamber fell on the ground near

the driver's side door.  That's what your police report says,
correct?

A.   Yes, that's what I wrote.

Q.   But your testimony today is that you saw an object?

A.   Right, because I never said I observed it.

Q.   And is it your testimony today that you saw anything
fumbling, or you just saw an object fall?

A.   I saw an object fall.

Q.   So during -- you had an opportunity to prepare in early
11:04AM July with the Assistant United States attorneys in this case,
and it was during that -- during that prep session you
mentioned seeing something fumbling, correct?

A.   Yes.

Q.   But today you don't recall anything fumbling?

A.   An item falling or fumbling is -- to me, it's the same.

Q.   So in your testimony, fumbling and falling is the same
thing?

A.   I didn't say someone ws was, I said they were both
fumbling when they exited the vehicle, and then I saw an item
11:05AM drop, and I'm unaware what the item was.

          THE COURT:  All right.  Why don't we take our break.

          MR. FLASHNER:  Sure.  Thank you.

          THE COURT:  Ladies and gentlemen, let's try to keep
this as close to 10 minutes as we can.  The faster the breaks,
the faster the trial will proceed.  Okay.  Thank you.

|      |                                                                          |
|------|--------------------------------------------------------------------------|
| 1    | THE CLERK:  All rise.                                                     |
| 2    | (A recess was taken.)                                                     |
| 3    | THE CLERK:  All rise for the jury.                                        |
| 4    | (JURORS ENTERED THE COURTROOM.)                                           |
| 5    | THE COURT:  Mr. Flashner.                                                 |
| 6    | MR. FLASHNER:  Thank you, your Honor.                                     |
| 7    | BY MR. FLASHNER:                                                          |

Q.   Officer Morris, I just read in your police report just before we took the recess.  Now, the first time that you told the prosecutor or the prosecutor's office that you didn't actually see a firearm fall was during preparation for this trial in July of 2024, correct?

A.   Yes.

Q.   And that was contrary to your police report, right?

A.   No.

Q.   Well, your police report said that you saw -- let me ask a new question, sir.  Your police report said, quote, "As Perez started to run, a loaded Glock 34X semiautomatic handgun with one bullet in the chamber fell on the ground near the driver's side door."

Did I read that correctly?

A.   You did, yes.

Q.   Great.  So after you wrote that report, about a week later, some time in December, middle of December, the firehouse video was obtained, correct?

11:18AM 10

11:19AM 20

1    A.   Yes.

2    Q.   Okay.  And you had an opportunity to see that video at

3    that time?

4    A.   I did.

5    Q.   And you wrote a supplemental report in this case, as well?

6    A.   I believe I wrote it within days of the initial.

7    Q.   Okay.

8    A.   Yes.

9    Q.   But you've never written a police report that says you

11:19AM 10   only saw an -- you saw an object drop, correct?

11   A.   No.

12   Q.   Now, this firehouse video, by the way, you know that what

13   I'm showing you is just the way that the Lexington Fire

14   Department produced the video, correct?

15   A.   Yes.

16   Q.   All right.  That's the format that they use with whatever

17   technical video player they use?

18   A.   Yes, sir.

19   Q.   And it has a bunch of different camera angles, correct?

11:20AM 20   A.   Yes, I believe so, yes.

21   Q.   Okay.  You're not familiar with that?

22   A.   I'm not familiar with the camera system at the firehouse.

23   No.

24   Q.   But this is an accurate depiction from the firehouse?

25   A.   It is.

1    Q.   Okay.  So I'm going to walk through this in somewhat
2    detail here.  Before I do, do you know that at 10:43:15, so
3    just a minute and one second after it's paused right here, the
4    video just stops, correct?
5    A.   I'm unaware of the specific time the video stops.
6    Q.   Fair enough.  You don't know the exact time?
7    A.   Yes.
8    Q.   But you know that the video stops?
9    A.   The video has to stop somewhere.  I don't know where it
11:21AM 10    specifically stops.  I'm sorry.  I can't recall.
11         THE COURT:  One at a time.  Wait for him to finish his
12    answer, Mr. Flashner.
13         MR. FLASHNER:  Right.
14    A.   I can't recall.
15    Q.   Okay.  Do you know what, let's just play it through for a
16    minute, please.
17         (Video played)
18    Q.   And, Officer, you can see your lights are flashing?
19    A.   Yes.
11:22AM 20    Q.   And I apologize it's 42:24.  That's the wrong time.
21    You'll see it stop in just a second.  Fair to say at 43:40, or
22    so, your lights appear to stop flashing but the timer keeps
23    running?
24    A.   Yes.
25    Q.   And you agree with me that the video appears to have

1    stopped recording, for whatever reason?

2    A.    It appears to, yes.

3          MR. FLASHNER:  And that was -- just for the record,

4    that was 43:40, as it was stated in the stipulation.  Now, if

5    we could rewind that video back to 42:14, please.  13 is fine.

6    Q.    So you see here the black SUV is up against the stone

7    pillar, correct?

8    A.    Yes.

9    Q.    And your police car hasn't arrived in the location,

11:23AM 10  correct?

11   A.    Yes.

12   Q.    At least the location captured?

13   A.    Yes.

14         MR. FLASHNER:  And let that play forward just a little

15   bit more, just go frame by frame.  Go slowly, please.

16   Q.    You'll see -- I'm going to stop it right there at 42:19,

17   you can see someone exiting the driver's side of the car,

18   correct?

19   A.    Yes.

11:24AM 20  Q.    Keep going, please.  And your vehicle is still moving,

21   correct, and Mr. Perez is almost past the driver's side door,

22   correct?

23   A.    Yes.

24   Q.    Now, we're at 42:21 and Mr. Perez is past the driver's

25   side door and you haven't exited your vehicle and it's still

1    moving, correct?

2    A.   Yes.

3    Q.   Do you agree with me -- stop it right there, please.

4    42 -- 10:42:23, your driver's side door is opening, correct?

5    A.   Yes.

6    Q.   And you agree with me that Mr. Perez is now past the

7    vehicle and has entered -- at least started to enter into the

8    parking lot area?

9    A.   Yes.

11:25AM 10   Q.   Mr. Del Rio, the man in red, is still in the car, as far

11   as you can tell?

12   A.   I wouldn't be able to tell --

13   Q.   You weren't focused on him before?

14   A.   No, I was.  But I -- referring to the video, I'm not

15   aware.  Yes.  I can't make it out.

16        THE COURT:  One at a time.  Mr. Flashner, please stop

17   talking over him.

18        MR. FLASHNER:  Okay.

19   Q.   I'm going to ask you a new question, okay?

11:25AM 20   A.   Sure.

21        MR. FLASHNER:  So if you can move the video forward

22   just a couple of frames, Ms. Hutchinson.  Pause it right there.

23   Q.   Officer, we're at 42 -- 10:42:27, you've exited your

24   vehicle, correct?

25   A.   Yes.

1    Q.   You appear to have your left arm extended?

2    A.   Yes.

3    Q.   Did you have your firearm drawn?

4    A.   I did.

5    Q.   And there's still an individual, individual -- strike

6    that.  The individual closest to you is the individual that's

7    in the passenger side, correct?

8    A.   Yes.

9    Q.   And the individual closest to you in some ways presents

11:26AM 10  the biggest threat to you, correct, because they're close in

11   terms of distance?

12   A.   I believe they're both threats.  I didn't categorize one

13   over the other, but, yes, with the ski mask on.  Yes.

14   Q.   And one individual is running away, correct?

15   A.   Correct.  They're both running away.  Yes.  They both are

16   running away.  They both got out and ran away.

17   Q.   And you'll agree with me at this point Mr. Perez is into

18   the parking lot, correct?  You can see the black figure?

19   A.   Yes.

11:27AM 20  Q.   And Mr. Del Rio, it's hard to see, but there's a red kind

21   of shape on the passenger's side of the car?

22   A.   Okay.  I can't make it out, but I see a taillight, but in

23   the zoom, I can't -- it's very hard to tell, not to make your

24   life difficult, but I just --

25   Q.   Thank you.  Can you just move it forward a couple of more

1   frames.  And you would agree with me just past -- now we're at
2   42:30, just past the front of the SUV there appears to be a red
3   shape emerging?
4   A.   Yes.
5   Q.   So Mr. Del Rio is clearly out of the vehicle?
6   A.   Yes.
7   Q.   Have you holstered your weapon at that point?
8   A.   I can't recall, sir.
9   Q.   But you begin to chase, correct?
11:28AM 10   A.   I do.
11          MR. FLASHNER:  Can you zoom out a little bit, please.
12   And can you let the video play.
13          (Video played)
14          MR. FLASHNER:  Pause it right there.
15   Q.   So now we can clearly see Mr. Del Rio in red running
16   across the parking lot and Mr. Perez is further up the parking
17   lot, correct?
18   A.   Correct.
19   Q.   And you're in pursuit?
11:29AM 20   A.   I am in a foot pursuit, yes.
21   Q.   And I know you don't know the exact second, I wouldn't
22   expect you to, but at some point you put out a description of
23   these vehicles, correct?
24   A.   Yes.
25   Q.   All right.  And something along the lines of two black

        1   males, one in red, one in black?

        2   A.    I can't recall.  I haven't listened to the tape since --

        3   like you said, sir, it's been months.

        4   Q.    It's been months.  Do you recall putting out a

        5   description?

        6   A.    Yes.

        7   Q.    And if you're putting out that description, you would have

        8   probably holstered your weapon by that time, or not?

        9   A.    I can't speculate on that.

11:29AM 10   Q.    Fair.

       11         MR. FLASHNER:  So if you could just let this play.

       12         (Video played)

       13         MR. FLASHNER:  Pause it right there.

       14   Q.    Do you know whose police car that is?

       15   A.    I don't know, sir.

       16   Q.    Do you know who the first responding officer was on this

       17   particular scene after you?

       18   A.    Sergeant Barry pulled out behind my cruiser at 57 Bedford

       19   Street and rendered aid to the operator of the Prius.

11:30AM 20   Q.    But you don't know whose car this is?

       21   A.    No, sir.

       22   Q.    Let it play.  Stop it right there.  Would you agree with

       23   me that that car goes right past the driver's side door, the

       24   black SUV?

       25   A.    Yes.

1   Q.   Now, Officer Morris, you never observed a gun on the
2   ground on the driver's side of the SUV, correct?
3   A.   Correct.
4   Q.   As a matter of fact, you never observed any gun until long
5   after -- until -- strike that.  You never observed a gun until
6   after Mr. Perez was in custody, correct?
7   A.   Correct.
8   Q.   Okay.  And you didn't recover any firearm in this case,
9   correct?
11:31AM 10   A.   Correct.
11   Q.   So I want to ask you some questions about when you pulled
12   up to the area.  I know we've covered this a little bit.  I'm
13   going to try to get us there.  When you pull up, the SUV is
14   stopped, correct?
15   A.   Correct.
16   Q.   A car is on the sidewalk and the rear of the car is out
17   into the roadway into what would be almost the bike lane,
18   correct?
19   A.   The vehicle was angled, yes, at the bike lane.
11:31AM 20   Q.   And you are in the -- what I'm going to call the proper
21   direction of travel on Bedford Street?
22   A.   Yes.
23   Q.   Your car is not going the wrong way, it's in the right
24   lane?
25   A.   Correct.

```
 1   Q.   And it's just past that -- if you look in the video here
 2   you can see a white line that comes out and then a fire pole or
 3   a telephone pole?  Sorry.
 4   A.   Yes.
 5   Q.   All right.
 6        MR. FLASHNER:  Ms. Hutchinson, could you just move to
 7   the white line.  Thank you.  Just move that cursor.  Yeah.
 8   Q.   So that's the white line that I'm referring to.  Is that
 9   what you were referring to, sir?  You see that white line,
10   correct?
11   A.   Yes, that's the stop line for the fire house.
12        MR. FLASHNER:  Now, could we pull up 1.03.  If it's
13   easier for you, I can use the Elmo.  Would that be easier,
14   Ms. Hutchinson?  All right.  Are you able to pull that up,
15   Ms. Hutchinson?  I'm sorry 1.3, my mistake.  Thank you.
16   Q.   So I'm just going to use this exhibit to orient us a bit.
17   You're able to see this 1.03?  Are you able to see in the upper
18   left-hand corner the fire house, correct?
19   A.   Yes.
20        MR. FLASHNER:  And I think it's going to be easier if
21   we just go a little bit old school here.  Would it be possible
22   to have the Elmo turned on, so the jurors are able to see it?
23   This is Exhibit 1.3.
24   Q.   I'm sorry.  I want to give you a second to orient
25   yourself.  This is the fire station and that white line we were
```

1  just referring to is right there, correct?

2  A.   No, you're incorrect.  There's a white line where your pen

3  is, sir.

4  Q.   It's right here?

5  A.   Yes, that is a stop line for the apparatus for the fire

6  department.

7  Q.   Perfect.  And your cruiser is pulling up on the roadway

8  this way towards the SUV, correct?

9  A.   It's pulled up behind the SUV, yes.

11:34AM 10  Q.   Correct.

11       MR. FLASHNER:  Now, can I have 1.4, please, and 1.5.

12  Now I'm going to put Exhibit 1.4 on the monitor.  Are the

13  jurors able to see that okay?

14  Q.   Are you able to see that okay, Officer?

15  A.   Yes.

16  Q.   Okay.  And fair to say that this is a view looking down

17  Bedford Street.  You can see the white line, I think you called

18  that the stop line for the fire house; is that correct?

19  A.   Correct.  That's a stop line for the apparatus for

11:35AM 20  allowing them to exit and enter.

21  Q.   The Gulf station is over here --

22  A.   Yes.

23  Q.   -- on the left-hand side of Exhibit 1.4 and as we look at

24  this, this would have essentially been the view that you would

25  have had traveling down the road that night.  I understand it's

1  daytime and not nighttime.

2  A.    Yes.

3  Q.    Now I'm going to do show you Exhibit 1.5.  Is this a

4  close-up view of that same perspective that you would've had?

5  A.    It is a picture representing the area of the crash, yes.

6  Q.    Okay.  And my question is your cruiser would have been

7  traveling and eventually stopped somewhere -- not in this exact

8  area, but somewhere in this general area, correct?

9  A.    Yes.

11:36AM 10  Q.    And you can see the arrow that points outward from the

11  parking lot?

12  A.    Yes.

13  Q.    And you're familiar with the area.  You know there's

14  another arrow that points inward, correct?

15  A.    Yes.

16  Q.    And the SUV would have been parked -- or not parked, but

17  rather stopped in this area up against the stone pillar,

18  correct?

19  A.    Yes.

11:37AM 20        MR. FLASHNER:  So I want to talk about the location of

21  the SUV now.  If we can pull up 101.1.  Are the jurors able to

22  see that, Exhibit 1.1, on the monitor?

23        THE CLERK:  It's not admitted yet.

24        MR. FLASHNER:  Your Honor, I'd offer Exhibit 101.1 at

25  this time.  It is a police photo taken on the evening of

1    December 8, 2022.

2          THE COURT:  Is there any objection?

3          MS. HOEFLE:  No, your Honor.

4          THE COURT:  It's admitted, 101.1.

5          MR. FLASHNER:  Thank you.

6          (Exhibit No. 101.1 received into evidence.)

7    Q.   And looking at that photograph, I understand -- well, the

8    trunk is open of the SUV, correct?

9    A.   Yes.

11:38AM 10    Q.   And when you pulled up to the SUV, the trunk was closed,

11    correct?

12    A.   Yes.

13    Q.   And when you pulled up the driver's side door would have

14    been closed, as well, correct?

15    A.   The driver's side door?

16    Q.   Yes.

17    A.   No.

18    Q.   When you first pulled up, was the driver's side door

19    closed?

11:38AM 20    A.   No.

21    Q.   Okay.  How about the passenger's side door.  Was the

22    passenger side door closed?

23    A.   No.  The only door that was closed was the trunk and the

24    rear passenger door.

25          MR. FLASHNER:  Okay.  Now if we can have 101.2.  And

1    just, your Honor --

2         THE COURT:  Don't show anything to the jury that is

3    not admitted.  Okay.  Offer it.  Do you want to offer all of

4    them at once?

5         MR. FLASHNER:  Exhibits 101.2, 101.3, 101.4 and 101.5

6    all as exhibits.

7         THE COURT:  Any objection?

8         MS. HOEFLE:  No, your Honor.

9         THE COURT:  They're admitted.  101.2 through 101.5.

10        (Exhibit No. 101.2 through 101.5 received into

11   evidence.)

12   Q.   So that's a view of the back of the SUV, correct?

13   A.   Correct.

14   Q.   All right.  And the passenger's side door is open?

15   A.   Yes.

16   Q.   And the driver's side door is open, correct?

17   A.   I can't tell in this picture because the rear passenger

18   door is open as well.

19   Q.   The rear passenger door is open?

20   A.   Correct.

21   Q.   You would agree with me that the back of the SUV is across

22   the sidewalk into that area between the roadway and the white

23   line on the roadway?

24   A.   Yes.

25   Q.   If we can go to 101.3.  Is this a photograph facing now

1  the other way of the SUV?  By the other way, I mean facing --

2  this would have been facing towards your cruiser back up

3  towards where the fire station is, correct?

4  A.   Towards my cruiser?  It's a left-hand side shot, sir, so

5  that would be -- the front of the car would be facing, if you

6  took it from the rear.  I'm a little bit confused about that.

7  Q.   Let me ask the question differently.  This is a

8  photograph, Exhibit 101.3, that's showing the driver's side of

9  the SUV, correct?

11:40AM 10  A.   That is correct.

11  Q.   And that's the position that the car was in when it came

12  to rest that night, correct?

13  A.   That is correct.

14  Q.   Okay.  And in this photograph the driver's side door is

15  closed?

16  A.   That is correct.

17  Q.   And there is an airbag that's been deployed in the car?

18  A.   Yes.

19  Q.   Okay.  There were numerous airbags deployed in the car

11:40AM 20  that night, correct?

21  A.   Yes.

22  Q.   And the angle here is looking back towards M&T Bank,

23  that's the building in the background, correct?

24  A.   Yes.

25  Q.   May we please have 101.4.  Now, the perspective here,

1  Officer, you'd agree with me this is the front of the SUV?

2  A.   That is correct.

3  Q.   Okay.   The fire station is in the back left of the

4  photograph?

5  A.   Yes.

6  Q.   The M&T Bank would be -- looking at the photograph, it

7  would be off to the left, correct?

8  A.   That is correct.

9  Q.   And you would agree with me that the passenger side

11:41AM 10  airbags are deployed on the side of the car?

11  A.   Yes.

12  Q.   Can we have 101.5, please.   Now looking at Exhibit 101.5,

13  this is a photograph looking from the front passenger area of

14  the car into the black SUV, correct?

15  A.   Yes.

16  Q.   You would agree with me the passenger side airbag is

17  deployed by the passenger -- can you pull that up, please.   By

18  the passenger side door?

19  A.   Could you repeat it?   I'm sorry.

11:41AM 20  Q.   The passenger side curtain airbag is deployed?

21  A.   Yes.

22  Q.   Okay.   And the driver's side airbags are deployed down the

23  driver's side of the car, correct?

24  A.   Yes.

25  Q.   Could we pull up 101.1 again.   And this is the perspective

1  that you would have had coming down Bedford Street that night

2  on December 8, 2022, correct?

3  A.   I believe so, yes.

4  Q.   So I'm going to ask a question and we can go back to the

5  video, but we may not have to, I'm going to try to

6  short-circuit this a bit.  You'd agree with me you've watched

7  this video numerous times?

8  A.   I have.

9  Q.   And you'd agree with me that at no point in this video do

11:43AM 10  you see a firearm falling to the ground?

11  A.   That is correct.

12  Q.   At no point do you see an object fall to the ground near

13  the driver's side door?

14  A.   No, that's incorrect.

15  Q.   That's incorrect?

16  A.   Yes.

17  Q.   So on the video you see an object --

18  A.   No, I'm sorry.  I thought you were talking about my

19  recollection itself.  I'm sorry, sir.  I misunderstood you.

11:43AM 20  Q.   It's okay.  It was probably my question.  Just to make a

21  clear record, at no point in the video do you see an object

22  fall to the ground by the driver's side?

23  A.   That is correct.

24  Q.   Now, the firearm that was recovered in this case --

25  A.   Yes.

1    Q.    Do you remember that Ms. Hoefle showed you that firearm?

2    A.    I remember that, yes.

3    Q.    I believe it was offered in evidence?

4    A.    Yes.

5    Q.    In your report you referred to it as a Glock 34X, correct?

6    A.    Yes, that was a typo.

7    Q.    That's not my question.  Is that what your report said?

8    A.    Yes.

9         MR. FLASHNER:  Okay.  And your Honor, may I display

11:44AM 10   the firearm on the Elmo?  It's been admitted in evidence.

11         THE COURT:  Yes.

12         MR. FLASHNER:  Okay.  May we go back to the Elmo,

13   please, Matt.

14   Q.    You'd agree with me that this firearm is a Glock 43X?

15   A.    That is correct.

16   Q.    Do you recall you testified on direct examination that

17   this had a, quote, "distinctive gray slide."  You recall saying

18   that, right?

19   A.    Yes.

11:45AM 20   Q.    Okay.  And that's a detail that stuck out in your mind,

21   correct?

22   A.    Absolutely, yes, because I own a Glock 43X, but it's a

23   newer generation, and it has a black slide because they don't

24   make the gray slides anymore.

25   Q.    Thank you.

1    MR. FLASHNER:  I'd move to strike that as

2 nonresponsive.

3    THE COURT:  I'll let it stand.

4 Q.   It stuck out to you as distinctive, correct?

5 A.   Absolutely.

6 Q.   Okay.  Now, at no point on December 8, 2022 did you ever

7 send out a radio broadcast that you had observed a firearm,

8 correct?

9 A.   I don't recall because I didn't see a firearm.

11:45AM 10 Q.   You didn't see a firearm?

11 A.   Correct.

12 Q.   Okay.  So you wouldn't have put it out over the turret

13 tape that you saw a firearm, correct, over the police

14 recordings?

15 A.   I am unaware.  I don't recall that, sir.

16 Q.   Let me ask the question a different way.

17 A.   Sure.

18 Q.   At any point, did you broadcast over the police radio that

19 night that you had observed a firearm?

11:46AM 20 A.   Like I said, sir, I'm unaware.  I don't recall any of my

21 radio transmissions, to be honest with you, except for that I

22 was in pursuit, the description of the males, and where they

23 were traveling.

24 Q.   If you could listen to the radio rebroadcast -- or

25 Lexington PD, police, use radio transmissions to communicate

1  with each other, correct?

2  A.   They do.

3  Q.   And all those radio transmissions are recorded?

4  A.   Yes.

5  Q.   And the idea of that is that it allows the police to

6  communicate and coordinate during any type of situation,

7  correct?

8  A.   Yes.

9  Q.   It's one of the purposes?

11:46AM 10  A.   Yes.

11  Q.   It also creates a record that's accurate of what was said?

12  A.   Absolutely.

13  Q.   So if you listen to the turret tape, or police

14  recordings --

15  A.   Sure.

16  Q.   -- of that evening, would that refresh your recollection

17  as to whether you ever gave any information about seeing a

18  firearm?

19  A.   Sure, yes.

11:47AM 20       MR. FLASHNER:  Your Honor, if I can approach the

21  witness, I would ask to approach him with a laptop, a pair of

22  headphones, and if he could listen to two or three minutes.

23       THE COURT:  All right.

24       Ladies and gentlemen, while he's doing this, you can

25  stand up and stretch, if you'd like.

BY MR. FLASHNER:

Q.    There's about another minute and a half.  Thank you.  So, Officer, having had an opportunity to listen to that recording, is your recollection refreshed as to whether you ever stated that you saw a firearm that night over the police radio?

A.    It's refreshed and it confirms what I said.  I didn't ever say I saw a firearm.

Q.    Okay.  So you never broadcast that, correct?

A.    Never.

Q.    Now, sir, you chased Mr. Perez across the Stop & Shop parking lot, correct?

A.    That is correct.

Q.    Okay.  And you chased Mr. Del Rio?

A.    Both parties, yes.

Q.    And you never saw Mr. Perez drop any drugs while you were chasing him, correct?

A.    I never did.

Q.    You never recovered any drugs from Mr. Perez's person, correct?

A.    I never did, no.

Q.    As a matter of fact, no Lexington police officer ever recovered any drugs from Mr. Perez's person on December 8, 2022, correct?

          MS. HOEFLE:  Objection.

          THE COURT:  I'll allow him to testify as to his

1  understanding.

2  A.   To my understanding, I did not, no.

3  Q.   And when you reach Mr. Perez, when you got closer to

4  Mr. Perez, you -- he was near the dumpster, correct?

5  A.   They were both at the back of the fence near the loading

6  dock.  There are dumpsters there, yes.

7  Q.   And you commanded both Mr. Perez and Mr. Del Rio to quote

8  "get on the ground," correct?

9  A.   Yes.

11:52AM 10  Q.   Your weapon is drawn?

11  A.   Yes.

12  Q.   Mr. Perez, he had run across the parking lot, but at that

13  point he stops and he complies with your command, correct?

14  A.   Yes.

15  Q.   Mr. Del Rio, he doesn't comply with your command, though,

16  correct?  He keeps running?

17  A.   Yes.

18  Q.   Okay.  Did he go over a fence?

19  A.   I'm unaware.

11:52AM 20  Q.   You lose sight of him?

21  A.   I do.

22  Q.   And on the path that Mr. Perez had run from that black SUV

23  up until he showed you his hands and got on the ground, there's

24  no drugs or plastic bags with controlled substances found,

25  correct?

1   A.   I'm unaware, no.  I don't believe so.  Not to my knowledge

2   in the Stop & Shop loading area.  I did not see anything at the

3   time, my focus was on the two suspects that were fleeing.

4   Q.   But my question is a little bit different.  When Mr. Perez

5   ran across the parking lot, let's just deal with that parking

6   lot area before you get to the rear of the Stop & Shop?

7   A.   Yes.

8   Q.   There's no drugs recovered there, correct?

9   A.   In the parking lot?

11:53AM 10   Q.   Correct.

11   A.   Yes.

12   Q.   And then Mr. Perez gets to the dumpster, correct?

13   A.   They get to the loading dock area, yes.

14   Q.   And when Mr. Perez gets to the dumpster, you command him

15   to stop with your firearm and he stops, correct?

16   A.   It took a few seconds.  He was still trying to vault the

17   fence there.

18   Q.   But he doesn't actually get over the fence?

19   A.   No, he stops.

11:53AM 20   Q.   Mr. Del Rio, though, he keeps going?

21   A.   Correct.

22   Q.   And that area where Mr. Perez stops, there's no drugs

23   recovered within that area?

24   A.   Not to my knowledge.

25   Q.   Who transported Mr. Perez to the Lexington Police Station

1    that night?

2    A.   I'm unaware, sir.

3    Q.   You don't know?

4    A.   I was busy with the inventory.

5    Q.   And are you aware that Mr. Perez was seen by an EMT before

6    he left the area behind Stop & Shop?

7    A.   Yes, he complained to me of difficulty breathing and I

8    radioed for Lexington paramedics to evaluate.

9    Q.   So my question was were you aware that he was seen by an

11:54AM 10   EMT.

11   A.   Yes.

12   Q.   Yes.  And he was seen by an EMT on the scene in the rear

13   of the Stop & Shop in the parking lot, correct?

14   A.   I believe it was in front of the Stop & Shop by the

15   loading dock area, yes.

16   Q.   And at some point Detective Aiden Evelyn arrived on the

17   scene, correct?

18   A.   At some point.

19   Q.   Do you recall Detective Evelyn arriving on the scene and

11:55AM 20   then leaving the scene to go get his camera?

21   A.   No.

22   Q.   Do you recall Detective Evelyn coming back to the scene

23   and helping you, assisting you in the motor vehicle inventory

24   search?

25   A.   I do.

1  Q.   Okay.  Do you recall seeing -- after the motor vehicle

2  inventory search, do you recall seeing Detective Evelyn go back

3  to the rear of the Stop & Shop?

4  A.   I don't recall.

5  Q.   Okay.  Did you ever see the drugs that were recovered in

6  the rear of the Stop & Shop, in the wooded area?

7  A.   Yes.

8  Q.   And that -- you did?

9  A.   I recall seeing them brought back to the vehicle, yes.

11:55AM 10  Q.   Okay.  Did you ever see them in the woods?

11  A.   No.

12  Q.   Do you have any information as to where they were actually

13  recovered from in the woods?

14  A.   I can't speak on that.  I don't recall.

15  Q.   Do you not recall, or you didn't see it?  I'm sorry.  Let

16  me just ask a different question --

17  A.   I might have, but I don't recall.  There was a lot going

18  on that night, sir.

19  Q.   Well, do you know that the drugs weren't recovered -- you

11:56AM 20  know that the drugs weren't recovered in the area where

21  Mr. Perez was, correct?

22  A.   Like I said, sir, I can't recall the specifics of where

23  the drugs were located, the other bags.  All I can speak to is

24  the motor vehicle inventory.

25  Q.   Now, this motor vehicle inventory search, did that search

1   take about 20 minutes?

2   A.   Like I said, sir, it's a long time ago.  I can't recall

3   those specific facts.

4   Q.   Okay.  I think you testified that there was a -- I think

5   you used the term a whole bunch or several items that were

6   recovered from the vehicle, correct?

7   A.   That is correct.

8   Q.   Okay.  Would you agree with me that it took more than

9   15 minutes to photograph them and log them in?

11:56AM 10   A.   Like I said, sir, I don't want to be -- I don't want to

11   lead you down a wrong road.  I want to make sure everything is

12   factual.

13   Q.   I appreciate that, but was this the first time you ever

14   conducted a motor vehicle inventory?

15   A.   Oh, no.  No, sir.

16   Q.   And have you conducted motor vehicle searches since then?

17   A.   Yes.

18   Q.   Okay.  You were trying to be detail oriented in this case,

19   correct?

11:57AM 20   A.   Absolutely.

21   Q.   Trying to be precise, correct?

22   A.   Absolutely.

23   Q.   All right.  So as you're there with Detective Evelyn

24   you're identifying things and he's taking photographs, correct?

25   A.   Correct.

1    Q.   All right.  This process takes some amount of time.  Can

2    you offer this jury any estimate of the amount of time that it

3    would have taken that night?

4    A.   I would say it was definitely more than 10 minutes, but I

5    can't speak on behalf of the -- with adrenaline going, I can't

6    say -- you know, 10 minutes could feel like an hour.  I'm

7    sorry, sir.

8    Q.   I appreciate it.  You agree with me it's more than at

9    least 10 minutes?

11:57AM 10   A.   I would believe so, yes.  I'm sure the cameras at the fire

11   house could reflect.

12   Q.   Well, the camera at the fire house stopped recording,

13   correct?

14   A.   Right, but they don't -- they save the video footage, sir.

15   I mean it's a Town of Lexington building.

16   Q.   And if the cameras at the firehouse were recording, we

17   would have had an exact time stamp as to when you went to that

18   car, correct?

19          MS. HOEFLE:  Objection.

11:58AM 20          THE COURT:  Sustained.

21          THE WITNESS:  I can't speculate on that.

22          THE COURT:  There's no question.

23   Q.   The view captured by the cameras at the firehouse included

24   the SUV, correct?

25   A.   That is correct.

1  Q.   The SUV wasn't moved when you conducted your motor vehicle

2  inventory search, correct?

3  A.   That is correct.  The vehicle was parked.  It was not

4  movable.

5  Q.   No one moved it?

6  A.   Right.

7  Q.   Now, sir, you're aware that the Lexington Police

8  Department has policies and procedures governing the recovery

9  of evidence and the photographing of evidence, correct?

11:59AM 10  A.   Yes.

11  Q.   Okay.  And more specifically, sir, are you familiar with

12  Lexington Police Department policy 83A, general -- titled

13  "General Considerations and Guidelines"?

14  A.   I'm unaware of the specific chapters, guidelines of what

15  the --

16  Q.   Would it help you to take a look at it, sir?

17  A.   If you don't mind, please.  Thank you.  What area would

18  you like me to focus on, sir?

19  Q.   Have you had a second to look at that?

12:00PM 20  A.   Yes.

21  Q.   And the policy Number 83A is -- the subject is "Collection

22  and Preservation of Evidence," correct?

23  A.   Correct.

24  Q.   And this would be something that you as a Lexington police

25  officer would be trained in, correct?

1  A.  Correct.

2  Q.  And are you aware that the policy indicates that

3  photographs of areas of the crime scene itself should be taken

4  to document the overall crime scene.  Are you aware of that?

5  A.  Yes.

6  Q.  All right.  And that wasn't really done in this case, was

7  it, though?  Correct?  I understand you didn't take the photos.

8  A.  Detective Evelyn took photos of the scene.

9  Q.  Okay.  But the overall crime scene, were there photos of

12:00PM 10  that?

11  A.  There were photos of the crash and the location of the

12  substance found in the back trunk, all the information was

13  presented -- all the evidence was presented in the back trunk,

14  and then there's a picture in the wooded area of the bag of the

15  brown substance.

16  Q.  And sir, it's correct -- it's fair to say that the items

17  were not all recovered or located for the first time in the

18  back trunk, correct?

19  A.  That is correct, yes.

12:01PM 20  Q.  The police picked them up and moved them there for a

21  photograph, correct?

22  A.  For clarity and photography, yes.

23  Q.  I'm glad you used that word, "clarity."  So with regard to

24  clarity, sir, is it fair to say that there's a policy that

25  photographs of each evidence item should be taken, when

1  possible, prior to the item being collected or processed?  Is

2  that part of the policy?  Yes or no.

3  A.    I would have to review that.

4  Q.    Would it refresh your recollection if you looked at page 5

5  of the policy, sir?

6  A.    I will take a look at that, sir.

7  Q.    I'm going to direct your attention to 5 -- do you want me

8  to identify it for you, sir?

9  A.    I just found it.  Thank you.

12:02PM 10  Q.    Okay.

11  A.    Yes.

12  Q.    Okay.  So it is part of the policy that "photographs of

13  each evidence item should be taken when possible prior to the

14  item being collected or processed."  Did I read that correctly,

15  sir?

16  A.    Yes.

17  Q.    And in this case no photos were taken of the firearm prior

18  to it being collected, correct?  Yes or no.

19  A.    Yes.

12:02PM 20  Q.    And no photographs were taken of any drugs or plastic bags

21  recovered from the center console of the black SUV prior to it

22  being collected, correct?

23  A.    Yes.

24  Q.    And the Lexington PD policy goes on to talk about crime

25  scene diagrams on page 6.  And it's fair to say that the -- you

1   never completed a diagram of the crime scene that night or the

2   area around the black SUV, correct?

3   A.   A sketch diagram?

4   Q.   Yes.

5   A.   Right, because it says it may be.  It doesn't say it -- it

6   says, "shall."

7   Q.   Agreed.  My question is a little different though.  Did

8   you draw a sketch of the area?

9   A.   No, sir.  With the amount of tasks that I had, it was

12:03PM 10   impossible with the time given to me to do so.

11   Q.   I understand that it may be someone else's task or your

12   task.  My question is just for you.  Did you draw a diagram?

13   A.   No, I did not.

14   Q.   Have you ever seen a diagram that any other Lexington

15   police officer drew of the scene around the black SUV?

16   A.   No, not to my knowledge.

17   Q.   You don't have any evidence to offer to this jury about

18   any diagram ever being created, correct?

19   A.   No, I do not.

12:03PM 20   Q.   And with regard to these plastic bags of drugs that may

21   have been found in the woods, you've never seen a diagram of

22   that either, correct?

23   A.   No.

24   Q.   And are you aware that the policy goes on on page 8 and 9

25   to talk about fingerprinting.  In the police academy that you

1   went to, you studied fingerprinting, correct?

2   A.   Fingerprinting for apprehension purposes, not for

3   investigations.

4   Q.   Well, as a police officer, you're aware that items can be

5   fingerprinted, correct?

6   A.   That is correct.

7   Q.   And as a police officer, you're aware that there's

8   something called latent prints, correct?

9   A.   That is correct.

12:04PM 10   Q.   And you're aware that latent prints can be left on objects

11   when an individual touches them, correct?

12   A.   That is correct.

13   Q.   And you're aware that fingerprints are unique to

14   individuals, correct?

15   A.   Yes.

16   Q.   Okay.  Now, the firearm that was recovered in this case,

17   that was never fingerprinted, correct?

18   A.   Not to my knowledge.

19   Q.   Okay.  You, as a Lexington police officer testifying here

12:05PM 20   in court, have never seen a report indicating that any

21   fingerprints were ever conducted, correct?

22   A.   That is correct.

23   Q.   You don't have any evidence to offer this jury about any

24   fingerprints that would have been taken off that gun?

25   A.   That is correct.

1   Q.   Okay.  And that it was even ever submitted for

2   fingerprints?

3   A.   I wouldn't know.  That's the detective bureau on patrol.

4   Q.   And that would be Detective Evelyn, correct?

5   A.   Correct, and Lieutenant Dunbar.

6   Q.   And with regard to the controlled substances recovered in

7   the woods, those were never submitted for fingerprints, as far

8   as you know?

9   A.   No, not to my knowledge.

12:05PM 10   Q.   Again, it would be Detective Evelyn, right?

11   A.   And the bureau commander, not me.

12   Q.   You don't have any information on that, correct?

13   A.   No, I do not.

14   Q.   And the controlled substances are -- that allegedly were

15   recovered from the center console of the car, those were never

16   submitted for fingerprints either, correct?

17   A.   Not to my knowledge.

18   Q.   And just to be clear, when you say center console, you

19   don't mean a cup holder, correct?  You mean the thing that

12:06PM 20   lifts up?

21   A.   Correct.

22   Q.   And you're familiar and on page 9 of the policy that

23   Lexington PD has the ability to conduct DNA testing on items,

24   correct?

25   A.   Yes.

1    Q.   Okay.  And the policy even on page 15 has a specific

2    section about DNA testing of firearms, as well, correct?

3    A.   Yes.

4    Q.   And I understand you were the police officer, but there's

5    no -- you have no information to offer about any DNA testing on

6    the firearm that was recovered in this case, correct?

7    A.   I do not.

8    Q.   You have no information to tell the jury, correct?

9    A.   I have no information.

12:06PM 10   Q.   With regard to the controlled substances that were found

11   in the woods, you have no information that there was ever any

12   DNA testing of those either, correct?

13   A.   I have no information.

14   Q.   And you have no information about any DNA testing or even

15   something being submitted for DNA testing with regard to the

16   items that were found in the center console, correct?

17   A.   Correct.

18   Q.   With regard to the item that was found in the center

19   console, you'd agree with me that the passenger has access to

12:07PM 20   the center console, correct?

21   A.   Yes.

22   Q.   It's not as though it's the driver's side door, which

23   would be much more difficult for a passenger to reach, correct?

24   A.   Correct.

25   Q.   And you would agree with me that this car was rented by

1   Henry Del Rio, correct?

2   A.   Yes.

3   Q.   Yes?

4   A.   Yes.

5   Q.   Now, sir, do you -- you had a motor vehicle inventory

6   report that you completed in this case, correct?

7   A.   Correct.

8   Q.   Okay.  And you, like all your police reports, you strive

9   to have that report be accurate, correct?

12:07PM 10   A.   Correct.

11   Q.   Try to have it be detailed?

12   A.   Yes.

13   Q.   And you know that others may rely on it, correct?

14   A.   Absolutely.

15   Q.   Okay.  And the report, if you can recall, the motor

16   vehicle inventory report is more of a form, correct?

17   A.   It's a form.

18   Q.   All right.  And that form, just so we're talking about the

19   same thing, that form indicates that you should log, quote,

12:08PM 20   "itemized property found in the passenger compartment, glove

21   box, and trunk," and then it says "use back, if necessary,"

22   referring to back of the form.  Is that what it indicates on

23   the form, if you recall?

24   A.   I would like to refresh my memory, but I'm sure you're

25   correct.

1    Q.    Absolutely.

2              MR. FLASHNER:  May I approach again, your Honor?

3              THE COURT:  Yes.

4    A.    Thank you.

5    Q.    And looking at that form and having an opportunity, that

6    is the form that you used that night, correct?

7    A.    Yes.

8    Q.    Okay.  And the report, or the form indicates that, quote,

9    "itemized property found in the passenger compartment, glove

12:09PM 10   box, and trunk" should be logged on the form, correct?

11   A.    Correct.

12   Q.    And what you logged on the form is a bunch of different

13   items, correct?  There's multiple items listed there, correct?

14   A.    That is correct.

15   Q.    And included in those items are a Glock 34X firearm that

16   has numbers next to it, correct?

17   A.    That is correct.

18   Q.    Okay.  And, in fact, you didn't recover a firearm from the

19   passenger compartment, glove box, or trunk of that motor

12:09PM 20   vehicle, correct?

21   A.    Correct.  Yes.

22   Q.    So that police report is incorrect, correct?  Is that

23   accurate?

24   A.    From the scope of the vehicle, that's what the -- where

25   the firearm, that's why I put that there.

1    Q.    So we can --

2    A.    Technically, it was not in the vehicle. You're correct.

3    Q.    Okay. And your report indicates, or rather your report

4    lists it under a section that requests for itemized property

5    found in the passenger compartment. It wasn't there, correct?

6    A.    That was correct.

7    Q.    It wasn't in -- the gun wasn't in the glove box, correct?

8    A.    Correct.

9    Q.    And the gun wasn't in the trunk, correct?

12:10PM 10    A.    That is correct.

11    Q.    Now, you're aware that Mr. Perez is charged in a drug

12    conspiracy in this case before this court?

13    A.    I'm unaware of a conspiracy. Could you rephrase that?

14    I'm sorry. I apologize.

15    Q.    I'm sorry. It's okay. My question probably could have

16    been better.

17    A.    Okay.

18    Q.    You're aware, sir, that Mr. Perez is charged with engaging

19    in a drug conspiracy or a controlled substance conspiracy,

12:10PM 20    that's one of the charges before the jury. You're aware of

21    that, correct?

22    A.    Yes.

23    Q.    Okay. And you're aware that a conspiracy can be an

24    agreement, correct?

25    A.    Yes.

```
 1              MS. HOEFLE:  Objection, your Honor.
 2              THE COURT:  Sustained.  That's a legal question.
 3    Q.   Well, sir, you never wrote a report about hearing
 4    Mr. Perez and Mr. Del Rio talk about drugs or controlled
 5    substances, correct?
 6    A.   Never mentioned that, no.
 7    Q.   And you never heard Mr. Perez and Mr. Del Rio talking
 8    about controlled substances, correct?
 9    A.   That's correct, yes.
12:11PM 10    Q.   And what you did do, though, is you did seize a bunch of
11    cell phones in this case, three cell phones that were in that
12    black SUV, correct?
13    A.   Correct.
14    Q.   You never obtained a warrant to search those phones for
15    any evidence related to drug-related communications, correct?
16    A.   Correct.
17    Q.   Okay.  And you're aware, you're unaware of anybody at the
18    Lexington Police Department ever obtaining a warrant to search
19    those phones, whoever was searching those phones, correct?
12:11PM 20    A.   Correct.
21    Q.   So as you sit here today, sir, you have no evidence to
22    share with this jury of any drug or narcotic-related
23    communications between Mr. Perez, my client, and Mr. Del Rio,
24    that man in the red sweatsuit, correct?
25    A.   I'm sorry.  Could you repeat that?
```

1    Q.   Sure.  I can try.  As you sit here today, sir, you have no

2    evidence that you can share with this jury about drug-related

3    communications between Mr. Perez and Mr. Del Rio, correct?

4    A.   Correct.

5    Q.   And you have no knowledge that anyone ever even bothered

6    to search those phones, correct?

7    A.   Not to my knowledge.

8         THE COURT:  That's argumentative, but I'll let it

9    stand.

12:12PM 10   A.   Not to my knowledge.

11        MR. FLASHNER:  I don't have anything further at this

12   time.  Thank you.

13        THE COURT:  All right.  Redirect.

14        MS. HOEFLE:  We're all set, your Honor.

15        THE COURT:  Thank you.  You may step down.

16        THE WITNESS:  Thank you, sir.

17        MR. CROWLEY:  The government calls Matthew Snell.

18        THE COURT:  While we're getting him, I'll give you

19   another chance to stretch.

12:14PM 20        MATTHEW SNELL, having been duly sworn by the Clerk,

21   testified as follows:

22                        DIRECT EXAMINATION

23   BY MR. CROWLEY:

24   Q.   Sir, would you please state your name.

25   A.   Matthew Snell.

1  Q.   How are you presently employed?

2  A.   The Town of Lexington.

3  Q.   And how are you employed with Lexington?

4  A.   With the police department.

5  Q.   How long have you been with the Lexington Police?

6  A.   Just over six years.

7  Q.   And what is your present position?

8  A.   Patrolman.

9  Q.   And have you been a patrolman the entire six years?

12:14PM 10  A.   I have been, yes.

11  Q.   And, sir, calling your attention to December 8th, 2022,

12  were you on duty the evening of December 8th, 2022?

13  A.   I was, yeah.

14  Q.   And what was your assignment?

15  A.   I was patrolling the 413 sector.

16  Q.   And were there other individuals assigned to patrol that

17  night?

18  A.   There was, yes.  Officer Morris, Officer Sharer, and

19  Officer Frissore.

12:15PM 20  Q.   And, sir, did you become involved in a traffic incident

21  that night?

22  A.   I was, yeah.

23  Q.   Now, how did you become involved?

24  A.   So I was at the intersection of Bedford Street and

25  Hartwell Ave.  I was sitting at a red light.  I was waiting for

1  my light to turn green when I observed a silver sedan traveling

2  at a high rate of speed go through the intersection.  As I was

3  about to pull out to go after that vehicle, a black Ford

4  Explorer came through the intersection as well at a high rate

5  of speed.

6  Q.   And could you anticipate what the rate of speed was?

7  A.   Yeah.  Approximately 75 to 80 miles per hour.

8  Q.   And what steps did you take after seeing those two

9  vehicles?

12:15PM 10  A.   I proceeded to go on Bedford Street towards 128 to see if

11  they were going to go on the highway.  If they weren't going to

12  go on the highway, I knew, prior to going up to the

13  intersection, Officer Morris was down the street just past the

14  highway.

15  Q.   And did they go on the highway?

16  A.   They did not, no.

17  Q.   And what actions did you take when you observed the two

18  vehicles did not go on the highway?

19  A.   I radioed to Officer Morris that I had two vehicles

12:16PM 20  traveling at a high rate of speed towards him.

21  Q.   And what steps did you take?

22  A.   I still proceeded towards that route, towards that way,

23  towards Officer Morris.  I did not have my emergency lights on

24  at this time because the distance was too far from my cruiser

25  to the two vehicles that were traveling at that speed.

1    Q.   Okay.  And did you continue down Bedford Street?

2    A.   I did, yeah.

3    Q.   And at any point did you receive any radio communications

4    from Officer Morris?

5    A.   I did.  He called off that there was a motor vehicle

6    accident that just occurred at Bedford Street and Worthen Road.

7    Q.   And what steps did you take after you heard Officer Morris

8    call out that there had been an accident?

9    A.   I activated my emergency lights and started heading

12:16PM 10   towards the crash.

11   Q.   And where did you drive to?

12   A.   Bedford Street at Worthen Road, right at the intersection.

13   I started driving towards there, and I observed a red Prius

14   with significant damage, as well as a black Ford Explorer with

15   heavy front end damage.

16   Q.   And after you observed those, did you take any other

17   steps?

18   A.   I did.  Officer Morris radioed that the two occupants from

19   the Ford Explorer came out of the -- came out of the vehicle

12:17PM 20   and started running from the scene towards the Stop & Shop.

21   Q.   And so what steps did you take once you received that

22   radio communication?

23   A.   I did a U-turn and then started going down towards Worthen

24   Road.  Right behind the Stop & Shop there is a small apartment

25   complex.  I went in to the wrong way because it abuts Stop &

1    Shop because Office Morris said there were two suspects that

2    were going towards that corner.

3    Q.   So I'm just going to show you what's been admitted as

4    Exhibit 1.2, to help orientate the jury.  So could you -- you

5    stated you took -- could you describe what you did in relation

6    to Worthen Road and the Battle Green Apartments?

7    A.   Yes, just use my finger here?

8    Q.   Why don't you just describe.

9    A.   Describe.  Yeah.  So I came down Bedford Street and then

12:18PM 10   right at the intersection of Worthen Road, did a U-turn, then

11   came down Worthen Road, there's that white apartment complex

12   right behind Stop & Shop, and that's where I was right there.

13   Q.   So there's a complex marked Battle Green Apartments?

14   A.   Yeah.

15   Q.   Which road were you on?

16   A.   I was on Worthen Road and then I came in through the exit.

17   Q.   And is that the one closest to the white building?

18   A.   It is, yeah.

19   Q.   And so you turned down that?

12:18PM 20   A.   I did, yeah.

21   Q.   And where did you go?

22   A.   I went right just before it bends sharp to the left in

23   this picture here, right at the end.

24   Q.   At the end?

25   A.   Yes.

1    Q.   And why did you go there?

2    A.   Officer Morris said that there was another suspect that

3    had gone into the woods.

4    Q.   And as you drove down the road for the apartment complex,

5    did you make any observations?

6    A.   I did.  I could see and hear Officer Morris giving verbal

7    commands to another person, and I was -- as I was exiting my

8    cruiser and making sure Officer Morris didn't need other

9    assistance, there's a creek there, it's kind of like a V-shape.

12:19PM 10   The second suspect was laying on the hill of the creek facing

11   towards the Battle Green Apartments.

12   Q.   And how was that suspect dressed?

13   A.   He was wearing all red.  He was wearing a sweatsuit with a

14   black ski mask.

15   Q.   And when you saw the suspect on the creek bed with the

16   black ski mask and a red jumpsuit, what steps did you take?

17   A.   I unholstered my firearm, just for officer safety because

18   I could not see his hands.  When I was asking Officer Morris if

19   he was okay, he said there was a firearm that was mentioned

12:19PM 20   from the crash.

21   Q.   And what steps did you take with that individual?

22   A.   I started giving him verbal commands, to which he

23   complied.  Once he was compliant, I asked for some other

24   officers to come to my location and Officer Morris's.  So I

25   waited for backup.  When my sergeant showed up, my sergeant

1    took over as the cover officer, and I placed later identified

2    Henry Del Rio under arrest.

3    Q.   And when you say you placed him under arrest, what

4    physical steps did you take?

5    A.   I placed him in handcuffs and then I did a search incident

6    to an arrest.

7    Q.   During that search, did you recover a wallet?

8    A.   I did.

9    Q.   And how did you identify Mr. Del Rio?

12:20PM 10   A.   With his Massachusetts license.

11   Q.   I'm going to show you what's been marked as Exhibit 1.3.

12   And that's a different view of the Stop & Shop area?

13   A.   Yeah.

14   Q.   Now, in this photo, could you identify by the -- where you

15   arrested Henry Del Rio, the general area of where you were?

16   A.   Yes.  So the parking lot right behind, if you see the

17   white and blue cars, there's kind of like a split between two

18   trees, it was right in that area.

19   Q.   And that's where you arrested Mr. Del Rio?

12:21PM 20   A.   I did, yes.

21   Q.   After you arrested Mr. Del Rio, what other steps did you

22   take, if any, in dealing with that situation?

23   A.   With Mr. Del Rio, Officer Frissore also responded to my

24   location.  We transported Mr. Del Rio back to the

25   Lexington Police Department for him to be booked.

```
 1    Q.   Now, that area where you arrested Mr. Del Rio?

 2    A.   Yeah.

 3    Q.   To the right of it, would you describe the general area,

 4    what it looks like?

 5    A.   The -- it's like a creek, it's a wooded area, a lot of

 6    leaves, a lot of sticks, it's a little damp.

 7              MR. CROWLEY:  No further questions, your Honor.

 8              THE COURT:  All right.  Cross.

 9                        CROSS-EXAMINATION
```
12:21PM
```
10    BY MR. DALEY:

11    Q.   Good afternoon, Officer Snell.  My name is Ed Daley, I

12    represent Jose Perez.  You testified earlier today that you --

13    the night in the question, you saw two cars racing down Bedford

14    Street, correct?

15    A.   Yeah.

16    Q.   One was a silver sedan?

17    A.   Yes.

18    Q.   The other was a black SUV?

19    A.   Correct.
```
12:22PM
```
20    Q.   And you started following those cars, correct?

21    A.   Correct, yeah.

22    Q.   And your testimony is you did not turn on your emergency

23    lights right then?

24    A.   Not at that time, no.

25    Q.   So you followed these cars, but you didn't turn on your
```

1    emergency lights?

2    A.    Correct, yeah.

3    Q.    And these cars were traveling at a high rate of speed?

4    A.    Correct.

5    Q.    And at some point after you started following these cars,

6    you either heard on the radio or learned that somehow that

7    Officer Morris saw the occupants of the SUV, the black SUV --

8    A.    Yeah.

9    Q.    -- leave the SUV and run towards Stop & Shop; isn't that

12:22PM 10    right?

11    A.    Correct, yeah.

12    Q.    And it was at that point that you drove your car towards

13    the Battle Green Apartments?

14    A.    Correct, yeah.

15    Q.    And as you just described, the Battle Green Apartments

16    is -- could we please pull up the map?  1.2 or 1.3?

17         And so on this map, which has been marked and admitted

18    into evidence as Exhibit 1.2, the Battle Green Apartments are

19    on the bottom left of the map; is that correct?

12:23PM 20    A.    Correct, sir.  Yeah.

21    Q.    Okay.  And then you can see the apartment complex and the

22    road that kind of goes up and down next to those buildings,

23    correct?

24    A.    Correct, yeah.

25    Q.    And then the white building is the Stop & Shop, correct?

1    A.    Correct, yeah.

2    Q.    Okay.  And there's a wooded area in between the Battle

3    Green Apartments and the Stop & Shop?

4    A.    Correct, yeah.

5    Q.    And there's also another wooded area to the -- below the

6    Stop & Shop?

7    A.    Yeah, it is.  Yeah.

8    Q.    Okay.  And that's a -- that wooded area is a larger wooded

9    area than the one separating the Battle Green Apartments and

12:24PM 10    the Stop & Shop, correct?

11    A.    It's more thickly settled, yeah.

12    Q.    Well said.  And so after you parked your cruiser in the

13    parking lot of the Battle Green Apartments, I believe it's your

14    testimony that you then started to look towards the creek or

15    the more densely wooded area?  Is that correct?

16    A.    No, because it was like -- I was right before the bend of

17    the Battle Green, if you can see in the picture.  I was right

18    before it kind of goes back and to the left, I was right before

19    it.  So I wasn't looking down more like towards the thickly

12:24PM 20    settled.  I was looking more towards like the Stop & Shop.

21    Q.    So you were looking towards the Stop & Shop?

22    A.    Yeah, because when I excited my cruiser, I could hear

23    Officer Morris giving verbal commands to someone.

24    Q.    I understand.  And so, if you're looking towards the

25    Stop & Shop --

1    A.    Yes.

2    Q.    -- you saw a large six-foot fence, correct?

3    A.    Correct, yeah.

4    Q.    Okay.  And that's in the wooded area, you said, I think

5    there's a river there?

6    A.    Yeah, it's like a small creek.

7    Q.    Small creek?

8    A.    Yeah.

9    Q.    Okay.  And that's the area that you were investigating or

12:24PM 10    searching, right?

11    A.    Yeah.

12    Q.    Okay.  And you did not cross over and go over the fence

13    towards Stop & Shop, correct?

14    A.    Towards Officer Morris?  No, I did not.  No.

15    Q.    Okay.  And you didn't investigate the area near Officer

16    Morris?

17    A.    No.

18    Q.    Okay.  Just in the wooded area.

19    A.    Yeah.  Just basically the -- it's the Battle Green

12:25PM 20    Apartments's property.  That's as far as I went.

21    Q.    Understood.  So it's the wooded area that we're in now?

22    A.    Yeah.

23    Q.    And so you eventually found a man dressed in a red

24    sweatsuit in that wooded area?

25    A.    Correct.

1    Q.   And that man you later learned was Henry Del Rio?

2    A.   Correct, sir.

3    Q.   Okay.  And you arrested Mr. Del Rio, correct?

4    A.   Correct, yeah.

5    Q.   And is it at that point when Sergeant Barry, Sergeant

6    Michael Barry came to cover you, I think you --

7    A.   Yeah, so he came over to assist me with placing

8    Mr. Del Rio under arrest.

9    Q.   And I'm going to put it on the Elmo, as well, Matt,

12:25PM 10    because it's probably easier for us to point.  This is the same

11    picture, but just not on a computer.  So this is Exhibit 1.2?

12    A.   Okay.

13    Q.   And is it fair to say, where I'm pointing here on the map,

14    that's about where Officer Morris was approximately standing?

15    A.   Yes.

16    Q.   So this is the Battle Green Apartments on the bottom side

17    of the map?

18    A.   Yes.

19    Q.   And you parked your cruiser in the parking lot here?

12:26PM 20    A.   Yeah.  Right in that general area.  Yeah.

21    Q.   Okay.  And the wooded area that we keep talking about is

22    here just below the Stop & Shop?

23    A.   Yeah.  Yeah.

24    Q.   Okay.  And so I think you just testified that Sergeant

25    Michael Barry came to cover you or take over after you had

1   arrested Mr. Del Rio?

2   A.   So he came to assist me with placing Mr. Del Rio under

3   arrest.  After that I don't know what his actions were after he

4   left the scene with me.  Me and officer Frissore transported

5   Mr. Del Rio back to the station.  So after that --

6   Q.   We're just going to go one step at a time.  So Sergeant

7   Michael Barry came to cover for you after you arrested

8   Mr. Del Rio?

9   A.   Yeah, correct.

12:27PM 10   Q.   And Sergeant Michael Barry is -- he works with the

11   Lexington Police Department?

12   A.   He does.

13   Q.   How long have you known him?

14   A.   I have known him for probably about seven years.

15   Q.   Seven years.  Okay.  And I'd like to direct your attention

16   back to Bedford Street?

17   A.   Yeah.

18   Q.   And I'm going to point to it right here.  It's the

19   intersection of Bedford Street and Worthen Road?

12:27PM 20   A.   Correct, yeah.

21   Q.   Okay.  That's not where you parked your cruiser when we

22   had just talked about where you went to the Battle Green

23   Apartments, right?  This intersection right here?

24   A.   I did not park my cruiser up there, no.

25   Q.   Okay.  And you didn't see the black SUV come to rest at

1   the granite post, correct?

2   A.   No.

3   Q.   And you didn't see Mr. Perez exit that vehicle, did you?

4   A.   I did not, no.

5   Q.   Okay.  So you just -- you were on the scene when that

6   happened?

7   A.   I was not, no.

8   Q.   So the first time that you saw Mr. Perez that night was

9   when he was in custody?

12:27PM 10   A.   Correct, yeah.

11          MR. DALEY:  Nothing further, your Honor.

12          THE COURT:  Any redirect?

13          MR. CROWLEY:  No, your Honor.

14          THE COURT:  Thank you.  You may step down.

15          THE WITNESS:  Thank you, your Honor.

16          MS. HOEFLE:  Your Honor, the government would call

17   Captain Donald Chisolm of the Lexington Fire Department.

18          DONALD A. CHISOLM, JR. having been duly sworn by the

19   Clerk, testified as follows:

20                    DIRECT EXAMINATION

21   BY MS. HOEFLE:

22   Q.   Good afternoon.

23   A.   Good afternoon.

24   Q.   What's your name?

25   A.   Donald A. Chisolm, Jr.

1   Q.   Where do you work?

2   A.   The Lexington Fire Department.

3   Q.   What is your current position?

4   A.   Currently, I'm assistant chief of fire prevention.

5   Q.   As assistant chief, what are your duties and

6   responsibilities?

7   A.   I oversaw the fire prevention office which deals with

8   permitting, new construction, existing construction, solar,

9   energy storage systems, hazardous materials, and everything

12:29PM 10   along those lines, as well as I also oversee the fire

11   investigation unit and our public safety program.

12   Q.   Prior to -- how long have you been an assistant chief?

13   A.   I've made assistant chief in October of 2023.

14   Q.   Prior to that, how were you employed?  Were you still at

15   Lexington Fire Department?

16   A.   Yes, I've been with Lexington since 1994, starting out as

17   a firefighter/paramedic.  I was then a lieutenant after about

18   eight years, and then after about eight years of that, I made

19   captain, which was the last position I was in before I made

12:30PM 20   assistant chief.

21   Q.   So thinking about and focusing you on December of 2022,

22   what was your position then, was it captain?

23   A.   I was captain and also, in that role, I'm also the shift

24   commander for one group.

25   Q.   Are you familiar with a person named Jose Perez, Jr.?

A.    Yes.

Q.    How are you familiar, generally, with that person?

A.    Just generally as it relates to this trial and this case.

Q.    I want to bring you back to December 8th, 2022.  Were you working that night?

A.    Yes.

Q.    What were you doing?

A.    At that time I was, again, shift commander, so it was approximately 10:00, or so in the evening and I was finishing up a few reports from the day, and then just getting ready to check the building before -- as we do 24-hour shifts, the firefighters, after a certain period of time, are allowed to try to get a little bit of sleep in between calls, so I was the last one up and just going to check the house before trying to do the same.

Q.    And what street is the fire station on?

A.    It's located at 45 Bedford Street in Lexington, which is also Route 4 and 225.

Q.    So what happened at approximately 10:45-ish that night, December 8th?

A.    I had finished up in my office on the first floor, which is situated on the side street off of Bedford Street and was walking out of the office area into the apparatus floor or the garage area of the station.

Q.    What happened when you were walking there?

1  A.   I had gotten into that section of the garage and I heard a

2  loud crashing sound, so I turned and there's a garage door on

3  the Camellia Place side, which is the side towards my office.

4  So I walked over to that, where there's a window, and at that

5  point I could see blue lights of a police car passing by.

6  Q.   What did you do after you saw those lights?

7  A.   I walked through the garage towards the front entrance, or

8  the front garage entrance which faces Bedford Street and walked

9  up -- all the garage doors are glass, so I could see out.  I

12:32PM 10  could see blue lights of the cruiser which was stopped just

11  beyond the station and I could see what looked like a black SUV

12  with front-end damage on Bedford Street right at the edge of

13  the -- what's known as the apron, or the front driveway of the

14  situation.

15  Q.   What did you do after seeing that?

16  A.   I opened the garage doors, walked out onto the apron of

17  the station.  I could see the black vehicle, like I said, and

18  then to my right, which is the intersection of Bedford Street

19  and Worthen Road is the main drag coming into that traffic

12:33PM 20  light, there was a red Prius with heavy front-end damage to it.

21  Q.   What did you do next?

22  A.   I looked and I could see who I assumed was the police

23  officer from the cruiser that was stopped in the street running

24  across the parking lot across the street through the Stop &

25  Shop grocery store parking lot.

1    Q.   What did you do?

2    A.   I -- at this time, my fire radio also scans for police, so

3    I knew they had something going on that I didn't want to call

4    over the radio to have my companies dispatched out for the

5    motor vehicle accident, so I went back in to the back of the

6    station on the apparatus floor, and there was a PA there that I

7    was able to call for all the members to come down for a motor

8    vehicle accident.

9    Q.   Is that like a loud speaker, A PA system?

12:34PM 10   A.   Yes.

11   Q.   What happened after you called for people to come down to

12   assist with the crash?

13   A.   I believe I went back out onto the front apron to go check

14   to see if anybody was injured at all.  I walked towards the

15   operator of the Prius, yelled over to him to ask if he was all

16   right, he said he was fine.  I asked him if he had any pain or

17   anything, he said no.  So then I turned and went over to the

18   black SUV, it was a Ford Explorer four-door.  As I walked up to

19   it, the driver's door was open so I walked towards that side.

12:34PM 20   Q.   What did you see as you walked towards the open driver's

21   side door?

22   A.   The driver's door was fully opened, so as I stepped up to

23   it, I could see there was a firearm on the ground basically

24   directly in that wedge, pie-shaped wedge, that's created if you

25   opened the door, but within that few couple of feet of that

1    space.

2    Q.   And the pie-shaped wedge you just described, or that you

3    mentioned, what are the sort of edges of the wedge, if you

4    will?

5    A.   If you go from what's called the B post of the car, the A

6    post is where the windshield is.  The second post between the

7    front door and the back door is the B post.  So if you open up

8    and drew a line from that B post to the open edge of the door

9    and then the pie area is within that small triangle shape area

12:35PM 10   just before you step into the car.

11   Q.   So in between the driver's side door on the one hand and

12   then the body, if you put it one way, of the car?

13   A.   Yes.

14   Q.   Okay.  And you observed a firearm in that area on the

15   pavement?

16   A.   Yes.

17   Q.   Okay.  What did you do with the firearm?

18   A.   Initially, I left it on the ground where it was.

19   Q.   What did you do next?

12:36PM 20   A.   I wanted to see if there was anybody in the vehicle.  So

21   the driver's side and passenger side airbags, as well as the

22   side curtain airbags had all deployed, so I took my right arm,

23   pushed up the side curtain airbags so that I could look in.

24   There was nobody in the driver's seat, nobody in the passenger

25   seat, nobody in the back seat at all, and then I went around

1    and looked in the rear window to see if there was anybody in

2    the storage compartment, or back of the vehicle, and I saw

3    nobody at that time.

4    Q.   What did you do after checking the car to make sure no one

5    was in there?

6    A.   At this point, my firefighters -- different companies were

7    coming out of the building.  I gave different instructions to

8    different members, my company officers to check the operator of

9    the other vehicle, see if there was any fuel leaking from any

12:36PM 10   vehicles at all.  And at that time I called over the radio to

11   my dispatch on the fire frequency to have them let the police

12   officers on scene know that we had found a weapon and that I

13   wanted to make them aware in case there were other weapons

14   involved.

15   Q.   What did you do next?

16   A.   I believe at that point I went back to the black SUV by

17   the door.  Seeing that the gun was there, not knowing what the

18   whole circumstance of the accident was, how many people were in

19   the vehicle, if there was anybody else hiding somewhere that I

12:37PM 20   wasn't aware of, so I felt the safest thing to do was to place

21   the weapon somewhere out of sight, so that if somebody was able

22   to circle around to the vehicle again, they wouldn't be able to

23   get the weapon.

24   Q.   So what did you do?

25   A.   So I'm not a real gun person, but the little bit I know

about them, it was a semiautomatic pistol.  I could tell that

the hammer was not pulled back in the cocked position, so I

felt relatively comfortable that I was able to pick it up by

the trigger guard with one finger, carry it into the fire

station apparatus floor, and I went to one of the fire engines

that was not being used and put it inside there with the -- and

shut the door behind it.

Q.   So about how long were you in physical possession of the

firearm?

A.   I'd say maybe 30 to 40 seconds walking from the SUV to the

fire apparatus inside the station.

Q.   Okay.

          MS. HOEFLE:  Can we have the Elmo, please?

          THE COURT:  Let me explain that word the lawyers are

using, the word, "Elmo."  I'm not sure where it came from.  I

don't know if it's a brand name or an acronym, but it's a

document camera or object camera.

Q.   So I'm showing you, Captain -- Assistant Chief Chisolm,

what has been marked here as Exhibit 10.  What is this?

A.   It's a semiautomatic pistol.

Q.   Okay.  Do you recall the semiautomatic pistol -- as you

remember, do you recall details about the firearm that you

recovered that night?

A.   Yes.

Q.   What color scheme was the firearm that you remember

recovering that night?

A.   It was two-tone black and a nickel gray metal.  As I documented in my fire report, I actually did document it as the slide mechanism on top is black and the bottom part was gray, but --

Q.   So when you say slide, I'm pointing here to my finger next to where it says Glock 34X Austria, is this the slide?

A.   Again, not a gun person, but that's what I would call it and basically the reverse of what you're looking at.  What is nickel gray there, I thought looked black to me, and vice versa, and then the black I thought was gray.

Q.   Okay.  So same two colors, you just inverted it in your report that you wrote that night?

A.   Correct.

Q.   After you placed the firearm inside the truck that was in the fire station, what did you do as it relates to the firearm?

A.   So I had shut the door of the actual vehicle.  It was put into what's known as Forestry 1.  It's a Forestry fire truck, so I just shut the door so that nobody walking by would see anything in the vehicle.  I walked back out onto the apron area in front of the station.  So at this point there's four garage doors across the front of the station.  Those four doors were all open, so I was standing there talking to a couple of my officers and firefighters giving different instructions and getting reports back from them, but also in the back of my mind

1  keeping an eye on the apparatus floor to just make sure nobody

2  was going in there, whether it be my own people or anybody for

3  that matter.

4  Q.  And why was that important to you?

5  A.  I did not want anybody going near the gun.

6  Q.  What, if anything, else did you do as it relates to the

7  firearm after that?

8  A.  I waited until the Lexington police officers were

9  returning -- came back to the scene and I warned them what I

12:41PM 10  had found, where I had put it, and at that point Officer Sharer

11  came with me to go retrieve the firearm.

12  Q.  And Officer Sharer, is that an officer with the

13  Lexington Police Department, as far as you know?

14  A.  He was at the time.  He's gone -- I believe he's moved on

15  to a different department.

16  Q.  Okay.  And that's the officer who you brought back to show

17  where the firearm was?

18  A.  Yes.

19  Q.  And one moment, please.  To clarify, after you brought

12:42PM 20  Officer Sharer, then Officer Sharer back to the forestry truck,

21  did you see Officer Sharer take possession of the firearm?

22         MR. FLASHNER:  Objection.

23         THE COURT:  Overruled.

24         MS. HOEFLE:  You can answer.

25         THE COURT:  What did you see?

1      THE WITNESS:  So I brought him back to the forestry

2   truck, I opened up the passenger side front door and indicated

3   that's where the gun was.  It was in clear sight still in the

4   same spot where I had set it, and he then proceeded to take the

5   gun, remove the clip, and then cleared the one round that was

6   in the chamber, and then he took possession of it, and I don't

7   know what occurred after that.

8      MS. HOEFLE:  Okay.  Thank you, nothing further.

9      THE COURT:  Cross.

10                    CROSS-EXAMINATION

11  BY MR. FLASHNER:

12  Q.   Good afternoon, Assistant Chief Chisolm.  My name is

13  Cory Flashner, I represent Jose Perez.  We've never met or

14  spoken before, as far as you know, correct?

15  A.   (No response)

16  Q.   In preparation for your testimony today, though, you did

17  meet with the government?

18  A.   Yes.

19  Q.   Did you meat with them on more than one occasion?

12:43PM 20  A.   I believe two times, three times by Zoom or a

21  Facetime-type conversation.  Yes.

22  Q.   Not necessarily in person, but some sort of video

23  conference?

24  A.   Correct.

25  Q.   And just to set the stage, you never saw Mr. Perez with a

1  firearm that night?

2  A.   No.

3  Q.   You never saw anybody holding that firearm, correct,

4  except a police officer?

5  A.   Correct.

6  Q.   Okay.  And you never saw Mr. Perez with any plastic

7  baggies or controlled substances, correct?

8  A.   Correct.

9  Q.   And you never saw the controlled substances that were

12:44PM 10  recovered from the car, you weren't a part of them when they

11  were recovered, correct?

12  A.   I was not part of the search, but I believe I do recall

13  one of the officers when he had recovered some of it, coming

14  out of the vehicle.

15  Q.   You didn't see any controlled substances in the car?

16  A.   I don't believe so, no.

17  Q.   You didn't look inside any of the passenger compartments,

18  such as the center console, or the glove box, or anything like

19  that, did you?

12:44PM 20  A.   When I was looking to see if there was anybody in there, I

21  did notice there were a couple of cell phones I believe sitting

22  in the center console, but I didn't really look that deep into

23  those areas.

24  Q.   Okay.  But when you saw the car that night as a -- let me

25  rephrase this questions.  As a fireman, I assume you responded

1  to too many accident scenes involving motor vehicles, correct?

2  A.   Correct.

3  Q.   And you've seen these scenes when cars strike another

4  object, or another car, the airbags go off, correct?

5  A.   Yes.

6  Q.   And what happens, if you're familiar, based on your

7  training and experience, when a car is traveling at a high rate

8  of speed and it strikes another object, the car slows down

9  dramatically typically, correct?

12:45PM 10  A.   Correct.

11  Q.   And the objects in the car, however, they continue to move

12  forward with some velocity, correct?

13  A.   Yes.

14  Q.   I mean, that's a fancy way of saying that's why we wear

15  seat belts, right?

16  A.   Correct.

17  Q.   But objects in a car generally don't have -- aren't

18  strapped down.  If they're not strapped down they continue to

19  move in the car, correct?

12:45PM 20  A.   Correct.

21  Q.   Now, the black SUV that you approached that night, fair to

22  say you observed that the airbags had deployed?

23  A.   Correct.

24  Q.   And by the airbags, I mean the passenger side -- are they

25  called curtain airbags?

            1    A.    Correct, side curtain airbags.

            2    Q.    Side airbags.  The side airbags are deployed and those

            3    would cover the side windows of the SUV, correct?

            4    A.    Correct.

            5    Q.    And they deployed on both the driver's side and the;

            6    passenger's side, correct?

            7    A.    Yes.

            8    Q.    And when you first approached the car and looked at it,

            9    the first thing that you would have seen -- the doors were

12:46PM  10    open, but you would have seen those deployed airbags still in

           11    their deployed state, for lack of a better expression?

           12    A.    Correct.

           13    Q.    But you looked inside the car and you made some

           14    observations of some items in the car, but no people in the

           15    car, correct?

           16    A.    Correct.

           17    Q.    Did you observe where the Lexington Police Department

           18    vehicle was that was closest to the black SUV?  Do you remember

           19    that?

12:46PM  20    A.    Yes.

           21    Q.    All right.  And fair to say it's in the -- what I'm going

           22    to call the proper travel lane, it's in the travel lane that it

           23    would typically travel in, correct?

           24    A.    No.

           25    Q.    It's not?  Where is it?

1    A.    So if you were looking out from the --

2    Q.    Let me ask.  I may have confused you with my question.

3    The black SUV is off to the side against the stone pillar,

4    correct?

5    A.    I'm trying to picture the stone pillar you're talking

6    about.  There's a traffic light stanchion.

7          MR. FLASHNER:  Could we have what's previously been

8    marked as Exhibit 100.3.  Just to orient you a little bit and

9    we can blow that up, I think.  Can you just blow up the area

12:47PM 10   around the fire house.  Could you put the map back up, sorry.

11   1.03.  You had the correct exhibit and I misinstructed you, my

12   mistake.  There we go.  And can you make it just a little bit

13   bigger around the fire house and the bank area.  There we go.

14   Q.    So Assistant Chief, I'll just give you a second to orient

15   yourself.

16   A.    Yeah.

17   Q.    Do you see where it's labeled "Lexington Fire Department,"

18   correct?

19   A.    Yes.

12:48PM 20   Q.    And then you see the Gulf gas station that's next door?

21   A.    Yes.

22   Q.    All right.  And you know that there's an M&T Bank kind of

23   across the street from the Lexington Police Department and the

24   gas station?

25   A.    Yes.

Q.   And the vehicle that came to a rest, it was -- the black
SUV is somewhere in the area of that tree that is now kind of
directly in between the Gulf gas and the M&T Bank?

A.   Okay.  That's actually a traffic light stanchion, but,
yes, it was somewhere in that general area.

Q.   All right.

A.   At a slight angle.

Q.   At a slight angle.  And do you recall that the rear of the
vehicle is actually sticking out into the roadway across what
would be the -- I think it's a bike lane?

A.   Yes.

Q.   It's not depicted here.

A.   I recall the front end, if you're heading east on Bedford
Street, so passing from right to left in front of the station,
the vehicle was sort of angled to the left slightly and in --
almost into I would say -- describe it as into oncoming
traffic.

Q.   Let me show you Exhibit 1.04.  Does that help orient you a
little bit?  That would be heading, is that east?

A.   So you're heading -- you're facing east there, yes.

Q.   Okay.  And you see the Gulf gas station on the left?

A.   Yeah.

Q.   And do you see the telephone pole with the "no parking"
sign on it, correct?

A.   Yes.

1    Q.   Do you see just past that there appears to be a metal

2    fence with granite pillars?

3    A.   On the right?

4    Q.   On the right side, sorry.  Do you see that?

5    A.   Yeah.

6    Q.   Now, could you put up 1.05, 1.5.  Looking at that, this is

7    across the street from the fire station, right?

8    A.   Yes.

9    Q.   Are you able to orient on that particular photograph?

12:50PM 10    A.   Yes.

11    Q.   Okay.  Is it fair to say that the black SUV is -- comes to

12    rest with the front right of the vehicle, the front passenger

13    side is by that stone pillar?

14    A.   I didn't believe it was quite that far, but in that

15    general area of that exit from the M&T Bank.

16    Q.   Okay.  In any event, there's nobody in the car when you

17    come up to it, right?

18    A.   Correct.

19    Q.   And there's a Lexington police cruiser behind it, what

12:51PM 20    would be in the foreground of this particular Exhibit 1.05?

21    A.   When I went out there the police car was just past.

22    Q.   So you remember the police car being past the black SUV?

23    A.   Yes.

24    Q.   Is it stopped there?

25    A.   Yes.

                    1    Q.   Is there another police car behind the black SUV, or you

                    2    don't recall?

                    3    A.   There ended up another one came in behind and went up

                    4    Worthen Road.

                    5    Q.   All right.  So you come up to the car and you said that

                    6    you observed a firearm, correct?

                    7    A.   Yes.

                    8    Q.   Okay.  And you wrote a report in this case, it's a brief

                    9    report, but did you have an opportunity to review it before you

    12:52PM  10    testified today?

                   11    A.   I didn't review it today, but I have read it recently.

                   12    Q.   You've read it?

                   13    A.   Yes.

                   14    Q.   And that report would have been written -- it looks like

                   15    it was written just after midnight on December 9th, 2022, so

                   16    within hours of this incident?

                   17    A.   Some time in that period.

                   18    Q.   Some time in that night?

                   19    A.   Yeah.

    12:52PM  20    Q.   And it's fair to say that in that report you describe the

                   21    firearm as a semiautomatic handgun --

                   22            MS. HOEFLE:  Objection.

                   23            THE COURT:  Hold on.

                   24    Q.   And you describe the weapon as --

                   25            THE COURT:  Hold on.  You're reading from the report.

         1    Is not -- is the report in evidence?

         2            MS. HOEFLE:  No.

         3            THE COURT:  So sustained.  Are you confronting him

         4    with something inconsistent?  Back up.  I'm not sure what

         5    you're doing.  Right now you're just reading from a report

         6    that's not in evidence.

         7            MR. FLASHNER:  I can slow down, your Honor.  I'm

         8    trying to finish before 1:00.

         9    BY MR. FLASHNER:

12:53PM 10    Q.    So I'm going to put what's been marked as Exhibit 10 on

        11    the monitor, all right.  You'd agree with me that this has a

        12    silver or nickel slide, this portion right here?

        13    A.    Yes.

        14    Q.    All right.  And you'd agree with me that it has a black

        15    body, correct?

        16    A.    Yes.

        17    Q.    And your testimony is -- your best memory of the firearm

        18    you recovered had a black slide, correct?

        19    A.    I would say that my memory of it was based on what I had

12:53PM 20    written in my report, my best memory of it.

        21    Q.    And your report would indicate your best memory of it,

        22    correct?

        23    A.    My report would indicate my initial comments after the

        24    incident.

        25    Q.    Well, you write your reports because you want the reports

1  to be accurate, correct?

2  A.   Correct.

3  Q.   Okay.  And you know that you might have to rely on them at

4  a later date for either courtroom testimony or something else,

5  correct?

6  A.   Yes.

7  Q.   And you know that other people rely on your reports,

8  correct?

9  A.   Yes.

12:54PM 10  Q.   And you know that the details of those reports are

11  important?

12  A.   Yes.

13  Q.   All right.  So is it your testimony today that your best

14  memory is that the weapon was a grayish nickel with a black

15  slide on top?

16  A.   That's what I wrote in my report.  I don't know if that's

17  accurate.

18  Q.   Okay.  I understand that and my point is you would have

19  written your report within hours of this incident, though,

12:55PM 20  correct?

21  A.   Correct.

22  Q.   All right.  Now, after you picked up a firearm from the

23  scene and brought it back to the fire house, you met with

24  Lexington police officers within the Lexington -- let me ask

25  that again.  Lexington police officers met with you in the

1   Lexington Fire Department, correct?

2   A.   I don't recall that we had a meeting in the --

3   Q.   They came and they asked you about the firearm, correct?

4   A.   Yes.

5   Q.   All right.  At any point did anybody from the

6   Lexington Police Department ask you to walk outside to the

7   black SUV and show them exactly where you recovered that

8   firearm from?

9   A.   I don't recall whether they did or did not.  I --

12:56PM 10   Q.   If you don't recall --

11   A.   I'll leave it at that.

12   Q.   You wrote a report about this, and that would've been an

13   important detail to put in your report that someone actually

14   asked you to walk back out and identify the location that you

15   recovered the firearm, and that never happened, or at least

16   that's not in your report?

17   A.   So my report is a fire report that deals with the

18   fire/EMS/hazards-related issues, so that's what would go in my

19   report.

12:56PM 20   Q.   Okay.  Fair enough.  And I understand that you work for

21   fire and they work for the police department, but my -- I'm

22   asking you about what the police did with you.  So the police

23   never -- have you ever seen any report or do you have any

24   memory of the police ever asking you to walk back outside and

25   point to the spot where you allegedly or where you recovered

1    that firearm?

2    A.    I don't recall if they did or didn't.

3    Q.    Do you recall standing there outside the SUV while the

4    police officers took photographs of that area on the ground

5    outside the SUV?

6    A.    I don't believe I was there when they were taking

7    photographs.  I was dealing with other things as well.

8    Q.    Do you recall the police ever taking -- do you know what a

9    crime scene marker is?

12:57PM 10    A.    Yes.

11    Q.    Okay.  Can you describe what it is for the jury?

12    A.    I believe it's some sort of numbered yellow or orange

13    marker.

14    Q.    Do you recall the police ever taking one of those crime

15    scene markers and putting it in a spot that you told them to

16    put it because you had recovered the firearm from there?

17    A.    That, I don't.  No, I do not.

18    Q.    So you have no information for this jury that that ever

19    happened, correct?

12:57PM 20    A.    Correct.

21           MR. FLASHNER:  If I could just have two minutes, your

22    Honor.  If we could pull up 101.9, please.  I'd offer this into

23    evidence, your Honor.

24           THE COURT:  Any objection?

25           MS. HOEFLE:  What is it?

1       MR. FLASHNER:  101.9.  It's a photograph of the SUV.

2       MS. HOEFLE:  No objection.

3       THE COURT:  It's admitted, 101.9.

4       (Exhibit No. 101.9 received into evidence.)

5   Q.   And have you seen these before today, Assistant Chief?

6   A.   Of these pictures?  No.

7   Q.   And the inside of the SUV, you agree with me that there's

8   items on the ground of the SUV on the -- sorry, on the driver's

9   side floor mat of the SUV?

12:59PM 10   A.   Yes.

11   Q.   And you can see the side airbag on the passenger's side

12   that's deployed on the SUV, correct, that white thing?

13   A.   Yes.

14   Q.   And you can see in the front right, next to the pillar,

15   you can see what looks to be part of an airbag in the

16   foreground?

17   A.   Yes.

18   Q.   Just a moment, your Honor.  Have you watched the video

19   that was captured from the fire station in this case?

01:00PM 20   A.   I watched I believe a few minutes of it, yes.

21   Q.   Okay.  And are you aware that the video just stops at some

22   point?

23   A.   No.

24   Q.   You're not aware of that.  Assistant Chief, thank you very

25   much.

1    THE COURT: Redirect?

2    MS. HOEFLE: No, your Honor. All set, thank you.

3    THE COURT: Thank you, you may step down. Let me see

4 counsel at the side table and talk about the schedule before I

5 let the jury go.

6    (THE FOLLOWING OCCURRED AT SIDEBAR:)

7    THE COURT: What's your expectation about the

8 timetable?

9    MR. CROWLEY: For tomorrow, we have Officer Sharer,

01:00PM 10 who we think should be about 10, 15 minutes, Detective Evelyn,

11 our firearms expert, our drug expert, we think those should be

12 short. I don't know what the cross would be, and then the last

13 people would be our detective just testifying as to the

14 packaging and the amounts, so I would assume the detective's

15 testimony would be about 15 minutes, the firearms expert, I

16 think would be no more than 20 minutes, the drug expert.

17    MS. HOEFLE: No more than 20?

18    MR. CROWLEY: So Evelyn, our direct would be half

19 hour, maximum 35 minutes. I don't know what the cross is going

01:01PM 20 to be.

21    THE COURT: Do you expect a defense case?

22    MR. FLASHNER: I do not expect a defense case, but I

23 expect an extended recross of Detective Evelyn.

24    THE COURT: Okay. What I'm going to tell the jury is

25 that it's at least possible they could get the case tomorrow,

1  but it's -- the most likely the scenario is they get the case

2  Thursday.  We may wrap up the evidence tomorrow, but there's --

3  I'm not going to split the closings and --

4       MR. CROWLEY:  I think the worst is we could leak into

5  Thursday morning and we could close right after that.

6       MR. FLASHNER:  Could we just plan on closing on

7  Thursday morning?  I don't necessarily know what Detective

8  Evelyn's testimony is going to be, and --

9       THE COURT:  The answer is probably let me talk to the

01:02PM 10  jury.

11       (SIDEBAR CONFERENCE WAS CONCLUDED)

12       THE COURT:  All right, ladies and gentlemen, I think

13  the most likely scenario is the evidence is going to wrap up

14  tomorrow, possibly leak into Thursday morning, and that you'd

15  get the case on Thursday.

16       There's an outside chance, sometimes cases end earlier

17  than expected, sometimes people expect that a witness is going

18  to take an hour and they take three minutes.  I mean, it's just

19  not necessarily predictable, so it's possible you could get the

01:02PM 20  case tomorrow.

21       I'm telling you that just for planning purposes.  I

22  don't think it's very likely, but I think Thursday is when

23  you're likely to get it, and, again, once you do get the case,

24  you should be prepared to be here all day to deliberate.  It

25  may not take you that long.  You can take as much time or as

1    little time as you think you need, and, of course, you can go

2    day-to-day until you render a verdict.  But that's what I think

3    the schedule looks like.  By far, the most likely scenario is

4    you'll get the case Thursday.  You don't need to worry about

5    getting lunch, we'll provide it to you if we keep you over past

6    one.

7         All right.  So that's where we are, and please

8    remember my cautions not to discuss the case among yourselves

9    or with anyone else, and we'll see you tomorrow morning at

01:03PM 10   9:00.  Thank you.

11        THE CLERK:  All rise for the jury.

12        (JURORS EXITED THE COURTROOM.)

13        THE COURT:  All right.  I think we ought to convene

14   this afternoon to begin talking about the jury charge.

15   Someone -- who has my schedule?  Is it a status?  A telephone

16   status conference?

17        Why don't we convene at 3:30 and, again, this is a bit

18   of a rolling process.  I'm trying to make whatever progress we

19   can on the instructions, and we'll see where we are at 3:30,

01:05PM 20   and we may not resolve every issue, but you should be prepared

21   to talk about that, Mr. Flashner.

22        MR. FLASHNER:  Now, just one moment.  Mr. Perez, he'll

23   remain here?  Is that what will happen?

24        THE COURT:  He can if he wants to.  We just have to

25   hold the van, but, yes, we can.

1          MR. FLASHNER:  If I could just have a moment to

2    discuss that with him.

3          THE COURT:  Yes.

4          MR. FLASHNER:  Your Honor, Mr. Perez would waive his

5    presence for that conference.  Would that be in person or --

6          THE COURT:  In person.

7          MR. FLASHNER:  Okay.

8          THE COURT:  3:30, then we'll call it a preliminary

9    charge conference.  Okay.  We'll stand in recess.

01:06PM 10          THE CLERK:  All rise.

11          ( A recess was taken.)

12          THE CLERK:  All rise.  Thank you.  You may be seated.

13    Court is now in session.

14          THE COURT:  Again, this is the -- we'll call it the

15    preliminary charge conference.  We circulated a copy last

16    evening of the draft jury instructions, which is, again, it's

17    starting with kind of a cut and paste affair.  No mistake is

18    too small to comment on.  Sometimes it's hard to get plurals

19    and genders and things like that correct.

03:30PM 20          My clerk just pointed out something to me that there's

21    a reference to ammunition, and I think the indictment only

22    charges the firearm, right?

23          MR. CROWLEY:  That's correct, it's page 17, your

24    Honor.

25          THE COURT:  Page 17?

1     MR. CROWLEY:  Yes.

2     THE COURT:  Okay.  The ammunition is --

3     MR. CROWLEY:  The ammunition --

4     THE COURT:  It's not charged, but it's also not in

5  evidence.

6     MR. CROWLEY:  I think it did come in evidence.  It was

7  the gun and the ammunition came into evidence.

8     THE COURT:  Well, the statement about it, but did the

9  actual clip with the actual rounds come in?

03:31PM 10     MR. CROWLEY:  Yes.

11     THE COURT:  So it's part of the evidence, just not

12  part of the charge, so it should be in 17 because here we're

13  talking about how we handled the evidence.  Okay.

14     MR. CROWLEY:  Also, on that one, your Honor, the first

15  line.

16     THE COURT:  Yes.

17     MR. CROWLEY:  It states, "The parties have agreed that

18  controlled substances..."  There's no stipulation to the

19  controlled substances.

03:32PM 20     THE COURT:  Okay.  The government alleges, okay.

21     MR. CROWLEY:  The other ones we had are page 33.

22  That, I think that deals with the elements for the 922(g)(1)

23  charge, and we were a little confused because the pattern

24  instruction requires the conviction, knowledge of the

25  conviction, knowing possession of a firearm, and the commerce.

1    So we have that defendant acted knowingly, and our concern is

2    that they may look at knowingly for the possession rather than

3    also the fact, the knowledge of his predicate category that he

4    had been convicted of a felony.  If the Court wants, we have

5    the pattern jury instructions form, that we can pass that up.

6         THE COURT:  Sure.  I have no problem that, yes, to act

7    knowingly with regard both the fact of conviction --

8         MR. FLASHNER:  Your Honor, I just want to be clear,

9    we're talking about adding "knowingly" to what we had the first

03:33PM 10    and second on page 33?

11         THE COURT:  Well, I won't wordsmith it here in open

12    court, but the concept here is that the defendant must know

13    that he has been previously convicted and know that he

14    possesses a firearm.

15         MR. CROWLEY:  Right.

16         MR. FLASHNER:  Yes.

17         THE COURT:  And I'll look at the pattern instruction.

18    Is this First Circuit pattern?

19         MR. CROWLEY:  It is, your Honor.

03:34PM 20         THE COURT:  One of the joys of giving jury

21    instructions is some things are framed as "knowingly," some as

22    "intentionally," some are "willfully."  "Knowingly" is defined

23    as intentionally.  "Intentionally" is defined as "knowingly,"

24    but, anyway.  I'll try to get it all right.

25         MR. CROWLEY:  Then the only other one we had, we've

1  spoken to defense counsel, it's page 34. There is a

2  stipulation in this case, your Honor. The only concern we have

3  is there's a discussion that you may not speculate about prior

4  crime that the defendant was convicted of, and we have the

5  404(b) that came in. So I believe that the defendant has a

6  pattern jury instruction that they've modified, and I think

7  they forwarded it to the Court just a couple of minutes ago.

8  And that's -- if the Court wants the actual pattern, I can hand

9  that up also. It's pattern 206 on "prior similar bad acts."

03:34PM 10      THE COURT: Okay. I'll take a look at that. So it's

11  really two things here in parallel, there is the disabling

12  conviction.

13      MR. CROWLEY: Correct.

14      THE COURT: Which clearly can come in, and there is

15  the contested 2017 and 2020 404(b) evidence. Normally, when

16  something like that comes in, I give a limiting and cautionary

17  instruction at the time, not in the instructions, but let me

18  take a look at this.

19      And then, Mr. Flashner, you had a modified version of

03:35PM 20  the pattern?

21      MR. FLASHNER: I do, your Honor. And, candidly, it's

22  just the First Circuit 404(b) instruction with -- it lists four

23  different purposes or uses for this particular type of

24  evidence, and it is using, as I understand it, and speaking to

25  AUSA Crowley, it would be using the first part and the fourth

1    part, crossing out 2 and 3, so whether Mr. Perez had the state

2    of mind or intent necessary to commit the crime charged in the

3    indictment.

4            THE COURT:  Okay.

5            MR. FLASHNER:  And then Number 4, whether Mr. Perez

6    committed the acts he is on trial for by accident or mistake.

7            THE COURT:  Okay.

8            MR. FLASHNER:  I would leave out the 2 and 3, I can

9    send that to the Court as soon as I have wi-fi.

03:36PM 10          THE COURT:  Okay.

11           MR. CROWLEY:  And just for the Court, it will probably

12   get done anyways.  We just wanted to point out 37, page 37, if

13   we change the jury instructions for the felon in possession,

14   that's the instruction on "knowingly," and it refers to an

15   element in the caption, but once we -- if that gets changed,

16   all that stuff will probably be resolved.

17           THE COURT:  Okay.  All right.

18           MR. CROWLEY:  Other than that, your Honor, we believe

19   everything else is appropriate.

03:36PM 20          THE COURT:  Okay.  Mr. Crowley, you can let Ms. Hoefle

21   speak directly if she's the one with the legal knowledge and

22   capability.

23           MR. CROWLEY:  I always allow her to speak on the

24   point.  She clearly has more knowledge than me.

25           THE COURT:  All right.  And the same goes for the

1 defense as well. Just hypothetically, if Mr. Flashner is not

2 the lead researcher, you can also, either of you can also

3 speak.

4       MR. FLASHNER: Thank you.

5       THE COURT: Anything else from the defense that you

6 want to call my attention to?

7       MR. FLASHNER: There is. It's on the verdict form.

8       THE COURT: Let me pull that out. Okay.

9       MR. FLASHNER: So with regard to the verdict form,

03:37PM 10 Count One is conspiracy to possess a controlled substance with

11 the intent to distribute and to distribute it. I think it

12 should say -- there shouldn't be an "it" there, it should be

13 "controlled substances."

14       THE COURT: Okay.

15       MR. FLASHNER: It's pretty minor.

16       THE COURT: Okay. No, it's maddening to try to get

17 the minor mistakes out, and so, again, I appreciate any

18 comments at all. All right. Anything else that?

19       MR. FLASHNER: Nothing, your Honor. If I want to send

03:38PM 20 that 404(b) to the Court, can I email it to your clerk with

21 the --

22       THE COURT: Yes, that's fine.

23       MR. FLASHNER: And copy counsel?

24       THE COURT: Yes.

25       MR. FLASHNER: Okay. Thank you.

1    THE COURT:  And so I will take a look at what we've

2  talked about now.  We'll make some modifications, send another

3  version.  It seems highly likely that what we'll do is conclude

4  the evidence tomorrow.  Again, because I'm not splitting

5  closings, I think the chance that we're going to -- that I'm

6  going to give a jury instruction tomorrow is pretty slight, but

7  because you never know, people change their mind, it's possible

8  it could happen tomorrow.  But I think by far the most likely

9  scenario is we'll finish the evidence tomorrow, we'll have our

03:38PM 10  final charge conference tomorrow afternoon, and then we will

11  have closings and jury instructions Thursday morning.

12    I can't remember if I told you this or not, so I'll

13  say it before I forget the thought.  You will have, before your

14  closing arguments, a final version of the instructions that I

15  will -- that I expect to give verbatim.

16    I will let you quote from that.  I want you to say, "I

17  expect Judge Saylor will instruct you X," but you can read it,

18  structure your argument around it, whatever it is you want to

19  do, as long as it is verbatim, as long as you're not

03:39PM 20  paraphrasing, not putting your own spin on it.

21    It has to be acknowledgement that this is what you

22  expect I will say.  And so, you know, for example, if the

23  defense wants to say, "Well, here's what possession means," you

24  can say, "I expect Judge Saylor will tell you that to possess

25  something means X, or to act knowingly means Y."

1          Or if the whole case turns on interstate commerce, you

2     can do that verbatim as well, but what you need to acknowledge

3     is that this is what I'm going to say and it's only what you

4     expect I'm going to say.  Okay?

5          MR. FLASHNER:  Your Honor, before we recess, I

6     understand that point.  I would just renew my objection to the

7     404(b) evidence coming in.  I know I've made that objection.

8     I'll just make it again on the record now for the reasons I've

9     previously stated.

03:40PM 10          THE COURT:  Okay.  All right.  Overruled.

11          MR. FLASHNER:  Thank you.

12          THE COURT:  All right.  We will confer again at 8:30

13     tomorrow morning.  Okay.  Thank you.

14          MR. CROWLEY:  Thank you, your Honor.

15          THE CLERK:  All rise.

16          (Whereupon, the hearing was adjourned at 3:40 p.m.)

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7          I do hereby certify that the foregoing transcript,

8    Pages 1 through 186 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 23-10028-1-FDS, UNITED STATES of AMERICA vs. JOSE

11   PEREZ, JR. and thereafter by me reduced to typewriting and is a

12   true and accurate record of the proceedings.

13          Dated this May 22, 2025.

14                    s/s Valerie A. O'Hara

15          _____

16          VALERIE A. O'HARA

17          OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

1                   UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS

2

3

4   UNITED STATES OF AMERICA,      )
                             )

5   vs.                        )  Criminal Action
                             )

6   JOSE PEREZ, JR.,           )  No. 23-10028-1-FDS
                   Defendant    )

7                             )
                             )

8                             )

9

10  BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV

11

                      JURY TRIAL DAY 3

12

13

14

        John Joseph Moakley United States Courthouse

15                Courtroom No. 10
                 1 Courthouse Way

16                Boston, MA 02210

17

                  July 31, 2024

18                  8:30 a.m.

19

20

21

22

23                Valerie A. O'Hara
               Official Court Reporter

24    John Joseph Moakley United States Courthouse
                1 Courthouse Way

25               Boston, MA 02210
          E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by MICHAEL CROWLEY, ASSISTANT UNITED STATES ATTORNEY, and SARAH HOEFLE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., by CORY S. FLASHNER, ESQ., EDMUND P. DALEY, III, ESQ., and JULIA HUTCHINSON, ATTORNEY, One Financial Center, 42nd Flr. Boston, Massachusetts 02111.

1                          **INDEX**

2                    **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

3
   JACK SHARER            17          25            45            46
4
   AIDEN FREDERICK EVELYN  46         62           117
5
   RYAN GRIFFIN          126         134
6
   KATELYN THOMAS       138         156
7
   MICHAEL NOONE        161         166
8

9

10               **INDEX OF EXHIBITS**

11

12   **EXHIBITS**          **FOR IDENTIFICATION**    **IN EVIDENCE**

13   14                                                149

14   16.5                                              119

15   16.6                                              120

16   16.7                                              121

17   16.8                                               16

18   16.9                                               16

19   101.1                                              91
     THROUGH
20   101.22

21

22

23

24

25

1                          PROCEEDINGS

2          THE CLERK:  All rise.  Thank you.  Court is now in

3     session in the matter of United States vs. Jose Perez, Jr.,

4     Matter Number 23-10028.

5          Would counsel please identify themselves for the

6     record, starting with the government.

7          MR. CROWLEY:  Good morning, your Honor,

8     Michael Crowley and Sarah Hoefle on behalf of the

9     United States.

08:31AM 10          THE COURT:  Good morning.

11          MR. FLASHNER:  Good morning, your Honor.  Cory

12     Flashner, Edmund Daley, and Julia Hutchinson on behalf of

13     Mr. Perez, who is seated at counsel table.

14          THE COURT:  All right.  Good morning.  All right.

15          The first order of business is to report the

16     following:  Mr. McKillop received a text from the juror in seat

17     11, Katherine Brooks, that she is at the hospital with an

18     attack of appendicitis, so this is why we impanel alternates

19     even in relatively short trials.  So I'm going to -- she's not

08:31AM 20     going to be here today, so I'm going to discharge her, which

21     means, according to my notes, that the juror in seat 13,

22     Anne Bellefeuille, Beautiful Leaf, is now one of the 12, and

23     Mr. Hart is the remaining alternate in seat 14, and I don't

24     propose to explore that any further with her.  I mean, I think

25     she's at the hospital dealing with whatever it is she's dealing

1   with.

2         All right.  You should have received a newly edited

3   draft of the jury instructions at about 6:15 last night.  I

4   don't know if you've had a chance to look at it, but I'll take

5   any comments, suggestions, objections you may have.

6         MR. CROWLEY:  Yes, your Honor.  On page 34.

7         THE COURT:  Yes.

8         MR. CROWLEY:  Which is the -- we'd request -- since

9   the Court is going to instruct later, we'd request that the

08:33AM 10   last sentence be deleted because we think that starts to get

11   confusing.  The Court is going to do a longer instruction later

12   about the use of the conviction.

13         THE COURT:  Okay.  Let me think about that.  That may

14   be redundant.

15         MR. CROWLEY:  And then page 35.

16         THE COURT:  Yes.

17         MR. CROWLEY:  This one was a stipulation, so we

18   believe that the Court could delete the second paragraph and

19   use similar stipulated language that they had for the prior

08:33AM 20   one.

21         THE COURT:  Do you agree it's stipulated to,

22   Mr. Flashner?

23         MR. FLASHNER:  I do agree that it's stipulated to,

24   that Mr. Perez knew it was illegal for him to possess a

25   firearm.

                    THE COURT:  Okay.  All right.

                    MR. CROWLEY:  And then on page 40, that's the --

                    MR. FLASHNER:  Excuse me, just one second.  I want to
be clear.  We're going to keep that in the jury instructions,
we're just going to change the language and make it --

                    THE COURT:  Well, I'm going to tweak it.  Let me think
about it.  I had forgotten it was stipulated.  Let me think
about how to word that.  One of the things that I like to do is
to try to put the language in parallel using the same terms, so
if there's four elements and he's stipulated to two of them, I
think it's easier to say he stipulated to element 1, he
stipulated to element 2, he disputes elements 3 and 4, but let
me think about that.

                    MR. CROWLEY:  And then our last comment is on page 40,
which is the instruction on the prior convictions.

                    THE COURT:  Yeah.

                    MR. CROWLEY:  We were proposing for the last sentence
of the first paragraph that you've also heard that the
defendant stipulated that he was convicted of certain crimes in
2017 and 2020 because there's -- he stipulated that notes
evidence.

                    THE COURT:  All right.  And that's the stipulation
while preserving the objection, right?

                    MR. FLASHNER:  Yes.

                    THE COURT:  Okay.  Let me think about how that should

1    be worded as well.

2         MR. CROWLEY:  And then we wanted to perhaps clarify,

3    it's a difficult process because there's the stipulation to the

4    underlying conviction and then the two 404(b)s.  So what we're

5    looking for is perhaps on the second, the last paragraph, the

6    third paragraph to clarify as to the stipulations involving the

7    defendant's convictions in 2017 and 2020.  You may not use the

8    evidence to infer that the defendant --

9         THE COURT:  Isn't it true, it's a little

08:35AM 10   complicated -- it's the same, isn't it, the 2017 and the 2020

11   are the prior convictions?

12        MR. CROWLEY:  Yes, they would be.

13        THE COURT:  So it's complicated, but it's really,

14   whatever those convictions are, they can't use it to infer that

15   he has a bad character or propensity.

16        MR. CROWLEY:  Correct.

17        THE COURT:  And I'm also going to give a limiting and

18   cautionary instruction when this comes in, so that's why I

19   framed it the way I did.  I'm not wedded to that, but I feel

08:36AM 20   like I need to get across two different concepts.  He

21   stipulated to prior convictions -- well, maybe the second

22   paragraph is unnecessary.  If he stipulated to the 2017 and

23   2020 convictions, maybe that's the easiest way to deal with it

24   is just say, you know, just give the 404(b) instruction.

25        MR. CROWLEY:  Sure, that would work.

1          THE COURT:  Maybe that's what makes sense here.

2          Mr. Flashner.

3          MR. FLASHNER:  Your Honor, I'm not entirely following

4     you, I have got to confess.

5          THE COURT:  Okay.  So let's -- to illustrate, let's

6     say there's three convictions, a 2013, a 2017 and a 2020.  If

7     that were the case, and he's stipulated that -- as to the 2013

8     prior conviction, to the fact, but disputed 2017 and

9     2020 -- let me back up.

08:37AM 10         I'll make it simpler.  Let's say that the government

11    was relying on a 2013 conviction and the 404(b) evidence was

12    not coming in.  I would give the standard instruction, he

13    stipulated to the fact that it is a prior conviction and you're

14    not to speculate about what that conviction might have been.

15    Done.

16         I don't think that's the situation here.  I think the

17    situation is we have the 2017 and 2020 convictions.  He is --

18    those are the prior predicates that makes possession of a

19    firearm unlawful, if I have the facts right.

08:38AM 20         MR. CROWLEY:  Both could be, yes.  So they could have

21    been charged.

22         THE COURT:  Either/or.

23         MR. CROWLEY:  Yes.

24         THE COURT:  So if it were not for the 404(b), I would

25    give the standard instruction.  He stipulates that he has a

1  prior conviction.  Because it's coming in as 404(b), I don't

2  think I need to give the instruction about speculation because

3  the testimony is coming in.  And it's a little confusing to

4  give the instruction, don't speculate or guess about what crime

5  the defendant may have committed because the jury is going to

6  hear evidence of what that is, and so that kind of clouds and

7  confuses the critical point, which is that in paragraph 3,

8  which is -- you can use it only to consider the defendant's

9  knowledge and intent and not for character or propensity, which

08:38AM 10  is really the point that needs to be made here, so I think I

11  would propose eliminating the second paragraph on page 40 and

12  giving a modified version of the third paragraph, which is the

13  404(b) instruction.

14      MR. CROWLEY:  That makes sense to the government and

15  it's a better solution than ours, quite frankly.

16      THE COURT:  And while we're on the topic,

17  Mr. Flashner, you asked me to give me a instruction that they

18  can consider it only for, you know, whether the defendant's

19  state of mind, or whether he committed the acts by accident or

08:39AM 20  mistake, I'll give it if you want, but it does seem a little

21  confusing.  It's not really your theory of the case, I don't

22  think, accident or mistake.  I think you're saying it's not his

23  gun, not his drugs.  So it's not an accident or mistake, he

24  just says it was Del Rio's.  I think that's basically, as I

25  understand it, the way you're trying the case, It's not his.

1        MR. CROWLEY:  I think that fourth element would come

2    into play in a certain aspect, your Honor, that we view -- one

3    of their potential arguments is that when they use the term

4    "mistake," I think subsumes somewhat of the innocent

5    involvement argument, that he was in the car.

6        THE COURT:  Okay.  All right.  I'll give the

7    instruction.  I'm tossing the idea out there.  I don't want to

8    undercut your theory of the case, I guess, let's put it that

9    way.  If you want the instruction, I'll give it.  You know, you

08:40AM 10    can say in a criminal case, yes, I did the act, but I did it by

11    accident, mistake, or neglect.  I didn't declare my income, but

12    I didn't commit tax evasion because it was a mistake, or you

13    can just say I didn't do it, I wasn't there, you know, it just

14    didn't happen.  You know, there's different ways to defend the

15    case, but your call.  I'll let -- you don't need to make this

16    decision right now.

17        MR. FLASHNER:  Thank you.  I prefer not to.

18        MR. CROWLEY:  Your Honor, we won't be putting the

19    stips in until the end of our fact case before we put in our

08:41AM 20    experts, and that would be two more witnesses.

21        THE COURT:  All right.  And on the 404(b), I'm going

22    to give at that time a limiting cautionary instruction.  So

23    this is going to be -- and it probably will be more fleshed out

24    than the instruction on the third paragraph of page 40, but

25    anyway.  I'm going to give the instruction twice, once when the

1    evidence comes in and then once in the jury instruction.

2           MR. FLASHNER:  Your Honor, the stipulations have come

3    in.  They were read in the beginning.

4           THE COURT:  Yes.

5           MR. FLASHNER:  There was no instruction given at that

6    time, I didn't request --

7           MR. CROWLEY:  They actually -- they haven't come in

8    yet.

9           MR. FLASHNER:  Did you read them in the beginning?

08:41AM 10           MS. HOEFLE:  No.

11           Your Honor, I read three stipulations.  Those were to

12    the photographs, the maps, and to the videos, and then

13    subsequently we read the stipulation as to the fentanyl in the

14    bucket, Exhibit 12.

15           THE COURT:  Okay.  But not as to the prior conviction?

16           MS. HOEFLE:  Not as to the 2017 and 2020.  We got

17    those signed later.

18           THE COURT:  Okay.  All right.  We don't need to

19    resolve this finally now.  So Mr. Flashner, you have the look

08:42AM 20    of someone who wants to consult with his co-counsel.

21           MR. FLASHNER:  I do.  That's it, your Honor.  We do

22    have two additional stipulations to read to the jury.

23           THE COURT:  Okay.  Anything else?  And I'll continue

24    to work on this, try to clarify it, make sure I have it right.

25           Anything else, Mr. Crowley?

1          MR. CROWLEY:  Not for the government, your Honor.

2          THE COURT:  All right.

3          MR. FLASHNER:  Your Honor, I consulted with my client,

4     just to clarify, I think the defense is that the government

5     hasn't met its burden, and that is --

6          THE COURT:  Well, yes.  That's another way of framing

7     it, and there are different ways, obviously.  You can approach

8     that, you know, you can -- well, I'm not going to tell you how

9     to do your job, but, yes, of course.  That's the core of the

08:43AM 10    defense.  I just, I want to make sure that I am not underlying

11    in the way that you are defending the case, but you've asked

12    for the instruction, I'll give it.  I'm just pointing it out,

13    as I think it seems to me like a tiny bit confusing, but I

14    don't want to undermine what you -- you know, if you want it,

15    I'll give it to you.

16         MR. FLASHNER:  Thank you.  And if I can just have a

17    moment to speak to Mr. Perez.  Just one more moment.

18         THE COURT:  Again, you do not need to decide this

19    issue now.

08:45AM 20    MR. FLASHNER:  Your Honor, I'm just going to clarify

21    on the record that it is our defense that the government has

22    not met its burden.

23         THE COURT:  Yes.

24         MR. FLASHNER:  Not that any other individual may have

25    possessed it.  That's our --

1          THE COURT:  Fair enough.  It occurs to me, sitting

2     here and thinking about the instruction on page 40, I think I

3     need to make two points here.  In terms of what the jury can do

4     with these prior convictions, they can, of course, consider it

5     as to the element of a prior conviction for Count Two, that's

6     stipulated to, and then there's the 404(b) limitation

7     instructions.

8          So I need to get both of those concepts across here.

9     If I say the jury can only consider it for the limited purposes

08:45AM 10     of ascertaining his intent, that suggests that they can't

11     consider it as to whether the element of a prior conviction is

12     satisfied, so I need to tweak that, but let me think about

13     that, and I'll propose some language.

14          All right.  To be continued and we will -- unless

15     there's anything else, we will convene once we have everyone.

16          MR. FLASHNER:  Your Honor, we have two additional

17     stipulations.  I think Mr. Daley has them.  They're just -- one

18     is a stipulation regarding the photographs that we discussed I

19     think yesterday at the start of the officer's testimony.  The

08:46AM 20     second one just involves the fire department video that we've

21     played for the jury that we've already offered into evidence,

22     just clarifying that it's in a different format.  It's the

23     original format.

24          THE COURT:  Okay.  We can start today by cleaning up,

25     as a housekeeping matter, those -- you know, put those

1    stipulations in, so that -- even though it's in the middle of

2    the government's case, if there's no issue with that.

3           MR. CROWLEY:  And that's fine with us.

4           MR. FLASHNER:  Either way, 16.8 and 16.9.

5           THE COURT:  Okay.  Why don't we do that just to -- it

6    seems odd, otherwise, after the government rests to have that

7    be your evidence, but, again, I'll leave it up to you.

8           MR. FLASHNER:  May I be permitted to read them?

9           THE COURT:  Yes.

08:47AM 10          MR. FLASHNER:  Thank you.

11           THE COURT:  And I'll just call it cleaning up as a

12    housekeeping matter for evidentiary purposes.  Okay.

13           MR. FLASHNER:  We will endeavor to use numbers that do

14    not all have ones in them, 1-0, 1.0 next time we're in front of

15    you, your Honor.

16           THE COURT:  It's good to try to keep all that

17    straight.  Okay.

18           THE CLERK:  All rise.

19           (A recess was taken.)

08:54AM 20          THE CLERK:  All rise for the jury.

21           (JURORS ENTERED THE COURTROOM.)

22           THE COURT:  Good morning, ladies and gentlemen.  I'm

23    pleased to see that we're a few minutes early thanks to your

24    cooperation.  A few things before we get started with the

25    witnesses today.  As you may have heard, the juror in seat 11,

1    Katherine Brooks, texted this morning with a medical emergency.

2    I've discharged her.  I don't have any further word, whether

3    she's all right or not, which obviously I hope she is, but

4    that's why we impanel alternates even in cases that are

5    relatively short.  Things happen.  So I hope the rest of you

6    feel healthy or 12 of you, anyway, and we'll continue and wish

7    her the best.

8         Then I think we had a sort of a housekeeping issue

9    with an evidentiary stipulation.  We're going to go out of turn

08:58AM 10   a little bit, and I think Mr. Flashner is going to read a

11   couple of stipulations just to clean up the record about some

12   photographs and video evidence.

13        Mr. Flashner.

14        MR. FLASHNER:  Thank you, your Honor.  Good morning.

15   Two stipulations that I'd be reading in.  One is -- will be

16   marked and I'd ask to have it marked and admitted as

17   Exhibit 16.8.  Would it be possible for the jurors to see it as

18   I'm reading it?

19        THE COURT:  Yes, 16.8.

08:59AM 20   MR. FLASHNER:  Thank you.  This is a stipulation

21   concerning video recording from Lexington Fire Department

22   Headquarters.  "The defendant, Jose Perez, Jr., and the

23   United States of America by undersigned counsel hereby

24   stipulate and agree to the following:

25        "Exhibit 103, which was previously admitted into

1    evidence is the video surveillance footage obtained from the

2    Lexington Fire Department Headquarters located at

3    45 Bedford Street.  Exhibit 103 is in the format it was

4    originally produced in by the Lexington Fire Department.  This

5    exhibit contains video surveillance footage from multiple

6    cameras at the Lexington Fire Department."

7            "Exhibit 103 has not been altered from its original

8    form in any way.  The video stops recording at 10:43.40, after

9    which additional footage is unable to be viewed.  The content

09:00AM 10   depicted in this exhibit is a true and accurate representation

11   of the events in question.  The parties further agree that this

12   stipulation shall be admitted into evidence without any further

13   foundation."  And it is signed by counsel.

14           THE COURT:  And that's admitted, 16.8.

15           MR. FLASHNER:  Thank you, your Honor.

16           (Exhibit No. 16.8 received into evidence.)

17           MR. FLASHNER:  And I'd offer Exhibit 16.9, as well.

18           THE COURT:  All right.  That's also admitted.

19           (Exhibit No. 16.9 received into evidence.)

09:00AM 20           MR. FLASHNER:  A stipulation concerning authenticity

21   and admissibility of photographs.

22           "The United States of America and the defendant,

23   Jose Perez, Jr. by undersigned counsel, hereby stipulate and

24   agree to the following:

25           "During the investigation of the incident involving

Mr. Perez that occurred on December 8, 2022 in the area of

Bedford Street in Lexington, Massachusetts, Lexington Police

Department Detective Aiden Evelyn took photographs of the area

and related evidence.

"The parties stipulate that Exhibits 101.1 through

101.22 are true and accurate copies of the photographs taken by

Detective Aiden Evelyn on December 8, 2022.

"The parties further agree that this stipulation shall

be admitted into evidence without any further foundation."

MR. FLASHNER:  I'd offer it at this time.

THE COURT:  All right.  As I said, it's admitted.

MR. FLASHNER:  Thank you.

THE COURT:  All right.

MR. CROWLEY:  Your Honor, the United States calls

Officer Jack Sharer.

JACK SHARER, having been duly sworn by the Clerk,

testified as follows:

<u>DIRECT EXAMINATION</u>

BY MR. CROWLEY:

Q.   Good morning, sir.  Would you please state your name for

the record.

A.   Good morning.  My name is Jack Sharer.

Q.   And how are you presently employed?

A.   I'm employed as a police officer with the MBTA Transit

Police.

|     |     |
| --- | --- |
| 1 | Q. And how long have you been an officer with the MBTA? |
| 2 | A. Since December of 2023, so about six, seven months. |
| 3 | Q. And were you employed in law enforcement before you joined |
| 4 | the MBTA? |
| 5 | A. I was. I was employed in Lexington, Mass. |
| 6 | Q. As? |
| 7 | A. As a police officer. |
| 8 | Q. And how long were you employed in Lexington? |
| 9 | A. About two and a half years. |
| 09:03AM 10 | Q. And what position did you have in the Lexington Police |
| 11 | Department? |
| 12 | A. I was a patrolman. |
| 13 | Q. And, sir, calling your attention to December 8th, 2022, |
| 14 | the night of December 8th, 2022, were you on duty? |
| 15 | A. I was. |
| 16 | Q. And did you have a specific assignment? |
| 17 | A. I did. |
| 18 | Q. What was that assignment? |
| 19 | A. I was assigned to patrol in the east side of Lexington. |
| 09:03AM 20 | Q. And were you aware whether there were other patrolmen on |
| 21 | duty that evening? |
| 22 | A. There were. |
| 23 | Q. And do you remember who they were? |
| 24 | A. I do. It was Officer Frissore, Officer Morris, |
| 25 | Officer Snell, and the duty supervisor was Sergeant Barry. |

1 Q. And at some point did you become involved in an incident

2 that occurred in the evening around 10:50 on December 8th,

3 2022?

4 A. I did.

5 Q. And how did you become involved?

6 A. I heard it over the radio initially.

7 Q. And what did you hear over the radio?

8 A. I heard Officer Snell call over the radio that there were

9 two vehicles driving at a high rate of speed down Bedford

09:04AM 10 Street toward the east, eastbound.

11 Q. And what steps did you take when you heard that?

12 A. I then began to slowly make my way over to that location

13 from the east side of town.

14 Q. And why did you do that?

15 A. Just to be there in case the other vehicles passed my

16 location, be able to intercept them, make a stop if they passed

17 me.

18 Q. And what occurred as you headed in that direction?

19 A. As I was going towards that location, Officer Morris

09:04AM 20 called out that the vehicles passed him and that he was behind

21 the vehicles --

22    MR. FLASHNER:  Objection.

23    MR. CROWLEY:  It goes to the context and to the

24 actions taken by the witness as an officer that evening.

25    THE COURT:  Yes.  So, again, this is, again, an

1    example of hearsay.  I'm not going to let you consider it for
2    the truth, that is, what he's saying actually happened, but
3    he's testifying about what he was told to provide a context for
4    what he did next, and you may consider it for that purpose
5    only.
6    Q.   So after you heard the radio call, again, what did you
7    hear on that radio call?
8    A.   So then after that, very shortly after that, it was called
9    off that the vehicle had crashed at the intersection of Bedford
09:05AM 10   at Worthen right in front of the Lexington Fire Station and
11   then --
12   Q.   And when you heard that, did you take any steps?
13   A.   I did.  I activated my emergency lights and kind of sped
14   up my response to that location.
15   Q.   And where did you end up going?
16   A.   I ended up arriving at the crash scene right in front of
17   the firehouse at Bedford and Worthen.
18   Q.   And did you take any steps that evening pursuant to the
19   crash?
09:05AM 20   A.   I did.
21   Q.   And what did you do?
22   A.   As I arrived, there were no occupants in the vehicle.  I
23   was notified that the occupants of the vehicle had fled.
24           MR. FLASHNER:  Objection.
25           MR. CROWLEY:  It provides context.

1          THE COURT:  The same thing again.  You may consider

2     this not for it's truth but for the fact that this is what the

3     officer was told.

4     A.    So I was notified that they were fleeing towards the

5     Stop & Shop in Lexington, which I then went towards that

6     location.

7     Q.    And did you take any steps when you got in that location?

8     A.    I did.  I identified the two individuals involved, as well

9     as Officer Morris and another detail, Officer -- Retired

09:06AM 10  Officer Savage.

11     Q.    And were you involved in any actions when you got there?

12     A.    I did.  Officer Morris had one of the suspects proned out,

13     and I asked him if he needed assistance.  He told me the other

14     suspect had fled behind Stop & Shop into the treeline towards

15     what would be the Battle Green Apartments on the other side and

16     then -- so I then rerouted my response to that location to

17     attempt to locate the other suspect.

18     Q.    And what did you do once you got there?

19     A.    Once I got there, I located the suspect.  Officer Snell

09:07AM 20  had already had him in custody, and so then I was notified that

21     there had been a firearm that was dropped on scene and that the

22     fire captain had located it, so I --

23          MR. FLASHNER:  Objection.  Move to strike.

24          MR. CROWLEY:  Context for that evening by the officer.

25          THE COURT:  Why don't we back up, because it's --

1    let's strike that last sentence and take it a step at a time.

2    Again, I'll allow him to testify about what he was told, not

3    for the truth of it.

4    Q.    Let's put it this way.  After you received the radio

5    communication, did you take any steps to go to the Lexington

6    Fire Department?

7    A.    I did.

8    Q.    And did you go to the Lexington Fire Department?

9    A.    I did.

09:07AM 10    Q.    And when you got to -- did you arrive at the Lexington

11    Fire Department?

12    A.    I did.

13    Q.    And what steps did you take when you got to the Lexington

14    Fire Department?

15    A.    I located the firearm.

16    Q.    Did you meet with anyone before you located the firearm?

17    A.    I did.  I first met with the fire captain, Captain

18    Chisolm.

19    Q.    And did you -- what did you and Captain Chisolm do after

09:08AM 20    you met?

21    A.    He directed me towards the location of where the firearm

22    was.

23    Q.    And where was the firearm?

24    A.    It was located in the front passenger seat of one of the

25    fire trucks in the station.

1    Q.   And what did you do?

2    A.   I then took the firearm, took possession of it, I cleared

3    the firearm to make it safe.

4    Q.   We'll go into that briefly for a second.  I want to show

5    you something that's been admitted in evidence as Exhibit 10.

6    Sir, could you please look at what's been marked -- what's been

7    admitted as Exhibit 10?

8    A.   Yes, sir.

9    Q.   Do you recognize Exhibit 10?

10   A.   Yes.

11   Q.   And how do you recognize it?

12   A.   I recognize it as the firearm I recovered that night.

13   Q.   How do you recognize that?

14   A.   The make and model that's inscribed in the slide of the

15   firearm and the color of the firearm itself.

16   Q.   And so you stated that you took some steps with the

17   firearm?

18   A.   Correct.

19   Q.   Could you describe briefly to the jury what steps you

20   took.

21   A.   So I assume that every firearm that I handle is loaded, so

22   what I do is I disengage the magazine, I take the magazine out,

23   I then pull the slide back, which will -- if there are any

24   bullets in the firearm that is loaded, it will be ejected and

25   the firearm will be deemed safe at that point.

1    Q.    When you pulled the slide back, what happened?

2    A.    There was a bullet that was ejected from the firearm, the

3    chamber of the firearm.

4    Q.    After -- are those steps done for a certain purpose?

5    A.    Yes, sir.

6    Q.    What's the purpose?

7    A.    Just to create a safe firearm.

8    Q.    And after you made the firearm safe, did you take any

9    other additional steps?

09:10AM 10    A.    I did.

11    Q.    What did you do?

12    A.    I brought the firearm back to my cruiser, I placed it, the

13    magazine, as well as the loose bullet, in a plastic evidence

14    bag.

15    Q.    And did you go anywhere with the firearm?

16    A.    I did.  With the firearm in my cruiser, I returned to the

17    main area of the scene where all the parties were located.

18    Q.    And when you say the main area, was that around the

19    vehicle, or where was it?

09:10AM 20    A.    It was in front of the Stop & Shop.

21    Q.    And what did you do with the firearm, if you remember?

22    A.    I turned it over to Sergeant Barry, the sergeant on scene.

23    Q.    And did you have any other steps after you provided that

24    firearm that you recovered from the firehouse to Sergeant

25    Barry?

1    A.    In terms of the firearm, sir?

2    Q.    Just in terms of either the firearm or any other

3    investigative steps that night?

4    A.    I did.  I then -- I went into the ambulance where one of

5    the suspects was being evaluated.

6    Q.    And why did you enter the ambulance?

7    A.    Just for safety purposes, safety of the paramedics.

8    Q.    And did you end up having to travel anywhere in that

9    ambulance?

09:11AM 10   A.    No, the suspect refused to be treated at the hospital,

11   transported to the hospital.

12   Q.    And after that point, were you involved with any other

13   actions?

14   A.    I then transported the suspect back to the station where I

15   assisted with the booking process.

16   Q.    And do you remember who that was?

17   A.    I do.

18   Q.    And who was it?

19   A.    It was Jose Perez.

09:11AM 20          MR. CROWLEY:  No further questions, your Honor.

21          THE COURT:  All right.  Cross.

22          MR. FLASHNER:  Thank you, your Honor.

23                         CROSS-EXAMINATION

24   BY MR. FLASHNER:

25   Q.    Good morning, Officer Sharer.

```
     1    A.   Good morning, sir.

     2    Q.   Excuse me.  I apologize.  Thank you.  Sorry about that.

     3    We've never met before, correct?

     4    A.   Correct.

     5    Q.   And we obviously never have spoken before?

     6    A.   That's correct.

     7    Q.   You testified on your direct examination about recovering

     8    a firearm from the fire station, correct?

     9    A.   Yes.

09:12AM 10    Q.   Okay.  You testified about doing other things with that

    11    firearm, you testified about giving it to a Sergeant Mike

    12    Barry, correct?

    13    A.   Yes, sir.

    14    Q.   Okay.  How long was your report about this?

    15    A.   I did not write a report on this, sir.

    16    Q.   You didn't write a report at all?

    17    A.   No, sir.

    18    Q.   You're the one who recovered the firearm, correct?

    19    A.   Yes, sir.

09:12AM 20    Q.   You're the one who got it from the fire station, correct?

    21    A.   Correct.

    22    Q.   Okay.  When you finished your duty shift that night, you

    23    could have sat down at the computer and wrote a report,

    24    correct?

    25    A.   I could have.
```

1    Q.   You agree with me that in a case charging someone with

2    possession of a firearm that someone who takes possession of a

3    firearm is an important witness in that, correct?

4            MR. CROWLEY:  Objection, your Honor.

5            THE COURT:  Sustained.

6    Q.   It's fair to say when you finished your shift that night,

7    there was nothing preventing you from writing a report,

8    correct?

9    A.   Nothing preventing me, correct.

09:13AM 10   Q.   If you could just keep your voice up a little bit.  I'm

11   sorry.

12   A.   Correct.  You're correct.

13   Q.   And since that time, you've never written a report about

14   this incident, correct?

15   A.   No, sir.  Correct.

16   Q.   Now, in terms of how long you were at the scene, you were

17   at the scene after you left the firearm and Mr. Perez is there,

18   correct?

19   A.   I'm sorry.  Could you just repeat that?

09:14AM 20   Q.   After you recovered the firearm from the fire station, you

21   go back to the Stop & Shop parking lot, correct?

22   A.   Yes.

23   Q.   And Mr. Perez, my client, is there?

24   A.   Yes.

25   Q.   How long was that, do you know?

1   A.   I can't say for sure.

2   Q.   Okay.  And if you had written a report, that might have

3   been a detail that you would include in the report, correct?

4   A.   Possibly, yeah.

5          MR. FLASHNER:  Can we -- it's previously been

6   admitted, Exhibit Number 9, I'm going to ask that we display

7   that for the members of the jury.  If you could -- right there

8   is perfect, if you could just -- before you start playing it.

9          I'm now displaying for the record what's been

09:14AM 10   previously marked and admitted into evidence as Exhibit 9.

11   Q.   And Officer Sharer, is this a view from Stop & Shop

12   looking back out towards Bedford Street?

13   A.   It appears so.

14   Q.   And although you're not there now, is this the area that

15   you responded to after the firearm was recovered from the fire

16   station?

17   A.   I believe so.

18          MR. FLASHNER:  So if you can just play the video,

19   Exhibit 9.

20          (Video played)

21          MR. FLASHNER:  Pause it right there.

22   Q.   And you'd agree with me, we started playing it a couple of

23   seconds before, but now the video says 51 seconds, correct?

24   A.   Yes, sir.

25   Q.   All right.  And there appears to be a man or an individual

        1    in black that's running across the parking lot?

        2    A.    Correct.

        3    Q.    And if you look towards the center upper left, there's an

        4    individual in red as well?

        5    A.    Yes.

        6    Q.    Have you ever seen this before?

        7    A.    The video?

        8    Q.    Yes.

        9    A.    I have not.

09:15AM 10    Q.    You have not?

       11    A.    No.

       12    Q.    Okay.

       13          MR. FLASHNER:  You can keep playing it, please.

       14          MR. CROWLEY:  Objection, your Honor.

       15          THE COURT:  I'll let him ask questions about it.

       16          MR. FLASHNER:  Your Honor, I can speed this up.

       17          THE COURT:  I'll let you keep going.  There's no

       18    foundation that he was there at this moment, but I'll let you

       19    keep going.

09:16AM 20          MR. FLASHNER:  So, Ms. Hutchinson, if you could be

       21    kind enough to move this video forward and slowly drag it

       22    forward so that the screen images continue to change.  And if

       23    you could stop when you get to just before 10 minutes.

       24          (Video played.)

       25    Q.    Stop right there.  You'd agree that there's an ambulance

1  that appears on the scene?

2  A.   Yes.

3  Q.   Okay.  And looking at this, is this the location of the

4  ambulance that Mr. Perez was treated in that night?

5  A.   Yes.

6  Q.   Okay.  And you were aware that Mr. Perez had been involved

7  in a fairly serious auto accident that night, correct?

8  A.   Yes.

9  Q.   Okay.

09:17AM 10        MR. FLASHNER:  If you can move it forward to 14:24.

11  It's good enough.

12        (Video played.)

13  Q.   The individual that just is now being moved into the

14  ambulance.  Do you recognize that person?

15  A.   I do.

16  Q.   Who is it?

17  A.   That's Mr. Perez.

18  Q.   And do you see yourself as any of these officers that are

19  depicted in the screen, if you're able to tell?

09:17AM 20  A.   I believe so.

21  Q.   Which one are you?

22  A.   I believe I'm the one standing behind to the right of the

23  ambulance.

24  Q.   Next to the officer that has the yellow vest on?

25  A.   I believe that's a fire chief or a fire lieutenant, but

1    yes.  I believe that's a member of the fire department, but,

2    yes.

3    Q.   Okay.  It's a member of the fire department, okay.

4         MR. FLASHNER:  Can you just continue to move this

5    forward until 21:30.  If you can just --

6         (Video played.)

7    Q.   Do you recognize yourself at 21:30?  We're going to let it

8    play forward now and then I'm going to just pause it in about

9    10 seconds and ask you if you recognize the individuals in the

09:18AM 10    -- displayed on the video screen.

11        MR. FLASHNER:  Just pause it right there.  For the

12   record, that's 21:38.

13   Q.   Do you recognize those three individuals that are now

14   behind the ambulance?

15   A.   I do.

16   Q.   Who is it?

17   A.   Mr. Perez in front, myself directly behind him, and

18   Sergeant Barry behind the two of us.

19   Q.   Can you continue to let it play.  And Mr. Perez is --

09:19AM 20   just pause it there for a moment.  Mr. Perez isn't struggling

21   with you there, is he?

22   A.   No, he's not.

23   Q.   Okay.  He's compliant?

24   A.   Correct.

25   Q.   Okay.  Pause it right there.  So that gentleman on the

1   outside is Sergeant Michael Barry?

2   A.   Yes, sir.

3   Q.   Continue to let it play.  If you can fast forward it just

4   to keep things moving to 23:10 or so.  And if you can pause it

5   right there.  And fair to say that Mr. Perez has now been

6   placed inside that vehicle in the foreground that has a 412 on

7   the back?

8   A.   Yes.

9   Q.   Can you let it continue to play now.  That's you driving

09:21AM 10   the vehicle away?

11   A.   Yes, sir.

12   Q.   It hasn't left yet, but, yes.  You can stop it right

13   there, just one more second.  Thank you.

14        So you would agree with me, sir, that you're departing

15   the scene -- strike that.

16        When we first started watching this video, it was

17   about 45 seconds in, and you could see Mr. Perez and

18   Mr. Del Rio running across the parking lot, correct?

19   A.   Yes.

09:22AM 20   Q.   And you weren't there at that time, correct?

21   A.   Correct.

22   Q.   But you were able to hear, as Mr. Crowley brought out, you

23   were able to hear radio transmissions?

24   A.   Correct.

25   Q.   And by the time you get to the scene, Mr. Perez is in

1   custody, correct?

2   A.   Not in custody yet, but...

3   Q.   Okay.  And you don't leave the scene with Mr. Perez for --

4   well, on this video, you leave the scene approximately

5   23 minutes and 15 seconds later from when he's running across,

6   correct?

7   A.   Yes, sir.

8   Q.   Now, if we can take down this video now, please.  Thank

9   you.  You never had assistant -- Assistant Fire Chief Chisolm

09:22AM 10   is obviously not a police officer, correct, he's a fireman?

11   A.   Yes, sir.  That's correct.

12   Q.   And you never had him walk back out to the scene with you

13   and indicate the exact location where he recovered that

14   firearm, did you?

15   A.   No.

16   Q.   You never had him walk back out to the scene and take a

17   crime scene marker -- you're familiar with crime scene markers,

18   correct?

19   A.   Yes.

09:23AM 20   Q.   You never had him go out and place one exactly where he

21   recovered the firearm?

22   A.   No, I did not.

23   Q.   Assistant Chief Chisolm was there, he's a fireman,

24   correct?

25   A.   Yes, sir.

1    Q.    He's cooperative with you?

2    A.    Yes, sir.

3    Q.    He didn't tell you he had to do other things, he was there

4    to assist you?

5    A.    Correct.

6    Q.    But you never did either of those things.  You never

7    walked him back out to the scene, correct?

8    A.    No, I did not.

9    Q.    And you never placed a marker where the firearm was

09:23AM 10    recovered?

11    A.    I did not.

12    Q.    What you do with the firearm is -- actually one more

13    question about that.  You never had Assistant Chief Chisolm

14    draw a diagram indicating where the firearm was recovered, a

15    little sketch, just a little thing?

16    A.    No, I did not.

17    Q.    And I understand that you're a patrolman?

18    A.    Correct.

19    Q.    I don't mean that in any sort of degrading way.  I just

09:24AM 20    understand you're not a sergeant, you're not a detective.  As a

21    patrolman, you never submitted the firearm for fingerprints,

22    correct?

23    A.    Correct.

24    Q.    Okay.  And you never submitted the firearm for DNA,

25    correct?

1  A.   Correct.

2  Q.   And at no point did you ever see Mr. Perez with a firearm

3  that night, correct?

4  A.   I did not.

5  Q.   At no point did you ever see Mr. Perez with narcotics or

6  plastic bags that look like they could have drugs in them,

7  correct?

8  A.   I did not.

9  Q.   Now, once you handed this firearm to Sergeant Barry, how

09:24AM 10  did you hand it to him?  Let's start with that.  What was it

11  contained in?

12  A.   It was contained in a plastic department issued -- what we

13  call an evidence bag.  It's just a plastic bag.

14  Q.   An evidence bag?

15  A.   Yes, sir.

16  Q.   And you put it in the evidence because you're trying to

17  preserve it?

18  A.   Yes, and also it's ease of carry and everything with that.

19  Q.   I'm sorry.  You just have to move the microphone closer to

09:25AM 20  you.

21  A.   Part of that preserve the evidence, as well as, you know,

22  bundle everything together so it's not three separate loose

23  items.

24  Q.   Okay.  What was that last?  I couldn't hear what you said.

25  A.   Just so everything is contained in one space, and it's not

         1    three looses items; the gun, the magazine, as well as the loose

         2    bullet.

         3    Q.   And once you hand this to -- is it Sergeant Detective

         4    Barry or Sergeant Barry?

         5    A.   It's just Sergeant Barry.

         6    Q.   Okay.  And can you explain for the members of the jury in

         7    the Lexington Police Department how that works?  Is it fair to

         8    say that detectives are in charge with investigating or longer

         9    term investigations at the Lexington Police Department?

09:25AM 10    A.   Yes, that's correct.

        11    Q.   They do the follow-up?

        12    A.   Correct.

        13    Q.   All right.  And the sergeant on a night shift would be the

        14    supervisor of the officers that are on patrol that night,

        15    correct?

        16    A.   Yes, sir.

        17    Q.   Okay.  He's your boss that night, for lack of a better

        18    term?

        19    A.   Yes, sir.

09:26AM 20    Q.   Chain of command, right?

        21    A.   Yes, sir.

        22    Q.   You give it to Sergeant Barry.  Do you see what he does

        23    with it?

        24    A.   I do not.

        25    Q.   Okay.  Do you ever see that firearm again besides today?

          1    A.    Yeah.  I saw it back at the station.

          2    Q.    And when you see that firearm, is it always in that

          3    evidence bag that you've now secured it in?

          4    A.    It was then transferred into a firearm container.

          5    Q.    Did you keep the -- once it's transferred, do you keep

          6    the -- can you describe for the members of the jury what a

          7    magazine is?

          8    A.    The magazine is this --

          9    Q.    Actually, if you could just show them.  Yeah.

09:26AM  10    A.    This is a magazine.  It's what contains the bullets.

         11          MR. FLASHNER:  May I approach, your Honor?

         12          THE COURT:  Yes.

         13          MR. FLASHNER:  I'll put it on the monitor and let you

         14    describe it.

         15          May I publish that to the jury, your Honor,

         16    Exhibit 10?

         17          THE COURT:  Yes.

         18    Q.    Is the magazine this section right here?

         19    A.    Yes, it is.

09:27AM  20    Q.    Okay.  And it looks like it's a separate, but to be clear,

         21    it's not actually a separate item, correct?

         22    A.    Yes.

         23    Q.    Okay.  Did you make any efforts to separate that magazine

         24    from the firearm?

         25    A.    At the scene, I did.  Yes.

1    Q.   Okay.  And once it gets back to the station, though, do

2    you make any efforts to separately bag those items?

3    A.   I do not partake in that process.

4    Q.   Was there ammunition recovered as well?

5    A.   From the scene?

6    Q.   Yes.

7    A.   Yes.

8    Q.   Did you make any efforts to separately bag those items?

9    A.   I did not participate in that process.

09:27AM 10   Q.   And when I use the term "bag," it's not a particularly

11   precise term.  I mean place in a separate evidence container?

12   A.   Yes.  I did not make that transfer.

13   Q.   Okay.  So from the time you hand that -- this firearm,

14   Exhibit 10, to Sergeant Barry, until the time you get back to

15   the station, you don't know what happens to that firearm?

16   A.   I do not.

17   Q.   And you have no idea what happens to it after it's at the

18   station for processing?

19   A.   Correct.

09:28AM 20   Q.   So who is in charge of the scene that night?

21   A.   The entire scene?

22   Q.   Yes.

23   A.   It would be Sergeant Barry, the patrol supervisor.

24   Q.   Sergeant Barry?

25   A.   Yes.

1    Q.   Okay.  And if a detective responded, Detective Evelyn,

2    would he be in charge for the follow-up part of the

3    investigation after the scene?

4    A.   Yes.

5    Q.   Okay.  And are you aware that Detective Aiden Evelyn

6    responded to the scene?

7    A.   He did.

8    Q.   So based on your training and experience and your time

9    with the Lexington Police Department, is it fair to say that

09:28AM 10   Detective Evelyn would have been responsible for any follow-up

11   investigation that night?

12   A.   Yes.

13   Q.   Now, at no time that night did you ever hear a radio

14   broadcast from Officer Morris that he had observed a firearm,

15   correct?

16   A.   I don't recall that, no.

17   Q.   You don't recall?

18   A.   I don't recall.

19   Q.   You don't have a memory either way?

09:29AM 20   A.   I don't know.  No, sir.

21   Q.   During your time with the Lexington Police Department, how

22   many radio broadcasts -- how many years were you there?

23   A.   About two and a half.

24   Q.   Two and a half.  During your time at the Lexington Police

25   Department, how many radio broadcasts did you have, or if you

1   can recall, with a gun?

2   A.   Three, four, maybe three or four.

3   Q.   Pretty unusual?

4   A.   Correct.

5   Q.   Okay.  Would you agree with me that if there was a

6   broadcast of a gun that night, that's a fact that would stick

7   out in your mind?

8   A.   Given the circumstances.

9   Q.   Fair to say?

09:30AM 10   A.   Fair.

11   Q.   Now, you're aware that the -- you're aware where the

12   Lexington Fire Department is, obviously?

13   A.   Yes.

14   Q.   All right.  And you're aware -- or are you aware that the

15   Lexington Fire Department has surveillance cameras?

16   A.   I am aware.

17   Q.   Okay.  And are you aware that there was surveillance video

18   that captures part of this incident?

19   A.   I am, yeah.

09:30AM 20   Q.   All right.  Are you aware that that surveillance video

21   just stops at some point?

22   A.   I'm not aware of that.

23   Q.   Okay.  You're not aware.  So you're not aware that the

24   video doesn't show you walking into the fire station?

25              MR. CROWLEY:  Objection.

                    1       THE COURT:  He said he's not aware that it stops.

                    2   Q.   Now, if we can display the firehouse video, which is

                    3   Exhibit 103, which has previously been admitted into evidence.

                    4   I'm going to play this in just a moment, but I just want to set

                    5   the stage for a moment, sir.  You hear about these -- you hear

                    6   a radio broadcast about cars racing, correct?

                    7   A.   Yes, sir.

                    8   Q.   You proceed to the scene, and at some point you speed up

                    9   your pace getting to the scene, correct?

09:31AM  10   A.   Yes.

                  11   Q.   And that was in response to you believe that there may

                  12   have been a motor vehicle crash?

                  13   A.   Yes.

                  14   Q.   Okay.  You didn't testify that it was in response to

                  15   hearing about a firearm, correct?

                  16   A.   No, the response was for the crash.

                  17       MR. FLASHNER:  Now, your Honor, with the Court's

                  18   permission, we'll just play this for a few moments.

                  19       THE COURT:  Yes.

09:32AM  20       MR. FLASHNER:  This video.  And I've started at

                  21   10:42:14.

                  22       (Video played.)

                  23       MR. FLASHNER:  Actually, can you pause it.

                  24   Q.   Officer, I'm sorry, in fairness to you, are you able to --

                  25   you've seen this video a lot, but are you able to tell what's

1   depicted here?

2         MR. CROWLEY:  Objection to the form of the question.

3   Q.   Are you -

4         MR. CROWLEY:  Objection, your Honor.

5         THE COURT:  Sustained.

6   Q.   To the left-hand side of the screen, you see a Gulf gas

7   station, correct?

8   A.   Yes.

9   Q.   And if we're looking straight ahead, that would be the

09:32AM 10  Stop & Shop parking lot; is that correct?

11  A.   Yes.

12  Q.   Okay.  So behind the camera would be the firehouse?

13  A.   Yes.

14  Q.   Okay.  And that would be Bedford Street, correct?

15  A.   Correct.

16  Q.   Okay.  And across the street where there's a

17  green -- there's a building that appears to have a glass front

18  and a green object inside it, that would be the M&T Bank,

19  correct?

09:33AM 20  A.   Correct.

21  Q.   And there appears to be a motor vehicle with brake lights

22  on and a door open, correct?

23  A.   Yes.

24  Q.   That vehicle appears to be off the road?

25  A.   Yes.

1          MR. FLASHNER:  Can you please play it through now.

2          (Video played.)

3     Q.  Pause it right there.  Officer, is that your vehicle

4     that's heading that way?

5     A.  No.

6     Q.  Okay.  Can you keep on playing it.  Pause it right there.

7     Do you know whose vehicle that is that drives past the open

8     driver's side door of the SUV?

9     A.  I can't say for sure.  It appears to be the 416 cruiser of

09:34AM 10     Sergeant Barry.

11    Q.  Okay.  Which direction would you have been coming from?

12    A.  I would have been coming from the opposite direction, from

13    the left towards --

14    Q.  The gas station side?

15    A.  Yes.

16    Q.  Can you continue to let it play.  Pause it right there.

17    Is that your vehicle that's coming down the street?

18    A.  I can't tell from the video quality.

19    Q.  Okay.  Would you agree that this video depicts that

09:35AM 20    vehicle driving in the travel lane going the opposite direction

21    of the police car that is stopped?

22    A.  Yes.

23    Q.  Let it play, please.  Pause it right there.  Do you agree

24    with me that that vehicle that drove past didn't appear to

25    swerve in any way, it just kind of continued down the road?

         1    A.    It continued down the road.

         2    Q.    Okay.  And now there's another police car coming up from

         3    the opposite direction.  Do you see that, sir?

         4         MR. CROWLEY:  Objection to the form of the question.

         5         THE COURT:  I'm sorry.

         6         MR. CROWLEY:  Objection, assuming facts not in

         7    evidence.

         8         THE COURT:  I'll allow it.

         9    Q.    Is that your vehicle, if you're able to tell, if you let

09:35AM 10    it play?

        11    A.    I cannot tell from this frame.

        12    Q.    We can let it play if that helps.  If you can pause it

        13    right there.  Are you able to tell if that's you?

        14    A.    I believe so.

        15    Q.    Okay.  And if you could just back it up a little bit when

        16    the vehicle stops.  Okay.  If you can back it up a little bit

        17    further.  We're going to play it through again for you,

        18    Officer, but fair to say your vehicle appears to pause or -- I

        19    don't want to say stop, but pause momentarily?

09:36AM 20    A.    Yes.

        21    Q.    And then continue to proceed down the road.  Play that one

        22    more time.  The vehicle pauses and then it keeps going,

        23    correct?

        24    A.    Correct.

        25         MR. FLASHNER:  Just a moment, your Honor.  Your Honor,

1    I don't have any further questions.

2          Thank you very much, Officer.

3          THE COURT:  Redirect.

4                    REDIRECT EXAMINATION

5    BY MR. CROWLEY:

6    Q.   Briefly, counsel asked you about the magazine from the

7    handgun?

8    A.   Yes.

9    Q.   Do you remember those questions?  You removed that,

09:37AM 10    correct?

11    A.   I did.

12    Q.   But was -- did you take another step?

13    A.   After removing the magazine?

14    Q.   Yes.

15    A.   I did.

16    Q.   What was that?

17    A.   Clearing the pistol.

18    Q.   And -- do you have an objection?

19          MR. FLASHNER:  I'm just having trouble hearing the

09:37AM 20    witness.  If you could just keep the mic on you.

21          THE COURT:  You're leaning back there, Officer.  If

22    you could just lean forward.

23          THE WITNESS:  Oh.  I'm sorry.

24    Q.   When you say you cleared the weapon, where was that round?

25    A.   Inside the chamber of the firearm.

1   Q.   And what would that, the location of that round, mean to

2   you?

3   A.   That if the trigger was pressed that the bullet would have

4   fired out of the firearm.

5        MR. CROWLEY:  No further questions, your Honor.

6        THE COURT:  Any recross?

7                    RECROSS-EXAMINATION

8   BY MR. FLASHNER:

9   Q.   Is there a safety on that firearm?

09:38AM 10  A.   On a Glock 42?  No.

11       THE COURT:  Is that it, Counselor?

12       MR. FLASHNER:  That is it, your Honor.

13       THE COURT:  Okay, thank you.  You may step down.

14       THE WITNESS:  Thank you, your Honor.

15       MR. FLASHNER:  Thank you.

16       MR. CROWLEY:  Aiden Evelyn, your Honor.

17       Your Honor, I apologize, the witness had to go to the

18   restroom.

19       THE COURT:  Sure.  Why don't you stand up and stretch

09:40AM 20  if you want, and we'll try to find him.

21       THE WITNESS:  Good morning, your Honor.

22       AIDEN FREDERICK EVELYN, having been duly sworn by the

23   Clerk, testified as follows:

24                    DIRECT EXAMINATION

25   BY MR. CROWLEY:

1    Q.   Sir, would you please state your name for the record.

2    A.   Aiden Frederick Evelyn.

3    Q.   And, sir, how are you presently employed?

4    A.   I'm employed full time with the Town of Lexington.

5    Q.   And are you employed with the Lexington Police Department?

6    A.   I am.

7    Q.   And how long have you been with the Lexington Police

8    Department?

9    A.   I'm in my 29th year.

09:41AM 10    Q.   And what is your present position, sir?

11    A.   I'm a detective, major crimes.

12    Q.   And how long have you been a detective with the major

13    crimes?

14    A.   Approximately two and a half years.

15    Q.   And prior to that, what was your position?

16    A.   I was still a detective, but I was the community resource

17    officer.

18    Q.   Okay.  And prior to that, what role did you have in the

19    Lexington Police Department?

09:41AM 20    A.   I was on patrol for approximately 18 years.

21    Q.   And how long were you a community resource officer, I

22    believe?

23    A.   Yes, about eight years or so.

24    Q.   Now, sir, as a detective, what are your duties?

25    A.   For major crimes, we respond to stolen vehicles, house

1    breaks, sudden deaths, things of that nature, any serious

2    crime.

3    Q.   And what role do you play when you respond in that

4    fashion?

5    A.   Investigation and investigatory.

6    Q.   And can you give a description that's kind of some of the

7    general duties you would have in investigating?

8    A.   For instance, if it was a house break, I would obviously

9    photograph the scene, process the scene, which would possibly

09:42AM 10   be dusting for fingerprints, collecting evidence, if necessary.

11   Q.   Now, calling your attention to December 8th, 2022, were

12   you on duty that day?

13   A.   I was.

14   Q.   Were you on duty that night?

15   A.   Correct, yes.

16   Q.   And at approximately 10:45, or around a little before

17   11:00, did you become aware of an incident that was occurring?

18   A.   I did.

19   Q.   And how did you become aware?

09:43AM 20   A.   Excuse me.  I was in my office with my -- you know, I

21   always have my radio on, obviously.  And I heard a call from

22   Officer Snell that he was either there were two cars racing on

23   Bedford Street heading into Lexington.

24   Q.   And did you hear any other radio calls that you acted on

25   that night?

1    A.    Yes, quickly after that, I heard Officer Morris say that

2    they passed him, I believe.

3            MR. FLASHNER:  Objection.

4            THE COURT:  Again, I'll permit it not for the truth of

5    the matter asserted, but for the fact that the witness heard

6    it.  Go ahead.

7    Q.    You can answer.

8    A.    All right.  Officer Morris said that he was behind the

9    vehicles and they were doing about 75 miles an hour or so, and

09:43AM 10    then quickly after that, I heard Officer Morris say the

11    vehicles crashed.

12    Q.    And once you heard that, did you take any steps?

13    A.    I started -- I was starting to put my things away to go

14    home, but I stopped.  I put my things back on, my firearms and

15    stuff like that, and then because Officer Morris said there

16    were two suspects fleeing, so at that point I went -- I left

17    the station and headed towards the scene of Bedford and

18    Worthen, the intersection where he said the vehicles had

19    crashed.

09:44AM 20    Q.    And so you were in the office, you headed to that

21    location?

22    A.    Yes.

23    Q.    And what did you drive?

24    A.    I'm sorry.

25    Q.    What were you driving?

1    A.    My cruiser, unmarked cruiser.

2    Q.    And did you get to the location?

3    A.    I did.

4    Q.    And when you arrived, what did you do?

5    A.    I saw there was a red Prius in the middle of Bedford and

6    Worthen.  It was obviously -- it was in a traffic accident.  I

7    saw the black vehicle farther up.  I then took a right onto

8    Worthen Road because there was still some question as to how

9    many suspects were out there, if there were two or three.

09:45AM 10          As I headed down Worthen Road, I saw two vehicles -- I

11    mean, two cruisers kind of parked in the Battle Green Apartment

12    area.  They had their lights on, so I turned down there, and I

13    can't remember who the officers were that I spoke to, but I

14    confirmed either if all the suspects were in custody or not,

15    and they said yes, everybody was in custody that they were

16    looking for.

17    Q.    And when you learned that suspects were in custody, did

18    you take any other steps that evening?

19    A.    I then turned around, went back up towards the crash sight

09:45AM 20    of Bedford and Worthen, and I think Officer Morris was there at

21    that point, and I told him, I said I'll help him take

22    photographs, so I returned to the station to get my camera, and

23    I told him I'd come back and assist him with that.

24    Q.    When you told him you'd assist with that, what did you

25    mean by that?

1  A.  Just take photographs of the scene for him.

2  Q.  Okay.  And you said -- so did you go and obtain that

3  camera?

4  A.  I did.

5  Q.  And after you got the camera, what did you do?

6  A.  I also returned to the scene, and then there was -- I

7  don't remember if there was some discussion.  I didn't start

8  taking photographs right away, but -- and then after a period

9  of time, I did start photographing the whole scene from the

09:46AM 10  intersection to where the black Explorer was located, in that

11  area.

12  Q.  And did you take a series of photos?

13  A.  I did.

14  Q.  And when you say of the scene, what was your goal that

15  night in taking photos?

16  A.  Just to document the scene basically.

17  Q.  And so did you take photos of the red Prius?

18  A.  I did.

19  Q.  And of the black Explorer?

09:46AM 20  A.  Yes, I did.

21  Q.  And at some point, sir, were you involved in an inventory

22  search of the black Explorer?

23  A.  Yes.  I did tell Officer Morris I would assist him in

24  inventorying the vehicle prior to being towed.

25  Q.  Now, can you describe to the jury what an inventory search

1    is?

2    A.   It's just going through the vehicle to describe anything

3    that was in it, anything that you may take for the vehicle for

4    liability purposes prior to it being towed from the scene.

5    Q.   Okay.  And while you were doing that, did you take photos?

6    A.   I did.  I did take pictures of the interior of the

7    vehicle.

8    Q.   Okay.  And did you -- the inventory search, who was

9    involved in the inventory search?

09:47AM 10   A.   Myself and Officer Morris.

11   Q.   And where were you located when it began?

12   A.   I was on the driver's side of the vehicle.

13   Q.   And where was Officer Morris?

14   A.   He was on the passenger side.

15   Q.   Okay.  And during the inventory search of the vehicle, did

16   Officer Morris identify things that he found?

17   A.   Quickly after we started, he held up a large, well, a

18   baseball-size package of a white powdery substance.

19   Q.   And did you observe that?

09:48AM 20   A.   I did.

21   Q.   That bag?

22   A.   Yes, I did.

23   Q.   And did you observe anything about that bag?

24   A.   There were individual baggies contained in this larger

25   package.

1    Q.   And did you see where that was recovered from?

2    A.   I don't recall exactly.  I think Officer Morris said he

3    got it from the cup holder.

4         MR. FLASHNER:  Objection -- withdrawn.

5         THE COURT:  Was that an objection?

6         MR. FLASHNER:  That was no objection.

7         THE COURT:  Okay.  Go ahead.

8    Q.   But you did observe the baggy in the car?

9    A.   I did.

09:48AM 10    Q.   In the black SUV?

11    A.   Oh, yes.  Yes.

12    Q.   Did the inventory search continue?

13    A.   Yes, sir.

14    Q.   And did you identify other objects?

15    A.   Quickly after Officer Morris discovered the white powdery

16    substance, he then held up another baggy with a green leafy,

17    which I -- which he pulled it from underneath the passenger

18    seat.

19    Q.   Were any other objects found?

09:49AM 20    A.   There were three cell phones, there was a balaclava, or a

21    ski mask, if you will, four bottles of Johnny Walker, I

22    believe, some sunglasses, a ring, like a wedding band ring,

23    some sunglasses, I believe, and some other various -- there was

24    bottles of soda or water, things like that.

25    Q.   And during the search, who was the person primarily

1    responsible for documenting it?  After the inventory search,

2    what was seized from there?

3    A.    Officer Morris.

4    Q.    Okay.  Now, during the search, you found -- Officer Morris

5    pointed out that white baggy, the white substance in the baggy,

6    correct?

7    A.    Yes.

8    Q.    At some point, did you take a picture of that?

9    A.    Yes.

09:50AM 10    Q.    And did you take it in place?

11    A.    I did not.

12    Q.    Why?

13    A.    Again, I didn't know where he pulled it from, so I kind

14    of my own thing, I don't kind of say put it back where, but I

15    did take a photograph after of the items that we were going to

16    take from the vehicle that we placed in the back of the floor

17    just kind of laid out.

18    Q.    So the items that you found in the black SUV, you put them

19    someplace to take a photo?

09:50AM 20    A.    Yes.

21    Q.    Where did you place them?

22    A.    In the back -- if you open up the tailgate, in the back

23    area, the little trunk area, I guess you could say.

24    Q.    Showing you government's 2.7, is that the photo you took

25    that evening?

1    A.    Yes, it is.

2    Q.    And so looking at that photo on the far right, if we could

3    blow up the baggy, sir, is that the baggy that was located

4    inside the crashed SUV?

5    A.    It is.

6    Q.    And, sir, is that the black ski mask that you found in the

7    SUV?

8    A.    Yes, sir.

9    Q.    And, sir, what is that?

09:51AM 10    A.    That's the white powdery substance that was obtained in

11    the vehicle.

12    Q.    And is that a closer shot?

13    A.    Yes, sir.

14    Q.    And I believe you said there were smaller baggies in it?

15    A.    Yes, sir.

16    Q.    And what is that, sir?

17    A.    That's the green leafy substance that was obtained.

18    Q.    From the vehicle?

19    A.    Yes, sir.

09:51AM 20    Q.    Now, sir, at some point, did officers bring a firearm to

21    the vehicle?

22    A.    I don't know when the firearm came to the vehicle.  I know

23    it did because I did take a photograph of it, but I can't

24    recall exactly when it came to the vehicle.

25    Q.    Now, what you say -- you say you'd take a photograph, did

1   you document the firearm?

2   A.   Yes.

3   Q.   And was that by photo?

4   A.   Yes, sir.

5   Q.   And is that the photo of the firearm that you documented

6   that evening?

7   A.   Yes.

8   Q.   Now, for the jury, to the far right of the photo is a

9   black object.  Can you explain to the jury what that is?

09:52AM 10   A.   That would be in a magazine that would contain the

11   ammunition for the weapon.

12   Q.   And for -- and in the forefront of that photo, there's a

13   number of objects.  What are those?

14   A.   That would be the bullets or ammunition that were

15   contained in the magazine.

16   Q.   And that's a photo that you took the evening of

17   December 8th, 2022?

18   A.   Yes, sir.

19   Q.   Now, after -- and you took a number of other photos,

09:53AM 20   correct?

21   A.   Yes, sir.

22   Q.   We haven't gone through all the photos you took that

23   evening, is that accurate?

24   A.   Yes, sir.

25   Q.   Now, after the inventory search of the black SUV, where

1  the bags, including the bag with the white substance, was found

2  in, did you have any steps that -- did you take any other

3  investigative steps that evening?

4  A.   Not really investigatory steps, no.

5  Q.   Were you contacted by Sergeant Barry?

6  A.   I was.

7  Q.   And did you go to a certain area?

8  A.   Yes.  He requested that I come to the south side --

9       MR. FLASHNER:  Objection.

09:53AM 10       THE COURT:  Overruled.

11  A.   So he requested that I come to the south side of the

12  Stop & Shop, which would be like the loading dock area.  If

13  you're looking at Stop & Shop, it would be to my left.

14  Q.   So you traveled to the Stop & Shop area?

15  A.   Yes.

16  Q.   Showing you what's been admitted as Exhibit 1.3, sir, do

17  you recognize what that is?

18  A.   That's the aerial view of the Bedford Street Stop & Shop

19  area.

09:54AM 20  Q.   So the large white building, is that the Stop & Shop

21  building?

22  A.   Yes.

23  Q.   And when you say that you traveled to a certain area,

24  could you describe in this photo what area you traveled to?

25  A.   So it would be -- if looking at the photo, it would be to

1   the right where the tree line is and towards the rear of it.

2   Q.   And can you describe for the jury what's back there?

3   A.   There was a dumpster, there's a chain link fence that

4   would kind of run on the tree wooded area, and towards the back

5   of the dumpster is a wooded like six-foot fence.  The chain

6   link fence was also about six feet long -- I mean, six foot

7   high.

8   Q.   And you said there's a wooded area there?

9   A.   Yes, to the left of the chain link fence.

09:55AM 10   Q.   And when you went back there at some point did you observe

11   anything of value, or of evidentiary value that you thought was

12   there?

13   A.   Yes, there were two white baggies, similar to the ones

14   found in the SUV that were pointed out to me in the wooded

15   area.

16   Q.   Now, can you describe where you found those?

17   A.   One would be to the left of the chain link fence kind of

18   in the wooded area approximately maybe a foot away, and then

19   the second one would be approximately six feet further into the

09:55AM 20   wooded area to the left of that first baggy.

21   Q.   Now, sir, at some point did you recover those items?

22   A.   Yes.

23   Q.   And when you looked at them, did you observe anything that

24   you thought was of significance?

25   A.   They were clean for the time and in the area that it was

1    in, they weren't covered in any water, they weren't covered in

2    any leaves or anything like that, so I then photo documented

3    the area, and then I put them in evidence bags, but prior to

4    that I did -- I picked them up by the top, and I did notice

5    that they were still warm for the time of the season.  It was

6    December and very cold that night.

7    Q.   Sir, I'm going to -- want to review a couple of things.

8    I'm showing you what's been entered into evidence as

9    Exhibit 2.11.  Do you recognize that?

09:56AM 10   A.   Yes, sir.

11   Q.   How do you recognize that?

12   A.   That would be the -- one of the baggies that was pointed

13   out to me.

14   Q.   And do you recall whether this was the one by the fence or

15   the other one?

16   A.   That I believe was the one that was farther into the

17   wooded area.

18   Q.   And so there's a light on this.  Is that a light that was

19   generated by your camera?

09:56AM 20   A.   By my flash.  Yes, sir.

21   Q.   Okay.  Because, just to be clear, when you took these

22   photos, was it dark out?

23   A.   Yes.

24   Q.   And showing you what's been admitted as Exhibit 2.12, do

25   you recognize that photo, sir?

         1    A.    Yes, sir.

         2    Q.    And what is that?

         3    A.    That is the same baggies as previous that was farther into

         4    the wooded area.

         5    Q.    And 2.13?

         6    A.    That's just a close-up version of the same bag.

         7    Q.    Now, you stated there was also one that was near a chain

         8    link fence?

         9    A.    Yes.

09:57AM 10    Q.    Could you describe -- 2.14.  And do you recognize what

        11    this photo memorializes?

        12    A.    That would be the second baggy I guess that was by the

        13    chain link fence area.

        14    Q.    And that area where the baggy is found, can you describe

        15    how that area is in relation to the Stop & Shop area?

        16    A.    Well, the Stop & Shop area is obviously asphalt paved.

        17    This area is very, as you can see, very woody, a marshy type

        18    area, a lot of leaves had fallen and it was kind of wet at the

        19    time.

09:58AM 20    Q.    You stated there was a chain link fence?

        21    A.    Uh-hum.

        22    Q.    What side of the chain link fence was this, the Stop &

        23    Shop side, or the other side?

        24    A.    That would be on the left side, on the wooded side.

        25    Q.    Looking at 2.15, in the far left corner, what is that,

1    sir?

2    A.    That would be the baggy that was located.

3    Q.    And 2.16?

4    A.    That would be the same baggy.

5    Q.    And 2.17, sir?

6    A.    And then a closer up version of the same baggie.

7    Q.    And to the upper right-hand corner, sir, is that the chain

8    link fence?

9    A.    Yes, sir.

09:58AM 10    Q.    And, sir, you were talking about the area the fence and

11    the Stop & Shop area.  What does 2.9 show?  Excuse me.  2.18.

12    A.    So to the right side of that chain link fence, that would

13    be the Stop & Shop area where the dumpster and loading dock

14    area would be, and then obviously to the back of that photo to

15    the right side, you could see the six-foot wooded fence, and

16    then to the left area is the previously described marshy wood

17    area that was described previously before.

18    Q.    And, sir, after you recovered the two baggies, what did

19    you do with them?

09:59AM 20    A.    I put them into the evidence bags, separate bags, and then

21    I returned to the SUV.

22    Q.    And, sir, did you take any other steps that evening

23    related to this incident?

24    A.    After everything was returned back to the station, I

25    assisted weighing the baggies, the white powdery substance and

the green leafy substance, I assisted with that, and I did a --

I also did a presumptive test on the white substance.

Q.   When you say a presumptive test, is that a drug test?

A.   Correct.  Yes, sir.

Q.   And were you involved in aiding Officer Morris process

evidence?

A.   I bagged up everything separately.  They weren't sealed,

but Officer Morris was typing and everything, you know, I wrote

on the bag what everything was so he could put everything into

the property section of the report.

          MR. CROWLEY:  No further questions, your Honor.

          THE COURT:  All right.  Cross.

          MR. FLASHNER:  Thank you, your Honor.

          THE COURT:  And we can do a quick stretch again while

he's getting ready.

                    CROSS-EXAMINATION

BY MR. FLASHNER:

Q.   Good morning, sir.

A.   Good morning.

Q.   My name is Cory Flashner, and I represent Jose Perez, Jr.,

who is seated at counsel table?

A.   Good to meet you, sir.

Q.   We've never met before today, correct?

A.   No, sir.

Q.   All right.  I'm going to ask you some questions.  If you

1    don't understand my questions, or if I talk over you, which

2    I'll try really hard not to do, I will repeat the question,

3    okay?

4    A.    Okay.

5    Q.    And I would just ask that you keep your voice up.  I have

6    a little trouble hearing sometimes, so if you could just make

7    sure you talk into the microphone.  Your voice was fine during

8    direct exam.

9    A.    Thank you.

10:02AM 10    Q.    Thank you.  You've been a police officer for 29 years,

11    correct?

12    A.    Yes, sir.

13    Q.    All right.  All the time in Lexington, correct?

14    A.    Yes, sir.

15    Q.    And you've been a detective in the major crimes unit of

16    the Lexington Police Department for about two and a half years?

17    A.    Yes, sir.

18    Q.    So when did you start in major crimes?  Sorry to make you

19    do the math.

10:02AM 20    A.    Yeah.  Early 2022, I believe.  Somewhere in there.

21    Q.    Early 2022?

22    A.    I can't -- I don't remember exactly.

23    Q.    In any event, the time of this incident on December 8th,

24    2022, you would have been a major crimes detective?

25    A.    Yes, sir.

1  Q.   And as a major crimes detective, you received training,

2  correct?

3  A.   Yes, sir.

4  Q.   You received training about how to collect evidence?

5  A.   Yes, sir.

6  Q.   You received training about how to fingerprint evidence?

7  A.   Yes, sir.

8  Q.   Training about DNA technology?

9  A.   Yes.

10:03AM 10  Q.   And DNA technology, the last -- since you became a police

11  officer, has changed tremendously over the past 29 years,

12  correct?

13  A.   Yes, it has.

14  Q.   Okay.  Fair to say you're aware now that DNA technology

15  allows for the identification of DNA profiles on something that

16  has a smaller sample of a person's DNA than it did when you

17  first started?

18            MR. CROWLEY:  Objection, not in evidence.

19            MR. FLASHNER:  If you know.

10:03AM 20            THE COURT:  I'll allow it just as casual testimony.  I

21  don't think he's a DNA expert, but I'll allow it.

22  Q.   So can you explain to the jury how the duties of a

23  detective differ from the duties of a police officer in

24  Lexington?

25  A.   We would be called out as secondary for, again, a major

crime, again, an example house breaks, stolen vehicles, sexual

assaults possibly, things of that nature, and patrol officers,

they handle any accidents, any day-to-day traffic violations,

things like that.

Q.   Okay.  And is there a limit on the type of crimes that the

Lexington Police Department would handle on its own?  For

example, if a homicide -- hopefully it doesn't, but if a

homicide was to happen in Lexington, you'd partner with another

law enforcement agency like the State Police, correct?

A.   Yes, sir.  Correct.

Q.   What additional training, if any, did you receive upon

becoming a detective?  I know it was 11 years ago.

A.   Oh, boy.  I've been through several interviewing

techniques, read techniques.  I'm also a background

investigator.  I've been trained in that.  I've been to

secondary sexual assault training.  I've been to, again, DNA

certification training.  I've had 40 hours -- no, 80 hours, I'm

sorry -- of training for detective through NEMLEC.  I've been

through a street level narcotics course, 40 hours given.

Q.   Okay.  Now, your training, I assume -- or would it be fair

to say that your training also included training on the

Lexington Police Department's policies and procedures?

A.   Yes, we read through them.

Q.   You what from them?

A.   We read through them.  I mean, we're not like trained

1    to -- you know, you have to read these, but we do read through

2    our policies.

3    Q.   It's an expectation of the job that a detective,

4    especially a detective in the major crimes unit, would be

5    familiar with the Lexington Police Department policies and

6    procedures?

7    A.   Yes.

8    Q.   And as someone -- I assume you're one of the more senior

9    people on staff there?

10:06AM 10  A.   I am.

11   Q.   Okay.  As a more senior person on staff at the

12   Lexington Police Department, do you also train some of the

13   younger officers when they join the force?

14   A.   No, that would be an FTO trainer, field training officer.

15   Q.   Okay.  Have you ever done that?

16   A.   No, sir.

17   Q.   Were you ever tested in any way on the contents of the

18   Lexington Police Department policies and procedures?

19   A.   I've done a sergeant's test.  I've been, you know, we've

10:06AM 20  had to read through policies.

21   Q.   So you studied them?

22   A.   Read through them.

23   Q.   Read through them, fair enough.  Well, as part of your

24   training as a detective in the major crimes unit and as a

25   police officer for 29 years, you understand the importance of

1  writing accurate reports, correct?

2  A.  Yes, sir.

3  Q.  And you understand that your report needs to be an

4  accurate record of what transpired, correct?

5  A.  Yes.

6  Q.  And you understand that other individuals rely on your

7  police reports and what you put in that written document,

8  correct?

9  A.  Yes.

10:07AM 10  Q.  You understand that those other individuals can include

11  prosecutors?

12  A.  Yes.

13  Q.  Okay.  State prosecutors?

14  A.  Yes, sir.

15  Q.  Federal prosecutors?

16  A.  Yes.

17  Q.  And your reports are also significant because oftentimes

18  you're called to testify like this 20 months after an incident

19  and they are something that you're able to rely on, correct?

10:07AM 20  A.  Yes.

21  Q.  I want you to focus now with me back on December 8, 2022.

22  You're in your office at the Lexington Police Department.  What

23  were you doing that night just before 11:00?

24  A.  Like I said before, I was just cleaning up, getting ready

25  to go home because I leave at 11:00.

1    Q.    End of your shift?

2    A.    Yes, sir.

3    Q.    And you received a radio call about two cars racing, and

4    that's some time about 10 minutes of 11:00, correct?

5    A.    I didn't receive it, I heard it.

6    Q.    You didn't receive it, you heard it?

7    A.    Yes.

8    Q.    Fair distinction.  Can you explain what you mean by that

9    distinction?

10:08AM 10    A.    I was -- my portable radio was always on my desk, and the

11    call came over from Officer Snell that there were two cars

12    racing down Bedford Street, and that's what kind of started the

13    whole thing.

14    Q.    Are you the only detective who is working for the

15    Lexington Police Department on December 8, 2022 just before

16    11:00?

17    A.    Yes.

18    Q.    And the night detective in Lexington, your shift ends at

19    11:00?

10:08AM 20    A.    Yes, 3 to 11:00.

21    Q.    So there's no detective from -- after 11:00 until 7:00

22    a.m.?

23    A.    No, sir.  We're on call.

24    Q.    When you get that radio call, sir, you went to the area of

25    the Stop & Shop, correct?

1    A.    Not at first.  Again, I didn't leave the station until I

2    heard that there were two suspects fleeing and there was a

3    possible gun involved.

4    Q.    Thank you for that clarification.  So is it your testimony

5    today that you heard a radio call -- was it a radio call from

6    Officer Morris about a gun involved?

7    A.    Possible gun involved and he was chasing two suspects.

8    Q.    So after you get that radio call about a possible gun

9    involved from Officer Morris -- that is your testimony, right?

10:09AM  10    A.    Yes.

11    Q.    Okay.  You drive to Stop & Shop, correct?

12    A.    The area of Stop & Shop, yes.

13    Q.    The area.  And that's about .6 miles according to Google?

14    A.    Yeah.  Yes, it would be.

15    Q.    Takes you two or three minutes?

16    A.    Yes, at that time of night, yes.

17    Q.    And the radio broadcasts of the Lexington Police

18    Department, all those broadcasts are recorded, correct?

19    A.    They would be.

10:10AM  20    Q.    And those recorded broadcasts are all going to be on the

21    same channel, correct?

22    A.    Yes, they should be.

23    Q.    And the idea is that you -- police officers, you can

24    coordinate, you want to make sure that everybody is, for lack

25    of a better expression, rowing in the same direction, everybody

1    knows what the other people are doing, correct?

2    A.    Hopefully, yes.

3    Q.    Hopefully.  So, sir, have you reviewed the radio

4    broadcasts from that night?

5    A.    I have not.

6    Q.    Okay.  If you reviewed that radio broadcast -- let me

7    withdraw that question.  So in preparation for your testimony

8    today, you didn't review the radio broadcast, correct?

9    A.    That's correct.

10   Q.    All right.  Is your memory clear about exactly what those

11   radio broadcasts said?

12   A.    No, sir.

13   Q.    Okay.  If you listen to those radio broadcasts again,

14   would that refresh your recollection --

15          MR. CROWLEY:  Objection, your Honor.

16   Q.    -- as to exactly what those radio broadcasts said?

17          THE COURT:  I thought he said he did not review the

18   radio broadcasts.

19          MR. CROWLEY:  He said he did not review them.  I asked

20   him if he -- I'm attempting to refresh his recollection with

21   the radio broadcasts.

22          THE COURT:  I thought he just said that he -- not that

23   he has a lack of memory.  I thought he said he didn't.

24          MR. FLASHNER:  I can ask the question again, your

25   Honor.

1    Q.   Do you recall exactly what those radio broadcasts stated?

2    A.   I don't recall exactly.  It's been, like I said,

3    26 months.

4    Q.   If you listen to them again, would that refresh your

5    memory as to exactly what was transmitted during those radio

6    broadcasts?

7    A.   Yes, it would.

8    Q.   Okay.

9         MR. FLASHNER:  Your Honor, may I approach the witness?

10:13AM 10         THE COURT:  Yes.

11         MR. FLASHNER:  Thank you.

12         MR. CROWLEY:  Your Honor, we'd request that if they're

13    playing the turret tapes, they play them through 9:40, through

14    that time period, so they play a full --

15         THE COURT:  Well, I'll let you do that on redirect.

16    He's refreshing his recollection.

17    Q.   My question to you, having listened to that portion of

18    that turret tape --

19    A.   Yes.

10:16AM 20    Q.   -- is it fair to say that Officer Morris never mentions a

21    possible firearm involved?

22    A.   That's correct.  I stand corrected on that.

23    Q.   And you wrote a police report in this case as well,

24    correct?

25    A.   Yes, sir.

1    Q.   And you understand the importance of having accurate

2    police reports, as we've gone over?

3    A.   I do, yes.

4    Q.   And fair to say in your police report, you

5    indicated -- would you like to see your police report?

6    A.   No, I'm familiar.

7    Q.   At any point, if you'd like to see it, let me know, and

8    I'll bring it up there.

9    A.   Yes.

10:17AM 10   Q.   In your police report, you state that, after the crash,

11   you could hear Officer Morris notify dispatch that he was in a

12   foot pursuit and there was a possible firearm involved,

13   correct?

14   A.   Yes, I did write that.

15   Q.   And the portion of the 911 -- not the 911, the radio

16   broadcast that I played for you, you heard Officer Morris talk

17   about a foot pursuit?

18   A.   Yes.

19   Q.   But Officer Morris didn't say anything about a firearm?

10:17AM 20   A.   I didn't hear that.

21   Q.   So you would agree with me that that particular section of

22   your police report about Officer Morris sending out a radio

23   broadcast regarding a firearm is not accurate?

24   A.   I would agree that fleeing with a possible firearm is

25   incorrect, yes.

1   Q.   The fleeing is correct, but the possible firearm part is
2   not?
3   A.   Correct.
4   Q.   Okay.  Now, when you arrived, Detective, at the Stop &
5   Shop, is it five or six minutes after you hear that radio
6   broadcast about the car crash?
7   A.   It's possible.  I don't recall exactly how much time want
8   by.
9   Q.   I'm not trying to lock you in, I'm just trying to get a
10  ballpark.  Do you have any idea?
11  A.   It would probably be around five -- 5 to 10 minutes.
12  Q.   5 to 10.  So you arrived there, and, when you arrive,
13  there are already two individuals in custody, correct?
14  A.   I later learned that, yes.
15  Q.   Well, did you write a police report in this case?
16  A.   Just my report that you have there.
17  Q.   Okay.  And do you recall in your police report indicating
18  that, when you arrived, you confirmed with other officers that
19  they had two in custody and there were no outstanding suspects
20  on foot?
21  A.   That's correct.
22  Q.   Okay.  So would you agree with me that by the time you
23  arrive at the scene, Mr. Perez and Mr. Del Rio are both in
24  custody?
25  A.   Yes.

1  Q.   Okay.  And we think that's about somewhere between 5 to
2  10 minutes after that first radio call?
3  A.   Approximately.
4  Q.   And at no time on December 8, 2022 do you see Mr. Perez
5  with a firearm?
6  A.   I did not see either subject.
7  Q.   And at no time do you see Mr. Perez with any controlled
8  substances?
9  A.   I did not see any.
10:20AM 10  Q.   And at no time on December 8, 2022 do you ever observe
11  Mr. Perez and Mr. Del Rio discussing controlled substances or
12  distribution of controlled substances?
13  A.   I had no contact with them.
14  Q.   And you don't have any evidence about any discussions that
15  night between the two of them, correct?
16  A.   I do not.
17  Q.   And, sir, you remained at the scene until Mr. Perez and
18  Mr. Del Rio are taken away, correct?
19  A.   I don't recall when they were taken away.  I left the area
10:20AM 20  where they were put into custody, and, like I said, I went back
21  to the intersection of Bedford and Worthen.
22  Q.   Well, you went back to the intersection of Bedford and
23  Worthen, but, sir, then you leave and go get your camera,
24  correct?
25  A.   Yes.

1  Q.   Okay.  And you don't leave and go get your camera until
2  both Mr. Perez and Mr. Del Rio had been transported back to the
3  station for booking; is that correct?
4  A.   I don't know when they were transported back to the
5  station.
6  Q.   Well, you write a report in this case and the idea of your
7  report is to be accurate, correct?
8  A.   Correct.
9  Q.   Would it refresh your recollection if you could see your
10:21AM 10  police report?
11  A.   Yes, I guess.
12  Q.   I'll direct you to the spot right here, if you could just
13  read that section to yourself.
14  A.   Okay.  It does say that they were transported back.  I
15  don't know the exact time they were transported back.
16  Q.   So, sir, I know you don't know the exact time, but you'd
17  agree with me that your police report that you strive to be
18  accurate indicates that, after both suspects had been
19  transported back to the station for booking, you advised
10:22AM 20  Officer Morris that you're going to retrieve your camera to
21  photo document the scene?
22  A.   Yes, because as I said before, I went back to the scene
23  where Bedford and Worthen, I kind of looked at the scene again,
24  and Officer Morris was there.  When I left to go back to the
25  station, I believe the cruisers were just pulling out with both

1  suspects.  I don't know exactly, you know, exact what time

2  each, you know, whether I arrived first or they arrived first.

3  Q.   And, sir, would you agree with me that about 23 minutes

4  had gone by from the time -- strike that.  Would you agree with

5  me that about 25 minutes have gone by from the time the radio

6  call about the cars racing until Mr. Del Rio and Mr. Perez are

7  taken into custody and transported back to the Lexington Police

8  Department?

9  A.   I couldn't tell you exactly minutes.

10:23AM 10  Q.   Okay.  Have you had an opportunity to review the Stop &

11  Shop video in this case?

12  A.   I reviewed it way back when they first got it.

13  Q.   And would seeing that video now, would that help you place

14  the amount of time specific that it took for Mr. Perez and

15  Mr. Del Rio to be taken into custody and transported back to

16  the station?

17  A.   Yes, I assume so.

18  Q.   Okay.  Thank you.  Placing Exhibit 9 on the monitor.  If

19  you can pause it now.  So I'm going to give you a second,

10:24AM 20  Detective, to orient yourself.  I want to make sure you're able

21  to -- do you recognize that this is a video from the Stop &

22  Shop camera looking out towards Bedford Street?

23  A.   Yes, sir.

24  Q.   Okay.  So Stop & Shop is behind us, the fire station is in

25  the upper left?

1  A.   Yes.

2  Q.   Okay.  And there's a figure in black on the upper

3  right-hand quadrant of the screen?

4  A.   Yes.

5  Q.   And there appears to be a person in red by the white van?

6  A.   Yes.

7  Q.   And do you see way over on the left in the right next to

8  the green strip of grass, there appears to be another figure

9  underneath the white pole?

10:24AM 10  A.   Yes, sir.

11  Q.   Okay.

12       MR. FLASHNER:  Can you play this forward?

13       (Video played.)

14       MR. FLASHNER:  And I just ask you to note the time.

15  It's 55 seconds.  Actually, that's fine.  Can you pause it

16  there.

17  Q.   Do you agree with me that the radio transmission about a

18  crash happened before the radio transmission about any type of

19  foot pursuit?

10:25AM 20  A.   Yes.

21  Q.   All right.  Now the figures have run off the screen,

22  correct?

23  A.   Yes.

24  Q.   All right.

25       MR. FLASHNER:  And, Ms. Hutchinson, if you would be so

1    kind as to just slowly drag it forward so we don't have to

2    watch the next 22 minutes of this.  Slowly, please.  Can you

3    pause it right there.

4    Q.    Detective, that was rather quick.  Are you aware that

5    Mr. Perez was treated in an ambulance that night?

6    A.    I wasn't.

7    Q.    Okay.  Keep bringing it forward.  You agree with me that

8    those appear to be two Lexington police officers and they

9    appear to have someone in custody that they're moving towards a

10:27AM 10   police cruiser?

11   A.    That's correct.

12   Q.    And that's at 21:41.  Pause it right there.  Can we agree

13   that we're now at 23:11 and Mr. Perez is being placed into the

14   cruiser?

15   A.    Yes, it would appear so.

16        MR. FLASHNER:  Stop it right there.  And just go

17   forward a little bit further.  Sorry.  Thank you,

18   Ms. Hutchinson.  You can actually just -- can you just let it

19   play?  Thank you.  Pause it right there.

10:28AM 20   Q.    So you agree with me that that's 24:02 when Mr. Perez has

21   now been placed in a cruiser and left the scene?

22   A.    Yes.

23   Q.    Okay.  And for Mr. Perez to get transported back to the

24   station for booking is going to take another couple of minutes,

25   right?

1    A.   Correct.  Yes.

2    Q.   Okay.  So you agree with me that that's about 25 minutes?

3    A.   I would say so, yes.

4    Q.   From the time, at least 25 minutes from the time of the

5    initial call about cars racing until he's transported back?

6    A.   Yes.

7    Q.   And 25 plus the transport, so is that another five

8    minutes?

9    A.   It could be roughly, yes.

10:28AM 10   Q.   Okay.  And you then had a conversation with Officer

11   Morris, correct?

12   A.   Yes.

13   Q.   And as a result of that conversation, you make a decision

14   to go get your camera, correct?

15   A.   Yes.

16   Q.   So you go back -- how long is the conversation with

17   Officer Morris?

18   A.   I honestly don't recall.  Again, I kind of reviewed the

19   scene, see what was going on.  I had a conversation with

10:29AM 20   Officer Morris and then, again, I went back to the station, so

21   I don't know precise time.

22   Q.   Okay.  Is it a couple of minutes?

23   A.   It may have been, maybe five, ten minutes.  I really don't

24   recall.

25   Q.   Five minutes?

1          MR. CROWLEY:  Objection, your Honor.

2          THE COURT:  Sustained.

3     Q.   Then you get in your police car and you drive back to the

4     Lexington Police Department, correct?

5     A.   Yes.

6     Q.   And that would take another five minutes?

7     A.   Roughly, yes.

8     Q.   And then once you arrive at the Lexington Police

9     Department, you'd have to get out of your car, correct?

10:30AM 10    A.   Yes.

11    Q.   Go inside and go in your office?

12    A.   Yes.

13    Q.   Is the camera located in your office?

14    A.   It was at the time.

15    Q.   You'd check and see if it's charged?

16    A.   I do.

17    Q.   And then you go back out to your car?

18    A.   Yes.

19    Q.   How long does that process take?

10:30AM 20    A.   It could have been ten minutes.  Again, I don't recall.

21    Q.   Okay.  Maybe ten minutes.

22          MR. CROWLEY:  Objection, your Honor.

23          THE COURT:  Please don't comment on the answer because

24    that way you're drawing a --

25    Q.   Sure.  Would you agree it's maybe ten minutes?

1  A.   It could have been.  Again, I don't recall exactly how

2  long it took me to go back and return.

3  Q.   Okay.  And then you would drive back to -- you drive back

4  to the Stop & Shop, correct?

5  A.   Correct.

6  Q.   Fair to say that takes another five minutes?

7  A.   Yes, sir.

8  Q.   And once you return to the scene, you and Officer Morris

9  perform an inventory search of the black SUV that's up against

10:31AM 10  the pillar, correct?

11  A.   Not right away, no.  I took -- again, I started taking

12  photos of the entire scene, which would include the red Prius

13  and then moving onto the black SUV.

14  Q.   Okay.  How long are you taking photos of the red Prius?

15  A.   I took several photos.  I couldn't tell you exactly how

16  long, but I took probably around 90 photos or so.  I don't know

17  exactly how many.

18  Q.   You took roughly 90 photos that night?

19  A.   Roughly.  I don't recall exactly how many.

10:32AM 20  Q.   If you're able, can you estimate the amount of time that

21  you were taking photos of the Prius?

22  A.   I couldn't tell you exactly how much time I spent.

23  Q.   Would it be fair to say it's more than five years?

24  A.   Absolutely, yes.

25  Q.   Is it more than ten minutes?

1    A.   It could be, if possible, because I took quite a bit of

2    photos of the area, the intersection.

3    Q.   How long are you taking photographs before you go back to

4    the SUV?

5    A.   I honestly don't know.  Again, I took overall photos and

6    then moved to the SUV and took overall photos of that, too.

7    Q.   Is it -- could that be ten minutes?

8    A.   It could be 15, it could be 20, sir.  I don't know.

9    Q.   Okay.  And once you're at the SUV with Officer Morris, you

10:33AM 10   conduct an extensive inventory of the SUV, correct?

11   A.   We started, yes.

12   Q.   Okay.  Would you agree with that term, "extensive"?

13   A.   It would be, yes.  It would, yes, to document everything

14   prior to towing.

15   Q.   Well, would you agree with me, sir, that it's an extensive

16   inventory?

17   A.   I believe I worded it that way.

18   Q.   Okay.  That's the way you worded it in your report?

19   A.   I believe I did.

10:33AM 20   Q.   So during this inventory, you're taking photographs of

21   items in the SUV, correct?

22   A.   Not precisely.  I didn't -- I took interior pictures of

23   it, and then we started the inventory.  It's not common that we

24   would take pictures of everything in the inventory search.

25   Q.   And Officer Morris is recording the items that you're

1  taking?

2  A.   Not at that time.  He would record them after everything

3  would be taken out.

4  Q.   Okay.  How long does that process take, the photographing

5  of the interior of the black SUV?

6  A.   It all depends.  It could take anywhere from 20 minutes,

7  it could take half an hour, I don't know, it all depends on

8  what's in the car.

9  Q.   Okay.  Is it fair to say that it took somewhere -- -is it

10:34AM 10  fair to say it took at least 20 minutes?

11  A.   At a minimum, yes.

12  Q.   Could it have taken 30 minutes?

13  A.   It's possible.  I don't know.

14  Q.   Now, is it your testimony today that Officer Morris

15  recovered the plastic bag from the cup holder?

16  A.   Yes, I believe that's where he pulled it from.

17  Q.   He didn't recover it from the center console?

18  A.   The cup holder is in the center console, I believe.

19  Q.   Well, you're familiar with the general layout of an

10:35AM 20  automobile, correct?

21  A.   Yes.

22  Q.   I don't -- And you agree that in most automobiles there's

23  cup holders next to the shifting area?

24  A.   Yes.

25  Q.   Drive, neutral, reverse, and then there's the cup holders,

1   correct?

2   A.   Correct.

3   Q.   And then there's a center console, correct?

4   A.   I would term the whole thing as a center console, but,

5   yes.

6   Q.   Okay.  Well, do you know if these drugs were recovered

7   from the center console, the part that has a place that would

8   lift up?

9   A.   I don't recall him lifting that up and pulling anything

10:36AM 10   out of there at that time.  Again, I don't recall where

11   exactly, see where he was.  I was doing something else at the

12   time when he pulled them up and he showed them to me.

13   Q.   So you don't know where the drugs were recovered from?

14   A.   Not exactly, no.  Again, I believe he pulled it from a cup

15   holder.

16   Q.   And did you photograph the drugs?

17   A.   Again, afterwards, yes, I did, but not during the search.

18   Q.   Did you photograph the drugs in the location that they

19   were first observed?  Yes or no.

10:37AM 20   A.   No, it's not customary.

21   Q.   My question wasn't about custom, sorry --

22        MR. CROWLEY:  Objection.

23   Q.   -- it was just about whether you photographed in the

24   location you first observed?

25   A.   I did not.

          1          THE COURT:  I'll allow it.

          2     Q.   And you would agree with me that a photograph of an item

          3     where it's first observed by police is going to create the

          4     clearest record of when it's first observed by police, correct?

          5     A.   During an investigation search, yes.

          6     Q.   Now, you're aware that the Lexington Police Department has

          7     policies and procedures regarding the collection of evidence,

          8     correct?

          9     A.   Yes.

10:37AM  10     Q.   And you're the detective on the scene, you have 29 years

         11     of experience, correct?

         12     A.   I am not officially the detective.  We don't investigate

         13     crashes.  I was assisting at the time, so my role wasn't as an

         14     official detective.  The patrol handles all crashes.  I just

         15     assisted with doing an inventory and photographing.

         16     Q.   But once possible controlled substances are recovered,

         17     this isn't just a crash scene, correct?

         18     A.   No, it still is.  You could make a car stop and find

         19     drugs.

10:38AM  20     Q.   Well, once a firearm is recovered, that changes it from a

         21     fender bender, correct?

         22     A.   The firearm wasn't there at the time, if I recall.  I was

         23     told the firearm was retrieved by someone else.

         24     Q.   So is it your testimony that you're not in charge of the

         25     scene?

1    A.    Not particularly, no.  It was sergeant of the road and

2    then --

3    Q.    Who?

4    A.    Sergeant Barry would be on the road at the time, so it's

5    his -- he's the supervisor of the road.

6    Q.    Well, you're the only officer taking photographs on

7    December 8, 2022, correct?

8    A.    I did, yes.

9    Q.    And as a detective, one of the reasons you take photos is

10:39AM 10    to accurately document where items are located, correct?

11    A.    In an investigation.

12    Q.    And items were seized from the SUV, correct?

13    A.    Yes.

14    Q.    And you're aware that Lexington Police Department has a

15    specific policy, policy 83A, regarding the collection and

16    preservation of evidence, correct?

17    A.    I do, yes.

18    Q.    Okay.  Are you familiar with that policy?

19    A.    Somewhat, yes.

10:39AM 20    Q.    Would it help you to -- I'm going to ask you some

21    questions, but would it help you to see it, sir?

22    A.    Yes, sure.

23    Q.    If I -- the policy is 17 pages, Detective, so if I refer

24    to a particular page or section, I can try to refer you to it,

25    but feel free to look at the whole policy.  So you would agree

1    with me that the Lexington Police Department has a policy

2    regarding the collection of articles of evidence?

3    A.   Yes.

4    Q.   And if we look on page 7 under Number 4 of that policy, I

5    think it's highlighted on the copy I gave you.

6    A.   On page, what was the page again?

7    Q.   Page 7 of 17, sir.

8    A.   Okay.

9    Q.   You have that and you have Number 4, collection of

10:41AM 10   articles of evidence?

11   A.   Yes.

12   Q.   You'd agree with me that the policy indicates that all

13   articles collected as evidence should be photographed in place

14   prior to being collected, if practical, correct?

15   A.   If practical, yes.

16   Q.   Okay.  And the items, the white, the plastic bag

17   containing a white substance that was recovered from the SUV,

18   that was not photographed in place prior to being collected,

19   correct?

10:41AM 20   A.   It was not, no.

21   Q.   And there was no emergency going on when that SUV was

22   being inventoried?

23   A.   No.

24   Q.   And so you'd agree with me, sir, that there was nothing,

25   no practical reason that that plastic bag containing a white

1  powdery substance could not have been photographed in place
2  prior to being collected?
3  A.   It was already moved by Officer Morris.
4  Q.   And that was Officer Morris that had moved it?
5  A.   Correct.
6  Q.   And as you sit here today, you can't tell us if it's
7  recovered from the cup holder or the center console, correct?
8  A.   I don't recall, all I remember is him holding it up, and I
9  thought he pulled it from the cup holder.
10:42AM 10  Q.   Was there anything -- strike that.  Fair to say that
11  nothing prevented you from going back to the station and
12  getting an evidence marker or a crime scene marker?
13  A.   I would have that in my cruiser, but I wouldn't mark any
14  of the evidence because it wasn't an investigatory search.
15  Q.   Okay.  But you could have gone back to the station and
16  gotten an evidence marker, right?
17  A.   They're in my cruiser.
18       MR. CROWLEY:  Asked and answered.
19  Q.   And you could have put that -- I'm sorry, I didn't get
10:43AM 20  your answer.  I apologize.
21  A.   They were in my cruiser.  I have markers in my cruiser.
22  Q.   Oh, you had them in your cruiser?
23  A.   Yes.  They are in my cruiser, but, again, I wouldn't mark
24  these because, again, it's an inventory search.
25  Q.   My question is nothing would have prevented you from

1    putting a marker where that item was recovered and

2    photographing it, correct?

3    A.    You're correct.

4    Q.    Now, this same policy on page 5 has an entire section on

5    photographs and the taking of photographs.  Do you have that in

6    front of you, sir?

7    A.    Yes, sir.

8    Q.    And you would agree with me that 2, under A, taking

9    photographs, there's a part 6?

10:44AM 10   A.    Yes.

11    Q.    Right?  And that part of the policy indicates that

12    photographs of each evidence item should be taken when possible

13    prior to the item being collected or proposed, correct?

14    A.    Yes, when possible.

15    Q.    Similar to the other part of the policy?

16    A.    Yes.

17    Q.    And on Part B of that same subsection under photographs,

18    it indicates about a photo log.  Do you have that?  I believe

19    it's highlighted on your copy.

10:44AM 20   A.    We don't do photo logs because our cameras are all

21    digital.

22    Q.    That's not my question, sir.  My question was just is that

23    part of the policy about the photo logs?

24    A.    It is.

25    Q.    Okay.  And the policy indicates that a photographic video

1    log should be maintained of each video or photograph taken,

2    correct?

3    A.    That's what the policy states, yes.

4    Q.    And this is a crime scene, right?

5    A.    I guess you could term it as a crime scene.

6    Q.    Now, with regard to the firearm that was recovered in this

7    case, I understand it's recovered prior to your arrival,

8    correct?

9    A.    Yes.

10:45AM 10   Q.    Okay.  So no photographs were taken of it prior to it

11   being recovered and moved, correct?

12   A.    Yes.

13   Q.    Okay.  But at no point did you use one of those crime

14   scene markers and put that in the location where the firearm

15   was recovered, correct?

16   A.    I don't know exactly where it was recovered.

17   Q.    Well, there are other officers at the scene, correct?

18   A.    Myself and Officer Morris.  I don't think there was

19   anybody else there.

10:45AM 20   Q.    And at some point did you become aware that there was an

21   Assistant Fire Chief Chisolm that was involved in locating the

22   firearm?

23   A.    I did.

24   Q.    Okay. Did you ever try to interview Assistant Fire Chief

25   Chisolm that night?  Yes or no.

1   A.   No.

2   Q.   Now, I know you didn't take photographs of the plastic bag

3   with the white substance in it where it was allegedly located

4   in the vehicle and you didn't take photographs of the firearm

5   where it was first located?

6   A.   Correct.

7   Q.   But you took photographs of other items that were located

8   in the car, correct?

9   A.   Yes, I believe so.

10:46AM 10   Q.   Okay.

11          MR. FLASHNER:  Your Honor, at this time I'd offer

12   Exhibits 101.1 to 101.22 into evidence.  I believe they're

13   subject to an earlier stipulation, your Honor.

14          THE COURT:  If there's no objection, they're admitted.

15          MR. CROWLEY:  No objection, your Honor.

16          (Exhibit No. 101.1 through 101.22 received into

17   evidence.)

18          MR. FLASHNER:  I'd ask to ask the witness some

19   questions about them and have them displayed on the monitor.

10:47AM 20   Thank you.

21   Q.   Sir, I'm showing you what's been marked as Exhibit 101.9.

22   Fair to say that that's the inside of the SUV?

23   A.   Yes.

24   Q.   Okay.  And on the far side of the SUV over the passenger's

25   side window, you see a side curtain airbag that is covering the

1   window; is that correct?

2   A.   That's correct.

3   Q.   And you'll see in between the seats, there's a center

4   console and that lid is flipped open, correct?

5   A.   It is.

6   Q.   You would agree with me that the center console is

7   accessible to the passenger?

8   A.   Driver and passenger.

9   Q.   Driver and passenger.  And are you aware that this car was

10:47AM 10   rented by Henry Del Rio?

11  A.   I am.

12  Q.   Now, is it fair to say that there's also items on the

13  floor, the passenger side floor of the vehicle?

14  A.   You mean the driver's side?

15  Q.   Driver's side, yes.  Thank you.

16  A.   Yes.

17  Q.   And it's fair to say on the right-hand side you can see

18  what appears to be part of a deployed airbag there as well?

19  A.   Yes, center airbag, yes.

10:48AM 20   Q.   And if we can move to 101.11.  Is that a close-up photo of

21  the cup holder area?

22  A.   It is.

23  Q.   And there's a Sprite can in the cup holder?

24  A.   Yes.

25  Q.   There appears to be something, a pamphlet that has ABC

1  written on it covering the other cup holder?

2  A.  Yes, sir.

3  Q.  Can you move to 101.13.  It's another photograph just a

4  slightly different angle and fair to say that you can see the

5  Sprite can and the items on the ground?

6  A.  Yes.

7  Q.  No drugs in that photo, correct?

8  A.  Not that I can see.

9  Q.  101.14, please.  This is a photograph of the passenger's

10:49AM 10  side of the vehicle?

11  A.  Yes, sir.

12  Q.  And there appear to be items on the ground of the

13  passenger side?

14  A.  Yes.

15  Q.  Items on the seat in the passenger side?

16  A.  Correct, Yes.

17  Q.  No photographs of any drugs, though, right?

18  A.  No.

19  Q.  Can you look at 101.15, please.  It's a slightly clearer

10:49AM 20  photo of the passenger side, again, focusing on the center

21  console area?

22  A.  Yes.

23  Q.  Or the cup holder area?

24  A.  Yes, sir.

25  Q.  And there's no drugs in that photograph, correct?

1    A.   No, sir.

2    Q.   If you go to 101.16.  And that's just a close-up of the

3    cup holder area and the Sprite can, correct?

4    A.   Yes, it is.

5    Q.   And did you ever make any observations of that Sprite can,

6    that it appeared to have alcohol in it?

7    A.   It did smell -- have the odor of alcohol on it.

8    Q.   Okay.  You don't know who was drinking it, you just know

9    it had the odor of alcohol?

10:50AM 10    A.   Yeah.

11    Q.   No drugs in that photo?

12    A.   No.

13    Q.   If we go to 101.17.  This is a photograph of the back seat

14    area?

15    A.   Yes.

16    Q.   And it depicts kind of a view from the passenger's side of

17    the car to the driver's side of the car across towards the

18    passenger side, correct?

19    A.   That's correct.

10:50AM 20    Q.   And you can see that part of the deployed airbag from the

21    driver's seat in the left-hand side of the photo, correct?

22    A.   Yes, sir.

23    Q.   No drugs in this photo, right?

24    A.   No, there isn't.

25    Q.   There is what appears to be an orange on the floor?

1    A.    It looks like it.

2    Q.    Or a round orange colored object?

3    A.    Yes.

4    Q.    If you go to 101.18.  That would be a close-up of that

5    round orange colored object, correct?

6    A.    Yes.

7    Q.    No drugs in that photo?

8    A.    No, sir.

9    Q.    101.19.  It's a photograph of an item in the back seat.

10:51AM 10    It appears to be a plastic bottle with a grayish brown

11    substance in it?

12    A.    It is.

13    Q.    No drugs in that photo, right?

14    A.    No, sir.

15    Q.    And 101.20.  You can see what appears to be two baseball

16    caps?

17    A.    Yes, sir.

18    Q.    No drugs in that photo?

19    A.    No, sir.

10:51AM 20    Q.    And 101.21.  Again, the photograph of the back seat area,

21    you can see a little more perspective now, and that appears to

22    be the same two baseball caps that were in the previous photo?

23    A.    It does, yes.

24    Q.    No drugs in that photo, correct?

25    A.    No, sir.

1    Q.    If we go to 101.22.  Fair to say there's three cell phones
2    there, correct?
3    A.    Yes.
4    Q.    Okay.  And there's some money, some single dollar bills,
5    correct?
6    A.    Yes.
7    Q.    Were those cell phones seized?
8    A.    They were.
9    Q.    They were taken into evidence?
10:52AM 10    A.    Yes.
11    Q.    Did you conduct any search of the cell phone on the
12    left-hand side with the clear plastic case?
13    A.    I did not.
14    Q.    Did you look at any text messages on that?
15    A.    I didn't look at anything on any of the phones.
16    Q.    You didn't look at anything on any of them?  Thank you.
17    So same for the other two, the one in the center and the one
18    that has a map on it, those, also, you didn't conduct any
19    search?
10:53AM 20    A.    No, sir.
21    Q.    You don't have any information for this jury about whether
22    there were any communications on those cell phones?
23    A.    No, sir.
24    Q.    As a detective, would it be fair to say that cell
25    phones -- strike that.  As a detective -- strike that.  When

1    you became a detective 20 years ago, cell phones weren't as

2    popular, correct?

3    A.    That's correct.

4    Q.    Okay.  Fair to say that, as a detective now in 2024, cell

5    phones are often used in your investigations, by that I mean

6    searches of cell phones?

7    A.    They are.

8    Q.    And they can often lead to investigative leads, correct?

9    A.    Correct.

10:53AM 10    Q.    But no one -- certainly you didn't conduct any search of

11    that's cell phones?

12    A.    No, sir.  We weren't able to yet.

13    Q.    Okay.  Well, did you ever make an attempt to get a -- did

14    you ever apply for or obtain a search warrant with regard to

15    these cell phones?

16    A.    No, because the ATF took all the evidence from us.

17    Q.    Okay.  And do you have any information that the ATF ever

18    obtained a search warrant or conducted any search warrant of

19    these cell phones?

10:54AM 20              MR. CROWLEY:  Objection, calls for hearsay.

21              THE COURT:  I'll allow him to testify as to his

22    understanding.

23    A.    I do not know.

24    Q.    And you don't have -- and when did the ATF take these from

25    you?

1    A.    I don't recall the exact time and date.

2    Q.    Was it in December 2022?

3    A.    It was after that because obviously it was late in

4    December, so I mean, I don't recall the exact date that the ATF

5    requested all of the evidence.

6    Q.    In any event, while the cell phones were in the custody of

7    the Lexington Police Department, you're unaware of any search

8    of these cell phones?

9    A.    We did not do any search of them.

10:54AM 10    Q.    And that night you would have taken about 90 or 91 photos,

11    is that fair?

12    A.    Yes.

13    Q.    Not all of the car, of different areas?

14    A.    Yes, sir.

15    Q.    And of those, do you remember the exact number, is 90 the

16    number you recall?

17    A.    I think it was 90.  I don't recall the exact number, I

18    don't know.

19    Q.    Of those approximately 90 photos, there's no photos of the

10:55AM 20    location where the firearm was originally recovered, correct?

21    A.    There was not, correct.

22    Q.    And of those 90 photos, there's no photos of where the

23    controlled -- the plastic bag containing a white powdery

24    substance in the black SUV was originally recovered, correct?

25    A.    That would be correct.

1    Q.   Now, as a detective, you're familiar -- we're back to the

2    policy 83A governing the collection and preservation of

3    evidence.  As a detective, you're familiar with an

4    investigative technique involving diagrams, correct?

5    A.   Yes.

6    Q.   And there's actually a part of the policy on page 6 that

7    addresses the drawing and use of diagrams, correct?

8    A.   Correct.

9    Q.   But you certainly never drew a diagram in this?

10:56AM 10    A.   There wouldn't be any need to do that.

11    Q.   What was that?

12    A.   There would be no need to do a diagram.  We normally --

13    again, we don't do diagrams.  We photo document the whole area,

14    in lieu of diagrams.

15    Q.   My question was --

16    A.   No, I did not do a diagram that night, sir.

17    Q.   And if there was a diagram, it could have laid out the

18    exact location --

19         MR. CROWLEY:  Objection, your Honor.

10:56AM 20    Q.   -- of where the controlled substance --

21         THE COURT:  Sustained.  It's a hypothetical.

22    Q.   Well, the purpose of a diagram is to more clearly capture

23    the distance between objects at a crime scene.  Would you agree

24    with me that's one of the purposes of a diagram?

25    A.   Possible, yes.

1  Q.   Okay.  And there was no diagram done of the area behind

2  Stop & Shop, correct?

3  A.   Not that I'm aware of.

4  Q.   You don't have any evidence that there ever was, right?

5  A.   Behind Stop & Shop?

6  Q.   Yes.

7  A.   There's no diagram.

8  Q.   I just want to make sure my question was clear.  By behind

9  Stop & Shop, I mean the area over by the dumpsters?

10:57AM 10  A.   Correct.  There was no diagram.

11  Q.   No diagram there.  But the policy indicates that crime

12  scenes sketches or diagrams is something that you can use,

13  correct?

14  A.   Possible.  It doesn't say you have to, it says may be

15  necessary.

16  Q.   Okay.  Now, you as a detective are familiar with

17  fingerprints and the fingerprinting, correct?

18  A.   Yes.

19  Q.   And you're aware that policy 83A governing the collection

10:57AM 20  and preservation of evidence has a section that provides

21  guidance on fingerprints and the processing and collection of

22  fingerprints, and that's on page 8, sir.  You would agree with

23  me that fingerprints are a tool that you have at your

24  disposal -- let me rephrase that.  Searching for fingerprints

25  is a tool that you have at your disposal, correct?

1    A.    It is, yes.

2    Q.    Okay.  You've fingerprinted objects before, correct?

3    A.    I have.

4    Q.    But the objects in this case, specifically the firearm

5    that was recovered, was never fingerprinted, correct?

6    A.    I wouldn't know.  It wasn't, and I wouldn't have done it

7    because in my mind it was contaminated, so I wouldn't have

8    fingerprinted it, I would probably send it to the State Police

9    lab.

10:58AM 10    Q.    I appreciate your answer, sir.  But my question was --

11    A.    No, I did not fingerprint it, sir.

12    Q.    Okay.  And because it wasn't fingerprinted, you don't know

13    if there were any fingerprints on it that connected it to

14    Mr. Perez, for example?

15    A.    I do not know that.

16    Q.    You don't know if there were any fingerprints on it that

17    connected it to the person in the red sweatsuit?

18    A.    I don't know that.

19    Q.    You don't know if there were any fingerprints on it

10:59AM 20    connecting it to anyone?

21    A.    That's correct.

22    Q.    Never fingerprinted the bullets, correct?

23    A.    No, I did not.

24    Q.    And you never fingerprinted the magazine or ammunition

25    clip, correct?

1    A.   I did not.

2    Q.   Now, it's not just you fingerprinting, you also have the

3    ability to send items to the State Police lab for

4    fingerprinting and processing, correct?

5    A.   Yes, that's what I would have --

6    Q.   And that wasn't done in this case, correct?

7    A.   The ATF took everything before we were able to do that.

8    Q.   With regard to the -- well, strike that.  You testified a

9    moment ago that you believe the firearm was -- I think the word

10:59AM 10   you used was "contaminated;" is that right?

11   A.   In my mind, because I don't know -- again, I learned later

12   the fire chief picked it up and then it was handed off.  I

13   don't know what it was placed into or where it went, so to me

14   that would be contaminated, in my mind.

15   Q.   I'll let you finish, sorry.

16   A.   And that's why it would have eventually gone to the State

17   Police.

18   Q.   My question was just did you testify that it was

19   contaminated?

11:00AM 20   A.   In my mind, yes, it was.

21   Q.   And you don't know that, you just made an assumption,

22   correct?

23   A.   Being that it was moved, yes.

24   Q.   Okay.  And the controlled substances or the plastic bags

25   that were recovered from the area around Mr. Del Rio, those

1    were never fingerprinted either, correct?

2    A.   They were not.

3    Q.   And you had the same opportunity, you could have sent

4    those out to the State Police lab, correct?

5    A.   We could have, yes.

6    Q.   Okay.  But that never happened?

7    A.   No, again, because ATF took all evidence.

8    Q.   Well, as the detective on the scene you have the

9    capability to use fingerprint dust and try to preserve

11:01AM 10    fingerprints, correct?

11    A.   I do.

12    Q.   But you didn't?

13    A.   I did not.  No.

14    Q.   Okay.

15         THE COURT:  Why don't we take our 11:00 break.

16         THE CLERK:  All rise.

17         (A recess was taken.)

18         THE CLERK:  All rise.

19         THE COURT:  You wanted to see me?

11:13AM 20         MR. FLASHNER:  I did, your Honor.  And I would just

21    ask that the witness be excused, or we can go to sidebar.

22    Whatever is easier.  It will be, I assume, pretty brief.  I

23    just didn't want to do it in front of the jury.

24         THE COURT:  Why don't we go to sidebar.

25         (THE FOLLOWING OCCURRED AT SIDEBAR:)

1          THE COURT:  Yes.

2          MR. FLASHNER:  Your Honor, what I am proposing to do,

3     and I wouldn't do it without coming to sidebar, which is the

4     reason we're here now is I believe that we have testimony alack

5     of Sergeant Michael Barry.  I think if there are testimony

6     alack, in other words, he's the one that directs people to

7     come, I objected, and it was admitted over my objection.  He

8     told this witness to go to the back, that results in this

9     witness recovering the drugs.

11:14AM 10          Sergeant Michael Barry has findings about his

11    credibility.  The government has made a strategic decision not

12    to call Michael Barry, and I believe that I am allowed to

13    impeach him under 806.  The impeachment would consist of

14    approximately three questions.  He has a disciplinary finding

15    against him.

16          THE COURT:  This is Sergeant Barry?

17          MR. FLASHNER:  Sergeant Barry, not this officer, and

18    that's why I'm under 806, your Honor, that Sergeant Barry has a

19    disciplinary finding against him relating specifically to

11:14AM 20    dishonesty, and as a result of that finding, Sergeant Barry

21    received a suspension.  I won't get into the lens of it, I know

22    the details of it.  It involved him -- I don't know if the

23    Court wants to hear it, but it involved him disconnecting

24    computers, and there was an investigation into the way he was

25    handling the workplace computers.

1          Actually, Mr. Daley, why don't you go into that in

2     more detail.

3          MR. DALEY:  There was a finding in an internal

4     investigation that he was noncooperative and was untruthful

5     during the internal investigation.  That's also been published

6     online in *The Post*, reporting for police misconduct.  Again,

7     Mr. Flashner will not get into a long litany of questions.

8          THE COURT:  Let me jump to the conclusion.  Why is it

9     competent for this witness to impeach Sergeant Barry who has

11:15AM 10    not testified, and the only testimony as to what Sergeant Barry

11    said or did is that he said, "Go over there," or you know,

12    "Look over there"?  I think he didn't recover the weapon.

13         MR. FLASHNER:  Well, Sergeant Barry took custody of

14    the weapon that Mr. Perez is charged with.  Sergeant Barry is

15    the one who locates the plastic bags or controlled substances

16    that are found in the rear of the Stop & Shop by Mr. Del Rio,

17    and Sergeant Barry directs this detective to go to the back.

18    That's the testimony that they have, so I'd suggest that this

19    is -- we've admitted it in a hearsay statement, his time will

11:16AM 20    come back there, a testimonial act, has been admitted into

21    evidence, and that a clearance credibility can now be attacked

22    and supported by a mountain of extrinsic evidence.  I'm not

23    looking to introduce the report.  I'm looking to ask three

24    questions.

25         MR. CROWLEY:  806 requires unavailability.  The

1  defense has chosen not to call Detective Barry.  The defense

2  was aware of Sergeant Barry's issues prior to trial.  They

3  could have called him, and they were not hearsay statements.

4  They were statements that were not introduced for the truth of

5  the matter asserted.  What they're trying to do is introduce

6  evidence outside the rules.

7  THE COURT:  Again, if you have some case, I'll read

8  it, but I don't see how you can impeach the credibility of a

9  nontestifying witness over what are effectively ministerial

11:17AM 10  acts, you know, "go look over there" or "come back here"

11  through this witness.  He's not Sergeant Barry.  You could call

12  Sergeant Barry, or he could have, and we can talk about

13  impeachment at that point.

14  MR. FLASHNER:  Mr. Perez has no part, it's the

15  government's choice how to put in its case-in-chief.  They've

16  decided to put on this detective, they've decided to not call

17  him.  They're having their cake and eating it, too.  We now

18  have a sergeant getting -- who seizes the firearm.  I agree

19  they don't --

11:17AM 20  THE COURT:  Again, but you didn't call him, either,

21  but to show that he is not credible suggests that he has -- he

22  has to testify, he has to do something, say something.  This is

23  not -- you're going to ask him are you aware that Sergeant

24  Barry had these disciplinary matters, which themselves may be

25  hearsay, and --

1          MR. FLASHNER:  But it goes directly to Sergeant

2     Barry's credibility, it was his own department finding that he

3     lacks the amount of candor and he lacks credibility.  I don't

4     believe that unavailability is a requirement under 806.

5          THE COURT:  Regardless, putting aside whether you can

6     call Sergeant Barry for the purposes of impeaching, maybe you

7     can.  I just don't see how this witness is appropriate or how

8     it's appropriate under the circumstances for him to effectively

9     comment on the credibility of another witness, not even a

11:18AM 10     witness, to comment on another person.  So I'm not going to

11     permit you to do this with this witness.

12          MR. FLASHNER:  I understand the Court's ruling.  I

13     would object to it, and I would agree that I would be bound by

14     whatever this witness says.  If this witness is a 29-year

15     veteran of the force, "I have no idea what you're talking

16     about," I'm --

17          THE COURT:  Even if he says I know every detail about

18     it and I don't think Sergeant Barry is credible, I think he's a

19     liar, I don't see how I can permit that.

11:19AM 20          MR. FLASHNER:  I wouldn't ask that.  Note my objection

21     for the record, please, your Honor.

22          (SIDEBAR CONFERENCE WAS CONCLUDED)

23          THE CLERK:  All rise for the jury.

24          (JURORS ENTERED THE COURTROOM.)

25          THE COURT:  Mr. Flashner.

1          MR. FLASHNER:  Thank you.

2     BY MR. FLASHNER:

3     Q.    Detective, just before the morning break, I was asking you

4     about the controlled substances found in the area behind the

5     Stop & Shop around where Mr. Del Rio was taken into custody.

6     Do you recall that?

7     A.    Yes.

8     Q.    Okay.  And those items were never tested for fingerprints,

9     correct?

11:20AM 10  A.    No, they were not.

11    Q.    Okay.  And the controlled substances from the black SUV

12    that were not photographed, those were also never -- that were

13    not photographed in the location they were recovered, were also

14    not tested for fingerprints, correct?

15    A.    That's correct.

16    Q.    As the detective on the scene, just yes or no, is it your

17    decision whether those controlled substances or plastic bags

18    got tested for fingerprints?

19    A.    They would have been, yes, eventually.

11:21AM 20  Q.    Would it be your's or Sergeant Barry's?

21    A.    That would make that call?  It would be mine to, and I

22    would probably send them to the State Police lab.

23    Q.    Now, I want to ask you some questions about DNA testing.

24    You're aware that the Lexington Police Department, that same

25    policy that I gave you previously, policy 83A, regarding the

1    collection and preservation of evidence provides guidance on

2    DNA evidence and the collection of DNA evidence, and that's on

3    page 9 of the policy?

4    A.    Yes.

5    Q.    Okay.  And, sir, you're aware that the policy even has a

6    specific section about DNA evidence that relates to the testing

7    of firearms, and that's on page 15.  Are you aware of that,

8    sir?

9    A.    Uh-hum.

11:22AM 10    Q.    It's on the bottom of 15, sir.

11    A.    Yes.

12    Q.    Fair to say there's a specific section about DNA testing

13    and firearms, correct?

14    A.    Yeah.

15    Q.    And the firearm that was recovered in this case was never

16    sent for DNA testing, correct?

17    A.    It wasn't by me, no.

18    Q.    Okay.  You never swabbed that item for DNA testing?

19    A.    I did not.

11:22AM 20    Q.    You don't have any evidence to offer this jury about any

21    DNA testing that may have been conducted on that firearm?

22    A.    I do not.

23    Q.    And with regard to the controlled substances found around

24    the area where Mr. Del Rio was arrested and taken into custody,

25    those controlled substances or plastic bags were never tested

1    for DNA, correct?

2    A.    They were not by me.  No, sir.

3    Q.    Okay.  And you're unaware of any DNA testing on those

4    items, correct?

5    A.    I don't know of any, sir.

6    Q.    Okay.  You don't have any evidence for this jury about DNA

7    testing on those items, correct?

8    A.    I do not.

9    Q.    And the controlled substance -- or the plastic bag

11:23AM 10   containing a white powdery substance, that wasn't photographed

11   in the location where it was recovered from the black SUV, that

12   was also not tested for DNA, correct?

13   A.    It was not.

14   Q.    Okay.  And you're familiar with swabbing for DNA, correct?

15   A.    I am.

16   Q.    Okay.  These items were never even swabbed?  That first

17   step.

18   A.    I wouldn't do that.  Again, I would send them to the State

19   Police lab.

11:24AM 20   Q.    In order to do that, you would have had to send them to

21   the State Police lab?

22   A.    I would.  I would have.

23   Q.    And that wasn't done in this case, correct?

24   A.    No.

25   Q.    Can I have what's previously been admitted as

1    Exhibit 101.22 up on the monitor, please.  You're aware, sir,

2    that Mr. Perez is charged in a drug related conspiracy

3    involving Mr. Del Rio, correct?

4    A.   I believe so.  I'm not aware of all the charges he's

5    involved in.

6    Q.   Are you aware what the two charges are, sir?

7    A.   Not precisely.  No, sir.

8    Q.   Okay.  You don't have any information about any

9    communications between Mr. Del Rio and Mr. Perez, correct?

11:24AM 10            MR. CROWLEY:  Objection, asked and answered.

11            THE COURT:  Information about any communications --

12            MR. FLASHNER:  Your Honor, I couldn't hear you, I'm

13   sorry.

14            THE COURT:  I'm sorry, I was repeating the question.

15   I guess I'll allow it.  Overruled.

16   A.   I don't know of any communications between the two of

17   them.

18   Q.   Okay.  But you did photograph the cell phones?

19   A.   I did.

11:25AM 20   Q.   Okay.  You would agree with me that, if Mr. Perez's cell

21   phone, if -- strike that.  You would agree with me if

22   Mr. Del Rio's cell phone contained communications related to

23   drug distribution, that would be an important piece of

24   evidence, correct?

25            MR. CROWLEY:  Objection.  It calls for specification.

1      THE COURT:  Sustained.

2  Q.  Well, you would agree with me that you've had

3  investigations in which cell phones have contained important

4  communications about the underlying crime you're investigating,

5  correct?

6      MR. CROWLEY:  Objection.  Relevance.

7      THE COURT:  I'll allow it.

8  A.  They do sometimes, yes.

9  Q.  Now, once --

11:26AM 10      MR. FLASHNER:  You can take that down, Ms. Hutchinson,

11  thank you.

12  Q.  Once you completed your photographs of the items in the

13  car, that extensive inventory, you went back to the rear of the

14  Stop & Shop by the dumpster, right?

15  A.  I only went there once to -- when I was called by Sergeant

16  Barry.  I didn't go back again.

17  Q.  I'm sorry.  My mistake, that was the first time you

18  went -- when you went back there?

19  A.  Yes.

11:26AM 20  Q.  Okay.  That was after inventorying the SUV, correct?

21  A.  Yes.

22  Q.  Okay.  Do you go through the Stop & Shop parking lot, or

23  do you go around by the Battle Green Apartments?

24  A.  I walked across the Stop & Shop parking lot.

25  Q.  Okay.  And how long were you back there taking

1    photographs?

2    A.    I don't recall.  I really don't -- I don't know.

3    Q.    Now, you didn't complete a photo log in this case,

4    correct?

5    A.    Again, no.  I did not.

6    Q.    Okay.  And a photo log would contain the date the photo

7    was taken, correct?

8    A.    It would, but, again, it's contained in our camera in

9    metadata.

11:27AM 10    Q.    Well, you didn't complete a photo log, correct?

11    A.    Not a written log, no.

12    Q.    And there was no log that was produced in discovery in

13    this case that says when these photographs were taken, correct?

14    A.    Not that I'm aware of.

15    Q.    So you go to the back of the Stop & Shop parking lot, you

16    see Sergeant Michael Barry, correct?

17    A.    Yes.

18    Q.    You have a conversation with Sergeant Barry, correct?

19    A.    Yes, he just pointed out the two objects to me.

11:27AM 20    Q.    He points the objects out.  Is he the only person that

21    told you where those objects were?

22    A.    He was, to my knowledge.  Yes.

23    Q.    And once you get back there, how long does it take you to

24    get in the appropriate position to see them, take photographs

25    of them?

1    A.   It was -- I saw them once I arrived on the scene.  Once he

2    pointed them out to me, it was a minute or two once I got there

3    to see them.  I don't know how long it took me to photograph

4    them.  It could have been ten minutes.  Honestly, I don't

5    recall how long.

6    Q.   And you photographed them before you touched them in any

7    way?

8    A.   Correct.

9    Q.   Okay.  When -- before you touched these plastic bags,

11:28AM 10   presumably you wore evidence gloves?

11   A.   Always.

12   Q.   Always.  And those are just normal hospital gloves, right?

13   A.   Yes, I don't recall what I had in my cruiser at the time.

14   Sometimes we have those blue ones, sometimes we have the

15   heavier black ones.  I don't recall which ones I had in my

16   cruiser at the time.

17   Q.   And it is December 8th, 2022 when you're doing this,

18   correct?

19   A.   Yes.

11:29AM 20   Q.   And it's just before midnight by this time, or just after

21   midnight, correct?

22   A.   It would be after midnight by that time.

23   Q.   After midnight.  And it was 37 degrees out that night?

24   A.   It was cold.  I don't know exact, but it was cold.

25   Q.   It was cold.  Do you recall in your report that you said

1    it was 37 degrees?

2    A.   I believe I did write 37 at the time.  I might have gotten

3    that from the cruiser thermostat or something.  I don't recall

4    where I got it.

5    Q.   It was cold?

6    A.   Yes.

7    Q.   And at that time it had been 25 minutes between when you

8    first heard the radio call about the car accident, at least

9    25 minutes, and Mr. Perez and Mr. Del Rio are taken into

11:30AM 10   custody, correct, and brought back to the station?

11   A.   Yes, that would be accurate.

12   Q.   It was about five minutes to transport them, you recall

13   testifying to that?

14   A.   Yes.

15   Q.   So that puts us at 30 minutes.  And then I think you said

16   you spent about five more minutes at the scene?

17   A.   Possibly, yes.

18   Q.   With Officer Morris, correct?

19   A.   Yes.

11:30AM 20   Q.   So that puts us at about 35 minutes.  Then you drove to

21   the Lexington Police Station.  That's about another five

22   minutes, correct?

23   A.   Correct.

24   Q.   That puts us at 40 minutes.  And then you said -- you

25   testified just moments ago that you were about 10 minutes

1   inside the station, correct?

2   A.   Roughly, yes.

3   Q.   So that puts us at about 50 minutes, and then you went

4   back to the Stop & Shop, that's about another 5 minutes, that's

5   55 minutes, correct?

6   A.   Roughly, Yes, it would be.

7   Q.   And then you said you were at the scene for about

8   10 minutes near the Prius, so that puts us at an hour and

9   5 minutes, correct?

11:31AM 10   A.   Yes.

11   Q.   Okay.  And then you said you conducted this extensive

12   motor vehicle inventory of the black SUV, and that took -- was

13   it --

14   A.   I don't know, 25 minutes, I don't know.

15   Q.   25 minutes.  So that puts us at an hour and a half, and

16   then you said there was about another 10 minutes between when

17   you finished that and you went back and went to photograph and

18   retrieve the plastic bags from behind the Stop & Shop, correct?

19   A.   Yes.

11:31AM 20   Q.   Okay.  So that's about an hour and a half from when you

21   received the radio call, right?

22   A.   Yes, I guess.

23   Q.   And it's December 8th, 2022?

24   A.   Yes.

25   Q.   After midnight?

1    A.   Correct.

2    Q.   It's 37 degrees.  You only touched the bag just with your

3    fingertips, right?  You don't want to pick it up and grab it?

4    A.   Yes, I picked it up by the top.

5    Q.   And your testimony to this jury is that you could still

6    tell that the bag was warm?

7    A.   Because I touched it with my other fingers as I picked it

8    up, and before I put it in, it was still warm to the touch.

9    Q.   That's your testimony that an hour and a half after you

11:32AM 10   received that first radio call, that bag was still warm to the

11    touch, correct?

12    A.   Yes.

13    Q.   And that's on a 37-degree night, according to your report?

14    A.   Yes.

15    Q.   The bag wasn't contained in anything else, right?  It was

16    just a plastic bag.  It wasn't in a cup or a thermos of any

17    kind, correct?

18    A.   No, it was not.

19         MR. FLASHNER:  I don't have any more questions.

11:32AM 20         THE COURT:  All right.  Redirect.

21         MR. CROWLEY:  Thank you.

22                    REDIRECT EXAMINATION

23    BY MR. CROWLEY:

24    Q.   I just have a few questions, Detective.  There's a number

25    of questions about the photos from the car, showing you

1    Exhibit 2.7.  Just to be clear, on the right-hand corner of

2    this photo, is that the white substance that you pulled from

3    the vehicle on December 8th, 2022?

4    A.   It is.

5    Q.   And photographed in the back of the vehicle?

6    A.   Yes, sir.

7    Q.   And is that a close-up of the substance that was in that

8    crashed black SUV on December 8th, 2022?

9    A.   It is.

11:33AM 10    Q.   And you took a photo of it?

11    A.   I did, sir.

12    Q.   And looking at 2.7, up in the upper right-hand corner, I

13    believe you testified that you also, or that during the

14    inventory search you found a black ski mask?  Is that correct?

15    A.   Yes, sir.

16    Q.   And was that in the vehicle?

17    A.   Yes, sir.

18    Q.   Are you aware that Mr. Del Rio was wearing a black ski

19    mask that night?

11:34AM 20    A.   I don't recall.  I think Officer Morris said he did have

21    one on, or something like that.  I don't recall.

22         MR. FLASHNER:  Move to strike.

23         THE COURT:  I'll strike that.  Strike the latter

24    comment.

25    Q.   And you did see video of -- I believe the defense showed

1    you video of Mr. Perez and Mr. Del Rio running through the back

2    parking lot of the Stop & Shop, correct?

3          MR. FLASHNER:  Objection, leading.

4    A.   That's correct.

5          THE COURT:  Overruled.

6    Q.   And running?

7    A.   Yes.

8    Q.   And then you went there a period of time after that and

9    you found, or the defense noted that, in the area where

11:34AM 10    Mr. Del Rio was, you found plastic bags?

11   A.   Yes.

12   Q.   And were they still warm?

13   A.   To my touch.  Yes, sir.

14          MR. CROWLEY:  No further questions.

15          THE COURT:  Recross.

16          MR. FLASHNER:  Just one moment, your Honor.  I don't

17   have anything further, your Honor.

18          THE COURT:  Thank you, you may step down.

19          THE WITNESS:  Thank you, sir.

11:35AM 20          MR. CROWLEY:  The government calls -- your Honor, at

21   this point, if we could, we'd like to introduce three

22   stipulations.

23          THE COURT:  All right.

24          MR. CROWLEY:  The first stipulation, your Honor, is

25   offered as Exhibit 16.5 that we'd move to admit.

1           THE COURT:  All right, it's admitted.

2           (Exhibit No. 16.5 received into evidence.)

3           MR. CROWLEY:  "The United States of America and the

4    defendant Jose Perez, Jr., by undersigned counsel, hereby

5    stipulate and agree that the following facts are true:

6           "Prior to December 8th, 2022, Jose Perez, Jr. had been

7    convicted of a crime punishable by imprisonment for a term

8    exceeding one year.

9           "On December 8th, 2022, Jose Perez Jr. knew that,

11:36AM 10    prior to December 8th, 2022, he had been convicted of a crime

11    punishable by imprisonment for a term exceeding one year.

12    Jose Perez, Jr. did not receive a pardon from the Governor from

13    the Commonwealth of Massachusetts restoring his right to carry

14    and/or possess a firearm and/or ammunition, nor has the

15    defendant had his firearm and ammunition privileges restored.

16           "The parties further agree that this stipulation

17    regarding a prior conviction shall be admitted into evidence

18    without any further foundation."

19           The government would offer Exhibit 16.6.  Move to

11:37AM 20    admit.

21           MR. FLASHNER:  Your Honor, may I be heard at sidebar?

22           THE COURT:  Yes.

23           (THE FOLLOWING OCCURRED AT SIDEBAR:)

24           THE COURT:  Yes.

25           MR. FLASHNER:  Your Honor, as stated previously, this

 1    is the stipulation regarding the --

 2              MR. CROWLEY:  404(b).

 3              MR. FLASHNER:  Yeah.  The 404(b), the 2017 and 2020.

 4              THE COURT:  So I'll give a cautionary and limiting

 5    instruction after the stipulation is read.

 6              MR. FLASHNER:  Yes.  And I'm objecting to the

 7    admission of this evidence for the reasons previously stated on

 8    the record and stated in my motions.

 9              THE COURT:  Yes.

11:37AM 10         (SIDEBAR CONFERENCE WAS CONCLUDED)

11              (Exhibit No. 16.6 received into evidence.)

12              THE COURT:  Go ahead.

13              MR. CROWLEY:  "The United States of America and

14    defendant Jose Perez, Jr., by undersigned counsel, hereby

15    stipulate and agree that the following facts are true and

16    undisputed:

17              "Jose Perez, Jr. plead guilty to engaging in the

18    business of dealing in firearms without a license in the

19    District of Massachusetts in or around 2017.  The parties

11:38AM 20    further agree that this stipulation of undisputed facts shall

21    be admitted into evidence without any further foundation."

22              THE COURT:  All right.  Is there a further related

23    stipulation?

24              MR. CROWLEY:  A second one.  The government offers

25    16.7 and would move to admit.

1        THE COURT:  All right.  It's admitted, 16.7.

2        (Exhibit No. 16.7 received into evidence.)

3        MR. CROWLEY:  "The United States of America and the

4    defendant Jose Perez, Jr., by undersigned counsel, hereby

5    stipulate and agree that the following facts are true and

6    undisputed:

7        "Jose Perez, Jr. plead guilty to, 1, conspiracy to

8    distribute and to possess with intent to distribute controlled

9    substances in violation of 21 United States Code Section 846;

11:39AM 10    and felon in possession of a firearm in violation of Title 18,

11    United States Code, Section 922(g)(1) in the District of

12    Massachusetts in or around 2020.

13        "2.  For this conviction, Mr. Perez admitted:

14        "1.  Mr. Perez had conspired with two other males to

15    distribute and possess with intent to distribute controlled

16    substances including cocaine.

17        "2.  Mr. Perez was stopped in a vehicle with his

18    co-conspirators.

19        "3.  Mr. Perez was driving the vehicle.

11:39AM 20        "4.  Mr. Perez had two small amounts of cocaine

21    packaged for distribution on his person as well as over $1,000

22    in cash.

23        "5.  Another bag with approximately a pound of

24    marijuana was recovered from the trunk of the vehicle.

25        "And, 6, a pistol was recovered within Mr. Perez's

1    reach from the passenger compartment of the vehicle.

2           "The parties further agree that this stipulation of

3    undisputed facts shall be admitted into evidence without any

4    further foundation."

5           THE COURT:  All right.  Ladies and gentlemen, let

6    me -- I have some instructions and cautions and limitations I

7    need to tell you about concerning these three stipulations.

8           To begin, the defendant is charged with a firearms

9    crime.  The crime is, in substance, being in knowing possession

11:40AM 10    of a firearm after a prior felony conviction.

11           One element that the government has to prove is that

12    the government has to prove that the defendant was, in fact,

13    convicted of a felony and the defendant knew he had been

14    convicted.

15           The parties have stipulated or agreed to that, both

16    that there was a prior conviction and the defendant knew he had

17    been convicted.  And you may, of course, consider those facts.

18    They're stipulated to in making your determination about

19    whether the government has proved that the defendant unlawfully

11:41AM 20    possessed a firearm after having been convicted of a felony.

21           That's not all they have to prove.  They also have to

22    prove that he possessed it and that he did so knowingly, and

23    there's an interstate commerce requirement as well, as I'll

24    describe to you at the end of the case.

25           The other two stipulations involve convictions in 2017

1  and 2022.  Let me give you a caution and limiting instructions

2  about that.

3       The government has to prove that the defendant had the

4  necessary knowledge and intent to commit the crimes charged.

5  Basically you can't commit a crime by negligence, mistake,

6  accident.  There has to be a crime for you to have committed

7  it, but the government has to prove that the defendant had the

8  required knowledge and intent.

9       And normally, of course, knowledge and intent have to

11:42AM 10  be proved indirectly by inference.  We can't look into someone

11  else's brain and tell what they were thinking or what they

12  knew, but we can make reasonable inferences from the evidence,

13  from the circumstances if those inferences are reasonably

14  supported by the inference and appear to be reasonable in light

15  of common sense and personal experience.

16       You may consider these 2017 and 2022 convictions and

17  the facts surrounding those convictions for whatever weight you

18  choose to give them in assessing whether or not the defendant

19  had the required knowledge and intent.  But there's a very

11:43AM 20  important limitation on that.  The law does not permit you to

21  convict on the ground that the defendant is a bad person

22  somehow, or that he has bad character, or that he has a

23  propensity to commit crimes.

24       You can't say, well, if he committed a crime in the

25  past, he must have committed this crime.  It doesn't work like

1   that.  That's improper and unfair.

2          One way to think about that is you are to decide

3   whether the defendant committed this crime or these two crimes,

4   and that includes assessing whether or not he had the required

5   knowledge and intent.  For example, did he knowingly possess a

6   firearm, did he knowingly possess a controlled substance.  But

7   you're not here to pass judgment on the defendant's character

8   as a person.  That's not permitted.

9          And, again, you can't conclude, well, if he has prior

11:44AM 10   convictions, he must be a bad person, have a bad character,

11   have a propensity to commit crimes.  That's improper.

12          So, again, you may consider this evidence that is his

13   earlier convictions and the details surrounding those

14   convictions only for the purposes of evaluating the defendant's

15   knowledge and intent.  You may not consider the evidence for

16   the purpose of ascertaining or determining whether the

17   defendant has a bad character, or is a bad person, or has a

18   propensity to commit crimes and, therefore, is guilty of these

19   crimes, or more likely to be guilty of these crimes.

11:44AM 20          All right.

21          MR. FLASHNER:  Your Honor, may we be heard at sidebar?

22          THE COURT:  Yes.

23          (THE FOLLOWING OCCURRED AT SIDEBAR:)

24          THE COURT:  Yes.

25          MR. FLASHNER:  I didn't just come here to renew my

1    objection, which I'll dole out later, but I will state I think

2    he said 2017 and 2022.

3         MR. FLASHNER:  It's 2020.  I didn't want to draw any

4    more attention to correct that one small thing.

5         (SIDEBAR CONFERENCE WAS CONCLUDED)

6         THE COURT:  Counsel just pointed out I misspoke.  The

7    events that we're talking about of course happened in 2022.

8    The stipulation involved 2017 and 2020, so I got that detail

9    wrong.  I misspoke and I apologize.  All right.

11:45AM 10      MR. CROWLEY:  The government calls ATF Special Agent

11   Ryan Griffin.

12        RYAN GRIFFIN, having been duly sworn by the Clerk,

13   testified as follows:

14                    <u>DIRECT EXAMINATION</u>

15   BY MR. CROWLEY:

16   Q.   Sir, would you please state your name for the record.

17   A.   Yes, Ryan Griffin.

18   Q.   How are you presently employed?

19   A.   I'm a special agent with the ATF, the Bureau of Alcohol,

11:46AM 20   Tobacco, Firearms, and Explosives.

21   Q.   And what is the ATF?

22   A.   It's a federal agency.  Our chief responsibilities are

23   firearms trafficking, criminal possession and use, and the use

24   of firearms in furtherance of drug trafficking crimes.

25   Q.   And how long have you been a special agent with the ATF?

1  A.   Approximately seven and a half years.

2  Q.   And did you receive any training to become a Special Agent

3  with the ATF?

4  A.   I did.  I went to a 28-week academy at the Federal Law

5  Enforcement Training Center in Glencoe, Georgia, and it's a

6  requirement for the job that you have an undergraduate degree.

7       THE COURT:  Can you just slow down a little bit for

8  the stenographer -- so she can keep up and the rest of us.

9  Q.   In addition to your training, have you received any

11:47AM 10  specialized training in what is known as interstate nexus?

11  A.   I have.

12  Q.   Could you describe to the jury what your training is?

13  A.   Sure.  Back in December, I attended a one-week course down

14  at -- on the Martinsburg, West Virginia facility.  We're

15  trained on where firearms are manufactured, where they come

16  from, how to determine where they came from.  The same thing

17  with ammunition, determine the different parts of the

18  ammunition, where they're manufactured, et cetera.

19  Q.   And are you provided information during that training

11:47AM 20  about various gun manufacturers?

21  A.   We are.

22  Q.   And was one of those gun manufacturers Glock?

23  A.   That's correct.

24  Q.   Now, in addition to your training, I believe you stated

25  that you've been with the ATF for over seven years?

1    A.    Correct.

2    Q.    Have you been involved in investigating various gun

3    crimes?

4    A.    I have.

5    Q.    And have those investigations included tracing where

6    firearms had been manufactured or where they were sold?

7    A.    That's correct.  I traced a lot of firearms.

8    Q.    Over seven and a half years?

9    A.    Correct.

11:48AM 10    Q.    And just without getting into the details too deeply, what

11    is a -- when you're tracing a firearm, is the serial number

12    used?

13    A.    That's correct.

14    Q.    And what's the relevance of a serial number?

15    A.    So a serial number cannot be duplicated, so when we trace

16    a firearm, we have a system that we plug all the information

17    in, and that includes the serial number, the make, the model,

18    the calibre, the country of manufacturer, and then we submit it

19    into the system, and then the tracing center down at

11:48AM 20    headquarters will actually trace the firearm from the

21    manufacturer through any distributors and trace it to the first

22    federal licensee or gun store and provide us with the first

23    purchaser.

24    Q.    So a serial number is an important aspect of identifying

25    firearms?

1   A.   Yes, very important.

2   Q.   And during your seven and a half years -- actually, taking

3   a step, during your training by the ATF, did you receive

4   information about where Glock manufactures its firearms?

5   A.   I did.

6   Q.   And what was that information?

7   A.   So Glock has a major facility in Georgia, in Smyrna

8   Georgia.   They manufacture there.   They also import there.

9   Then they have facilities in Austria, and I believe one

11:49AM 10   facility in Slovakia.

11   Q.   And during -- for your seven years and half as an active

12   ATF agent, where have you operated?

13   A.   In the North Shore of Boston mostly.

14   Q.   Massachusetts?

15   A.   Correct.

16   Q.   And approximately how many firearms investigations have

17   you been involved in?

18   A.   Hard to say, but probably hundreds.

19   Q.   And how many guns have you reviewed?

11:49AM 20   A.   Hundreds.

21   Q.   And have you been involved in the review of Glock

22   firearms?

23   A.   I have.

24   Q.   And during your seven and a half years of working in

25   Massachusetts, have you dealt with Glock firearms?

1   A.   I have.

2   Q.   And during that time period, have you learned where,

3   whether Glock -- any Glock components are made in

4   Massachusetts?

5   A.   That's correct.  They're not.

6   Q.   So based on your seven and a half years and hundreds of

7   investigations, you received information that no components are

8   made in Massachusetts?

9   A.   That's correct.

11:50AM 10   Q.   And, sir, I'm going to show you -- were you asked to

11   review a firearm pursuant to this investigation?

12   A.   I was.

13   Q.   And what was your review focused on?

14   A.   I focused on the firearm and the ammunition.  The firearm

15   in question was a Glock 43X.  I observed the firearm, I

16   physically inspected it, I observed all the markings that were

17   on the firearm.

18   Q.   If you could stop for a second.  I'll approach.  I'm

19   showing you what's been marked as Government Exhibit 10.  Sir,

11:51AM 20   do you recognize Exhibit 10?

21   A.   I do.

22   Q.   And how do you recognize it?

23   A.   I reviewed this on or about May 9th of 2024 for this case.

24   Q.   Now, when you say you did a review of it, what did the

25   review consist of?

1     A.   So the purpose of my review is to do an interstate nexus

2     on this firearm, and I reviewed all the markings on it.  One of

3     the things that I determined -- so the firearm itself is

4     actually the frame of the firearm, so that would be this black

5     piece down here, and this has its own serial number on it.

6     That's right here.

7          The slide, the barrel, and the spring component,

8     obviously, it's, you know, an important function of the

9     firearm, of course, but this alone is not the firearm.  The

11:51AM 10    firearm itself is the frame, so this particular firearm has a

11    serial number of BSDU632.  The slide and the barrel have a

12    different firearm -- different serial number, BMAR164.

13         This tells me -- and I believe the barrel has the same

14    serial number on it as well.  This tells me that this frame,

15    which is the firearm, at one point had a different barrel and

16    slide on it.

17         And then I also observed markings clearly displayed on

18    what I'll call the right side of the firearm.  It says, "Made

19    in Austria," and then below it, it says "Glock, Incorporated,

11:52AM 20    Smyrna, Georgia," abbreviation for incorporated, and then it

21    has the patent information.

22    Q.   Now, taking a step back, you said that there were two

23    different serial numbers on this?

24    A.   That's correct.

25    Q.   But did you focus on one as being the primary serial

1  number?

2  A.    Correct.  The serial number that's clearly marked on the

3  frame is the one that matters in this case.  The frame is the

4  firearm.  That is what I did my interstate nexus determination

5  on.

6  Q.    So was that a frame?

7  A.    This is a frame.

8  Q.    And you stated that you saw markings on it.  Based on your

9  training and experience, do commercial firearms manufacturers

11:53AM 10  mark certain aspects of their products?

11  A.    They do.

12  Q.    And can you explain why that is to the jury?

13  A.    Sure.  So according to Code of Federal Regulations, I

14  believe it's 27 CMR -- I'm sorry CFR 478.92, firearms

15  manufacturers are required to have their name, they're required

16  to have the model and calibre, and then there's also in the

17  case of a foreign-made firearm, they have to have the country

18  of origin printed on the firearm.

19  Q.    And on that frame did you see markings that had importance

11:53AM 20  to you during your review?

21  A.    Yes.  So "made in Austria" is very important for this

22  purpose and then "Glock, Incorporated, Smyrna, Georgia," that

23  tells me that that's the importer's marking.

24        So Glock, Austria, which is Glock GMBH is the actual

25  manufacturer of this firearm, and it was incorporated through

1    Glock, Incorporated in Smyrna, Georgia.

2    Q.   So based on your experience, including your seven and a

3    half years as an ATF agent, your specific training in

4    interstate nexus by the ATF, did you form an opinion as to

5    whether this was a firearm that traveled in foreign or

6    interstate commerce?

7    A.   I did form that opinion, that it traveled in interstate

8    and foreign commerce.

9    Q.   Now, after you formed that opinion, did you take any steps

10   to confirm that opinion?

11   A.   I did.  Just in the interest of -- like one of the things

12   that we learned about was different marking variances.  We

13   always check marking variances to see if a different

14   manufacturer actually manufactured that firearm.  I did not

15   find any marking variance, but just to confirm, I had contacted

16   Glock directly.  I had contacted an individual named Ed Silvey,

17   who is the FFL records coordinator for Glock, Incorporated in

18   Smyrna.

19   Q.   And how did you have that contact information?

20   A.   I sent him an email.

21   Q.   And did you have that information from -- how did you

22   learn about Mr. Silvey?

23   A.   So I've used Mr. Silvey for a bit just with different

24   questions of when I've come across Glocks in the past.  He's

25   the FFL records coordinator, and he has access to records for

1    Glock.

2    Q.   And when you contacted him by email, did you get a return

3    email?

4    A.   I did.

5    Q.   And what was the information provided on now?

6    A.   It just said import, and I believe the date was 1-26 of

7    '21, and then it said, "shipped to Bangers" which was a

8    distributor in Birmingham, Alabama on 1/27 of 2021.

9    Q.   And did the e-mail say where it was imported from?

11:55AM 10   A.   I believe it said imported from Austria.

11   Q.   So when you received that information from the

12   representative of Glock, how did you take that?

13   A.   Just as confirmation of my opinion.

14        MR. CROWLEY:  No further questions, your Honor.

15        THE COURT:  All right.  Any cross?

16                    CROSS-EXAMINATION

17   BY MR. DALEY:

18   Q.   Good morning, Agent Griffin.

19   A.   Good morning, Counselor.

11:56AM 20   Q.   My name is Ed Daley.  I represent Jose Perez in this case.

21   You testified a moment ago that you work for the ATF?

22   A.   Correct.

23   Q.   And how long have you worked there?

24   A.   Seven and a half years, approximately.

25   Q.   Okay.  And you weren't on the scene in Lexington,

1    Massachusetts on December 8th, 2022, correct?

2    A.    I was not.

3    Q.    So is it fair to say that you were not the person who

4    collected this firearm?

5    A.    That's correct.

6    Q.    And you didn't observe anybody collect this firearm?

7    A.    That's correct.

8    Q.    So when did you actually receive this firearm for

9    reviewing and analysis?

11:57AM 10    A.    On or about May 9th of 2024.

11    Q.    Okay.  So May 9th, 2024, so almost two years after

12    December 8th, 2022?

13    A.    That's correct.

14    Q.    Okay.  And when you received the firearm, you did a

15    physical inspection of the firearm?

16    A.    That's correct.

17    Q.    And so you looked at it?

18    A.    Correct.

19    Q.    And you saw that the slide was silver or grayish nickel?

11:57AM 20    A.    That's correct.

21    Q.    And the body is black?

22    A.    Correct.

23    Q.    And it's a Glock 43X?

24    A.    Correct.

25    Q.    And it's not a Glock 34X?

1    A.    Correct.

2    Q.    You examined the markings on the firearm, correct?

3    A.    That's correct.

4    Q.    And the markings don't indicate that it's a Glock 34X?

5    A.    No, the marking on the slide says 43X.

6    Q.    On the slide says 43X?

7    A.    Correct.

8    Q.    Thank you.  That slide is not black, correct?

9    A.    Correct.

11:57AM 10    Q.    And that body is not gray, correct?

11    A.    Correct.

12    Q.    And after examining the physical, I guess, how the firearm

13    looks, you then did some research into where the firearm was

14    manufactured, correct?

15    A.    That's correct.

16    Q.    And you contacted someone at the -- I think you said the

17    Glock manufacturer to confirm your, I guess, observations that

18    it was produced in Austria?

19    A.    So I contacted Glock, Incorporated in Smyrna, Georgia.

11:58AM 20    Q.    Okay.  And so a representative from Glock?

21    A.    Correct.

22    Q.    And that took some amount of time to review the firearm

23    and then contact someone from Glock?

24    A.    Correct.

25    Q.    Okay.  And that was part of your review and analysis of

1  this firearm --

2  A.  That's correct.

3  Q.  -- about the opinion you're offering today to the jury?

4  A.  Correct.

5  Q.  When you were analyzing this firearm, you didn't do any

6  testing to look for fingerprints on the firearm, did you?

7  A.  I did not.

8       MR. CROWLEY:  Exceeds the scope of the direct, your

9  Honor.

11:58AM 10      THE COURT:  I'll allow it.  Overruled.  You may

11  answer.

12  A.  I did not.

13  Q.  Okay.  So your testimony is that you did not do any

14  fingerprint testing on the firearm?

15  A.  I did not.

16  Q.  And are you aware that this firearm was never tested for

17  fingerprints?

18  A.  I'm not aware either way.

19  Q.  Okay.  And did you do any DNA testing on this firearm?

11:59AM 20  A.  I did not.

21  Q.  Are you aware that this firearm was never tested for DNA?

22  A.  Not aware either way.

23  Q.  So you're not aware that this firearm was not tested for

24  DNA?

25       MR. CROWLEY:  Objection.  Asked and answered.

```
        1              THE COURT:  It is repetitive, and obviously he has no
        2     basis for knowing one way or the other.  Let's move on.
        3              MR. DALEY:  I'll move on, your Honor.
        4     Q.   So the opinions you're sharing with us or the jury today,
        5     those have nothing to do with where this firearm was recovered
        6     on December 8th, 2022?
        7     A.   That's correct.
        8     Q.   And the opinions that you're sharing with the jury today
        9     have nothing to do with who possessed that firearm on the night
11:59AM 10     of December 8th, 2022?
       11     A.   That's correct.
       12              MR. DALEY:  Nothing further.
       13              MR. CROWLEY:  No redirect.  Thank you, your Honor.
       14              THE COURT:  Thank you.  You may step down.
       15              MS. HOEFLE:  The United States would call chemist
       16     Katelyn Thomas, your Honor.
       17              KATELYN THOMAS, having been duly sworn by the Clerk,
       18     testified as follows:
       19                          DIRECT EXAMINATION
12:00PM 20     BY MS. HOEFLE:
       21     Q.   Good morning.
       22     A.   Good morning.
       23     Q.   OR afternoon.  What's your name, please?
       24     A.   Katelyn Thomas.
       25     Q.   Where do you work?
```

           1    A.    I work at the U.S. Customs and Border Protection

           2    Laboratory in Chicago.

           3    Q.    How long have you worked at that lab?

           4    A.    Six years.

           5    Q.    What is your current position?

           6    A.    I am a forensic chemist.

           7    Q.    Can you please describe, generally, your duties and

           8    responsibilities?

           9    A.    I analyze evidence for controlled substances and write

12:01PM 10    reports on my findings.

          11    Q.    Before working at the lab, what did you do for work?

          12    A.    I worked at Doctors Data Inc. testing medical -- doing

          13    medical tests on body fluids.

          14    Q.    Prior to that, what did you do?

          15    A.    I tested body fluids for controlled substances.

          16    Q.    And prior to that, what did you do for work?

          17    A.    I worked at Microtrace LLC examining contaminants found in

          18    food, creating trace microscopy databases, and testing unknown

          19    pharmaceuticals.

12:02PM 20          THE COURT:  Can I get you to move just a little closer

          21    to the mic or move the mic a little closer to you?  Thanks.

          22          Go ahead.

          23    Q.    What is your educational background?

          24    A.    I have a master's of science from -- in forensic science

          25    from Loyola University of Chicago and a master's of science in

1    forensic science from University of Illinois at Chicago.

2    Q.    Have you received any specialized training in drug

3    analysis and identification?

4    A.    Yes.  We have a CVP controlled substance training program

5    that I went through to be able to do controlled substance

6    analysis, and I have further training on specific

7    instrumentation that we use in the laboratory.

8    Q.    I want to ask you some questions about the different

9    procedures that you use.  So how do you receive substances at

12:03PM 10    the lab for testing?

11    A.    So we either receive it by hand from our local agents or

12    we receive it in the mail via FedEx or UPS.

13    Q.    When evidence or substances come into the lab, what

14    happens to it?

15    A.    Initially, a supervisor will open the box that it's

16    received in in the presence of a witness, and they will do an

17    inventory of what was received in the box and just ensure that

18    all the paperwork that we need and the evidence is sealed

19    properly.

12:03PM 20    Q.    After that, what happens?

21    A.    The information from the sample is entered into our

22    computer system called LIN, our laboratory information network.

23    This computer program we will enter our -- the chain of custody

24    number, the evidence bag number, a sample description, and any

25    other identifying information that is received.  Our LIN system

1  will then auto generate a unique lab number that will stay with

2  the sample throughout the whole examination process.

3  Q.   So stay with the sample like a tracking number?

4  A.   Yes.

5  Q.   Okay.  So after that information is entered into the

6  computer system, the evidence is assigned a specific

7  trafficking number or laboratory number.  What happens after

8  that with the evidence?

9  A.   Then the evidence is placed into our vault for storage.

12:04PM 10  Q.   Can you describe the vault generally?

11  A.   Yes.  So the controlled substances analyst and latent

12  print examiners have the codes for the security code, the

13  security system that we have, and then there is also a unique

14  door code that we have to enter the vault.  Once you are in the

15  vault, there is a cage that requires a key, and a supervisor

16  has the key to that, so it requires two people to enter the

17  vault at one time.

18  Q.   So after the evidence is entered into the vault, what

19  happens to it?

12:05PM 20  A.   Then it is stored by the supervisors until it is assigned

21  to an analyst.

22  Q.   And perhaps to state the obvious to ask you, why is it

23  assigned to an analyst?

24  A.   To examine the evidence for controlled substances.  Sorry.

25  Q.   Once an analyst is assigned, what happens?

1   A.   We will take it into our organic chemistry lab, which has

2   a unique door code to get into, and the first thing we're going

3   to do is to sign our name on the chain of custody to show that

4   you have custody of the sample now.

5   Q.   So you've brought it from the -- gone to the vault if you

6   are the assigned analyst, gotten the substance, brought it to

7   a -- you just described it as an organic chemistry lab, so all

8   within the same general building of the laboratory?

9   A.   Yes.  Correct.

12:06PM 10   Q.   Okay.  So once you're at your station in the lab and after

11   you sign the chain of custody, what happens?

12   A.   I will fill out an inventory form, which will contain the

13   chain of custody number, the evidence bag number, any

14   descriptions of the sample that I can see through the evidence

15   bag.

16   Q.   After you do that, what do you do?

17   A.   I will get another chemist to witness me opening the

18   sample.  To open the sample, I will -- first, I will take

19   pictures of the evidence bag and the chain of custody number,

12:06PM 20   and then I will open the sample, write my descriptions of what

21   was received in the evidence bag, as well as take weights of

22   the sample.

23   Q.   So now at this point the sample is sort of unpackaged.

24   What happens after you've taken those steps?

25   A.   Then I will perform chemical analysis after I sub-sample

1    the evidence that I received.

2    Q.   And so I'll ask you some questions about the more

3    technical aspects of that analysis in a second, but to sort of

4    put the -- jump to the end quickly and than we'll return to the

5    analysis.  After you've analyzed, what happens with the

6    substance or the evidence?

7    A.    After the substance is analyzed, I will take a final

8    weight of the drug and note it on my inventory form, then I

9    will write a report of my findings.  This report will go

12:07PM 10    through two reviews.  It will go through a technical review,

11    where a supervisor will review all my data, and then it will go

12    through the administrative review with the assistant lab

13    director, who will just review it for any other mistakes that

14    could have been made and make sure everything makes sense.

15    Q.   And with respect to the evidence itself, after you get

16    that final weight, what do you do with the evidence or the

17    sample?

18    A.   I will reseal it in a new evidence bag, and once it is in

19    the new evidence bag, I will seal it and sign and date on the

12:08PM 20    top of that evidence bag across the seal.

21    Q.   And then what did you do with that new evidence bag that

22    you've signed and dated and sealed?

23    A.   It will be put back into the vault for storage until I

24    return it.

25    Q.   Okay.  So I do want to return to the analysis portion.  So

1 about how many times have you tested an unknown substance for

2 analysis and identification?

3 A. About 1,500 times.

4 Q. Have you tested for the presence of cocaine?

5 A. Yes.

6 Q. How about cocaine base?

7 A. Yes.

8 Q. And fentanyl?

9 A. Yes.

12:08PM 10 Q. What tests generally are performed or do you perform for

11 fentanyl or in determining whether a substance contains

12 fentanyl?

13 A. I will perform FT-IR, or fourier-transform infrared

14 spectroscopy, and GCMS analysis, which is gas

15 chromatography-mass spectrometry.

16 Q. What about for cocaine?  What types of tests are

17 conducted?

18 A. I will also test by FT-IR and GCMS, but I will also use

19 Raman spectroscopy.

12:09PM 20 Q. So those are three types of tests.  I want to ask you to

21 sort of briefly tell us about each.  So can you first describe

22 for us what you mentioned, FT-IR?

23 A. Yes, so FT-IR, or fourier-transform infrared spectroscopy,

24 uses infrared radiation to analyze unknown samples.  You will

25 place your unknown sample on a diamond crystal, and you will

1    send infrared radiation through the sample.  Unique drugs will

2    absorb a specific pattern of infrared radiation, and the

3    instrument will collect a spectrum or a graph of what infrared

4    light is absorbed for this sample.

5    Q.   What is done, or what do you do then, if anything, with

6    that graph that's produced by the instrument?

7    A.   I will then compare it to a known reference database of

8    known controlled substances.

9    Q.   Why do you do that?

12:10PM 10    A.   From there, I can identify what drugs specifically it is.

11    Q.   Can you please describe for us GCMS?

12    A.   So GCMS is two different tests combined into one.  So the

13    GC portion, or the gas chromatograph, is similar to a hose, so

14    the sample will go through the hose, and each drug will spend a

15    unique amount of time traveling through it.

16         Once it travels through the hose, it will be sent to

17    the mass spectrometer, which will send a beam of electrons at

18    the drug, which will break it apart, and this will present a

19    unique chemical fingerprint where you can identify what drug it

12:11PM 20    is.

21    Q.   And when you say present a unique chemical fingerprint, is

22    that something you can see, like a physical?

23    A.   Yes, it's another graph, type of graph.

24    Q.   Okay.  And then what do you do with that fingerprint or

25    graph?

1    A.    We compare it to known reference databases.

2    Q.    And why do you do that?

3    A.    So I can identify what drug it is.

4    Q.    And, finally, can you generally describe the Raman

5    spectroscopy test?

6    A.    Yes, so Raman spectroscopy uses a laser to analyze

7    samples.  It will send a beam from the laser onto the sample,

8    and the sample will reflect the light from the laser back into

9    the instrument.  This light will reflect back and form a unique

12:11PM 10   graph or spectrum again, and I will compare it to a referenced

11   database to identify what drug it is.

12   Q.   So before conducting any of these tests that you just

13   described, how do you know whether the instruments are in

14   proper working order?

15   A.    So for FT-IR, we do a monthly verification.  It's a

16   performance verification, so it is automatically run by the

17   instrument, and it goes through a bunch of different processes

18   to make sure everything is in proper working order and nothing

19   is out of place.  As long as that passes, we're able to use the

12:12PM 20   instruments.

21          Further tests that we do every single day is we use a

22   known reference.  Normally, just like a regular plastic

23   material that we know what the spectrum should look like, so we

24   use that every day to make sure that the reference is --

25   matches up to what we expect it to look like.

1  Q.  So when you say you use that reference, do you actually

2  run that reference for that known substance through the

3  instrument to sort of, as you just described, to make sure that

4  it matches what you just described as what it should match up

5  with?

6  A.  Yes.

7  Q.  Okay.  And then are any other tests done with the FT-IR,

8  or excuse me.  Any other steps taken to ensure the FT-IR

9  machine or instrument is in working order before you use it?

12:13PM 10  A.  Yes, every hour we perform a background check, which is

11  essentially we collect a spectrum of the environment around us

12  to ensure that nothing in the environment is interfering with

13  our sample analysis.  I will also collect a blank spectrum

14  beforehand to ensure that nothing is on the diamond crystal

15  before I place my sample on it.  So I will collect a graph of

16  just like the blank, nothing on the diamond crystal to show

17  that there's no contamination.

18  Q.  Okay.  What about the GCMS?  What steps do you take to

19  ensure that that machine or instrument is in working order

12:13PM 20  before you use it to -- in your analysis?

21  A.  We perform a weekly A Tune, which sends the instrument

22  through a lot of verifications and will tell us if there are

23  any leaks in the instrument or if anything is out of balance.

24  That will show us.  As long as that passes, we're able to use

25  the instrument.  We do a daily verification, again, of a known

1    reference that we know what to expect out of it, and as long as

2    that matches up, we are also able to use it.

3           Before and after every sample that we run, we also run

4    a blank of just a plain chemical to ensure that there is no

5    crossover or carryover from the sample before to interfere with

6    the following sample.

7    Q.   And then finally, what about the Raman spectroscopy

8    instrument?  What steps do you take to ensure that that's in

9    working order before using it for analysis?

12:14PM 10   A.   For the Raman spectrometer, we also do a monthly

11   performance verification to make sure that everything is in

12   working order.  We also do a daily known verification to ensure

13   that what we expect to see is what we are seeing.

14   Q.   Okay.  So what, if anything, were you asked to do in

15   relation to this case?

16   A.   I was asked to analyze for controlled substances.

17   Q.   Were -- the testing processes that you just described, did

18   you follow those processes in this case?

19   A.   Yes.

12:15PM 20   Q.   Did you generate a laboratory report or certificate in

21   connection with the analysis that you just described?

22   A.   Yes.

23          MS. HOEFLE:  Can we please have, for the witness only,

24   I suppose, Exhibit 14.  Thank you.

25   Q.   Ms. Thomas, do you see before you what's been marked as

1    Exhibit 14?

2    A.    Yes.

3    Q.    Do you recognize this?

4    A.    Yes.

5    Q.    What is it?

6          MS. HOEFLE:  And if we could scroll, there's two

7    pages, Mr. O'Donnell, pages 1 and 2.

8    A.    This is the laboratory report I created for this case.

9    Q.    Did you create this report at or around the time of the

10   testing that's reflected in it?

11   A.    Yes.

12   Q.    Was this made in the ordinary course of the business and

13   your laboratory work?

14   A.    Yes.

15   Q.    And does it appear to be true and accurate?

16   A.    Yes.

17          MS. HOEFLE:  Your Honor, I would offer Exhibit 14.

18          MR. DALEY:  No objection, 14.

19          THE COURT:  It's admitted, 14.

20          (Exhibit No. 14 received into evidence.

21          MS. HOEFLE:  Thank you.  Could we please put this up.

22   So let's go to the first page.  Thank you.

23   Q.    So, Ms. Thomas, what is the lab report number, looking at

24   the top left-hand corner, what's the lab number listed here?

25   A.    CH20230141.

1    Q.   And is that the lab number you previously told us about

2    that is sort of a tracker, if you will, that follows it through

3    the lab?

4    A.   Yes, it was assigned to this case, yes.

5    Q.   Okay.  What's the chain of custody number listed?

6    A.   639 -- oh, thank you.  6381316.

7    Q.   And what's the evidence bag number here?

8    A.   L366168.

9    Q.   And what does that evidence bag number refer to?

12:17PM 10    A.   That is the original evidence bag that I received the

11   evidence in.

12   Q.   Okay.

13        MS. HOEFLE:  If we could look at, please,

14   Mr. O'Donnell, sort of zoom in on line item 1, or actually line

15   items 1, 2, and 3.  And -- yeah.  Perfect.

16   Q.   So, Ms. Thomas, you testified that you were asked to

17   identify, I believe, three substances in this case.  And can

18   you please read what's been blown up here?

19   A.   Yes, the line items were 01, 02, and 03.  Description:

12:17PM 20   "The sample consists of three smaller evidence bags containing

21   various amounts of white chunks and brown powders."

22   Q.   Thank you.

23        MS. HOEFLE:  And if could go up to line item 1.  The

24   whole of it.  Perfect.

25   Q.   Ms. Thomas, could you please read the description here of

1    line item 1?

2    A.    Yes.  "The item was received in two additional evidence

3    bags and consists of a tied plastic baggy containing off-white

4    porous chunks of material wrapped in a white paper towel."

5    Q.    What did you do with this item 1, generally?

6    A.    I collected weights, analyzed it by FT-IR, Raman analysis,

7    and GCMS analysis.

8    Q.    Did you photograph item 1?

9    A.    Yes.

12:18PM 10          MS. HOEFLE:  Could we please have what has been

11    admitted into evidence as -- let's start with Exhibit 15.2 and

12    scrolling through to 15.3.

13    Q.    So Ms. Thomas, what are these that we just saw or are

14    looking at now?

15    A.    This is line item 1 as I received it.  These are the

16    photographs that I took of the evidence.

17    Q.    And looking back at Exhibit 14, what was the approximate

18    weight of line item 1?

19    A.    51.49 grams.

12:19PM 20    Q.    What did your tests show as to this item?

21    A.    It is composed of cocaine base.

22          MS. HOEFLE:  And with your Honor's permission, I'll

23    approach and I'll show you what's been marked as Exhibit 11.

24    I'm actually -- if it's okay with your Honor, I might leave

25    both of these with you.

1    Q.   If you could look at this one that's been marked and

2    admitted as Exhibit 11 first.  Do you recognize this?

3    A.   Yes.

4    Q.   What is it?

5    A.   This is line item 1 as I resealed it and sent it back to

6    the submitting agent.

7    Q.   How do you know that?

8    A.   The laboratory number that it was assigned at my lab is on

9    top of it, and my initials and my handwriting are on the top.

12:20PM 10    Q.   Did you seal that bag?

11    A.   Yes.

12    Q.   Okay.  Thank you.  And we'll look now -- actually, if we

13    can go back to Exhibit 14, please.  So I want to ask you about

14    line item 2.  So looking here at Exhibit 14, can you please

15    read the description of line item 2?

16    A.   Yes.  "The item was received in two additional evidence

17    bags and consists of a tied plastic baggy containing 44 corner

18    baggies of brown powder."

19    Q.   What was the approximate weight of item 2?

12:20PM 20    A.   The gross weight was 49.12 grams.

21    Q.   Can we -- did you photograph item 2?

22    A.   Yes.

23    Q.   Could we please look at Exhibit 15.5.  Looking here at

24    what's been admitted as Exhibit 15.5 and we'll sort of scroll

25    through to 15.6 and 15.7 and 15.8.  What are these that we just

1  looked at, Ms. Thomas?

2  A.    These are the photographs that I took of item 02.

3  Q.    What did you do with item 2?

4  A.    I took photographs, analyzed the samples by FT-IR and GCMS

5  analysis.

6  Q.    What did your tests show?

7  A.    The samples are -- I subsampled five of the baggies

8  randomly.

9  Q.    Five of the 44 baggies?

12:21PM 10  A.    Yes.  Yes.

11  Q.    Okay.

12  A.    And all five of them are composed of fentanyl and 4-ANPP.

13  Q.    What's 4-ANPP?

14  A.    4-ANPP is a precursor to fentanyl.  So essentially it's a

15  drug that you use to create fentanyl.

16  Q.    Okay.  So your tests show that the items contain this

17  precursor and fentanyl?

18  A.    Correct.

19  Q.    Thank you.  And what about item 3?

12:22PM 20        MS. HOEFLE:  Can we look at one last time Exhibit 14,

21  please.  Thank you.

22  Q.    We're on the second page of item 3 here.  Can you please

23  read the description of item 3?

24  A.    Yes.  "The item was received in two additional evidence

25  bags and consists of seven baggies of off white chunks or white

1  powder.  The analyst labeled the baggies A through G.  Items C

2  and G contain white powder, items, A, B, D, E, F contain off

3  white chunks."

4  Q.   Thank you.  And the analyst here, is that you?

5  A.   Yes.

6  Q.   You wrote this report?

7  A.   Yes.

8  Q.   Thank you.  Did you photograph item 3?

9  A.   Yes.

12:22PM 10       MS. HOEFLE:  Could we please have Exhibits 15.9, and

11  I'll ask you to do the same, sort of scroll through 15.9,

12  15,10, 15.11, 15.12, and if we could zoom in.  Thank you.

13  Q.   So, Ms. Thomas, what did we just look at here?

14  A.   These are the photographs I took of line item 03.

15  Q.   And what was the approximate weight of all of the seven

16  baggies?

17  A.   Approximately 43 grams.

18  Q.   What did you do with item 3?

19  A.   I photographed the evidence, tested it by FT-IR Raman

12:23PM 20  analysis, and GCMS analysis.

21  Q.   What did your tests show as to this item?

22  A.   It showed that item C is composed of cocaine HCL and all

23  of the other items are composed of cocaine base.

24  Q.   What is -- what's the difference between those two?  You

25  just mentioned two different sort of types of cocaine.  What's

1    the difference between those?

2    A.    So cocaine base is commonly known as crack cocaine, and

3    cocaine HCL is just powder cocaine.

4    Q.    And now I would ask you to look at, on your left-hand

5    side, what I've placed as what's previously been admitted as

6    Exhibit 13, so you can take that bag.  Do you recognize that?

7    A.    Yes.

8    Q.    What is that?

9    A.    This is line item 3 from this case.

12:24PM 10    Q.    How do you know that?

11    A.    The laboratory number is on here, the line item number, as

12    well as my initials and my date across the seal.

13    Q.    And did you seal that bag, in fact?

14    A.    Yes.

15    Q.    And once you were done analyzing the items in this case,

16    generally what did you do -- and I know you just read the

17    report that we described, but after that what did you do with

18    the evidence itself?

19    A.    I packaged it up to ship it out by FedEx, so I packaged up

12:24PM 20    the evidence, the original chain of custody, and an inventory

21    form so the agent knows what we are sending back to them.  I

22    prepared this in front of a witness to verify that my numbers

23    are correct, what I'm sending back is accurate, and that I am

24    shipping it back to the correct address.

25    Q.    Okay.  I will come and collect those from you.  And

Chemist Thomas, you previously listed -- you previously

testified as to the lab number that was listed in your

certificate of analysis; is that right?

A.   Yes.

Q.   And if you could pull up Exhibit 14 please again.  If you

could read that to us again, please, what was that on the lab

report number?

A.   Oh, CH20230141.

Q.   Okay.  And Chemist Thomas, when you -- have you seen what

I'm holding in my hand before Exhibit 12?

A.   Yes.

Q.   Okay.  And fair to say that you -- the items that you

tested that were the subject of item 2, you packaged all of

those up and sent those, as you just testified -- or packaged

them up, sealed them, and placed them for sending to return to

the agency; is that right?

A.   Yes, in a similar evidence bag to what I'm holding up

here.

Q.   Okay.  I'll come collect those from you.

          MS. HOEFLE:  I have nothing further, your Honor.

          THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

BY MR. DALEY:

Q.   Good afternoon, Ms. Thomas.

A.   Good afternoon.

| | |
|---|---|
| 1 | Q.   My name is Ed Daley and I represent Jose Perez.  I think |
| 2 | you testified a moment ago that you work in Chicago? |
| 3 | A.   Yes. |
| 4 | Q.   Okay.  And you mentioned during your direct examination a |
| 5 | vault in the place you work; is that correct? |
| 6 | A.   Correct. |
| 7 | Q.   And do you have access to that vault? |
| 8 | A.   Yes. |
| 9 | Q.   Do the latent fingerprint analysts or examiners have |
| 12:28PM 10 | access to that vault as well? |
| 11 | A.   Yes. |
| 12 | Q.   Okay.  So you work alongside, in your lab, with latent |
| 13 | fingerprint analysts or examiners? |
| 14 | A.   Yes. |
| 15 | Q.   Okay.  And on December 8th, 2022, you weren't in |
| 16 | Lexington, Massachusetts, were you? |
| 17 | A.   No. |
| 18 | Q.   And did you ever at any point travel to Lexington, |
| 19 | Massachusetts and visit the Lexington Police Department to |
| 12:28PM 20 | collect any samples from them? |
| 21 | A.   No. |
| 22 | Q.   Okay.  So since you were not in Lexington, Massachusetts |
| 23 | on December 8th, 2022, you don't have any firsthand knowledge |
| 24 | or observations about where the samples that you eventually |
| 25 | analyzed were located or collected, correct? |

    1    A.    Correct.

    2    Q.    And you don't have any firsthand knowledge of how those

    3    samples were collected?

    4    A.    No.

    5    Q.    At some point, you just received those samples.  Was it in

    6    the mail?

    7    A.    Yes.

    8    Q.    Okay.  And do you know who sent those samples?

    9    A.    Jason Fox.

12:29PM 10   Q.    And who is Jason Fox?

    11   A.    He is one of our Homeland Security investigation agents.

    12   Q.    But he's not with the Lexington Police Department, right?

    13   A.    I don't believe so, no.

    14   Q.    Okay.  So at some point you received a number of samples

    15   from I believe you said Jason Fox?

    16   A.    Yes.

    17   Q.    And then you analyzed those samples, correct?

    18   A.    Correct.

    19   Q.    And you did some testing on them?

12:29PM 20   A.    Yes.

    21   Q.    And I'm not going to try to pronounce the test that you

    22   just mentioned, because I will do an awful job of it, but one

    23   of them was FT-IR?

    24   A.    Yes.

    25   Q.    And you did FT-IR testing on a portion of each of the

1  samples that you reviewed?

2  A.    Correct.

3  Q.    And then you did GCMS on a portion of the samples that you

4  reviewed?

5  A.    Correct.

6  Q.    And I'm sorry.  To clean that up a bit, a portion of each

7  of the three samples that you reviewed?

8  A.    Yes.

9  Q.    Okay.  And then you also did Raman spectroscopy?

12:30PM 10  A.    Yes, on items 1 and 3.

11  Q.    Okay.  So those are three forensic tests that you did on

12  the samples that were sent to you to determine their chemical

13  makeup; is that fair to say?

14  A.    Yes.

15  Q.    Okay.  But you did not do any testing on the plastic bags

16  that you received in the samples?

17  A.    Correct.

18  Q.    So you did not test for any fingerprints that were on

19  those bags?

12:30PM 20  A.    No.

21  Q.    And are you aware that no one within your department

22  tested for fingerprints on those bags?

23  A.    Not that I'm aware of.

24  Q.    Okay.  And are you aware that fingerprint testing was

25  never requested from your department?

1          MS. HOEFLE:  Objection.

2          THE COURT:  Sustained.

3    Q.   Did you conduct any DNA testing on the bags that you

4    eventually tested?

5    A.   No.

6    Q.   Okay.  And are you aware that the Lexington Police

7    Department didn't do any DNA testing on the bags?

8          MS. HOEFLE:  Objection, your Honor.

9          THE COURT:  Sustained.

12:31PM 10  Q.   So the opinions that you shared today with the jury, those

11   only relate to the chemical makeup of the compounds that you

12   tested?

13   A.   Correct.

14   Q.   So those opinions don't have anything to do with where the

15   samples were initially located, correct?

16         MS. HOEFLE:  Objection, asked and answered, your

17   Honor.

18         THE COURT:  It's argumentative.  I mean, she's a lab

19   chemist.  Is there any dispute that she was not in Lexington at

12:31PM 20  the time?

21         MR. DALEY:  I'm just clarifying.

22         THE COURT:  Well, it's not very unclear.  Go ahead.

23   BY MR. DALEY:

24   Q.   Okay.  So the opinions you share with the jury only relate

25   to the chemical compounds and structures that you tested in the

1    lab in Chicago at some point recently?

2    A.   Yes, in 2023.

3    Q.   2023.

4         MR. DALEY:  Thank you, no further questions.

5         THE COURT:  Anything else?

6         MS. HOEFLE:  No, your Honor.

7         THE COURT:  Okay.  Thank you.  You may step down.

8         THE WITNESS:  Thank you.

9         MR. CROWLEY:  The government calls Sergeant Detective

12:32PM 10   Michael Noone.

11        MICHAEL NOONE, having been duly sworn by the Clerk,

12   testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. CROWLEY:

15   Q.   What's your name for the record?

16   A.   Michael Noone, N-o-o-n-e.

17   Q.   And are you presently a sergeant detective with the

18   Chelsea Police Department?

19   A.   I am.

12:33PM 20   Q.   And how long have you been a sergeant detective?

21   A.   Only since March of this year.

22   Q.   And prior to that, what position did you hold?

23   A.   From -- 2023, I got promoted to patrol sergeant.

24   Q.   And how long did you hold that position?

25   A.   For about a year and two months.

1    Q.    And prior to that, were you a detective in the

2    Chelsea Police Department?

3    A.    Yes.

4    Q.    And how long were you a detective in the Chelsea Police

5    Department?

6    A.    15 years.

7    Q.    And during this -- and what period of time was that?

8    A.    Between 2008 and 2023.

9    Q.    And, sir, are you also a task force officer with the

12:34PM 10   Bureau of Alcohol, Tobacco, and Firearms?

11   A.    I am.

12   Q.    And, sir, prior to -- just to round out your history,

13   prior to being a detective, were you a patrolman at -- in

14   Chelsea?

15   A.    I was.

16   Q.    For how long?

17   A.    Approximately four years.

18   Q.    But you were a detective and a task force officer for

19   approximately 15 years?

12:34PM 20   A.    Yes.

21   Q.    And as a detective and task force officer, were you

22   involved in investigations dealing with street level drug

23   dealing?

24   A.    Yes.

25   Q.    And were you involved in investigations of people buying

1   personal use amounts of drugs?

2   A.   Yes.

3   Q.   Approximately how many were you involved in?

4   A.   Over 100, I would say.

5   Q.   And have you been involved in the seizures of drugs from

6   people who had bought drugs on the street?

7   A.   Yes.

8   Q.   And over that 15-year period, about how many times have

9   you seized drugs from people who bought drugs on the street?

12:34PM 10   A.   Over 100.

11   Q.   And have those investigations involved cocaine base?

12   A.   Yes.

13   Q.   And is cocaine base also referred to as -- on the street,

14   as crack?

15   A.   Yes, it is.

16   Q.   Have they involved cocaine?

17   A.   Yes.

18   Q.   And have they involved fentanyl?

19   A.   Yes.

12:35PM 20   Q.   And in addition to investigating people buying drugs on

21   the street, did you also investigate the individuals who were

22   selling drugs on the street?

23   A.   Yes, I did.

24   Q.   And did you seize drugs from that type of person?

25   A.   Yes.

1    Q.    Approximately how many times during your investigations?

2    A.    I would say 75 to 100 times, at least.

3    Q.    And have you also gathered information from informants

4    about drug use on the street?

5    A.    Yes.

6    Q.    And the amounts of drugs bought by abusers?

7    A.    Yes.

8    Q.    And have you also -- when you've seized drugs, have you

9    seized drugs that have been packaged for sale on the street?

12:35PM 10    A.    Yes, I have.

11    Q.    Is there a certain way that drugs are packaged for sale on

12    the street?

13    A.    Yes.

14    Q.    Could you describe that to the jury?

15    A.    So it's -- 99 percent of the time it's a baggy, clear

16    glassine baggy.  They'll take the corners, they'll put the

17    drugs in the corners, cut it off, and then knot the top, either

18    they burn it sometimes or they'll physically knot it, and

19    you'll do that several times to have several one bag of drugs

12:36PM 20    or narcotics, one dose.

21    Q.    And is that how cocaine base is packaged for -- in your

22    experience, your 15 years, cocaine base packaged for

23    distribution in the street?

24    A.    Yes.

25    Q.    Is that how cocaine is packaged for distribution on the

1    street?

2    A.   Yes.

3    Q.   And is that how fentanyl is packaged for distribution on

4    the street?

5    A.   Yes.

6    Q.   Now, you stated that you've investigated both street level

7    buyers and individuals who were dealing to the street, correct?

8    A.   Yes.

9    Q.   Sir, based on your experience, would a bag with

12:37PM 10    approximately 50 grams of cocaine base be a personal use

11    amount?

12    A.   No.

13    Q.   What would it be consistent with?

14    A.   Distribution.

15    Q.   Based on your experience, would a bag with approximately

16    49 grams of fentanyl bagged in 44 small corner baggies be

17    consistent with a personal use amount of fentanyl?

18    A.   No.

19    Q.   What would that be consistent with?

12:37PM 20    A.   Once again, that would be distribution.

21    Q.   And based on your experience with a bag of approximately

22    40 grams of cocaine base and cocaine bundled in different

23    amounts, would that be consistent with a personal use amount?

24    A.   No.

25    Q.   What would it be consistent with?

1    A.    Distribution as well.

2          MR. CROWLEY:  No further questions, your Honor.

3          THE COURT:  Cross.

4          MR. FLASHNER:  Thank you.

5                    CROSS-EXAMINATION

6    BY MR. FLASHNER:

7    Q.    Good afternoon, Sergeant Noone.

8    A.    Good afternoon.

9    Q.    Just a few questions for you.  You were not in Lexington

10:38PM 10   on December 8th, 2022, correct?

11   A.    That's correct.

12   Q.    Okay.  And you didn't participate in any investigation

13   that may have happened in Lexington on December 8th, 2022,

14   correct?

15   A.    That's correct.

16   Q.    All right.  And, I'm sorry, I should introduce myself, I'm

17   Cory Flashner, and I represent Mr. Perez.  It's nice to meet

18   you, sir.

19   A.    Nice to meet you as well.

12:38PM 20   Q.    I don't believe we've ever met.

21   A.    I don't think so.

22   Q.    I don't believe so.  Now, during your 15 years as a

23   detective and now your promotion to sergeant detective, you're

24   familiar with various investigative techniques?

25   A.    Yes.

1   Q.   Okay.  And fair to say that during your time as a

2   detective, you've used fingerprints as an investigative

3   technique?

4   A.   Depending.

5   Q.   What was that, sir?  I couldn't hear you.

6   A.   It depends, depends on the investigation.

7   Q.   I understand it depends on the investigation.  My question

8   is --

9   A.   Yes, yes.  We've used fingerprints.  Yes.

12:39PM 10   Q.   Okay.  And in investigations, you've also used DNA or

11   submitted items for DNA testing at least, correct?

12   A.   Yes.

13   Q.   All right.  And during the course of your investigations,

14   you've also examined cell phones for evidence, correct?

15   A.   Yes.

16   Q.   Particularly in narcotics investigations, you've examined

17   cell phones for text messages, correct?

18   A.   Phone calls and text messages, yes.

19   Q.   Phone calls.  And you would agree with me that a cell

12:39PM 20   phone can present a wide variety of information about an

21   individual's activity, correct?

22        MR. CROWLEY:  Objection, your Honor.  Exceeds the

23   scope.

24        THE COURT:  Sustained.

25   Q.   Well, based upon your training and experience as a

1    detective, you know that people keep all sorts of information

2    on cell phones, correct?

3    A.   Yes.

4         MR. CROWLEY:  Objection.

5         THE COURT:  I'll let it stand.  I'm letting you

6    examine him outside the scope, but there are limits,

7    Mr. Flashner.  Go on.

8         MR. FLASHNER:  That's fine.

9         THE COURT:  I'll let his testimony stand.  Let's move

12:40PM 10   on.

11        MR. FLASHNER:  Thank you.  I don't have anything

12   further then.

13        Thank you.

14        THE COURT:  Any redirect?

15        MR. CROWLEY:  No thank you, your Honor.

16        THE COURT:  Thank you.  You may step down.

17        THE WITNESS:  Thank you.

18        MR. CROWLEY:  Your Honor, I just wanted to confirm one

19   point, and then we'll begin to close.  I think both -- all

12:40PM 20   three stipulations, 16.5 through 7, were admitted by the Court.

21   I just wanted to make sure.

22        THE COURT:  I believe that's correct.  Let me double

23   check.  Yes, 16.5, 15.6, and 15.7 are all admitted.

24        MR. CROWLEY:  Then the government rests, your Honor.

25        THE COURT:  All right.  Let me see counsel at sidebar.

1    (THE FOLLOWING OCCURRED AT SIDEBAR:)

2        THE COURT:  Is there a defense motion?

3        MR. FLASHNER:  Your Honor, I'd suggest that the

4    government's evidence at the close of the government's case

5    fails to establish the essential elements of the crime beyond a

6    reasonable doubt that the jury could find Mr. Perez guilty of

7    either offense.  Particularly with regard to the firearm,

8    there's no evidence that he actually possessed the firearm; and

9    to the narcotics, there's no evidence that he ever knowingly

12:41PM 10    possessed those controlled substances.  He's charged in a

11    conspiracy, and there's absolutely no evidence of any

12    agreement.

13        THE COURT:  Okay.  That motion is denied.

14        Is there going to be a defense case?

15        MR. FLASHNER:  There will not be a defense case.  We

16    should probably make sure that all the exhibits were marked by

17    Mr. Crowley and/or myself.

18        THE COURT:  We can deal with that.  What I'm going to

19    do is tell them -- I'm going to send them home for the day and

12:42PM 20    tell them what I expect tomorrow is we'll begin with the

21    closings and then we'll proceed to the jury charge and

22    deliberations.  Thank you.

23        (SIDEBAR CONFERENCE WAS CONCLUDED)

24        THE COURT:  All right.  Ladies and gentlemen, the

25    evidence is closed.  The government has rested.  So what I'm

1   going to do is send you home for the day.  We will reconvene

2   tomorrow morning at 9:00.  We'll have the government's closing

3   argument followed by a defense closing argument followed by a

4   very brief government rebuttal closing argument.  I'll then

5   instruct you on the law that you're to follow, and you will

6   then begin your deliberations.

7           As I have told you, I think, once you get the case,

8   you are the masters of your own schedule, you can take as much

9   or as little time as you think is required, but you should be

12:43PM 10  prepared to be here all day tomorrow, that is, until 5:00, and

11  we will provide lunch for you.  You don't need to worry about

12  that.

13          It's always important that you obey my instructions

14  not to discuss the case, but it's exceptionally important now.

15  You're about to begin deliberations after the closing

16  arguments.

17          So please heed that instruction not to discuss the

18  case among yourselves or with anyone else, stay healthy, if you

19  would, please, and we will see you tomorrow morning at 9:00, if

12:43PM 20  not earlier.  Thank you.

21          THE CLERK:  All rise for the jury.

22          (JURORS ENTERED THE COURTROOM.)

23          THE COURT:  All right.  Let's convene for the final

24  charge conference.

25          Well, I have a 2:00 and a 3:00?

1          (Discussion off the record.)

2          THE COURT:  Let's make it 3:30 final charge

3     conference.  I'm going to make another round of edits to

4     reflect the discussion we had this morning.  I'll try to

5     circulate those to you as soon as I can.  It probably will be

6     an email attachment in the short term, and then we will

7     finalize the charge this afternoon.

8          MR. FLASHNER:  Three issues, your Honor.  One, I just

9     wanted to confirm that I've consulted with Mr. Perez, and he

12:45PM 10   has knowingly, intelligently and voluntarily informed me that

11    he does not wish to testify in this matter, that I think we

12    adequately had a discussion with him, and we've fully discussed

13    that and had an opportunity to.

14         THE COURT:  Okay.

15         MR. FLASHNER:  It's his decision.  The second issue is

16    Mr. Perez doesn't necessarily have to be here.  I've spoken to

17    him, he.  Doesn't necessarily need to be here for the final

18    jury instruction, and I think he'd prefer not to be, just for

19    transportation issues.

12:45PM 20         THE COURT:  All right.

21         MR. FLASHNER:  The third issue, given the testimony

22    about Sergeant Barry today, and this directly relates to

23    potential jury instructions, I intend to argue about the

24    government's failure to call Sergeant Barry.  It wasn't my

25    intention to seek a missing witness instruction.  I don't know

1    if the government is going to seek one.  I've looked at the

2    case law.  I think it may be appropriate for a missing witness

3    instruction, but I think we should at least -- I will spend my

4    lunchtime looking at that issue, and I just flag it for the

5    Court.

6            THE COURT:  All right.  And if you want me to give an

7    instruction, you know, obviously I need to see what it is, and

8    I will be very much influenced by a case if anyone has a case

9    saying that I should either do or not do this or frame it in a

12:46PM 10  certain way, I will be very much influenced by that.

11           MR. FLASHNER:  Thank you.

12           THE COURT:  All right.

13           Anything?

14           MR. CROWLEY:  Nothing for the government.  Thank you,

15   your Honor.

16           THE COURT:  Okay.  All right.  Thank you.

17           ( A recess was taken.)

18                     FINAL JURY CHARGE CONFERENCE

19           THE CLERK:  All rise.  Thank you.  You may be seated.

03:30PM 20  Court is now back in session.

21           THE COURT:  All right.  This is the final charge

22   conference.  You should have received a slightly edited version

23   of the jury instructions, which includes some tweaking of the

24   404(b) instructions and related instructions.  What do we have

25   to discuss?  Let's start with the government.  Mr. Crowley.

1          MR. CROWLEY:  Your Honor, our only change is just a --

2     purely a mistake we made yesterday.  It's page 17.  The

3     ammunition actually didn't come in through Exhibit 10, so we

4     think, since this is dealing with evidence going back to the

5     jury.

6          THE COURT:  All right.  We'll strike the words "and

7     ammunition."

8          MR. CROWLEY:  Otherwise we're fine with the rest of

9     the instructions.

03:30PM 10          THE COURT:  Okay.

11          MR. FLASHNER:  We are content with the rest of the

12     instructions without waiving our previous objection regarding

13     the admission of the 404(b) evidence.

14          THE COURT:  Okay.  And otherwise we're --

15          MR. FLASHNER:  Well, there's still the issue of the

16     missing witness.  I think Mr. Daley is going to handle that.

17          THE COURT:  Well, that's okay.  Let's talk about that.

18          Mr. Daley.

19          MR. DALEY:  Throughout this case, we've heard

03:31PM 20     evidence, particularly in the government's case-in-chief and

21     through the government witnesses about officer -- or

22     Sergeant Barry.  He's been a key witness who has been discussed

23     but was obviously not produced by the government, and the

24     government has reasons for doing that.  If he were called, he

25     is certainly going to be -- he was a favorable government

1  witness or would be disposed as a law enforcement officer, an

2  officer with the Lexington Police Department to be disposed to

3  be favorable to the government.  So the fact that he's not

4  called is deserving of a missing witness instruction in favor

5  of Mr. Perez, pointing out his absence.

6       The fact that Officer Barry, he wouldn't have been a

7  cumulative witness had he been called, he was the officer in

8  charge that night, and that came out through Officer Sharer's

9  testimony this morning, and he was also the person who was in

03:32PM 10  the woods behind the Stop & Shop who was searching the woods by

11  himself, and that's important because it was his observations

12  and then his testimonial acts towards Officer Evelyn -- or

13  Detective Evelyn, rather, that identified the drugs in the

14  woods, identified the location of those drugs, and essentially

15  said those, you know, photograph those drugs.

16       He was not made available at -- and I'm sorry.  He was

17  also in control of the scene, which was a common or a pervasive

18  issue throughout all the testimony, three or four -- all of the

19  officers of who was in control, who was monitoring the scene,

03:32PM 20  and who was in control of the investigation.

21       THE COURT:  So let me walk through that step-by-step.

22  He's obviously someone who could be called by the defense.

23  He's subject to subpoena power, so that's not the issue.  I

24  think it's fair to say, as a police officer, he is aligned with

25  the prosecution or the government, so probably that piece of it

1    is satisfied, but what I'm struggling to see is why he's not

2    cumulative in the sense of what is it that he would add.  I

3    understand you want to impeach him, but, you know, let's take

4    the bit about him being in charge of the scene and you -- the

5    defense has pointed out various things that didn't happen, you

6    know, or what you're inferring, and I assume you're going to

7    argue are improper or sloppy handling of evidence.

8         What would he add on any of that?  What would he

9    potentially give you that you don't already have?

03:34PM 10         MR. DALEY:  Several very important things.  The first

11   being what happened with the firearm when it was handed off

12   from Officer Sharer to Sergeant Barry.  That's --

13         THE COURT:  So it's found by Chisolm, the fire

14   department guy.  He puts it in the fire vehicle, he then hands

15   it to Sharer, who hands it to Barry, but is it really an issue

16   in terms of chain of custody that it's not the right firearm or

17   the firearm has been swapped out?

18         MR. DALEY:  There was some inconsistent testimony

19   about that identification of that firearm, whether it was black

03:34PM 20   slide, silver body; silver slide, black body.  And it's also an

21   important chain in just the events that night of what happened.

22   How did that gun get from the fire station without ever being

23   documented where it was found by the vehicle back to the SUV?

24   That's a missing part that Sergeant Barry is --

25         THE COURT:  There's no testimony that Barry was --

1    well, I guess I'm trying to think this through.  I don't --

2    when did he supposedly arrive on the scene?  What is the state

3    of the evidence at this point?

4          MR. DALEY:  I believe Officer Sharer testified this

5    morning that Officer Barry's cruiser was the one that stopped

6    by the Prius and then went around the black SUV towards the

7    Stop & Shop.

8          THE COURT:  Right.

9          MR. DALEY:  And then was behind the Stop & Shop near

03:35PM 10  the Battle Green Apartments.

11         THE COURT:  Okay.  Yeah.  And we'll get to all of that

12   piece of it and the location of the drugs, but as far as what

13   happened near the car.  So, for example, there's no evidence

14   that he had an opportunity to plant the weapon, for example,

15   right?  I don't think that's consistent with the evidence.

16         MR. DALEY:  I'm not going quite that far, but what the

17   video shows is that Officer Barry drives right by the driver

18   side -- open driver's side door, would have had an opportunity

19   to see a firearm had one been dropped there, doesn't make any

03:36PM 20  radio calls, doesn't make any statements, drives right past it

21   and then proceeds back to the Battle Green Apartments.  So

22   that's another important piece of the story there.

23         THE COURT:  All right.  And then the two drug baggies,

24   or bags in the woods, is the argument there -- or the argument

25   going to be made that he could have planted those?

1          MR. DALEY:  In terms of could have planted, I'm not

2     making that argument.  The argument is is that Sergeant Barry

3     was the only person back in that area to be searching for

4     the -- to be searching the area to find the drugs, and it's

5     unclear, I think the state of the evidence now is slightly

6     unclear about exactly where they were found, given there's

7     multiple chain link fences behind the Stop & Shop, one fence

8     that runs at a 90-degree angle with the wooden fence, and then

9     another chain link fence near the Battle Green Apartments.

03:37PM 10          So identifying exactly where those drugs were found,

11     how they were found, and particularly when officer or Detective

12     Evelyn later testifies that the drugs were warm to the touch,

13     and the only person who is in that area who is looking for the

14     drugs is Sergeant Barry, after an hour and a half, I think.

15     Was it an hour and a half?  90 minutes.

16          THE COURT:  All right.  And is the government, are you

17     going to argue that those two packages were not associated with

18     Del Rio but with the defendant?  In other words that they --

19          MR. CROWLEY:  No.

03:37PM 20          THE COURT:  No?  I thought that this was the sort of

21     the Del Rio piece of the case.

22          MR. CROWLEY:  Correct.

23          THE COURT:  Let me sort of back up a bit here.  It

24     can't be the case that the government has to call every law

25     enforcement officer who is involved in any crime scene or

1  present at anything like this because we'll just have waves of,

2  you know -- or potentially get a missing witness instruction,

3  so there has to be something here to show that this would not

4  be cumulative.  You know, is there some argument that you can't

5  make that is supported by the evidence, or is there some

6  evidence that might be missing, and that's what I'm just

7  struggling a little bit to figure out.

8        So the argument on the drugs was what?  That he

9  mishandled it, that he put it in his own pocket and it became

03:38PM 10  warm and then he put it back, or he moved it?

11        MR. DALEY:  It may be all of the above.  The key issue

12  is that Sergeant Barry did not testify because the government

13  did not call him, that he was --

14        THE COURT:  But, again, you could have called him.  So

15  the question is, you know, it has to be cumulative.

16        MR. DALEY:  But just a second, the availability, he's

17  not equally available to us as he is to the government.  The

18  government is able to prep all their witnesses and they did and

19  is able to actually have more availability with these

03:39PM 20  witnesses.

21        I'm not saying that we tried and failed to subpoena

22  him.  AUSA Crowley and Hoefle were very clear that they would

23  make him available.  So that's not my contention at all.  In

24  terms of the element of availability, it's much different from

25  this side of the table than it is for the government talking

1    with a police officer.

2         THE COURT:  I'm not sure that's different from any

3    other police officer.  This is someone who the government might

4    ordinarily be reasonably have been expected to call, they

5    didn't call him.  It's not cumulative, his perspective or

6    whatever is not cumulative, and therefore, it's fair to give a

7    missing witness instruction that the inference could reasonably

8    be drawn that the testimony would be adverse, and, of course,

9    the question is not can you argue that, but the question is do

03:40PM 10  I give an instruction and put my judicial imprimatur on that?

11        Let me hear the government's response and I'll come

12   back that.

13        MR. CROWLEY:  Under *United States vs. Aboshady*, he

14   wasn't unavailable.  The First Circuit is clear that they could

15   be called.

16        Secondly, they skipped over all the analysis in *Perez*.

17   First, they have to show that he was actually unavailable,

18   which they can't, and that he was reasonably or so obviously

19   partial to the other side, the witness is deemed legally

03:40PM 20  unavailable.  That's not the case in this case, either, your

21   Honor.

22        Secondly, the favorably disposed of -- their argument

23   is all police officers are favorably disposed of.  In this

24   case, the officers actually gave testimony on vigorous

25   cross-examination that was contrary to the government, so I

1  don't believe that's satisfied, and they haven't cited a single

2  case that every police officer has to be treated in that

3  fashion.

4       And I would note that in *United States vs. Gonzalez*,

5  Ramos Gonzalez, 775, Fed 3d, 483, there was a discussion about

6  balancing about whether the testimony would be favorable to the

7  government.

8       In this case, all the witnesses crossed that were able

9  to provide evidence.  I would note, your Honor, that they're

03:41PM 10  discussing that there's an issue about where the location of

11  the drugs were.  They didn't cross-examine Detective Evelyn at

12  all on the issue of where the drugs were.

13       And after those elements are failed to be satisfied,

14  they also have to show that -- they must explain the witness's

15  absence.  They haven't explained his absence.  They knew we

16  weren't calling him before trial.  Yesterday they openly

17  mentioned his name in their questions multiple times, so they

18  had the ability to call him.  They chose not to subpoena him.

19  They crossed all day yesterday by using his name openly, and

03:42PM 20  now their argument is that they get an inference because they

21  chose not to call the officer.  It doesn't satisfy *Perez* or any

22  of the other First Circuit opinions on this.

23       THE COURT:  Well, I think there's two different

24  prongs.  One is whether the witness is unavailable, and that's

25  normally confidential informants, people in the witness

1    protection program, minor witnesses, people like that.  I don't

2    think we're on that prong of the case law.  It's -- I think

3    we're on the other prong, which is -- let me make sure I'm

4    getting this right, favorably disposed to testify for the

5    government by virtue of his status or relationship with the

6    parties.

7         And on top of that, it has to be not cumulative, which

8    suggests to me that there has to be some showing that there

9    would be some point to this exercise that had the witness

03:43PM 10    testified, the witness might have added something that

11    otherwise might not be available.

12         Just give me a moment here.

13         Mr. Daley.

14         MR. DALEY:  One other thing I'd like to point out,

15    your Honor, is that in terms of the importance of

16    Sergeant Barry -- and without getting into the details in open

17    court for what we agree with the government earlier, in terms

18    of reports and such, that's the person, the declarant that we

19    are seeking to impeach via 806, his credibility, and the reason

03:45PM 20    that was a key issue is because Detective Evelyn was only

21    alerted to the location of the drugs -- and the timing there is

22    important as well -- because of that testimonial action or

23    statement by Sergeant Barry, and that is he -- I don't know

24    exactly what he said, but essentially here are the drugs, this

25    is where I found them, take the photos here.

1          So the credibility of Sergeant Barry is a key issue

2     here and finding the drugs in the woods is a kind of certainly

3     a foundational finding in terms of two pieces of key evidence

4     for the government, and the only person who found that was

5     Sergeant Barry, and he is not testifying.

6          THE COURT:  I stand by my ruling that you cannot

7     impeach Barry through Evelyn based on this issue concerning his

8     credibility.  I would be absolutely astonished if I have that

9     wrong, but I stand by that ruling.  Again, it seems odd, at the

03:46PM 10     least, to say you want to impeach the credibility of someone

11     who did not testify, just kind of -- to just impeach him.

12          And if he did testify, presumably, the only thing that

13     he could testify about that was not completely cumulative is

14     where he found the drugs because he alerted them to -- alerted

15     to Evelyn of their presence.

16          And so everything else it seems to me is cumulative or

17     trivial, or you can argue it based on existing evidence.  We're

18     a little far removed from the defendant in the sense that

19     there's -- the government is not going to argue that the drugs

03:47PM 20     found in the woods belonged to the defendant, individually, as

21     opposed to Henry Del Rio, although they're co-conspirators.

22          But let me ask Mr. Crowley -- the government didn't

23     call him.  Presumably, that was on purpose, presumably -- well,

24     you didn't call him.  He was there.  He did find pieces of

25     evidence that were admitted.  Right?

1          MR. CROWLEY:  He didn't seize the evidence.

2          THE COURT:  Pardon?

3          MR. CROWLEY:  He didn't seize the evidence, so we'd

4     note that the testimony from Detective Evelyn today was that he

5     went there, he independently saw the bags, and he was the one

6     that seized them.  So we introduced testimony from every person

7     that seized evidence in this case.

8          MR. DALEY:  Your Honor, he found the evidence, so

9     whether it's photographed and seized at some point later and

03:48PM 10    then described as warm to the touch is a different issue.  He's

11    the only witness and the only person who found the evidence in

12    the woods.

13         MR. CROWLEY:  That's not an accurate description

14    because that description only works if they're claiming that he

15    planted the evidence because the other officer came and also

16    saw the evidence there.  So as the Court noted, that requires

17    to call every person that's present when evidence is seized and

18    the defense has also still not answered why they didn't

19    subpoena the defendant -- the officer who was equally available

03:49PM 20    to them.

21         THE COURT:  Which I'm also troubled by.  I mean, the

22    case law -- in the short time allotted, we've had trouble

23    locating cases, at least in the circuit, that don't involve

24    someone like a confidential informant or a minor witness or

25    someone who is, you know, not a local police officer or subject

                  1    to subpoena power.  The whole thing does feel odd to me.  If

                  2    he's a witness and you want to impeach him because you think

                  3    he's lying, you call him and you chose not to do it.  I mean,

                  4    you don't have the burden of proof, of course, but the whole

                  5    situation feels odd to me that you want this instruction, you

                  6    know, having me put a fairly heavy thumb on the scale when you

                  7    could have called him and you didn't and...

                  8         MR. DALEY:  And, your Honor, that goes to the legal

                  9    unavailability, and I believe that's discussed in *United States*

03:50PM   10    *vs. Sandoval,* and that's a First Circuit case, where, if the

                 11    officer is going to be so predisposed to the government, then

                 12    he's essentially legally unavailable to us, or at least not

                 13    equally as available to us as he is to the government.

                 14         MR. CROWLEY:  They haven't shown he's so predisposed

                 15    to the government that he's unavailable.  And I would note in

                 16    that *Aboshady*, the First Circuit made clear.  They said, "We

                 17    have also explained, however, that an attorney may not agree

                 18    that the jury should draw an inference against an opponent

                 19    where the opponent does not present witnesses that are

03:51PM   20    available to both parties."

                 21         They had an easy way of subpoenaing every witness they

                 22    wanted from Lexington and they chose not to.  And, again, we

                 23    would note, your Honor, they were aware we weren't calling that

                 24    witness, and yesterday they aggressively asked witnesses about

                 25    them, so basically what it is is they didn't subpoena them,

1    they used him in cross, and now want to ask for an inference

2    after trial is over.

3              THE COURT:  Mr. Daley.

4              MR. DALEY:  It's absolutely true that we did not

5    subpoena Sergeant Barry.  There's no question about that.

6              THE COURT:  And there's no foundation that you tried

7    to talk to him and he refused, right?

8              MR. DALEY:  The issue is now we could not have tried

9    to call him or to speak with him, or to go to his house, or to

03:52PM 10   show up at the police station, sure, but the issue is in terms

11   of practically speaking and legally speaking he wasn't

12   available to us in the same way that he was available to the

13   government to prepare his testimony, to discuss the case with

14   them.  That's not the same availability we would have had even

15   had we sent him a Rule 17 subpoena.

16             THE COURT:  But if that's the basis, that means that

17   any time the government doesn't call any law enforcement

18   officer who has anything to do with an investigation you might

19   get a missing witness instruction.  And *Sandoval* was my case.

03:52PM 20   It was an MS-13 case.  There were hundreds of law enforcement

21   officers involved in those cases.  I'd still be trying that

22   case if that were the rule that the government had to call

23   everybody, so it has to be more than just they're a cop, right,

24   they're an agent?  There must be something else.

25             MR. DALEY:  I agree.  Absolutely.  And that's why

1    there's the second piece of the test, which is this cumulative

2    testimony.  And so this isn't, you know, an officer who drove

3    by and just saw lights flashing and that's it, doesn't offer

4    anything to this case.  This is a key witness who found two of

5    the three bags of drugs that are at issue in the conspiracy

6    charge.  He was the person who other officers had testified was

7    in charge of the scene that night.

8         THE COURT:  Well, in charge of the scene thing I think

9    doesn't really move me at all.  I don't know how that's, you

03:53PM 10   know, whatever was done or not done, you've examined at great

11   length, you know, about things that -- law enforcement

12   techniques that were not used or evidence that may have been

13   mishandled.

14        There's lots of evidence about that.  I don't see how

15   him being in charge of the scene adds anything to that.  In

16   fact, the testimony was that he was in charge of the scene.  I

17   think if you get this at all, it depends on the location of the

18   drugs in the woods because that's the only piece of it that is

19   not, you know, practically cumulative, if not, you know,

03:53PM 20   literally cumulative and --

21        Yes, counselor.

22        MR. CROWLEY:  I would note, your Honor, that those two

23   elements are not in the disjunctive, they're in the

24   conjunctive, that they would have to show why.

25        THE COURT:  They were disjunctive.  Hold on.

1          MR. CROWLEY:  This is the discussion about the Court

2     must consider the --

3          THE COURT:  What are you reading from?

4          MR. CROWLEY:  This is *United States vs. Perez*.

5          THE COURT:  Which is 299?

6          MR. CROWLEY:  299 F.3d 1.  It's page 3.

7          THE COURT:  Okay.  Let me catch up.  All right.

8          MR. CROWLEY:  "The Court must consider the explanation

9     if any, for the witness's absence and whether the witness, if

03:54PM 10    called, would likely" -- "and whether the witness, if called,

11    would likely provide relevant noncumulative testimony."

12          The absence is because the defense chose not to call

13    the witness, so they have to show both of those once they get

14    passed the unavailability.  And in this case they had every

15    opportunity to call the witness, they chose not to.  And as the

16    Court noted, it is cumulative.

17          THE COURT:  If you look at *Orlandella*, 96 F.4th 71.

18          MR. CROWLEY:  I don't have that one, your Honor.

19          MR. DALEY:  Is that from March of this year, your

03:55PM 20    Honor?

21          THE COURT:  Yes, March 2024, 96 F.4th 71.  It says,

22    "The defendant would have only been entitled to a missing

23    witness instruction if he demonstrated that the witness was

24    favorably disposed to testify for the government by virtue of

25    the witness's status or relationship with the parties, or

1    peculiarly available to the government such as being within the

2    government's exclusive control."

3         Sergeant Barry is obviously not within the

4    government's exclusive control.  He was certainly available to

5    the defense.  "Favorably disposed to testify for the government

6    by virtue of the status or relationship with the parties."

7         Part of the problem I have there is the only basis for

8    that is the assumption that because he's a Lexington police

9    officer, he'd be favorably disposed to testify for the

03:56PM 10   government.  I mean, that's certainly an important factor, but

11   the question is is that enough to trigger the requirement that

12   you call him or risk a missing witness instruction?

13        MR. DALEY:  Your Honor, he was also included on the

14   government's witness list.

15        THE COURT:  Well, he was obviously -- he was equally

16   available to both sides.

17        MR. DALEY:  In terms of if he's expected to offer

18   favorable testimony for the government, he was identified as a

19   witness for the government.

03:57PM 20        THE COURT:  Well --

21        MR. CROWLEY:  So was the fire chief.

22        THE COURT:  I mean, it can't be the standard that

23   anyone on the government's witness list who they choose not to

24   call, again, triggers the missing witness instruction.  There

25   has to be something more than that.

1          I mean, the bottom line in all of this is fairness.

2     Right?  I'm going to follow what the Circuit says, which

3     appears to be somewhat inconsistent.  But is there something

4     unfair here?  I mean, the whole idea is, the government is

5     holding somebody back, the defense, in fairness, can't call

6     that person, doesn't really have a fair opportunity.

7          This almost always comes up in cases involving

8     confidential informants, people in the WITSEC program, minor

9     victims, again, things like that, where it's unfair to the

03:58PM 10    defense that they can't call this person, and, you know,

11    there's a hole in the case, so to speak, where the government

12    has refused to or declined to call the person.

13         Sergeant Barry is not exactly the central witness in

14    this case.  And presumably he's subject to subpoena, he's

15    local.  There's no predicate that the defense tried to find him

16    and couldn't, that he refused to speak to them.

17         MR. FLASHNER:  Your Honor, isn't it Sergeant Barry --

18    I don't mean to tag team this, but --

19         THE COURT:  Yes, that's all right.

03:58PM 20    MR. FLASHNER:  Isn't it Sergeant Barry that connects

21    the location of Mr. Del Rio and the location where the drugs

22    are found later by him, by Sergeant Barry?  He's there for both

23    those instances, he connects both those, and if we

24    cross-examined Detective Evelyn this morning on that, he could

25    give us the location of the drug, and then I'm left with having

1   to show more photographs to the --

2          THE COURT:  I thought he did.  He did the photographs,

3   he gave the location of the drugs.  He said they were here and

4   here and, you know, there's -- he could not testify as to the

5   visual spotting of those drugs, that is, beforehand.  Again, I

6   think it's not contested that the -- Sergeant Barry was the one

7   who supposedly first saw them and then reported that fact to

8   Evelyn who went back and photographed them, but Evelyn said,

9   well, here's where they were and they took photographs of them,

03:59PM 10   and the photographs are in evidence.

11          MR. FLASHNER:  But my point is that the government

12   would be expected to call him because he is also -- he would

13   also be a witness that could say and Henry Del Rio was arrested

14   right here, we would be fine with that.

15          MR. CROWLEY:  Which was Officer Snell's testimony,

16   which we put in evidence and he identified exactly where

17   Mr. Del Rio was arrested, which laid the foundation for that's

18   where the drugs were, and the defense actually asked multiple

19   questions where they referenced that the drugs were found where

04:00PM 20   Mr. Del Rio had been running.

21          THE COURT:  And you don't intend to argue otherwise?

22   Again, you do not intend to say -- putting aside the conspiracy

23   piece of it, you do not intend to say these drugs were in the

24   defendant pockets, and he's the one who threw them in the

25   woods?

1          MR. CROWLEY:  No, those drugs were carried by

2     Mr. Del Rio.

3          THE COURT:  Okay.  As a total aside, the Jets had a

4     running back in the 1960's named Matt Snell, which obviously is

5     showing my age here, but if your last name is Snell, you might

6     want to run the name through an NFL name list before naming

7     your child, but go on.  I didn't mean to throw you off there.

8          MR. FLASHNER:  That's okay.  I'm still using the term,

9     "turret tape."

04:00PM 10          THE COURT:  And both of you are using "Elmo," which is

11     pretty outdated at this point.  But here's how I'm going to

12     leave this.  The rest of the jury instructions are essentially

13     complete with that one change.  I'm going to talk to my clerks

14     about this, try to do some more reading and thinking about

15     this, and I'm going to let you know at 8:30 tomorrow what my

16     ruling is, okay?  And I'll either give it or I won't.  The

17     light switch will either be on or off.

18          MR. FLASHNER:  Your Honor, I'm free to argue it,

19     whether you instruct --

04:01PM 20          THE COURT:  But as a factual matter, I think you are

21     free to argue that they could have called the sergeant and

22     didn't.  I don't think there's --

23          MR. CROWLEY:  He can't ask for an inference based on

24     it, though?

25          THE COURT:  Pardon?

         1          MR. CROWLEY:  He can't argue asking for an inference

         2     based on --

         3          THE COURT:  Well, why couldn't he?  Why couldn't he

         4     say -- obviously, he can't say and Barry is a proven liar.  I

         5     mean, he can't talk about things that are not in evidence, but

         6     why can't he say there's a -- you know, it's reasonable to

         7     infer that the government didn't call him because, you know,

         8     they didn't think his testimony was going to be helpful, or

         9     whatever it is he's going to say, and you can counter and say

04:02PM  10     no, that's ridiculous.

        11          MR. CROWLEY:  That's the language from the

        12     First Circuit that says an attorney is not allowed to argue

        13     that inference.

        14          THE COURT:  Not argue -- to argue regardless whether

        15     they're entitled to the instruction?

        16          MR. CROWLEY:  Correct.

        17          THE COURT:  Where is that language?

        18          MR. CROWLEY:  That's in United States vs. -- one

        19     second, your Honor.  I would note probably the cleanest one is

04:02PM  20     *Aboshady,* 951 F.3d 1 (2020).  In that, actually, Judge Barron

        21     upheld -- the Judge given a sua sponte jury instruction when

        22     the defense argued for the inference, but they relied on the

        23     statement we have also explained that an attorney may not argue

        24     that the jury should draw an inference against an opponent

        25     where the opponent does not present witnesses that are

1    available to both parties citing *Jimenez-Torres* and *Johnson*.

2            THE COURT:  Okay.  I need to read that case, so the

3    answer is maybe.  I'll give that ruling at 8:30 as well.

4            MR. FLASHNER:  Your Honor, fundamentally, we have no

5    burden.  The burden is on the government.

6            THE COURT:  The case says what it says.  I'm going to

7    read the case --

8            MR. FLASHNER:  If I could just be heard for just a

9    moment?

04:03PM 10            THE COURT:  Yes.

11            MR. FLASHNER:  The entire defense in this case is

12    premised on the lack and the shoddy -- or the existence of a

13    police investigation.  The guy that was supposedly in charge,

14    Sergeant Barry, they don't call.  I intend to stand up

15    tomorrow.  If you instruct me not to, I will do my best not to,

16    but I intend to stand up and say to this jury you didn't hear

17    from him, and this is the guy that was in charge of the

18    investigation, he led the investigation and you didn't hear

19    from him.  It's a huge hole in the government's case.

04:03PM 20            THE COURT:  Okay.  I guess I would conceptualize that,

21    and, again, I need to read this case and think about this.  I

22    would conceptualize that it is commonplace for counsel,

23    particularly defense counsel in criminal cases, to say we

24    didn't hear from witnesses X, Y, or Z.  That is absolutely

25    normal.  You can draw the reasonable inference that their

1    testimony would have been unfavorable, as opposed to the

2    government has not met its burden of proof, is a separate

3    question.  I don't know the answer to that.

4         I would be surprised if the case law suggested you

5    can't say they didn't call this witness, therefore, they have

6    not met their burden of proof.

7         MR. CROWLEY:  No, that's actually the distinction

8    drawn in *Aboshady*, you can comment on the dearth of evidence.

9    You can't ask the jury to --

04:04PM 10        THE COURT:  Including the failure to call a witness is

11   a dearth of evidence.  I mean --

12        MR. CROWLEY:  Correct.  But you can't take that next

13   step and say, because he would have testified in a way

14   that's -- you can draw the inference that he would have

15   testified in a way that was contrary to the government's case.

16   I think that's the distinction that's drawn in *Aboshady,* and in

17   other cases, and we can provide those to the Court.

18        There's a number of them where they allow either --

19   the courts have either instructed or sua sponte instructed,

04:05PM 20   because then the response by the prosecution has been the

21   defense could have subpoenaed the person and called him if they

22   thought he was such a central witness.

23        THE COURT:  All right.  Let me read *Aboshady*, a great

24   case name.  And if you have cites favorable to your side,

25   either one of you, the time to give them to me is now.  I don't

1    need a memorandum or a brief, but an email to Mr. McKillop, if

2    nothing else, with a cite.  I mean, if you want me to read

3    something, the time is now and I'll deliver my ruling at 8:30

4    tomorrow morning.

5              MR. CROWLEY:  Thank you, your Honor.

6              THE COURT:  All right.  Thank you.

7              THE CLERK:  All rise.

8              (Whereupon, the hearing was adjourned at 4:05 p.m.)

9

10                   C E R T I F I C A T E

11   UNITED STATES DISTRICT COURT )

12   DISTRICT OF MASSACHUSETTS ) ss.

13   CITY OF BOSTON )

14             I do hereby certify that the foregoing transcript,

15   Pages 1 through 195 inclusive, was recorded by me

16   stenographically at the time and place aforesaid in Criminal

17   Action No. 23-10028-1-FDS, UNITED STATES of AMERICA vs.

18   JOSE PEREZ, JR. and thereafter by me reduced to typewriting and

19   is a true and accurate record of the proceedings.

20             Dated this May 22, 2025.

21                        s/s Valerie A. O'Hara

22             _____

23                   VALERIE A. O'HARA

24                   OFFICIAL COURT REPORTER

25

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2025 I electronically filed the foregoing document using the CM/ECF system, which will send notification to counsel of record.

*/s/ Eamonn R. C. Hart*
Eamonn R. C. Hart (Bar #1181162)

*Counsel for Defendant-Appellant*

BRANN & ISAACSON
113 Lisbon Street
P.O. Box 3070
Lewiston, ME  04243-3070
Tel.    (207) 786-3566
Fax    (207) 783-9325
Email:  ehart@brannlaw.com